**IN THE UNITED STATES DISCTIRCT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

FILED

MAY – 7 2014

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

| | |
|---|---|
| **CITYNET, LLC**, on behalf of the United States of America, | ) )  ) |
| Plaintiff/Relator, | ) ) |
| v. | )  ) |
| **FRONTIER WEST VIRGINIA, INC**, a West Virginia corporation, **KENNETH ARNDT**, individually, **DANA WALDO**, Individually, **MARK McKENZIE**, Individually, **KELLY GOES**, individually, **JIMMY GIANATO**, individually, and **GALE GIVEN**, individually, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

Civil Action No.: 2:14-cv-15947

Judge:_____

*FILED UNDER SEAL*

## QUI TAM COMPLAINT

RELATOR CITYNET, LLC brings this qui tam action in the name of the United States of America, by and through its undersigned attorney, Nicholas S. Preservati and PRESERVATI LAW OFFICES, PLLC, and alleges as follows:

## PARTIES

1.    Plaintiff/Relator, Citynet, LLC ("Citynet", "Relator" and/or "Plaintiff"), is a West Virginia limited liability company.

2.    Defendant, Frontier West Virginia Inc. ("Frontier"), is a West Virginia corporation with a principal place of business located at 1500 MacCorkle Avenue, SE, Charleston, WV 25396.

3.    Defendant, Kenneth Arndt is a citizen of West Virginia residing in the Southern District of West Virginia.

1

4.     Defendant, Dana Waldo is a citizen of West Virginia residing in the Southern District of West Virginia.

5.     Defendant, Mark McKenzie, is a citizen of West Virginia residing in the Southern District of West Virginia.

6.     Defendant, Gale Given, is a citizen of West Virginia residing in the Southern District of West Virginia.

7.     Defendant, Kelly Goes, is a citizen of West Virginia residing in the Southern District of West Virginia.

8.     Defendant, Jimmy Gianato, is a citizen of West Virginia residing in the Southern District of West Virginia.

### JURISDICTION & VENUE

9.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

10.     This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

11.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732 because: 1) All but one of the individual Defendants reside in this District; 2) Frontier transacts business in this District and did so at all times relevant to this Complaint; and 3) the Defendants committed acts proscribed by 31 U.S.C. § 3729 – acts giving rise to this action – within this District.

12.     Before filing this Complaint, Citynet served a copy of the same upon the United States, together with a written disclosure statement setting forth and enclosing all material evidence and information it possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

13.     Citynet has complied with all other conditions precedent to bringing this action.

14.     Citynet is the original source of, and has direct and independent knowledge of, all publicly disclosed information on which any allegation herein might be deemed based, and has

2

voluntarily provided such information to the Government of the United States before filing this action.

## DEFINITIONS AND ACRONYMS

The following definitions and acronyms are used throughout this Complaint and have the meanings as provided in the following paragraphs:

15.    ARRA or Recovery Act- American Recovery & Reinvestment Act of 2009, P.L. 111-5.

16.    ASAP - the Department of the Treasury's Automated Standard Application for Payments system utilized by BTOP recipients to submit grant fund requests.

17.    BTOP - Broadband Technology Opportunities Program - established by the 2009 stimulus legislation, a program created to disburse $4.7 billion to improve broadband access and literacy throughout the country.

18.    CAI - Community Anchor Institution such as: schools, libraries, medical and healthcare providers, public safety entities, community colleges and other institutions of higher education, and other community support organizations and agencies that provide outreach, access, equipment, and support services to facilitate greater use of broadband service by vulnerable populations, including low-income individuals, the unemployed, and the aged.

19.    EA - Environmental Assessment.

20.    GIT - Grant Implementation Team.

21.    Last-Mile - broadband network that provides broadband service to end users such as residences and small businesses.  Last-Mile projects provide the final connection between a service provider and the customer.  Last-Mile networks can be likened to driveways that connect to local streets.

3

22.     LCR **-** Location Construction Request is a construction estimate that is submitted to the State by Frontier for each individual construction project.

23.     Middle-Mile **-** broadband network that provides a high-capacity connection between the public Internet network and the Last-Mile connection.   Middle-Mile projects typically provide broadband service to centralized facilities such as the incumbent telephone company's central office and range from several miles in length to several hundred miles in length.  Middle-Mile networks can be likened to the interstate highway system.

24.     NOAA **-** National Oceanic and Atmospheric Administration.

25.     NRAO **-** National Radio Astronomy Observatory.

26.     NTIA  **-** National Telecommunications and Information Administration.

27.     WVEO **-** the West Virginia Governor's Executive Office, sometimes referred to hereinafter as the State.

28.     WVOT – West Virginia Office of Technology.

## STATEMENT OF FACTS

### *BTOP Grant Applications*

29.     The American Recovery and Reinvestment Act of 2009, P.L. 111-5 ("Recovery Act") was signed into law by President Obama on February 17, 2009.   The Recovery Act established a program to disburse $4,700,000,000 in grant funds through the BTOP program in order to improve broadband access throughout the country.  However, the Recovery Act limited funding to projects wherein the applicant made a showing that the project would not have been implemented during the grant period "but for" the availability of Federal grant assistance.

30.     Based upon the Recovery Act, a Notice of Funds Availability and Solicitation of Applications ("NOFA") was issued in the Federal Register, Volume 75, Number 14.  The NOFA

stated that the grant applicant must provide documentation showing that the project would not be implemented "but for" the Federal grant assistance.

31.     Thirty-four (34) West Virginia related proposals were submitted to the NTIA for consideration under BTOP. Those proposals included multiple Middle-Mile projects, Last-Mile projects, sustainability broadband adoption projects, and public computer center projects.

32.     Citynet submitted a grant application seeking approximately $34,000,000 to develop a Middle-Mile network to provide broadband service to more than 140 underserved communities in twenty-five (25) counties throughout West Virginia. Citynet met with the WVEO on multiple occasions and provided it with a copy of its grant application for consideration. The WVEO reviewed Citynet's application and also forwarded it to Verizon West Virginia Inc. ("Verizon") for its review. Verizon did not submit a BTOP grant application, as it was in the process of selling its West Virginia assets to Frontier.

33.     Citizens Telecommunications Company of West Virginia ("CTC") submitted a grant application seeking $14,499,017 to construct a Last-Mile project that would provide fiber to select "critical facilities" such as schools, libraries, primary care centers, nursing homes, hospitals, rural health care centers and 911 centers. That application also proposed the construction of 636 miles of fiber that would connect the CTC wire centers to the identified critical facilities. CTC's list of proposed critical facilities needing broadband service was provided to CTC by the West Virginia Division of Homeland Security and Emergency Management – the Director of which is Defendant Gianato. CTC also proposed using CISCO ME 3400 routers in the identified critical facilities. CTC is a subsidiary of Frontier. (See CTC Grant Application attached hereto as "Exhibit 1").

34.     Each BTOP applicant was to "self-score" its application based upon sixteen (16) categories.  The total potential points an applicant could receive was one-hundred (100) points. CTC scored its application a 44 out of 100.

35.     Frontier also submitted a BTOP grant application seeking approximately $40,674,893 to construct a Last-Mile network that would provide 1,793 miles of fiber to critical facilities such as schools, libraries, primary care centers, nursing homes, hospitals, rural health care centers and 911 centers.  Frontier's proposed system design included the placement of Cisco 3400 series equipment in each of the identified critical facilities.   In the Executive Summary of Frontier's grant application, it states that "This application is one part of two applications, West Virginia Fiber Build – Critical Facilities – CTC and West Virginia Fiber Build – Critical Facilities – FCA."  (See Frontier's Grant Application attached hereto as "Exhibit 2").

36.     Frontier's Executive Summary also states that both applications serve the same purpose but in different areas of the state through different legal entities.  It further states that, "These applications, in tandem, detail one cohesive approach that will ultimately provide complete broadband coverage to the specified 1,576 critical facilities in the State of West Virginia… These two applications should be reviewed and approved together as neither is intended to be implemented on its own."   Frontier concluded its Executive Summary with the following statement, "Completion of this project is vigorously supported by the Governor's office of the State of West Virginia."  Frontier self-scored its application a 40 out of 100.

37.     The WVEO also submitted an application for $126,323,296 for its project entitled "West Virginia Statewide Broadband Infrastructure Project – Middle-mile" to the NTIA.  The application was submitted to the NTIA on behalf of the WVEO by Defendant, Kelly Goes.  The proposed project contained three distinct components.  The first component involved the provision of 1,064 Cisco routers to each of the CAIs.  The second component involved the construction of,

and upgrade to, the State's emergency microwave tower system.   The final component initially involved the construction of a 2,429 mile "open-access" Middle-Mile network that would provide broadband service to the 1,064 CAIs throughout the state.[1]   However, the 2,429 miles was later reduced to 915 miles of fiber.   It was contemplated that the 915 miles of fiber would comprise a single interconnected network by connecting each CAI to Frontier's local central offices.  "Central Offices" are the locations where Frontier maintains its equipment to route telephone calls to and from end users.   Significantly, by connecting the fiber from the CAI to the Central Office, other service providers would be able to simply connect at the Frontier Central Office in order to provide their Last-Mile services to consumers.   (See the WVEO Grant Application attached hereto as "Exhibit 3").

38.   The breakdown of the proposed CAIs in the WVEO Grant Application was as follows:

| | |
|---|---|
| Schools (K-12) | 471 |
| 911 Centers | 55 |
| Libraries | 176 |
| Tele-Medicine | 184 |
| State Police | 77 |
| Jail Facilities | 34 |
| Planning Councils | 11 |
| Greenbank Observatory | 1 |
| County Courthouses | 55 |
| **TOTAL** | **1,064** |

39.   The majority of the 2,429 miles of new fiber to be built was located within the Frontier/Verizon service territories.   Under this proposal, Cisco Series 3900 routers were to be used in conjunction with the fiber build out at the CAI.   Defendant Goes represented in the BTOP grant application that the subject 1,064 CAIs did ***not*** have fiber service.

---

[1] Frontier proposed building 1,793 miles of fiber and CTC proposed building 636 miles of fiber.  The combined amount of fiber to be built by Frontier and CTC in their "joint application" was 2,429 miles of fiber, the exact same amount initially proposed by the State of West Virginia.

40.     The State's BTOP grant application contained a line-item budget.  There were only three line items that were specifically budgeted for in the application.  Network and Access Equipment (switching, routing, transport access) was listed at $27,408,640.  Outside Plant (cables, conduits, ducts, poles, towers, repeaters, etc.) was listed at $75,274,657.  Engineering and Professional Services was listed at $23,640,000.  As hereinafter discussed in detail, "indirect costs" were not included as a line item in the State's budget.

41.     In its application, the WVEO acknowledged that "high quality middle-mile is essential to last-mile completion of broadband deployment."  It also acknowledged that a viable Middle-Mile project was cost-prohibitive and would never be built by a private sector provider.  Therefore, the proposed Middle-Mile project would not be built "but for" the federal BTOP funds.

42.     The WVEO submitted an application that was "statewide and in locations where there is no middle-mile solution today, nor is any planned."  This was purposely done in order to "ensure broadband accessibility to our entire rural state."  This also was to be done by allowing service providers to extend broadband out to residents and private businesses from the CAIs as part of the Last-Mile service layer.[2]  However, the WVEO also expressly represented that no part of the "service layer" (*i.e.*, Last-Mile) would be funded by the BTOP grant funds.  The State concluded its application by recognizing that "West Virginia is positioned to systematically and completely deploy broadband throughout the state, which will create a replicable model for other states to follow."  The WVEO gave its application a score of one (1) out of one-hundred (100) possible points.

---

[2] The broadband services purchased by the State from Frontier/Verizon could not be resold by the State to individuals or private businesses.  Since the services purchased by the State could not be resold, the CAIs that received broadband under the State's project would be the ultimate end-user of Frontier/Verizon's services, thus making the State's project a Last-Mile project.

43.     On August 18, 2009, Governor Joe Manchin, III submitted the WVEO's "Certification Requirements for BTOP" to the U.S. Department of Commerce.  This document certified that: 1) the information in the grant application contained material representations of fact and were true and correct; 2) all sub-grantees and subcontractors would comply with the terms and conditions of the federal grant award; 3) that a false or fraudulent statement or claim on the grant application was grounds for termination of the grant award, criminal prosecution, and civil violations of the False Claims Act.  (See BTOP Certification attached hereto as "Exhibit 4").

44.     On December 31, 2009 Larry Puccio stepped down as then Governor Manchin's Chief of Staff.  Mr. Puccio was subsequently hired by Frontier as a paid lobbyist.

45.     On January 1, 2010 Billy Jack Gregg, former employee and Consumer Advocate at the West Virginia Public Service Commission, registered as a contract lobbyist for the reportable years 2009-2010.  Mr. Gregg was hired by Frontier to testify on its behalf before the Public Service Commission.  Mr. Gregg testified that the Public Service Commission should approve the proposed merger between Frontier and Verizon.  Mr. Gregg has continued to serve as a Frontier lobbyist for each year since 2009.

46.     On July 1, 2010 Gale Given was named the Regional President of Verizon covering the states of Pennsylvania, Delaware, and West Virginia.  She previously served as Verizon's President of West Virginia from 2000-03.

***Verizon/Frontier Merger Negotiations***

47.     On May 13, 2009, Frontier announced that it had signed an $8.6 billion agreement with Verizon to purchase 4.8 million landlines leased to residential and small business customers in several states.  During the time that the BTOP grant applications were being submitted,

9

Frontier was in merger negotiations with Verizon regarding said landlines, including those in the State of West Virginia.  During these merger negotiations, Defendant Goes openly inquired of Frontier's plan to request stimulus funding so that the State could "make our plans compatible with Frontier's."  Frontier and Verizon actively assisted the State in drafting its grant application by providing anticipated construction plans, and engineering information.

48.     Frontier and Verizon also assisted the State in identifying the amount of new fiber to be constructed from the Central Offices to the CAIs.  On January 7, 2010, the NTIA specifically asked the State "are the 2,429 fiber miles reported in your project all to be constructed new or do they include some existing fiber.  If so, how much of each?"  On January 7, 2010, Defendant Gianato responded, "Based on the estimates from Verizon and Frontier, the fiber is new fiber that does not exist today."  (See January 7, 2010 request from NTIA attached hereto as "Exhibit 5").

49.     During the merger negotiations, but prior to any BTOP grant being awarded, Verizon, Frontier and the State already contemplated that the State would receive a BTOP grant and that a substantial portion of the State's grant would go to Frontier.

50.     On January 14, 2010, the State informed Frontier that it was expected to make a capital investment of $250-$300 million in West Virginia in order for its merger with Verizon to be approved by the West Virginia Public Service Commission.  The State also expressly stated that the $250-$300 million "shall not include the $60 million dedicated to broadband expansion." (See January 14, 2010 communication attached hereto as "Exhibit 6").

51.     On January 15, 2010, Daniel McCarthy, Executive Vice President and COO of Frontier, provided the State with Frontier's proposed capital expenditure post-merger.  This number included $69 million of "stimulus funds."  (See January 15, 2010 communication attached hereto as "Exhibit 7").  Given that Frontier's grant application was for $40,674,893, the

expected $69,000,000 in anticipated BTOP funds would not have come from an award based upon Frontier's application.[3]   The only grant application that requested an amount in excess of $50,000,000 was the one submitted by the WVEO.   Mr. McCarthy also stated that Frontier was committed to an additional $279,000,000 in capital expenditures in West Virginia between 2010 and 2013.

52.      Verizon and Frontier consummated their merger on June 30, 2010.

## *BTOP Award to WVEO*

53.      The U.S. Department of Commerce Financial Assistance Award Number NT10BIX5570031 was awarded to the WVEO on February 12, 2010.   The total amount of the award was $126,323,296.00.   The Award grant expressly stated that by accepting the award offer, the Recipient agrees to comply with the identified award Terms and Conditions.   Those terms and conditions included: 1) the Department of Commerce Financial Assistance Standard Terms and Conditions; 2) Award Specific Special Award Conditions (See Financial Assistance Award and Special Award Conditions attached hereto as "Exhibit 8"); 3) Line Item Budget; 4) 15 CFR Part 24, Uniform Administrative Requirements for Grants and Agreements to States and Local Governments; 5) OMB Circular A-87, Cost Principals for State, Local, and Indian Tribal Governments; 6) OMB Circular A-133, Audits of States, Local Governments, and Non-Profit Organizations; 7) Department of Commerce Pre-Award Notification Requirements for Grants and Cooperative Agreements; and 8) DOC American Recovery and Reinvestment Act Award Terms.

54.      The Special Award Conditions specifically stated, "This award number supports the work described in the recipients proposal entitled *West Virginia Statewide Broadband*

---

[3] The combined amount requested by Frontier and CTC was only $55,173,910, which is approximately $14,000,000 less than the amount of stimulus funds Frontier expected to receive.

*Infrastructure Project – 'Middle-Mile'* dated 8-20-09 and revision dated 2/5/10 for budget narrative which is incorporated into the award by reference."   (See WVEO Budget Narrative attached hereto as "Exhibit 9").

55.   The proposed budget narrative contained eleven potential categories of project costs that were to be identified by the applicant with a narrative summary of the items in each category.  The amount of BTOP funds applied to each category by the State is as follows:

| | | |
|---|---|---|
| 1. | Administrative & Legal Expenses | $0 |
| 2. | Land, Structures and Rights of Way | $0 |
| 3. | Relocation Expenses and Payments | $0 |
| 4. | Architectural and Engineering Fees | $23,639,999 |
| 5. | Other Architectural and Engineering Fees | $0 |
| 6. | Project Inspection Fees | $0 |
| 7. | Site Work | $0 |
| 8. | Demolition and Removal | $0 |
| 9. | Construction | $49,094,657 |
| 10. | Equipment | $53,588,640 |
| 11. | Miscellaneous | $0 . |
| | **Total:** | **$126,323,296** |

56.   The Budget Narrative also had an addendum provision that read, "If indirect costs (*i.e.*, indirect, overhead, general and administrative, facilities and administration, etc.) and/or fringe benefits are included in the budget, please provide a copy of your existing Negotiated Indirect Cost Recovery Agreement (NICRA), if available.  If the NICRA is not available or is not consistent with the rates/calculations in the budget, please provide an explanation of how the amounts were calculated.  Please clearly list the manner in which indirect costs are calculated in the budget."  No indirect costs were identified by the State in its BTOP application.

57.   The Department of Commerce Financial Assistance Standard Terms and Conditions state that "indirect costs, or facilities and administrative costs are not allowable charges unless permitted under the award and specifically included as a line item in the award's approved budget."

58.     The ARRA Award Terms, 74 FR 33104 prohibits grant funds from being used to fund the operating expenses of the project, including fixed and recurring costs of a project.

59.     The Department of Commerce Pre-Award Notification Requirements for Grants and Cooperative Agreements prohibits the payment of indirect costs unless they are "specifically included as a line item in the approved budget incorporated into the award."   When there is a line item for indirect costs, the award recipient is prohibited from transferring amounts budgeted for direct costs to the indirect costs line item without prior written permission from the grant officer.

60.     There were seven amendments to the grant award.  Amendment 1 was to correct an administrative error.  Amendment 2 made an administrative change and amended the post award reporting requirements.  Amendment 3 acknowledged that the grant award was subject to the federal whistleblower laws and Davis Bacon wage requirements.  Amendment 4 approved a sub-award to the Lewis County Commission. Amendment 5 removed the restriction on the sale or lease of BTOP funded assets.   Amendment 6 approved the State's Mitigation Plan. Amendment 7 extended the project period through December 31, 2013.

*__Award Administration__*

61.     Following the award of the BTOP grant, the issue was raised as to whether the West Virginia Broadband Deployment Council would be the entity overseeing the administration of the BTOP grant funds.  The West Virginia Attorney General issued an opinion stating that the Council may only receive and dispense funds specifically appropriated to it pursuant to W. Va. Code § 31-15C-4(a)(4).  Since the grant was awarded to the WVEO and not the Council, it was determined that the Council could not administer the grant funds.

62.     In order to properly administer the grant, the WVEO created its Grant Implementation Team (GIT), which initially consisted of Jimmy Gianato, the Grant Recipient

13

Administrator, Lt. Col. Michael Todorovich, Grant Principal Investigator/Project Director, and John D. Dunlap, Director, Infrastructure, Design and Operations.

63.     The WVEO entered into a Memorandum of Understanding with Frontier wherein it was agreed that Frontier would serve as a "sub-recipient" of the grant.  Accordingly, Frontier agreed to comply with all of the grant's Special Award Conditions, as well as all other federal laws, rules and regulations governing the grant award.  Frontier's sub-recipient team included Ken Arndt, President of the Southeast Region, Joseph Starsick, Associate General Counsel, and Jason Anderson, Lead Engineer BTOP Grant Project.  (See WVEO-Frontier MOU attached hereto as "Exhibit 10").

64.     The WVEO also entered into a Memorandum of Understanding with the WVOT wherein the WVEO authorized the Office of Technology to administer the BTOP Grant.  As part of its responsibilities under the MOU with the WVEO, the WVOT was to: 1) document payroll and invoice information; 2) ensure compliance with the Grant Special Award Conditions; and 3) receive, distribute and account for all grant funds spent by the WVOT.  (See WVEO and WVOT MOU attached hereto as "Exhibit 11").

65.     Initially, Mr. Gianato requested that Col. Todorovich create a "bucket of money" that could be accessed by the State at any moment with no oversight or preapproval to obtain the funds.  Col. Todorovich refused to allow the BTOP funds to be accessed unless it was to pay for construction that had already been completed.

66.     The WVOT developed a protocol for processing vendor invoices that were submitted for payment with BTOP funds.  First, the vendor would submit its invoice to the WVOT, which would review it (match it against the original LCR) and approve it.  The invoice would then be sent to GIT member Todorovich to ensure that the invoice had received the proper approval from the WVOT and to ensure that there were sufficient BTOP funds available to pay

14

the invoice.  The invoice was then sent to the Governor's accountant for review before it was entered into the ASAP system.  Once the invoice was entered into ASAP, the BTOP funds were forwarded to the WVOT.  The WVOT then forwarded the BTOP funds directly to Frontier.

67.     During the time that Frontier was receiving BTOP funds as a sub-recipient of the grant, it hired former State employees Larry Puccio, Billy Jack Gregg and Senior Staff Member Scott Cosco as paid lobbyists.  Upon recommendation by Larry Puccio, Defendant Gale Given, the former President of Verizon, was appointed as the new State Technology Officer on June 4, 2012.  She immediately became a member of the GIT.

### *Fraudulent Conduct of Frontier and Representatives of the State*

68.     Citynet and other broadband service providers were concerned about the State's decision to choose Frontier to construct the Middle-Mile network given its already existing monopoly.  The broadband service providers were initially not opposed to the project because it was supposed to result in the construction of a new 2,400+ (then later revised to 915) mile "open-access" network that otherwise would not have been built without the BTOP funds.

69.     Since the new network would be over 915 miles of contiguous open-access fiber, each broadband service provider would be able to connect to the network and compete for the provision of Last-Mile service to the end-users, and to reach new markets that were previously part of Frontier's monopoly.  By creating competition for services in these new markets, the proposed Middle-Mile project would have resulted in improved services and better pricing for the business and residential customers in these rural areas.

### *Misrepresentations in the WVEO's Application*

70.     While this proposed 915 mile open-access Middle-Mile network would vastly expand broadband availability in West Virginia, it also would be catastrophic to Frontier.  This is

because it would open up the heart of Frontier's service territory to competition from other broadband service providers. Frontier was unwilling to acquire the Verizon assets and invest $279,000,000 in West Virginia unless the State could ensure that none of Frontier's competitors received BTOP funding and that an "open-access" network was not constructed in West Virginia.

71.     In order to make this happen, the State simply took CTC and Frontier's Last-Mile BTOP applications and regenerated them as its own Middle-Mile project in order to make it more attractive to the NTIA. The State also purposefully inflated the number of CAIs that were to purportedly receive fiber and the miles of fiber that were necessary to connect those CAIs to the Central Offices.

72.     For example, Frontier and the State identified the 1,064 CAIs that would receive new fiber as part of the State's proposed project. These 1,064 CAIs were identified because they purportedly did not have existing fiber. The State filed its grant application on August 20, 2009.[4]

73.     After identifying these 1,064 CAIs that did not have fiber, Frontier and the State reviewed the existing facilities to determine the amount of new fiber that would have to be built to connect the 1,064 CAIs to the Central Offices. Frontier and the State determined that 915 miles of new fiber would have to be built to connect the 1,064 CAIs to their respective Central Offices. (See Spreadsheet identifying each CAI attached hereto as "Exhibit 13").

74.     Despite the representations made in the BTOP grant application, of the 1,064 CAIs identified by Frontier and the State, 416 of them already had existing fiber, no longer were in existence, or had received other stimulus funding. For example, 20 of the 33 CAIs identified in Boone County as needing fiber already had existing fiber. Ninety-four (94) of the 115 CAIs

---

[4] On August 20, 2009 the State represented to the NTIA that it had identified 1,064 CAIs that needed fiber connectivity. As of April 15, 2010, the State had still not finalized its list of CAIs needing fiber. (See April 15, 2010 correspondence from Defendant Goes attached hereto as "Exhibit 12").

identified in Kanawha County did not need new fiber. Seven (7) of the eleven (11) CAIs identified in Lewis County did not need fiber. Twenty-one (21) of the thirty-three (33) CAIs identified in Marion County did not need fiber. Thirty (30) of the forty-five (45) CAIs identified in Raleigh County did not need new fiber. Twenty-two (22) of the thirty-three (33) CAIs identified in Wayne County did not need new fiber. (See Exhibit 13).

75. As part of its grant application, the WVEO identified the exact amount of proposed fiber footage that was necessary to connect each CAI to its respective CO. For the 416 CAIs that did not need new fiber, it was estimated that approximately 1,998,899 feet of new fiber would have been necessary to connect those 416 CAIs to their respective Central Office. That amount equates to approximately 378.57 miles of fiber that was no longer necessary.

76. Since 416 of the 1064 CAIs did not need new fiber, the actual number of CAIs identified by the WVEO as needing fiber was only 648. Correspondingly, the decrease in the number of CAIs also caused the proposed amount of new fiber miles to be built to decrease from 915 miles to 536 miles.

77. The proposed 536 mileage of fiber for the remaining 648 CAIs was also fraudulently inflated. For example, it was estimated that it would require 73,250 feet of new fiber to provide broadband service to the Hygenia Facilities Foundation in Boone County. LCR BB03A32 indicates that only 1,201 feet of fiber was actually needed. It was estimated that the Fayette Plateau Vocational Center needed 10,157 feet of new fiber. LCR BB10A03 reveals that only 450 feet of new fiber was required and constructed. The estimated fiber build to hundreds of remaining CAIs were grossly inflated. (See Exhibit 13).

78. Frontier and the WVEO also "double-counted" miles to inflate the total under the grant application. For example, two identified CAIs needing fiber may be located directly beside each other, such as a state police detachment and a 911 call center. In such an instance, it may

require 10,000 feet of new fiber to connect the first CAI to the Central Office.  However, it would then only take approximately 200 feet of new fiber to connect the first CAI with the second CAI.  In numerous instances, Frontier included the mileage of fiber necessary to connect to the Central Office for _both_ CAIs despite the fact that only one was actually directly connected to the Central Office.

79.     For example, the Martinsburg Correctional Center in Berkeley County is located directly beside the Eastern Regional Jail in Martinsburg.  LCR BB2A02 shows that it took 6,650 feet of new fiber to provide broadband to the Correctional Center.  LCR BB02A13 shows that it only took 794 feet of fiber to connect the Eastern Regional Jail to the Correctional Center. However, when Frontier estimated the new fiber mileage to the State, it represented that it would take 10,000 feet of new fiber to connect the Correctional Center _and_ another 10,000 feet to connect the Eastern Regional Jail.  By double-counting the build back to the Central Office for both jobs, Frontier inflated the estimated mileage by 10,000 feet on this job alone.  (See spreadsheet listing "double-counted" projects attached hereto as "Exhibit 14").

80.     Likewise, the New Cumberland State Police Troop 1 and the John D. Rockefeller Voc-Tech Center in Hancock County were identified as two of the original 1,064 CAIs needing fiber.  These two CAIs are located only a few hundred feet from each other off of County Highway 66/1 in Hancock County.  It was estimated by Frontier that it would require 17,600 feet of new fiber to connect the State Police Troop to the Central Office.  It was also estimated by Frontier that it would take 17,600 feet of new fiber to connect the Voc-Tech Center to the Central Office.  LCR BB15A05 shows that the Voc-Tech Center was not directly connected with fiber back to the Central Office.  Instead, 1,000 feet of fiber was used to connect the Voc-tech Center to the State Police Troop building.  Therefore, the 17,600 feet distance was double-counted and the proposed mileage was overstated by 16,600 feet.  (See Exhibit 14).

81.     The build-out of the fiber back to the Central Office was double-counted on at least fifty-eight (58) projects in thirty-two (32) Counties.   (See Exhibit 14).

82.     Frontier and the WVEO also fabricated the proposed distances for many of the CAIs.  The spreadsheet identifying the 1,064 CAIs listed the project name, the total feet of the proposed project, the number of new poles required, the number of aerial fiber feet, and the number of buried fiber feet.  Frontier simply cut-and-pasted the same number for many of these projects.  For example, it was estimated that the Clarksburg Parole Office would require *4,390* feet of new fiber, consisting of five (5) new poles, *3,882* feet of aerial fiber and *508* feet of buried fiber.  (See Exhibit 15 identifying all projects with 4,390 feet of proposed new fiber).

83.     It was estimated that the Auditor's Office in Clarksburg would also require *4,390* feet of new fiber, consisting of five (5) new poles, *3,882* feet of aerial fiber and *508* feet of buried fiber.  The same *4,390* feet of new fiber, consisting of five (5) new poles, *3,882* feet of aerial fiber and *508* feet of buried fiber was estimated for the WVOT project in Braxton County. (See Exhibit 15).

84.     It was estimated that twelve (12) of the twenty (20) CAIs in Lincoln County would require *4,390* feet of new fiber, consisting of five (5) new poles, *3,882* feet of aerial fiber and *508* feet of buried fiber.  (See Exhibit 15).

85.     It was estimated that the Big Creek High School, Southside K-8 School and the War Public Library in McDowell County also required *4,390* feet of new fiber, consisting of five (5) new poles, *3,882* feet of aerial fiber and *508* feet of buried fiber.  (See Exhibit 15).

86.     It was estimated that the State Police Troop in Bluefield, Mercer County would require *4,390* feet of new fiber, consisting of five (5) new poles, *3,882* feet of aerial fiber and *508* feet of buried fiber.  (See Exhibit 15).

87.     It was estimated that the Alternative Learning Center, Daybrook Elementary School, and the Mylan Park Elementary School in Monongalia County all would require *4,390* feet of new fiber, consisting of five (5) new poles, *3,882* feet of aerial fiber and *508* feet of buried fiber. (See Exhibit 15).

88.     It was estimated that the Panther Creek Elementary School, Beaver Elementary School, Dixie Elementary School and the Glade Creek Elementary School in Nicholas County all required *4,390* feet of new fiber, consisting of five (5) new poles, *3,882* feet of aerial fiber and *508* feet of buried fiber. (See Exhibit 15).

89.     It was estimated that the North Fork Elementary School and the North Fork Primary Care Clinic in Pendleton County would require *4,390* feet of new fiber, consisting of five (5) new poles, *3,882* feet of aerial fiber and *508* feet of buried fiber. (See Exhibit 14).

90.     It was estimated that eight (8) of the eleven (11) CAI's in Ritchie County would require *4,390* feet of new fiber, consisting of five (5) new poles, *3,882* feet of aerial fiber and *508* feet of buried fiber. (See Exhibit 15).

91.     Incredibly, and in all, there were thirty-six (36) CAIs in seven different Counties that each required the exact same *4,390* feet of new fiber, consisting of five (5) new poles, *3,882* feet of aerial fiber and *508* feet of buried fiber. (See Exhibit 15).

92.     The State also misrepresented in its application that "no middle mile network" existed in West Virginia when it knew some such facilities actually existed.  This fact was confirmed to the State on several occasions.  On February 16, 2010, Ken Arndt advised the State in writing that, "As a follow-up to our meeting regarding the middle mile broadband project, I have asked my team to review our post acquisition fiber optic network plan and compare to the proposed stimulus plan.  As you can see from the attached file, *approximately 90% of the stimulus project either exists or will be completed shortly after the acquisition is closed.*  I would

like the opportunity to review our plans and discuss the remaining 10% to determine if the route was designed to meet a specific customer need.  Please let me know if you have any questions and a convenient time for a conference call."   (See Ken Arndt e-mail attached hereto as "Exhibit16").

93.    The State also misrepresented that its project complied with the NOFA because no private entity could afford to build the $42,000,000 proposed network and that the network would not be built "but for" the federal grant.  At the time the State made this representation, Defendant Goes knew that Frontier had already committed to spend $279,000,000 to upgrade its facilities in West Virginia.  Again, these misrepresentations were made to make the State's application appear more attractive to the NTIA.

### *Citynet's Protest to the NTIA*

94.    On September 9, 2010, Citynet sent a protest letter to Earl E. Devaney, Chairman of the Recovery Accountability and Transparency Board, and Lawrence E. Strickling, Assistant Secretary of Commerce for Communications and Information for the NTIA, challenging the BTOP award to the WVEO.  (See Citynet letter attached hereto as "Exhibit 17").

95.    In that letter, Citynet advised the NTIA that the "Plan for the expenditure of the BTOP funds as currently contemplated by the EOWV is wholly contrary to the requirements of the NTIA and will result in a complete waste of taxpayer money."  Citynet also advised the NTIA that based upon meetings with Defendant Goes, it was "Clear that the EOWV has no intention of spending the BTOP funds in a manner that is consistent with the plan as described in the Executive Summary."

96.    Citynet further advised the NTIA that based upon personal meetings with Defendant Goes and her own description of how the WVEO's project was to be implemented, the material representations made to the NTIA by the WVEO in its grant application were false.

97.     Specifically, Defendant Goes advised Citynet that $40 million of the BTOP funds were going to be given to Frontier to construct "tails" to government facilities from the nearest Frontier hub or similar facility.   Defendant Goes acknowledged that the construction of the "Last-Mile" tails would constitute the full extent of fiber construction under the WVEO's plan. The letter further advised the NTIA that "Frontier will be given $40 million in taxpayer funds to build out its network on a Last-Mile basis to West Virginia government agencies and, if the government agency orders services under the existing "MPLS contract", then Frontier will bill the government agency for those services at existing prices."

98.     Citynet continued, "Rather than building true middle-mile fiber that will pass households, businesses and anchor institutions, only last-mile fiber will be built to the particular state agency that orders services from Frontier.   Despite the representations by the EOWV that 2,400 miles of middle-mile fiber will be built with the BTOP funds, the reality is that only a fraction of that amount of fiber will be built, and even what is built will not benefit the public at large.   Frontier essentially is being given a grant of $40 million to build last mile fiber to any state agency that wants to order, and can afford to pay for, services from Frontier."

99.     Citynet also advised the NTIA that the WVEO could not meet its statutory obligation of providing adequate oversight to ensure that the BTOP funds were properly spent. The letter stated, "How will the [WVEO] demonstrate to the NTIA that the public funds are being properly spent with adequate oversight?  For example, if Acme High School wants to order a DS3 from Frontier, Secretary Goes explained that the [WVEO] will order that facility from Frontier and Frontier will invoice the [WVEO] for the estimated cost of construction and the [WVEO] will pay Frontier's invoice.  The [WVEO] will not oversee construction or monitor the true cost of construction.  The [WVEO] will simply pay Frontier's bill."

22

100.    Citynet also raised the issue that the WVEO was responsible for guaranteeing that BTOP funds were only spent for "eligible costs."  The letter continued, "As described above, however, the [WVEO] will simply be paying invoices submitted to it by Frontier.  Thus, the [WVEO] will have no control over the uses of the funds by Frontier and will have no knowledge whether Frontier is spending the funds for eligible or ineligible costs."

101.    Citynet advised the NTIA that the NOFA required that the network resulting from the expenditure of BTOP funds be an "open access" network.  Citynet advised, "This requirement is highly problematic in this situation on at least two fronts.  First, given that Frontier will only be constructing "tails" or last mile facilities, there are no facilities for other carriers to connect to as the result of this purported "middle mile" project in violation of the scalability requirement of the NOFA.  *See, Federal Register/Vol. 74, No. 130/Thursday, July 9, 2009/Notices at p. 33114.*  Thus, as a practical matter, the network will be closed to competitive entities because any fiber that is constructed will serve just a single purpose—*i.e.,* to provide services to the government entity that orders the services from Frontier."

102.    Citynet warned the NTIA, "the [WVEO's] current plan provides Frontier not only a competitive advantage over existing competitive providers, it likely means that competitive options (superior to Frontier's) will be priced out of the market relative to installation cost alone, thereby leaving the end-users (*i.e.,* the state agencies) with no choice (current or future) to enjoy lower services costs, higher bandwidth performance and advanced service capabilities."

103.    Citynet concluded by informing the NTIA that, "The misguided implementation of the [WVEO's] plan introduces serious long-term economic risks for the State of West Virginia, limits state agency choice and effectively locks out competitive carriers.  The beneficiary of the EOWV's plan is not the State of West Virginia, it is clearly Frontier."  As

23

discussed further hereinafter, Citynet's predictions unfortunately has proven to be completely accurate.

### *Building of Last-Mile Project with Middle-Mile Project Funds*

104.   The State's BTOP application was solely for Middle-Mile construction.  The State expressly identified the BTOP category being applied for in its grant was "middle-mile." (Application, page 2).   It again represented that the request was for "middle-mile only." (Application, page 19.)  The State also expressly represented that the Last-Mile "service layer" is not included in the funding of its project.  (Application, page 12).

105.   The State and Frontier agreed that, if the State's application was granted, the State would make Frontier a sub-recipient of the grant and allow it to construct the 915 mile fiber portion of the State's project.  Once the award was granted to the State, Frontier was made a sub-recipient of the grant.  However, instead of constructing the Middle-Mile network contemplated in the State's application, Frontier began building the Last-Mile project contemplated in its joint application with CTC.

106.   Frontier did not have to build the 915 mile network contemplated by the State because the vast majority of the proposed Middle-Mile network already existed.  Importantly, the "open access" requirements of the BTOP award did not apply to Frontier's existing Middle-Mile network, because it was not constructed with BTOP funds.  Therefore, Frontier could deny its competitors access to its existing Middle-Mile network.

107.   Instead of a 915 mile open-access Middle-Mile network that could be accessed by any service provider, Frontier simply constructed short Last-Mile segments from its existing network to end users that could not feasibly be accessed by any provider other than Frontier.   In other words, rather than constructing fiber from Central Office to Central Office, or from the

24

CAI all of the way back to the Central Office, Frontier merely constructed fiber from the CAI to Frontier's nearest utility pole (*i.e.*, driveways to local streets).  The decision to approve not building fiber back to the Central Office was unilaterally made by Defendant Gianato.

108.   The NTIA and the State of West Virginia entered into a Programatic Agreement that required the State to identify all "areas of potential effect" ("APE") of the project.  As the result, the State was required to provide APE Maps to identify the areas that would be environmentally affected by the project.  The APE maps that were provided identify the proposed route for the fiber build to each of the 1,064 CAIs.  The APE Map for Hancock County identified the 17,600 foot fiber build that was to connect the Hancock State Police Troop to the Frontier Central Office in New Cumberland.

109.   Frontier also submitted "as-built" maps that showed the actual route of the fiber build to each of the CAIs.[5]  Contrary to the APE Map, the "as-built" map for the Hancock State Police Troop to the Frontier Central Office in New Cumberland shows that 17,600 feet of new fiber was not constructed back to the Central Office.  Instead, Frontier simply made a "service drop" from a utility pole outside of the State Police Troop to the CAI.  The service drop was approximately 1,000 feet.  Frontier was able to do this because the fiber build to the Frontier Central Office had already been constructed without the use of BTOP money.

110.   Frontier repeatedly and systematically constructed Last-Mile facilities and service drops instead of the Middle-Mile network described in the State's grant application and required by the NTIA in its approval of the project.  Frontier did not build an open-access Middle-Mile network with the BTOP funds provided by the State.  The State represented in its grant

---

[5] Per industry standard, "as-built" maps are engineering maps that provide technical information including the exact fiber footage constructed, the precise utility pole location, and other detailed engineering information.  Frontier's "as-built" maps that were provided to the State contained none of this information.  In most instances, Frontier simply used a computer print off from Google Maps and used a pen or pencil to hand draw the "as-built" location. (See Frontier sample "as-built" maps attached hereto as "Exhibit 18").

application that the local communities would be able to receive broadband services through the building of a Last-Mile "service layer" once the Middle-Mile portion was built.  However, at the time the State submitted its application, it knew that the broadband service that was going to be provided to the CAIs by Frontier could not be resold.  Therefore, at the time the State submitted its application, it knew that the CAIs were the sole ultimate end-users and that its project was in fact a Last-Mile project.  The State and Frontier knew that Middle-Mile projects were given special priority under the NOFA, and therefore, misrepresented the nature of its project in order to obtain funding from the NTIA.

111.    Frontier has expressly admitted that the facilities that it constructed using BTOP funds were Last-Mile rather than the required Middle-Mile.  Specifically, on April 7, 2014, Frontier submitted written comments to the Federal Communications Commission in WC Docket No. 13-184.  In those comments Frontier admitted, "Through the Broadband Technology Opportunities Program (BTOP), part of the American Recovery and Reinvestment Act, the State of West Virginia chose Frontier to connect 192 schools with ***last-mile*** fiber and routers to enable high-capacity broadband."  (emphasis added) (See Frontier FCC Testimony attached hereto as "Exhibit 19").

112.    Accordingly, Frontier used the BTOP funds to: 1) expand its existing network within its service territory; 2) ensure that its competitors would not have access to the network; and 3) lock the State (the CAIs) into doing business with Frontier in perpetuity.  By doing so, Frontier used the State's Middle-Mile project grant funds to construct the Last-Mile project that it initially proposed in the joint grant application submitted by Frontier and its subsidiary, CTC.

113.    Frontier submitted a total of 646 invoices to the State for a total amount of $41,531,832.25.[6]

***Conspiracy to Exhaust Surplus BTOP Funds***

114.    In their respective applications, both CTC and Frontier estimated that the cost to construct the fiber to the CAIs would average $24,816 a mile.  For example, Frontier represented to the NTIA in its application that it could build 1,793 miles of fiber for $44,495,616.  Since Frontier would only be constructing 915 miles as a sub-recipient of the State's grant, the estimated cost to build the 915 miles of fiber would have been $22,706,640.

115.    The State had represented to the NTIA that it would cost $42,482,657 to construct the 2,429 miles (later reduced to 915 miles) of fiber.  Since Frontier had already determined that it could build the 915 miles of fiber for approximately $22,700,000, it and the State realized that there would be a surplus of $20,000,000 or more in BTOP funds that could be awarded to Frontier's competitors.

116.    In addition, since approximately ninety-percent (90%) of the State's proposed project already existed, it was impossible for Frontier to spend the approximate $42,000,000 allocated for the CAI fiber build out on the remaining ten-percent (10%) of the project that had not been built.  This is because there was substantially less construction, engineering, and materials needed to construct the Last-Mile segments and service drops as compared to constructing the Middle-Mile network.

117.    In June of 2011, it was revealed that there was going to be a surplus of approximately $30,000,000 in grant funds that were not needed.  Therefore, numerous service

---

[6] The amount Frontier billed the State for building 590 miles of fiber is $856,939 more than the amount Frontier represented it would take it to build the 1,793 miles of fiber in its proposed BTOP project. The State of West Virginia has not processed the remaining $300,000 (approximate) in Frontier invoices due to some minor discrepancies in the submitted invoices that exist between the State and Frontier records.

providers and competitors of Frontier began drafting grant proposals to utilize the $30,000,000 surplus.

118.    Frontier adamantly opposed any of the BTOP funds being utilized to fund grants to other service providers and competitors.  Therefore, Frontier had to find a way to spend the excess funds without raising suspicion that it failed to build the contemplated Middle-Mile network.

119.    Frontier devised a plan to expend all of the $42,000,000 of the budgeted BTOP funds by: 1) charging for impermissible "loadings" that were nothing more than prohibited indirect costs; 2) fabricating the amount of fiber built by utilizing maintenance coils; 3) fabricating the amount of fiber built after the length of maintenance coils had already been considered in the total; 4) double-billing for "Facility Build-Outs" that were already contemplated as part of the original construction estimate; and 5) billing for inappropriate "invoicing fees" that were not allowed under the grant.

120.    The State Defendants assisted Frontier in implementing its plan by: 1) knowingly approving improper "loading" and "invoice processing fee" charges; 2) failing to verify Frontier's invoices and the corresponding charges; 3) failing to verify that Frontier completed the work billed for; and 4) purposefully holding Frontier's invoices for up to eighteen (18) months at a time before processing them so that the other service providers would not be able to determine whether there would be surplus BTOP funds available.  The majority of these changes occurred after Gale Given became the Chief Technology Officer.

***Improperly Charged Indirect Costs***

121.   For example, the payment of indirect costs was not permitted under the grant award.   Frontier had attempted to obtain reimbursement for indirect costs before Defendant Given became the Chief Technology Officer, but they were denied by Col. Todorovich.

122.   Col. Todorovich personally contacted the NTIA and confirmed that indirect costs were not permitted to be paid under the grant award.   Therefore, on February 14, 2012, Col. Todorovich drafted a memorandum that was circulated to various members of the GIT and the WVOT advising them that indirect costs were not reimbursable under the grant.   He also advised in the memorandum that there must be complete and detailed documentation to validate the number of hours charged and that a detailed invoice must be attached to the funds draw down. The memorandum concluded by stating, "I cannot overemphasize the fact that ALL invoices must be clearly identifiable as direct BTOP, and BTOP only work with full auditable detail to support the invoices."   (emphasis in original) (See Col. Todorovich Memorandum attached hereto as "Exhibit 20").

123.   Within one (1) month of Defendant Given becoming Chief Technology Officer, every one of Frontier's invoices that were submitted for payment contained a "Loadings" charge. Only one such invoice contained a loading charge before Defendant Given became the Chief Technology Officer.   Per Frontier's own invoices, the loading charge was for "allocated *indirect costs such as vehicles, accounting, administration*, etc."   Defendant Given approved the Frontier invoices containing the loading fee.   (See Sample Frontier Invoice with Loading Fee attached hereto as "Exhibit 21").

124.   In many instances, the indirect cost fee was higher than the original total cost estimate for the subject fiber build.   For LCR BB2A11, the original total construction estimate

29

was $3,414.60 and the loading fee was $9,010.58.  For LCR BB2A13, the original total estimate was $5,121.44 and the loading fee was $8,357.54.  Frontier submitted 365 separate invoices with loadings fees.  The total amount of loading fees for the 365 invoices was $4,553,387.31.  (See Exhibit 22 listing 365 invoices with "Loadings" fee).

125.   Even though Frontier often ended up building much less fiber than was originally estimated, its final charges were substantially higher than the original estimate.  For example, Frontier estimated that it would require 8,151 feet of fiber to connect the Central Preston Middle School to the Central Office.  It also estimated that it would require an additional 8,151 feet of fiber to connect the Preston High School to the Central Office, despite the fact that the High School is located directly next to the Middle School.  The original estimated LCR cost for these two projects combined was $71,989 for the 16,302 feet of proposed fiber.

126.   According to LCR BB39A04 and LCR BB39A07, the combined fiber build for these two projects was only 9,650 feet, which is a 41.81% decrease from the original estimate. However, despite this decrease, the cost of the combined project went from $71,989 to $303,870.15.  That was an increase of $231,881.15 or an increase of 422.10%.  Included in this amount was a Loading Fee of $186,870.15.

127.   Neither the State's line-item budget, nor its budget narrative accounted for indirect costs to be covered by the grant award.  In addition, the grant award was never amended to allow for indirect costs to be reimbursed under the grant.

***Maintenance Coils and False Mileage***

128.   Frontier also engaged in a practice of billing the BTOP grant for material and labor it did not provide.  Citynet continuously alleged that Frontier was including excessive maintenance coils in its compilation of total fiber miles built.  Frontier denied this allegation and insisted that it only used 100 feet of maintenance coil for every mile of fiber it constructed.

30

Citynet further alleged that the total feet of fiber listed on the LCRs submitted by Frontier were inflated compared to the actual feet of fiber identified on Frontier's engineering maps.  However, Citynet could not substantiate either of these allegations because Frontier refused to provide access to its engineering maps to Citynet, members of the West Virginia Broadband Deployment Council, and a large number of members of the West Virginia Legislature who requested copies of the engineering maps on numerous occasions.

129.   Citynet demanded that it be allowed to review Frontier's engineering maps so that it could review the facilities Frontier built using federal BTOP funds.  Frontier eventually relented and allowed Citynet to review a small sample (approximately fifty) of the engineering maps.  Citynet's review of those few maps revealed that Frontier, in fact, did use excessive maintenance coils.  The review also revealed that Frontier was charging the BTOP grant for fiber lengths that were not constructed.

130.   On LCR BB17A06, Frontier billed the State for constructing 1,380 feet of fiber.  However, its engineering map shows that it only built 735 feet of fiber and that it placed 600 feet of fiber in maintenance coils.  (See sample photograph of Frontier maintenance coil attached hereto as "Exhibit 23").

131.   On LCR BB46A08, Frontier billed the State for constructing 900 feet of fiber.  However, its engineering map shows that it only built 482 feet of fiber and that it placed 200 feet of fiber in maintenance coils for a total of 682 feet.

132.   On LCR BB17A09, Frontier billed the State for constructing 1,587 feet of fiber.  However, its engineering map shows that it only built 978 feet of fiber and that it placed 500 feet of fiber in maintenance coils.   This was a practice that was routinely utilized by Frontier to inflate its invoices in an attempt to draw down the surplus BTOP funds.  (See Exhibit 24 listing projects with excessive maintenance loops and falsified fiber distances).

***Facilities Build Out and Invoice Processing Fee***

133.    Once Defendant Given was hired as Chief Technology Officer, Frontier began submitting invoices with separate "FBO" charges.    The Facilities Build Out Charge was allegedly for the cost of construction inside the CAI to allow its facilities to accept the newly placed fiber.    Frontier claimed that the FBO was not included in the original estimate because need for the FBO was not discovered until the project was under way.    This assertion was made despite the fact that the State specifically listed "DMARC Const. Cost" under the Customer Facility heading with a unit cost of $9,750 for 250 units.    The "DMARC Const. Cost" is the equivalent to the FBO costs.

134.    The FBO costs were part of the original estimate.    Frontier simply created the fiction that they were not originally part of the estimate so that they could be double-billed.

135.    Once Defendant Given arrived, not only did Frontier double charge for FBO costs, it added a significant "invoice processing fees" to each of its FBO invoices.    The initial invoice processing fee was $1,808.00 for each invoice.

136.    Mark McKenzie provided the State with a breakdown of the costs associated with processing an FBO invoice.    He claimed that it took sixteen (16) individuals a combined four hours to process a single FBO invoice at a cost of $1,808.00 to Frontier (*i.e.*, $452.00 per hour). The breakdown of the process was described as follows:  1. Final FBO invoice received from Vendor, invoice forwarded to Engineering Team (.25 hours).  2. Infinium project created within Frontier Construction Accounting system for BTOP site.  If new project contains FBO Invoice information, original project is pulled.  Invoices marked with accounting codes needed, operating area and C.O. information.  Invoice is entered into FBO spreadsheet with the cost from the contractor and the mark-up amount.  Project is opened and input and completed (Engineering

Team 1.25 hours).   3. Infinium project reviewed and approved at Vice-president Level (Engineering Team .25 hours).   4. FBO Invoice and new Infinium Project mailed to Frontier Construction Maintenance Center (Engineering Team .25 hours).   5. Construction Maintenance Team reviews invoices, processes the invoice as necessary in Frontier accounting system and ensures that the FBO vendor is provided Davis-Bacon compliance information (.25 hours).   6. FBO Invoice and corresponding Infinium project information sent to Frontier Accounts payable (.25 hours).   7. Accounts payable team reviews information for accuracy and compliance with the company's policies and procedures and issues payment to FBO vendor (.5 hours).   8.   Once BTOP site is construction complete to the DMARC, engineering reviews all incurred expense. For locations that had FBO work, the newly created Infinium project costs are added to the Frontier incurred costs to produce one overall invoice per State requirements (.25 hours).   9. Upon Frontier receiving reimbursement from the State, those checks received locally are reviewed in accordance with the bill, and then are sent to the Corporate Office in Stamford, Connecticut (.25 hours).   10.   Frontier Corporate Accounting verifies that the reimbursement received is consistent with the expenses incurred, and deposits the funds. (.25 hours).   11. Infinium projects built for BTOP locations are then closed as complete (.25 hours).   (See M. McKenzie Letter attached hereto as "Exhibit 25").

137.     On February 25, 2013, Dana Waldo advised Defendant Given that the Frontier's cost of processing 330 FBO invoices would be $596,640.   Defendant Waldo stated that since the State had already paid the full amount for 27 invoices, it was going to drop the charge to $1,340.20 per invoice (*i.e.*, $335.05 per hour).   (See D. Waldo Letter attached hereto as "Exhibit 26").

138.     In several instances, the FBO Invoice Fee was charged even though no work was performed.   For example, LCR BB8A01 shows that the contractor performed no work because

the required work had already been performed by Frontier.  However the contractor still charged a $400 site visit fee.  Frontier added its $1,340.20 processing fee and charged the BTOP grant for $1,740.20 despite not one minute of work being performed by the contractor.  This pattern occurred on numerous instances, including, but not limited to LCR BB7A03 and LCR BB8A07.

139.    Frontier submitted 84 invoices that included the $1,808 invoice fee for a total of $266,952.  These 84 invoices are referenced in the February 25, 2013 letter from Defendant Waldo to Defendant Given.

140.    Frontier submitted 243 invoices that included the reduced invoice fee of $1,340.20.  The total amount of the invoicing fee for the 243 invoices was $326,936.80.  (See spreadsheet listing all invoice processing fees attached hereto as "Exhibit 27").  In all, Frontier submitted 327 invoices that contained FOB invoice processing fees in the amount of $593,888.20.  This processing fee is an indirect cost that is prohibited under the BTOP award.  These invoice fees were approved by Defendant Given and paid with BTOP funds.

***Cover up of Conspiracy and Interference with Other Projects***

141.    Frontier received criticism for the manner in which it was installing fiber to the CAIs under the BTOP grant.  More specifically, it was asserted by other broadband providers that Frontier was not constructing Middle-Mile fiber, but rather, was constructing "tails" or Last-Mile fiber.  Using the analogy of the interstate highway system, Frontier was building driveways.  In response to this criticism, Frontier issued a "Myths vs. Reality" memorandum that it provided to the media and members of the West Virginia Legislature.  In this memorandum, Frontier ***denied*** that the project was "last-mile" and also ***denied*** the allegation that the BTOP fiber was not continuous and that it did not extend all of the way from the CAI to the CO.  However, Frontier also acknowledged that the real reason that it reduced the fiber mileage to the CAIs from 900 miles to 675 miles was to comply with BTOP guidelines that funds not be used to duplicate

34

existing facilities.    Finally, Frontier denied that it overstated the total mileage of BTOP fiber built by including maintenance coils in the total number.  Frontier stated that it included only 100 feet of fiber in maintenance coils for every mile of fiber placed.  (See "Myths v. Reality" Memorandum attached hereto as "Exhibit 28").  As detailed above, these denials were false.

142.    In addition, Defendant Given demanded exclusive control of the review and approval of Frontier's invoices.  She also prohibited any member of the WVOT to discuss any matter with Citynet without her permission.

143.    Also, hundreds of invoices were either held by Frontier or were held in the WVOT for months after the work was completed by Frontier.  This was done so that the other broadband service providers would not be able to determine whether there would be surplus BTOP funds available.  Once Defendant Given arrived at the WVOT, the WVOT decided to continue to hold the invoices until it could rush the processing and approval of a large number of the invoices at one time.  Not until Defendant Given arrived at the WVOT were all of Frontier's invoices expedited for approval.  Once she arrived, the State started paying a $5.00 fee per invoice to have each and every invoice paid within twenty-four hours of its approval by her office.

144.    The NTIA was not pleased with the progress of the WVEO project under the grant and was concerned that the State would not meet it construction deadlines.  Therefore, it asked the State to develop a "mitigation plan" that would allow it to finish the grant construction on time.  The State submitted a Mitigation Plan that was crafted by Frontier.

145.    In that Mitigation Plan, the State indicated that the microwave tower portion of the project was on schedule and that no changes needed to be made.  In regard to the fiber build from WVU to the NRAO, the State and Frontier again stated that construction was on schedule and no changes needed to be made.  However, in regard to the fiber build to the 1,064 CAIs,

Frontier and the State represented that the construction was delayed due to environmental issues and because of a fiber shortage related to the 2011 tsunami in Japan. Due to the alleged environmental delays and the tsunami, Frontier represented that the number of CAIs receiving fiber would be reduced from 1,064 to 668. In addition, the miles of fiber to be built to the CAIs would be reduced from 915 to 590.

146.   Frontier and the State misrepresented to the NTIA the real reason why only 668 of the 1,064 CAIs were going to receive fiber. It was not due to a tsunami or because of environmental issues. It was because the remaining CAIs already had fiber at the time the State's application was submitted. Similarly, only 590 of the 915 miles of fiber could be built using BTOP funds because the remaining 325 miles of fiber already existed.[7] Of course, this fact does not take into consideration that the State's original BTOP application was for more than 2,400 miles of fiber.

147.   Frontier was able to spend a large portion of the $30,000,000 BTOP surplus.[8] However, several million dollars of unspent BTOP funds remained in 2012. Therefore, the State submitted a grant application on behalf of Citynet with the NTIA requesting $5,000,000 of the remaining BTOP funds. The project was initially approved by the NTIA without the knowledge of Frontier. Once Frontier became aware of the NTIA's approval of Citynet's grant application, it threatened to sue the State if the grant funds were actually awarded to Citynet.

148.   Frontier used every means possible to attempt to disrupt Citynet's grant application, which had been formally approved by the NTIA on September 4, 2013. In fact, Frontier representatives traveled to Washington, D.C. to lobby Senator Rockefeller and former

---

[7] More than 325 of the initial 915 miles had already been built. According to Mr. Arndt, approximately ninety-percent (90%) of the 915 miles existed or would be complete at the time the State submitted its application. Until Frontier makes all of its engineering maps available, it will be impossible to determine how many miles were actually built, how many miles were maintenance loops, and how many miles of construction were fabricated.
[8] A portion of the $30mm surplus was transferred to Mr. Gianato's use in the construction of the microwave tower system because it could not be exhausted in its entirety by Frontier on the fiber portion of the project.

West Virginia Governor and now Senator Joe Manchin.  Thereafter, Citynet was informed that its proposal had to be re-submitted to the NTIA due to an administrative issue.

149.    In order for the re-submitted proposal to be accepted by the NTIA, a formal request for an extension of time had to be filed with the NTIA by the WVOT.  Defendant Given knew that the request for an extension for Citynet's proposal had to be submitted to the NTIA via the ASAP computer system, as the State had properly requested and received an extension in time for the previous deadline.

150.    Instead of submitting the request for extension via the ASAP system, Defendant Given requested the extension via written correspondence that was mailed to the NTIA.  This was the only time that Defendant Given had ever requested an extension via written correspondence instead of through the ASAP system.  The NTIA ultimately rejected Citynet's re-submitted proposal because no request for an extension of time was ever submitted to the NTIA by the WVEO or WVOT through the ASAP system.

151.    Defendant Waldo wrote an op-ed for the Charleston Daily Mail.[9]  Defendant Waldo stated that under the project, more than 2,400 miles of new fiber optic cable was going to be constructed.  Defendant Waldo also stated that based upon the BTOP Project, West Virginia's national ranking for broadband connectivity would rise from being one of the bottom five states to one of the top five states.  (See D. Waldo Op-Ed attached hereto as "Exhibit 29").

152.    Defendant Waldo also represented to the West Virginia Legislature that Frontier had not only constructed a robust Middle-Mile network, he also represented that Frontier already had negotiated several interconnection agreements with broadband wholesalers and Last-Mile providers to allow them to use the new Mddle-Mile network.  As noted above, Frontier has

---

[9] Mr. Waldo's op-ed was provided to, and pre-approved by, Ms. Goes prior to its publication.

admitted in a formal FCC proceeding that it constructed only Last-Mile fiber contrary to BTOP rules.

153.    After Mr. Waldo testified to the Legislature, the State issued its quarterly BTOP report on August 29, 2013.  That report revealed that no agreements had been entered into with broadband wholesalers or Last-Mile providers.  It also revealed that no agreements were even being negotiated.

154.    As the result of the fraudulent misappropriation of BTOP funds, no real open-access Middle-Mile network has been constructed by Frontier.  The network it designed and built using BTOP funds is an unusable network for any broadband provider other than Frontier.  At best, Frontier constructed Last-Mile extensions or "service drops" with fiber builds that are isolated and lack connectivity between the Central Office and the CAI.  In other words, Frontier built driveways that connected to streets already owned by Frontier rather than the proposed interstate highways that could have been used by all broadband providers.

155.    Frontier and the State squandered tens of millions of dollars that were to provide an open-access Middle-Mile network that would have benefited all of West Virginia.  The State did so because, had it not, Frontier would have refused to purchase Verizon's existing facilities in the State of West Virginia.  Frontier was not going to proceed with the acquisition only to have other broadband service providers be given tens of millions of dollars in stimulus funds and Middle-Mile access in the heart of Frontier's monopoly protected service area.  Therefore, to ensure that Frontier went through with the acquisition, the State had to guarantee that no other broadband service provider obtained BTOP funds.  At the time of the merger, Verizon was reaping *net profits* of approximately $100 million per year from its customers in the State of West Virginia.  The State of West Virginia was the proverbial "cash cow" for Frontier as part of the acquisition.

156.   West Virginia was ranked 48th in the United States in broadband access by the FCC prior to the BTOP award.  Defendant Waldo and Frontier represented that once the project was completed, West Virginia would be ranked among the top five States for broadband access.  After the completion of the project and the expenditure of more than $126,000,000, West Virginia is now ranked 53rd by the FCC in broadband access behind every other state, the District of Columbia, Guam and Puerto Rico.  The United States of America has been defrauded by the Defendants herein in the exact manner that was predicted by Citynet in its September 9, 2010 letter to the NTIA.

## COUNT I
### 31 U.S.C. § 3729(a)(1)(A)

157.   Each of the foregoing allegations is realleged and incorporated hereby.

158.   Defendants knowingly presented, or caused to be presented, to the United States Government, at least 646 false or fraudulent claims for payment or approval by seeking payment from funds restricted to an approved NTIA grant award for construction of a mile middle-mile network for work that Frontier provided constructing a non-approved Last-Mile project.

159.   Defendant Frontier authorized, ratified and benefited from all of the violations of the False Claims Act committed by its various officers, agents, and employees.

160.   The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act in the amount of not less than $41,531,832.25.

161.   Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729(a)(1).

162.   Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the 646 false claims submitted to the United States pursuant to 31 U.S.C. §3729(a)(1).

39

163.    Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. § 3729(a)(3).

## COUNT II
### 31 U.S.C. § 3729(a)(1)(A)

164.    Each of the foregoing allegations is realleged and incorporated hereby.

165.    Defendants knowingly presented, or caused to be presented, to the United States Government, at least 365 false and fraudulent claims for payment or approval by seeking payment of no less than  $4,553,387.31 in prohibited Loadings and Indirect Costs under the BTOP award grant.

166.    Defendant Frontier authorized, ratified and benefited from all of the violations of the False Claims Act committed by Frontier's various officers, agents, and employees.

167.    The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act in the amount of $4,553,387.31.

168.    Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. §3729(a)(1).

169.    Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the 365 false claims submitted to the United States pursuant to 31 U.S.C. §3729(a)(1).

170.    Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. §3729(a)(3).

## COUNT III
### 31 U.S.C. § 3729(a)(1)(A)

171.    Each of the foregoing allegations is realleged and incorporated hereby.

172.    Defendants knowingly presented, or caused to be presented, to the United States Government, 327 false and fraudulent claims by seeking payment for $593,888.20 in prohibited FBO Invoicing Fees and Indirect Costs under the BTOP award grant.

173.    Defendant Frontier ratified and benefited from all of the violations of the False Claims Act committed by Frontier's various officers, agents, and employees.

174.    The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act in the amount no less than $93,888.20.

175.    Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729(a)(1).

176.    Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the 327 false claims submitted to the United States pursuant to 31 U.S.C. § 3729(a)(1).

177.    Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. § 3729(a)(3).

## COUNT IV
### *31 U.S.C. § 3729(a)(1)(A)*

178.    Each of the foregoing allegations is realleged and incorporated hereby.

179.    Defendants Frontier and Mr. McKenzie knowingly presented, or caused to be presented, to the United States Government, false and fraudulent claims by seeking payment for materials and services that were not provide under the BTOP award grant, including, but not limited to, 1) including excessive maintenance coils in the "as-built" amounts; 2) falsifying the total length of fiber built; and 3) falsifying the number of fiber strands provided on multiple jobs.

180.    Defendant Frontier authorized, ratified and benefited from all of the violations of the False Claims Act committed by Frontier's various officers, agents, and employees.

41

181.    The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act.

182.    Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729(a)(1).

183.    Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the false claims submitted to the United States pursuant to 31 U.S.C. § 3729(a)(1).

184.    Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. § 3729(a)(3).

**COUNT V**
***31 U.S.C. § 3729(a)(1)(B)***

185.    Each of the foregoing allegations is realleged and incorporated hereby.

186.    Defendants knowingly made, used, or caused to be made or used, 646 false records or statements material to false or fraudulent claims that were presented to the United States Government for payment from funds restricted to an approved NTIA grant award for construction of a mile middle-mile network for work that Frontier provided constructing a non-approved Last-Mile project.

187.    Defendant Frontier authorized, ratified and benefited from all of the violations of the False Claims Act committed by its various officers, agents, and employees.

188.    The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act in the amount of not less than $41,531,832.25.

189.    Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729(a)(1).

190.   Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the 646 false records or statements knowingly made, used, or caused to be made or used by the Defendants pursuant to 31 U.S.C. § 3729(a)(1).

191.   Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. § 3729(a)(3).

**COUNT VI**
*31 U.S.C. § 3729(a)(1)(B)*

192.   Each of the foregoing allegations is realleged and incorporated hereby.

193.   Defendants knowingly made, used, or caused to be made or used, 365 false records or statements material to false or fraudulent claims that were presented to the United States Government for payment of no less than $4,553,387.31 in prohibited Loadings/Indirect Costs under the BTOP award grant.

194.   Defendant Frontier authorized, ratified and benefited from all of the violations of the False Claims Act committed by Frontier's various officers, agents, and employees.

195.   The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act in the amount of $4,553,387.31.

196.   Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. §3729(a)(1).

197.   Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the 365 false records or statements knowingly made, used, or caused to be made or used by the Defendants pursuant to 31 U.S.C. §3729(a)(1).

198.   Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. §3729(a)(3).

## COUNT VII
### *31 U.S.C. § 3729(a)(1)(B)*

199.    Each of the foregoing allegations is realleged and incorporated hereby.

200.    Defendants knowingly made, used, or caused to be made or used, 327 false records or statements material to false or fraudulent claims that were presented to the United States Government for payment of no less than $593,888.20 in prohibited FBO Invoicing Fees/Indirect Costs under the BTOP award grant.

201.    Defendant Frontier ratified and benefited from all of the violations of the False Claims Act committed by Frontier's various officers, agents, and employees.

202.    The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act in the amount no less than $593,888.20.

203.    Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729(a)(1).

204.    Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the 327 false records or statements knowingly made, used, or caused to be made or used by the Defendants pursuant to 31 U.S.C. §3729(a)(1).

205.    Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. § 3729(a)(3).

## COUNT VIII
### *31 U.S.C. § 3729(a)(1)(B)*

206.    Each of the foregoing allegations is realleged and incorporated hereby.

207.    Defendants Frontier and Mr. McKenzie knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims that were presented to the United States Government for payment of materials and services that were not provide under the BTOP award grant, including, but not limited to, 1) excessive maintenance

44

coils in the "as-built" amounts; 2) falsifying the total length of fiber built; and 3) falsifying the number of fiber strands provided on multiple jobs.

208.    Defendant Frontier authorized, ratified and benefited from all of the violations of the False Claims Act committed by Frontier's various officers, agents, and employees.

209.    The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act.

210.    Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729(a)(1).

211.    Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each false record or statement knowingly made, used, or caused to be made or used by the Defendants pursuant to 31 U.S.C. § 3729(a)(1).

212.    Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. § 3729(a)(3).

**COUNT IX**
***31 U.S.C. § 3729(a)(1)(C)***

213.    Each of the foregoing allegations is realleged and incorporated hereby.

214.    All Defendants conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A) and (B) by engaging in conduct, including, but not limited to: 1) providing false records and information for use in the State's grant application and subsequent claims for payment; 2) falsifying the need for a Mitigation Plan; 3) engaging in conduct to hide the fraudulent claims submitted to the United States from being discovered; 4) assisting other Defendants in submitting fraudulent claims; 5) agreeing to engage in a pattern of conduct to allow the fraudulent claims to be submitted to, and paid by, the United States; and 6) advising other Defendants on how to submit fraudulent claims to be paid by the United States.

215.    The United States Government and the public have been damaged in the amount of $41,531,832.25 as a result of the Defendants' violations of the False Claims Act.

216.    Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729(a)(1).

217.    Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the 646 false claims submitted to the United States pursuant to 31 U.S.C. § 3729(a)(1).

218.    Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. §3729(a)(3).

## DAMAGES

WHEREFORE, PLAINTIFF/RELATOR demands judgment against the DEFENDANTS for damages and relief as follows:

a.      All compensatory damages to which it is entitled;

b.      All Civil Penalties to which it is entitled

c.      Attorney's fees and costs;

d.      All statutory relief to which PLAINTIFF/RELATOR is entitled;

e.      All legal relief to which PLAINTIFF/RELATOR is entitled;

f.      All equitable relief to which PLAINTIFF/RELATOR is entitled;

g.      Pre-judgment and post-judgment interest; and

h.      Any and all other relief this Honorable Court deems appropriate.

PLAINTIFF/RELATOR demands a trial by jury upon all issues triable by a jury raised herein.

PLAINTIFF/RELATOR,
**CITYNET, LLC**

By Counsel,

Nicholas S. Preservati (WV Bar #8050)
**PRESERVATI LAW OFFICES PLLC**
P.O. Box 1431
Charleston, WV 25325
(304)-346-1431 Telephone
(304)-346-1744 Facsimile

47