## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CITYNET, LLC, on behalf      )
of the United States of America,      )
     )
      Plaintiff/Relator,      )
     )     **Civil Action No.: 2:14-CV-15947**
v.      )
     )
**FRONTIER WEST VIRGINIA INC.**, a      )     **Judge: Copenhaver**
West Virginia corporation, **KENNETH**      )
**ARNDT**, individually, **DANA WALDO**,      )
Individually, **MARK McKENZIE**,      )
Individually, **KELLY GOES,** individually**,**    )
**JIMMY GIANATO**, individually, and      )
**GALE GIVEN**, individually,      )
     )
      Defendants.      )

## FIRST AMENDED QUI TAM COMPLAINT

RELATOR CITYNET, LLC brings this First Amended Qui Tam action in the name of the United States of America, by and through its undersigned counsel, and alleges as follows:

## INTRODUCTION

1.     On February 17, 2009 the American Recovery and Reinvestment Act ("the Act") became law. Through the Act's Broadband Technology Opportunities Program ("BTOP"), $4,700,000,000 in federal funds were distributed by the U.S. Department of Commerce to expand broadband technology throughout the United States. The goal of the program was to create jobs, expand broadband access in rural, remote and underserved communities, and to encourage demand for broadband. To accomplish these goals, the program was designed to allow for the construction of open access middle-mile broadband networks.

2.     Defendants Frontier, Arndt, Waldo, McKenzie, Goes and Gianato assisted with the submission of an application by the West Virginia Executive Office ("WVEO") for

$126,323,296.00 in funds from the BTOP grant. The WVEO application misrepresented that funds would be used to build a middle-mile network that would connect 1,064 community anchor institutions ("CAI") such as schools, libraries, and healthcare facilities, to internet peering points located at Frontier's central offices.  The WVEO application provided that the project would construct 2,429 miles of an open access network and the construction and upgrade to the State of West Virginia's emergency microwave tower system.  In addition to these material misrepresentations, the WVEO application contained a series of material misrepresentations based, in part, on information provided by Frontier and its representatives.

3.     This case seeks to recover damages and civil penalties on behalf of the United States of America arising from the Defendants false and fraudulent records, statements and claims made and/or caused to be made in connection with the WVEO application for the BTOP grant and the subsequent use and/or misuse of the funds awarded to the State of West Virginia and paid to Defendant Frontier from that grant, all in violation of the Federal False Claims Act, 31 U.S.C. §3729, *et. seq.* ("the FCA").

4.     The violations of the FCA involved a scheme by which the Defendants made or caused to be made misrepresentations to the federal government that they would use middle-mile grant funds to construct and enhance an open access network that linked essential CAIs to internet peering points located at Frontier's central offices.  Instead, Frontier, with the assistance and/or acquiescence of the individual Defendants, used middle-mile funds to build last mile facilities and service drops thereby expanding its own network and essentially rendering the newly constructed facilities useless to competitors.  Moreover, despite the fact that Frontier built less than half the number of miles of fiber represented to be built to less than half the number of CAIs, Defendants caused the same amount of money to be paid to Defendant, Frontier.

2

5.     Defendants further violated the FCA by causing the payment of hundreds of invoices that included prohibited and/or unlawful charges under the grant award. The fraud included the payment of 365 Frontier invoices that included prohibited Indirect Costs and 327 invoices that included unlawful facility build out fees.

6.     Defendants Frontier and Mark McKenzie defrauded the Government by seeking payment for materials and service not permitted under the grant award, including but not limited to, 1) excessive maintenance coils in the "as-built" maps; 2) falsifying the total length of fiber built; and 3) falsifying the number of fiber strands provided on multiple jobs.

## PARTIES

7.     Plaintiff/Relator Citynet, LLC ("Citynet", "Relator" and/or "Plaintiff"), is a West Virginia limited liability company with a principle place of business located in Bridgeport, West Virginia.

8.     Defendant Frontier West Virginia Inc. ("Frontier"), is a West Virginia corporation with a principal place of business located at 1500 MacCorkle Avenue, SE, Charleston, WV 25396.

9.     During the relevant time period, Defendant Kenneth Arndt was a citizen of West Virginia residing in the Southern District of West Virginia.  At all relevant times, Mr. Arndt was General Manager and Senior Vice President of Southeast Region at Frontier Communications Corporation.

10.    During the relevant time period, Defendant Dana Waldo was a citizen of West Virginia residing in the Southern District of West Virginia. Mr. Waldo was at all relevant times the Senior Vice President and General Manager of Frontier West Virginia, Inc.

11.     Defendant Mark McKenzie, is a citizen of West Virginia residing in the Southern District of West Virginia, and was at all relevant times was employed with  Frontier West Virginia, Inc.

12.     Defendant Gale Given, is a citizen of West Virginia residing in the Southern District of West Virginia. On July 1, 2010 Gale Given was named the Regional President of Verizon covering the states of Pennsylvania, Delaware, and West Virginia.  She previously served as Verizon's President of West Virginia from 2000-03.  Since July 1, 2012, Given has been the West Virginia State Technology Officer.

13.     Defendant Kelly Goes, is a citizen of West Virginia residing in the Southern District of West Virginia. At all relevant times, Kelly Goes was employed as Secretary of the West Virginia Department of Commerce.

14.     Defendant Jimmy Gianato, is a citizen of West Virginia residing in the Southern District of West Virginia. At all relevant time periods Gianato was the Director of the West Virginia Division of Homeland Security and Emergency Management.

## JURISDICTION & VENUE

15.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729 et seq.

16.     This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

17.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732 because: 1) All but one of the individual Defendants reside in this District; 2) Frontier transacts business in this District and did so at all times relevant to this Complaint; and 3) the Defendants committed acts proscribed by 31 U.S.C. § 3729 – acts giving rise to this action – within this District.

18.     Before filing its Complaint, Citynet served a copy of the same upon the United States, together with a written disclosure statement setting forth and enclosing all material evidence and information it possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

19.     Citynet has complied with all other conditions precedent to bringing this action.

20.     Citynet is the original source of, and has direct and independent knowledge of, all publicly disclosed information on which any allegation herein might be deemed based, and has voluntarily provided such information to the Government of the United States before filing this action.

**Broadband Technology Opportunities Program Grant Applications**

21.     Pursuant to the American Recovery and Reinvestment Act, a Notice of Funds Availability and Solicitation of Applications ("NOFA") was issued in the Federal Register, Volume 75, Number 14 which stated that the grant applicant must provide documentation showing that the proposed projects would not be implemented "but for" the Federal grant assistance.

22.     Thirty-four (34) West Virginia related proposals, including one by Citynet, were submitted to the National Telecommunications and Information Administration ("NTIA") for consideration under BTOP for multiple Middle-Mile projects, Last-Mile projects, sustainability broadband adoption projects, and public computer center projects.

23.     Citynet met with the WVEO on multiple occasions and provided it with a copy of its grant application for consideration.

24.     Defendant Frontier submitted a grant application seeking approximately $40,674,893 to construct a Last-Mile network that would provide 1,793 miles of broadband fiber to CAI's.   Frontier's proposed system design included the placement of Cisco 3400 series

equipment in each of the identified critical facilities.  (See Frontier's Grant Application attached hereto as "Exhibit 1").

25.     Frontier concluded its Executive Summary with the following statement, "Completion of this project is vigorously supported by the Governor's office of the State of West Virginia." *Id.*

26.     Citizens Telecommunications Company of West Virginia ("CTC") a subsidiary of Defendant, Frontier, submitted a grant application seeking $14,499,017 to construct a Last-Mile project that would construct 636 miles broadband fiber to select "critical facilities" such as schools, libraries, primary care centers, nursing homes, hospitals, rural health care centers and 911 centers (collectively known as "Community Anchor Institutions" and/or "CAI") that would also use CISCO ME 3400 routers in the identified critical facilities.  (See CTC Grant Applications attached hereto as "Exhibit 2").

27.     The WVEO, through Defendant Kelly Goes, also submitted an application for $126,323,296 for its project entitled "West Virginia Statewide Broadband Infrastructure Project – Middle-mile" to the NTIA.

28.     The WVEO proposed project contained three distinct components: 1) the provision of 1,064 Cisco routers to each of the CAIs; 2) the construction of, and upgrade to, the State's emergency microwave tower system; and 3) the construction of a 2,429 mile "open-access" Middle-Mile network that would provide broadband service to the 1,064 CAIs throughout the state.  (See WVEO Grant Application attached hereto as "Exhibit 3").

29.     Significantly, the combined amount of fiber to be built in the Frontier and CTC applications was 2,429 miles of fiber, the exact same amount initially proposed by the WVEO application.

30.     The WVEO, at the direction of Defendant Goes, simply took CTC and Frontier's Last-Mile BTOP applications, with Frontier's knowledge, and regenerated them as its own Middle-Mile project in order to make it more attractive to the NTIA.

31.     Defendants Frontier, McKenzie, Goes, Gianato, and others participated in the preparation of the WVEO grant application with the intent that Frontier be the actual recipient of the grant funds awarded to the WVEO.  (See January 7, 2010 email wherein Defendant Gianato indicates mileage estimates in application were provided by Verizon/Frontier attached as "Exhibit 4).

32.     Frontier and Verizon also assisted the State in identifying the amount of new fiber to be constructed from the Central Offices to the CAIs.  On January 7, 2010, the NTIA specifically asked the State "are the 2,429 fiber miles reported in your project all to be constructed new or do they include some existing fiber.  If so, how much of each?"  On January 7, 2010, Defendant Gianato responded, "Based on the estimates from Verizon and Frontier, the fiber is new fiber that does not exist today."  (See January 7, 2010 request from NTIA attached hereto as "Exhibit 5").

33.     The WVEO certified that 1) the information in the grant application contained material representations of fact and were true and correct; 2) all sub-grantees and subcontractors would comply with the terms and conditions of the federal grant award; 3) that a false or fraudulent statement or claim on the grant application was grounds for termination of the grant award, criminal prosecution, and civil violations of the False Claims Act.  (See BTOP Special Award Conditions attached as "Exhibit 6").

34.     The WVEO, Defendants Goes, Gianato, and Frontier were aware that middle mile projects were given special priority under the NOFA.

35.    During the time that the BTOP grant applications were being submitted, Frontier was in merger negotiations with Verizon regarding said landlines, including those in the State of West Virginia.  During these merger negotiations, Defendant Goes openly inquired of Frontier's plan to request stimulus funding so that the State could "make our plans compatible with Frontier's."  Frontier and Verizon actively assisted the State in drafting its grant application by providing anticipated construction plans, and engineering information.

36.    During the merger negotiations, but prior to any BTOP grant being awarded, Verizon, Frontier and the State already contemplated that the State would receive a BTOP grant and that a substantial portion of the State's grant would go to Frontier.

37.    On January 14, 2010, the State informed Frontier that it was expected to make a capital investment of $250-$300 million in West Virginia in order for its merger with Verizon to be approved by the West Virginia Public Service Commission.  The State also expressly stated that the $250-$300 million "shall not include the $60 million dedicated to broadband expansion." (See January 15, 2010 communication attached hereto as "Exhibit 7").

**Fraud In The WVEO Application And Supporting Documents**

38.    The WVEO application contained a series of false statements intended to insure that the grant would be awarded, and Defendants, Frontier, Arndt, McKenzie, Goes, Gianato, and others caused the false statements.

39.    The WVEO application misrepresented that the fiber would comprise a single interconnected network by connecting each CAI to Frontier's local central offices, which in turn would allow other service providers to connect at the Frontier Central Office to provide their Last-Mile services to consumers.  (See "Exhibit 3").

8

40.     "Central Offices" are the locations where Frontier maintains its equipment to route telephone calls to and from end users.  Significantly, by connecting the fiber from the CAI to the Central Office, other service providers, who are permitted to use space in the Frontier Central Office for purposes of connecting to Frontier's network, would be able to simply connect at the Frontier Central Office in order to provide their Last-Mile services to consumers.

41.     The WVEO application misrepresented that no part of the "service layer" (i.e. Last-Mile) would be funded by the BTOP grant funds.  See Exhibit 3, pp. 12, 26.

42.     The WVEO application misrepresented that the proposed 1,064 CAIs did **not** have fiber service.  See Application, p. 33 and Spreadsheet identifying CAIs attached as "Exhibit 8"

43.     Despite representing in the grant application that 1,064 CAIs identified by Frontier as needing fiber, 416 of the CAIs already had existing fiber, no longer were in existence or had received other stimulus.  For example, 20 of the 33 CAIs identified in Boone County as needing fiber already had existing fiber.  Ninety-four (94) of the 115 CAIs identified in Kanawha County did not need new fiber.  Seven (7) of the eleven (11) CAIs identified in Lewis County did not need fiber.  Twenty-one (21) of the thirty-three (33) CAIs identified in Marion County did not need fiber.  Thirty (30) of the forty-five (45) CAIs identified in Raleigh County did not need new fiber.  Twenty-two (22) of the thirty-three (33) CAIs identified in Wayne County did not need new fiber.  (See Exhibit 8).

44.     The actual number of CAIs needing new fiber was only 648.

45.     With the decreased number of CAIs, the amount of new fiber miles that needed to be built went from the 2,429 miles in the application and then was decreased from 915 to 536.

As set forth below, the 536 mile figure was inflated because it "double counted" miles and misrepresented proposed distances for many of the CAIs.

46.     For example, it was estimated that it would require 73,250 feet of new fiber to provide broadband service to the Hygenia Facilities Foundation in Boone County, yet LCR BB03A32 indicates that only 1,201 feet of fiber was actually constructed.  It was estimated that the Fayette Plateau Vocational Center needed 10,157 feet of new fiber.  LCR BB10A03 reveals that only 450 feet of new fiber was required and constructed.  The estimated fiber build to hundreds of remaining CAIs were grossly inflated.  (See Exhibit 9).

47.     Frontier and the WVEO also "double-counted" miles to inflate the total under the grant application by including the mileage of fiber necessary to connect to the Central Office for *two* CAIs despite the fact that only one was actually directly connected to the Central Office.

48.     For example, the Martinsburg Correctional Center in Berkeley County is located directly beside the Eastern Regional Jail in Martinsburg.  LCR BB2A02 shows that it took 6,650 feet of new fiber to provide broadband to the Correctional Center.  LCR BB02A13 shows that it only took 794 feet of fiber to connect the Eastern Regional Jail to the Correctional Center.  However, when Frontier estimated the new fiber mileage to the State, it represented that it would take 10,000 feet of new fiber to connect the Correctional Center *and* another 10,000 feet to connect the Eastern Regional Jail.  By double-counting the build back to the Central Office for both jobs, Frontier inflated the estimated mileage by 10,000 feet on this job alone.  (See spreadsheet listing "double-counted" projects attached hereto as "Exhibit 9").

49.     Likewise, the New Cumberland State Police Troop 1 and the John D. Rockefeller Voc-Tech Center in Hancock County were identified as two of the original 1,064 CAIs needing fiber.  These two CAIs are located only a few hundred feet from each other off of County

10

Highway 66/1 in Hancock County.  It was estimated by Frontier that it would require 17,600 feet of new fiber to connect the State Police Troop to the Central Office.  It was also estimated by Frontier that it would take 17,600 feet of new fiber to connect the Voc-Tech Center to the Central Office.  LCR BB15A05 shows that the Voc-Tech Center was not directly connected with fiber back to the Central Office.  Instead, 1,000 feet of fiber was used to connect the Voc-tech Center to the State Police Troop building.  Therefore, the 17,600 feet distance was double-counted and the proposed mileage was overstated by 16,600 feet.  (*Id.*).

50.     The build-out of the fiber back to the Central Office was double-counted on at least fifty-eight (58) projects in thirty-two (32) Counties.  (*Id.*).

51.     Frontier and the WVEO also misrepresented the proposed distances for many of the CAIs by simply inputting the same number for several projects.  For example, it was estimated that the Clarksburg Parole Office would require *4,390* feet of new fiber, consisting of five (5) new poles, *3,882* feet of aerial fiber and *508* feet of buried fiber.  (See Exhibit 10 identifying all projects with 4,390 feet of proposed new fiber).

52.     Incredibly, there were thirty-six (36) CAIs in seven different Counties that each required the exact same *4,390* feet of new fiber, consisting of five (5) new poles, *3,882* feet of aerial fiber and *508* feet of buried fiber.  (*Id.*).

53.     Defendants misrepresented that no middle mile network existed in West Virginia when in fact Defendant Arndt advised West Virginia representatives that 90 % of the stimulus project either existed or would be completed shortly after the Frontier acquisition of Verizon. (See Ken Arndt email attached as "Exhibit 11", which provides, "As a follow-up to our meeting regarding the middle mile broadband project, I have asked my team to review our post acquisition fiber optic network plan and compare to the proposed stimulus plan.  As you can see

from the attached file, *approximately 90% of the stimulus project either exists or will be completed shortly after the acquisition is closed*.").

54.     Defendants misrepresented that the proposed project complied with NOFA because no private entity could afford to build the $42,000,000.00 proposed network and that the network would not be built "but for" the federal grant despite knowing that Frontier had already committed to spend $279,000,000.00 to upgrade its facilities and infrastructure in West Virginia in order to gain approval of the Verizon merger.  See, Exhibit 11 January 14, 2010 email between Kelly Goes and Frontier.

55.     Defendants further misrepresented that the broadband services purchased by the State of West Virginia from Frontier/Verizon could be resold by the State of West Virginia to individuals and private businesses when in fact they could not be resold.  Thus, the CAIs that received broadband under the WVEO project would be the ultimate end-user of only Frontier/Verizon services which in turn made the project a Last-Mile project.

56.     Despite marketing the WVEO application as a "Middle-Mile" solution, Defendant Goes advised Citynet that $40 million of the BTOP funds were going to be given to Frontier to construct "tails" to government facilities from the nearest Frontier hub or similar facility and that the construction of the "Last-Mile" tails would constitute the full extent of fiber construction under the WVEO's plan.

57.     The overall effect of the misrepresentations in the WVEO grant application led to the grant being awarded to the WVEO for the sole benefit of Frontier.

**BTOP Grant Awarded to West Virginia**

58.     On or about February 12, 2010, the WVEO was awarded $126,323,296.00 for the construction of the *West Virginia Statewide Broadband Infrastructure Project – 'Middle-Mile'*

dated 8-20-09 and revision dated 2/5/10.   (See WVEO Budget Narrative attached hereto as "Exhibit 12").

59.     The grant expressly stated that by accepting the grant, the recipient agreed to comply with terms and conditions that included: 1) the Department of Commerce Financial Assistance Standard Terms and Conditions; 2) Award Specific Special Award Conditions; 3) Line Item Budget; 4) 15 C.F.R. Part 24, Uniform Administrative Requirements for Grants and Agreements to States and Local Governments; 5) OMB Circular A-87, Cost Principals for State, Local, and Indian Tribal Governments; 6) OMB Circular A-133, Audits of States, Local Governments, and Non-Profit Organizations; 7) Department of Commerce Pre-Award Notification Requirements for Grants and Cooperative Agreements; and 8) DOC American Recovery and Reinvestment Act Award Terms.

60.     The Special Award Conditions specifically stated, "This award number supports the work described in the recipients proposal entitled *West Virginia Statewide Broadband Infrastructure Project – 'Middle-Mile'* dated 8-20-09 and revision dated 2/5/10 for budget narrative which is incorporated into the award by reference."  (See "Exhibit 12").

61.     The proposed budget narrative contained eleven potential categories of project costs that were to be identified by the applicant with a narrative summary of the items in each category.  The amount of BTOP funds applied to each category by the State is as follows:

1.  Administrative & Legal Expenses           $0
2.  Land, Structures and Rights of Way        $0
3.  Relocation Expenses and Payments          $0
4.  Architectural and Engineering Fees        $23,639,999
5.  Other Architectural and Engineering Fees  $0
6.  Project Inspection Fees                    $0
7.  Site Work                                  $0
8.  Demolition and Removal                     $0
9.  Construction                               $49,094,657
10. Equipment                                  $53,588,640

13

| 11. Miscellaneous | $0 | . |
|---|---|---|
| **Total:** | **$126,323,296** | |

62.     The Budget Narrative also had an addendum provision that read, "If indirect costs (*i.e.*, indirect, overhead, general and administrative, facilities and administration, etc.) and/or fringe benefits are included in the budget, please provide a copy of your existing Negotiated Indirect Cost Recovery Agreement (NICRA), if available.  If the NICRA is not available or is not consistent with the rates/calculations in the budget, please provide an explanation of how the amounts were calculated.  Please clearly list the manner in which indirect costs are calculated in the budget."

63.     No indirect costs were identified by the WVEO in its BTOP application.

64.     The Department of Commerce Financial Assistance Standard Terms and Conditions precluded payment of indirect costs not included in a line item budget. (Department of Commerce Financial Assistance Standard Terms and Conditions, p. 10)

65.     The ARRA Award Terms, 74 FR 33104 also prohibited grant funds from being used to fund the operating expenses of the project, including fixed and recurring costs of a project.   **74 FR 33104 (IV)(D)(2)(b)(Award funds may not be used . . . to fund operating expenses of the project, including fixed and recurring costs of a project.)**

66.     The Department of Commerce Pre-Award Notification Requirements for Grants and Cooperative Agreements prohibited the payment of indirect costs unless they are "specifically included as a line item in the approved budget incorporated into the award."

67.     Grant recipients are prohibited from transferring amounts budgeted for direct costs to the indirect costs line item without prior written permission from the grant officer.

68.     There were seven amendments to the grant award, none of which included a request for payment of indirect costs.

**Frontier Sub-Recipient Of Grant Terms And Conditions**

69.     Prior to submitting the application, the WVEO and Frontier agreed that, if the State's application was granted, the State would make Frontier a sub-recipient of the grant and allow it to construct the 915 mile fiber portion of the State's project.

70.     The WVEO and Frontier formalized their agreement that Frontier would be a sub-recipient of the grant awarded to the WVEO with a Memorandum of Understanding ("MOU") dated October 1, 2010.

71.     The Memorandum of Understanding with Frontier provided that Frontier would serve as a "sub-recipient" of the grant to establish a middle-mile broadband network to over 1,000 points of interest throughout West Virginia.   See MOU between Frontier and WVEO attached hereto as "Exhibit 13").

72.     As a sub-recipient of the grant, Frontier agreed to comply with all of the grant's Special Award Conditions, as well as all other federal laws, rules and regulations governing the grant award.

73.     Pursuant to the MOU, Frontier agreed to comply with all accounting requirements contained in  the NOFA, invoice the WVEO for eligible costs under the Grant and that costs not eligible under the Grant would be billed separately to WVEO.  See, MOU, p. 3.

74.     Under the MOU, Frontier agreed to comply with the special award conditions associated with the Grant.  See, MOU, p. 3.

**Project Fraud**

75.     Instead of constructing the Middle-Mile network Frontier agreed to construct in the MOU, Frontier began building the Last-Mile project contemplated in its joint application with CTC.

76.     Frontier did not have to build the 915 mile network contemplated by the State because the vast majority of the proposed Middle-Mile network already existed.  Importantly, the "open access" requirements of the BTOP award did not apply to Frontier's existing Middle-Mile network, because it was not constructed with BTOP funds.  Therefore, Frontier could deny its competitors access to its existing Middle-Mile network.

77.     Moreover, Frontier did not want to build the proposed 915 mile open-access Middle-Mile network because it would be catastrophic to Frontier's business in that it would allow competition from other broadband service providers.

78.     Rather than constructing fiber from Central Office to Central Office, or from the CAI all of the way back to the Central Office as represented in the WVEO application, Frontier merely constructed fiber from the CAI to Frontier's nearest utility pole (*i.e.*, driveways to local streets).

79.     The decision to approve not building fiber back to the Central Office was unilaterally made by Defendant Gianato.

80.     As part of the project, "areas of potential affect" or APE maps were provided to the NTIA that identified the proposed route for the fiber to be built to each of the CAIs and included the fiber footage for each build.

81.     The APE maps showed fiber would be built from the Frontier Central Office to the CAI.

82.     Following construction, Frontier submitted "as-built" maps that showed the actual route of the fiber built.  Significantly, the "as-built" maps were not standard engineering maps typically used in the industry.

16

83.     Contrary to the APE map, Frontier "as-built" maps demonstrated that fiber was not constructed back to the Central Office, but instead a "service drop" was installed from the CAI to the nearest utility pole.

84.     These drops rendered the fiber built useless to third parties thus defeating the open access conditions set forth in the grant award.

85.     Frontier has expressly admitted in written comments to the Federal Communications Commission that the facilities that it constructed using BTOP funds were Last-Mile rather than the required Middle-Mile.  Specifically, on April 7, 2014, Frontier submitted written comments to the Federal Communications Commission in WC Docket No. 13-184.  In those comments Frontier admitted, "Through the Broadband Technology Opportunities Program (BTOP), part of the American Recovery and Reinvestment Act, the State of West Virginia chose Frontier to connect 192 schools with ***last-mile*** fiber and routers to enable high-capacity broadband."  (emphasis added) (See Frontier FCC Testimony attached hereto as "Exhibit 14").

86.     Frontier also engaged in a practice of billing the BTOP grant for material and labor it did not provide, and for fiber lengths that were not constructed.

87.     A sample of Frontier's engineering maps demonstrates that Frontier used excessive maintenance coils to make up for fiber not constructed.

88.     On LCR BB17A06, Frontier billed the State for constructing 1,380 feet of fiber. However, its engineering map shows that it only built 735 feet of fiber and that it placed 600 feet of fiber in maintenance coils.  (See sample photograph of Frontier maintenance coil attached hereto as "Exhibit 15").

89.     On LCR BB46A08, Frontier billed the State for constructing 900 feet of fiber. However, its engineering map shows that it only built 482 feet of fiber and that it placed 200 feet of fiber in maintenance coils for a total of 682 feet.

90.     On LCR BB17A09, Frontier billed the State for constructing 1,587 feet of fiber. However, its engineering map shows that it only built 978 feet of fiber and that it placed 500 feet of fiber in maintenance coils.   This was a practice that was routinely utilized by Frontier to inflate its invoices in an attempt to draw down the surplus BTOP funds.  (See Exhibit 16 listing projects with excessive maintenance loops and falsified fiber distances).

91.     Accordingly, Frontier used the BTOP funds to: 1) expand its existing network within its service territory; 2) ensure that its competitors would not have access to the network; and 3) lock the State (the CAIs) into doing business with Frontier in perpetuity.   Frontier submitted a total of 646 invoices to the State for a total amount of $41,531,832.25.[1]

92.     Frontier devised a plan to expend all of the $42,000,000 of the budgeted BTOP funds by: 1) charging for impermissible "loadings" that were nothing more than prohibited indirect costs; 2) fabricating the amount of fiber built by utilizing maintenance coils; 3) fabricating the amount of fiber built after the length of maintenance coils had already been considered in the total; 4) double-billing for "Facility Build-Outs" that were already contemplated as part of the original construction estimate; and 5) billing for inappropriate "invoicing fees" that were not allowed under the grant.

93.     In their respective applications, both Frontier and CTC estimated the cost to construct fiber would average $24,816.00 per mile.  Using their own estimates, the cost of the

---

[1] The amount Frontier billed the State for building 590 miles of fiber is $856,939 more than the amount Frontier represented it would take it to build the 1,793 miles of fiber in its proposed BTOP project. The State of West Virginia has not processed the remaining $300,000 (approximate) in Frontier invoices due to some minor discrepancies in the submitted invoices that exist between the State and Frontier records.

536 miles of fiber built by Frontier should have cost $12,700.00. Frontier, however, received triple that amount of money.

94.     Defendants, Given and Gianato assisted Frontier in implementing its plan by: 1) knowingly approving improper "loading" and "invoice processing fee" charges; 2) failing to verify Frontier's invoices and the corresponding charges; 3) failing to verify that Frontier completed the work billed for; and 4) purposefully holding Frontier's invoices for up to eighteen (18) months at a time before processing them so that the other service providers would not be able to determine whether there would be surplus BTOP funds available. The majority of these changes occurred after Gale Given became the Chief Technology Officer.

**Fraudulent Invoices - Indirect Costs**

95.     Frontier caused the federal government to pay 365 Frontier invoices that included prohibited Indirect Costs.

96.     Frontier attempted to obtain reimbursement for indirect costs before Defendant Given became the Chief Technology Officer, but was denied by Col. Michael Todorovich who advised the Grant Implementation Team and WVOT that indirect costs were not reimbursable under the grant. (See Col. Todorovich Memorandum attached hereto as "Exhibit 17").

97.     Initially, Mr. Gianato requested that Col. Todorovich create a "bucket of money" that could be accessed by the State at any moment with no oversight or preapproval to obtain the funds. Col. Todorovich refused to allow the BTOP funds to be accessed unless it was to pay for construction that had already been completed.

98.     The WVOT developed a protocol for processing vendor invoices that were submitted for payment with BTOP funds. First, the vendor would submit its invoice to the WVOT, which would review it (match it against the original LCR) and approve it. The invoice

19

would then be sent to GIT member Todorovich to ensure that the invoice had received the proper approval from the WVOT and to ensure that there were sufficient BTOP funds available to pay the invoice.  The invoice was then sent to the Governor's accountant for review before it was entered into the Department of the Treasury's Automated Standard Application for Payments ("ASAP") system.  Once the invoice was entered into ASAP, the BTOP funds were forwarded to the WVOT.  The WVOT then forwarded the BTOP funds directly to Frontier.

99.    Defendant Gale Given, the former President of Verizon, was appointed as the new State Technology Officer on July 1, 2012 who immediately took exclusive control over approving Frontier's invoices for the BTOP project.

100.    Within one (1) month of Defendant Given becoming Chief Technology Officer, every one of Frontier's invoices that were submitted for payment contained a "Loadings" charge.

101.    Per Frontier's own invoices, the loading charge was for "allocated *indirect costs such as vehicles, accounting, administration*, etc."  These indirect costs were in direct violation of the NOFA, ARRA Award Terms, 74 FR 33104 and the Special Award Conditions.

102.    Defendant Given approved the Frontier invoices containing the loading fee.  (See Sample Frontier Invoice with Loading Fee attached hereto as "Exhibit 18").

103.    In many instances, the indirect cost fee was higher than the original total cost estimate for the subject fiber build.  For LCR BB2A11, the original total construction estimate was $3,414.60 and the loading fee was $9,010.58.  For LCR BB2A13, the original total estimate was $5,121.44 and the loading fee was $8,357.54.  Frontier submitted 365 separate invoices with loadings fees.

104.    Frontier submitted 365 separate invoices with loadings fees totaling $4,553,387.31.  (See Exhibit 19 listing 365 invoices with "Loadings" fee).

20

105.     Even though Frontier often ended up building much less fiber than was originally estimated, its final charges were substantially higher than the original estimate.  According to LCR BB39A04 and LCR BB39A07, the combined fiber build for was only 9,650 feet, which is a 41.81% decrease from the original estimate.   Despite this decrease, the cost of the combined project went from $71,989 to $303,870.15, an increase of 422.10%, and included a Loading Fee of $186,870.15.

106.     Neither the State's line-item budget, nor its budget narrative accounted for indirect costs to be covered by the grant award.  In addition, the grant award was never amended to allow for indirect costs to be reimbursed under the grant.

**Fraudulent Invoices – Facilities Build Out (FBO) and Invoice Processing Fee**

107.     Frontier caused 327 invoices that included unlawful facility build out fees and invoice processing fees.

108.     Once Defendant Given was hired as Chief Technology Officer, Frontier began submitting invoices with separate "FBO" charges which allegedly consisted of the cost of construction inside the CAI to allow the facility to accept the newly placed fiber.

109.     Frontier claimed that the FBO was not included in the original estimate because need for the FBO was not discovered until the project was under way despite the fact that the WVEO specifically listed "DMARC Const. Cost", the equivalent of FBO costs, under the Customer Facility heading with a unit cost of $9,750 for 250 units.

110.     Thus, the FBO costs were part of the original estimate.

111.     Frontier simply created the fiction that they were not originally part of the estimate so that they could be double-billed.

112.    Once Defendant Given arrived, not only did Frontier double charge for FBO costs, it added a significant "invoice processing fees" to each of its FBO invoices.

113.    Defendant McKenzie provided the State with a breakdown of the costs associated with processing an FBO invoice which he claimed took sixteen (16) individuals a combined four hours to process a single FBO invoice at a cost of $1,808.00 to Frontier (*i.e.*, $452.00 per hour). (See M. McKenzie Letter attached hereto as "Exhibit 20").

114.    On February 25, 2013, Dana Waldo advised Defendant Given that the Frontier's cost of processing 330 FBO invoices would be $596,640.  Defendant Waldo stated that since the State had already paid the full amount for 27 invoices, it was going to drop the charge to $1,340.20 per invoice (*i.e.*, $335.05 per hour).  (See D. Waldo Letter attached hereto as "Exhibit 21").

115.    In several instances, the FBO Invoice Fee was charged even though no work was performed.

116.    Frontier submitted 84 invoices that included the $1,808 invoice fee for a total of $266,952.  These 84 invoices are referenced in the February 25, 2013 letter from Defendant Waldo to Defendant Given.

117.    Frontier submitted 243 invoices that included the reduced invoice fee of $1,340.20 totaling $326,936.80.  (See spreadsheet listing all invoice processing fees attached hereto as "Exhibit 22").

118.    In all, Frontier submitted 327 invoices that contained FBO invoice processing fees in the amount of $593,888.20.

*119.*    This processing fee is an indirect cost approved by Defendant Given that is prohibited under the BTOP award.

22

120.    Frontier and/or Defendants Given and Gianato also held hundreds of invoices for months which prevented other service providers from determining whether surplus BTOP funds would be available.

121.    Once Defendant Given arrived at the WVOT, the WVOT continued to hold the invoices until it could rush the processing and approval of a large number of the invoices at one time.

122.    Once Defendant Given arrived, the State started paying a $5.00 fee per invoice to have each and every Frontier invoice paid within twenty-four hours of its approval by her office.

**Mitigation Plan Fraud**

123.    During the course of construction, the NTIA asked the WVEO and Frontier to develop a "mitigation plan" that would allow the project to finish construction on time.

124.    Frontier drafted the Mitigation Plan which provided that the microwave tower portion of the project was on schedule and that no changes needed to be made, that the fiber build from WVU to the NRAO was on schedule and no changes needed to be made.

125.    However, Frontier's Mitigation Plan falsely represented that the construction to the 1,064 CAIs was delayed due to environmental issues and because of a fiber shortage related to the 2011 tsunami in Japan, which would require a reduction of CAIs receiving fiber from 1,064 to 668 and the number of miles to be reduced from 915 to 590.

126.    The reduction of the number of CAIs and miles of fiber was because the CAIs already had fiber at the time the application was submitted and the fiber already existed.[2]

---

[2] More than 325 of the initial 915 miles had already been built.  According to Mr. Arndt, approximately ninety-percent (90%) of the 915 miles existed or would be complete at the time the State submitted its application.  Until Frontier makes all of its engineering maps available, it will be impossible to determine how many miles were actually built, how many miles were maintenance loops, and how many miles of construction were fabricated.

**Waldo misrepresentations**

127.   Defendant Waldo stated that based upon the BTOP Project, West Virginia's national ranking for broadband connectivity would rise from being one of the bottom five states to one of the top five states.  (See D. Waldo Op-Ed attached hereto as "Exhibit 23").

128.   Defendant Waldo also misrepresented to the West Virginia Legislature that Frontier had not only constructed a robust Middle-Mile network, he also misrepresented that Frontier already had negotiated several interconnection agreements with broadband wholesalers and Last-Mile providers to allow them to use the new Middle-Mile network.

129.   After Mr. Waldo testified to the Legislature, the State issued its quarterly BTOP report on August 29, 2013.  That report revealed that no agreements had been entered into with broadband wholesalers or Last-Mile providers.  It also revealed that no agreements were even being negotiated.

130.   West Virginia was ranked 48th in the United States in broadband access by the FCC prior to the BTOP award.

131.   After the completion of the project and the expenditure of more than $126,000,000, West Virginia was ranked 53rd by the FCC in broadband access behind every other state, the District of Columbia, Guam and Puerto Rico.

132.   The United States of America has been defrauded by the Defendants herein in the exact manner that was predicted by Citynet in its September 9, 2010 letter to the NTIA.

<u>**COUNT I**</u>
*31 U.S.C. § 3729(a)(1)(A)*

133.   Each of the foregoing allegations is realleged and incorporated hereby.

134.   Defendants knowingly presented, or caused to be presented, to the United States Government, at least 646 false or fraudulent claims for payment or approval by seeking

payment from funds restricted to an approved NTIA grant award for construction of a mile middle-mile network for work that Frontier provided constructing a non-approved Last-Mile project.

135.    Defendant Frontier authorized, ratified and benefited from all of the violations of the False Claims Act committed by its various officers, agents, and employees.

136.    The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act in the amount of not less than $41,531,832.25.

137.    Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729(a)(1).

138.    Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the 646 false claims submitted to the United States pursuant to 31 U.S.C. §3729(a)(1).

139.    Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. § 3729(a)(3).

## COUNT II
### 31 U.S.C. § 3729(a)(1)(A)

140.    Each of the foregoing allegations is realleged and incorporated hereby.

141.    Defendants knowingly presented, or caused to be presented, to the United States Government, at least 365 false and fraudulent claims for payment or approval by seeking payment of no less than  $4,553,387.31 in prohibited Loadings and Indirect Costs under the BTOP award grant.

142.    Defendant Frontier authorized, ratified and benefited from all of the violations of the False Claims Act committed by Frontier's various officers, agents, and employees.

143.     The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act in the amount of $4,553,387.31.

144.     Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. §3729(a)(1).

145.     Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the 365 false claims submitted to the United States pursuant to 31 U.S.C. §3729(a)(1).

146.     Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. §3729(a)(3).

## **COUNT III**
### *31 U.S.C. § 3729(a)(1)(A)*

147.     Each of the foregoing allegations is realleged and incorporated hereby.

148.     Defendants knowingly presented, or caused to be presented, to the United States Government, 327 false and fraudulent claims by seeking payment for $593,888.20 in prohibited FBO Invoicing Fees and Indirect Costs under the BTOP award grant.

149.     Defendant Frontier ratified and benefited from all of the violations of the False Claims Act committed by Frontier's various officers, agents, and employees.

150.     The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act in the amount no less than $93,888.20.

151.     Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729(a)(1).

152.     Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the 327 false claims submitted to the United States pursuant to 31 U.S.C. § 3729(a)(1).

153.    Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. § 3729(a)(3).

**COUNT IV**
***31 U.S.C. § 3729(a)(1)(A)***

154.    Each of the foregoing allegations is realleged and incorporated hereby.

155.    Defendants Frontier and Mr. McKenzie knowingly presented, or caused to be presented, to the United States Government, false and fraudulent claims by seeking payment for materials and services that were not provide under the BTOP award grant, including, but not limited to, 1) including excessive maintenance coils in the "as-built" amounts; 2) falsifying the total length of fiber built; and 3) falsifying the number of fiber strands provided on multiple jobs.

156.    Defendant Frontier authorized, ratified and benefited from all of the violations of the False Claims Act committed by Frontier's various officers, agents, and employees.

157.    The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act.

158.    Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729(a)(1).

159.    Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the false claims submitted to the United States pursuant to 31 U.S.C. § 3729(a)(1).

160.    Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. § 3729(a)(3).

## COUNT V
### *31 U.S.C. § 3729(a)(1)(B)*

161.    Each of the foregoing allegations is realleged and incorporated hereby.

162.    Defendants knowingly made, used, or caused to be made or used, 646 false records or statements material to false or fraudulent claims that were presented to the United States Government for payment from funds restricted to an approved NTIA grant award for construction of a mile middle-mile network for work that Frontier provided constructing a non-approved Last-Mile project.

163.    Defendant Frontier authorized, ratified and benefited from all of the violations of the False Claims Act committed by its various officers, agents, and employees.

164.    The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act in the amount of not less than $41,531,832.25.

165.    Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729(a)(1).

166.    Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the 646 false records or statements knowingly made, used, or caused to be made or used by the Defendants pursuant to 31 U.S.C. § 3729(a)(1).

167.    Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. § 3729(a)(3).

## COUNT VI
### *31 U.S.C. § 3729(a)(1)(B)*

168.    Each of the foregoing allegations is realleged and incorporated hereby.

169.    Defendants knowingly made, used, or caused to be made or used, 365 false records or statements material to false or fraudulent claims that were presented to the United

States Government for payment of no less than $4,553,387.31 in prohibited Loadings/Indirect Costs under the BTOP award grant.

170.    Defendant Frontier authorized, ratified and benefited from all of the violations of the False Claims Act committed by Frontier's various officers, agents, and employees.

171.    The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act in the amount of $4,553,387.31.

172.    Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. §3729(a)(1).

173.    Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the 365 false records or statements knowingly made, used, or caused to be made or used by the Defendants pursuant to 31 U.S.C. §3729(a)(1).

174.    Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. §3729(a)(3).

## COUNT VII
### *31 U.S.C. § 3729(a)(1)(B)*

175.    Each of the foregoing allegations is realleged and incorporated hereby.

176.    Defendants knowingly made, used, or caused to be made or used, 327 false records or statements material to false or fraudulent claims that were presented to the United States Government for payment of no less than $593,888.20 in prohibited FBO Invoicing Fees/Indirect Costs under the BTOP award grant.

177.    Defendant Frontier ratified and benefited from all of the violations of the False Claims Act committed by Frontier's various officers, agents, and employees.

178.    The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act in the amount no less than $593,888.20.

29

179.     Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729(a)(1).

180.     Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the 327 false records or statements knowingly made, used, or caused to be made or used by the Defendants pursuant to 31 U.S.C. §3729(a)(1).

181.     Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. § 3729(a)(3).

### COUNT VIII
*31 U.S.C. § 3729(a)(1)(B)*

182.     Each of the foregoing allegations is realleged and incorporated hereby.

183.     Defendants Frontier and Mr. McKenzie knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims that were presented to the United States Government for payment of materials and services that were not provide under the BTOP award grant, including, but not limited to, 1) excessive maintenance coils in the "as-built" amounts; 2) falsifying the total length of fiber built; and 3) falsifying the number of fiber strands provided on multiple jobs.

184.     Defendant Frontier authorized, ratified and benefited from all of the violations of the False Claims Act committed by Frontier's various officers, agents, and employees.

185.     The United States Government and the public have been damaged as a result of Frontier's violations of the False Claims Act.

186.     Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729(a)(1).

187.    Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each false record or statement knowingly made, used, or caused to be made or used by the Defendants pursuant to 31 U.S.C. § 3729(a)(1).

188.    Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. § 3729(a)(3).

## COUNT IX
### 31 U.S.C. § 3729(a)(1)(C)

189.    Each of the foregoing allegations is realleged and incorporated hereby.

190.    All Defendants conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A) and (B) by engaging in conduct, including, but not limited to: 1) providing false records and information for use in the State's grant application and subsequent claims for payment; 2) falsifying the need for a Mitigation Plan; 3) engaging in conduct to hide the fraudulent claims submitted to the United States from being discovered; 4) assisting other Defendants in submitting fraudulent claims; 5) agreeing to engage in a pattern of conduct to allow the fraudulent claims to be submitted to, and paid by, the United States; and 6) advising other Defendants on how to submit fraudulent claims to be paid by the United States.

191.    The United States Government and the public have been damaged in the amount of $41,531,832.25 as a result of the Defendants' violations of the False Claims Act.

192.    Plaintiff/Relator seeks three times the amount of damages sustained by the United States pursuant to 31 U.S.C. § 3729(a)(1).

193.    Plaintiff/Relator seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the 646 false claims submitted to the United States pursuant to 31 U.S.C. § 3729(a)(1).

194.     Plaintiff/Relator is seeking its fees and costs related to this suit pursuant to 31 U.S.C. §3729(a)(3).

## **DAMAGES**

WHEREFORE, PLAINTIFF/RELATOR demands judgment against the DEFENDANTS for damages and relief as follows:

a.      All compensatory damages to which it is entitled;

b.      All Civil Penalties to which it is entitled

c.      Attorney's fees and costs;

d.      All statutory relief to which PLAINTIFF/RELATOR is entitled;

e.      All legal relief to which PLAINTIFF/RELATOR is entitled;

f.      All equitable relief to which PLAINTIFF/RELATOR is entitled;

g.      Pre-judgment and post-judgment interest; and

h.      Any and all other relief this Honorable Court deems appropriate.

PLAINTIFF/RELATOR demands a trial by jury upon all issues triable by a jury raised herein.

**PLAINTIFF/RELATOR,
CITYNET, LLC**

**By Counsel,**

*/s/Rebecca Pomeroy*
Benjamin L. Bailey (WVSB #200)
bbailey@baileyglasser.com
Rebecca Pomeroy (WVSB #8800)
bpomeroy@baileyglasser.com
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
(304) 342-1110 *facsimile*


Nicholas S. Preservati (WV  Bar #8050)
Preservati Law Offices PLLC
P.O. Box 1431
Charleston, WV  25325
(304)-346-1431
(304)-346-1744 *facsimile*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| **CITYNET, LLC**, on behalf<br>of the United States of America,<br><br>    Plaintiff/Relator,<br><br>v.<br><br>**FRONTIER WEST VIRGINIA INC.**, a<br>West Virginia corporation, **KENNETH<br>ARNDT**, individually, **DANA WALDO**,<br>Individually, **MARK McKENZIE,**<br>Individually, **KELLY GOES,** individually**,<br>JIMMY GIANATO**, individually, and<br>**GALE GIVEN**, individually,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Civil Action No.: 2:14-CV-15947**<br><br>   **Judge: Copenhaver** |

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of July, 2016, I filed the foregoing **FIRST AMENDED QUI TAM COMPLAINT** using the Court's CM/ECF system, and via US Mail to be served upon the following:

Augustine M. Ripa
Patrick Henry Building
601 D. Street NW, Room 9209
Washington, DC 20004

/s/*Rebecca Pomeroy*
Rebecca Pomeroy (WVSB #8800)