UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CITYNET, LLC, on behalf of
the United States of America,

      Plaintiff/Relator,

v.                         Civil Action No. 2:14-15947

FRONTIER WEST VIRGINIA INC.,
a West Virginia Corporation,
and KENNETH ARNDT, individually,
and DANA WALDO, individually,
and MARK McKENZIE, individually,
and KELLY GOES, individually,
and JIMMY GIANATO, individually,
and GALE GIVEN, individually,

      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

      Pending are two motions to dismiss the complaint, one
filed by defendants Frontier West Virginia Inc. ("Frontier"),
Kenneth Arndt, Dana Waldo, and Mark McKenzie (collectively, "the
Frontier Defendants") on August 23, 2016, and the other filed by
Kelley Goes, Jimmy Gianato, and Gale Given (collectively, "the
State Employees") on August 23, 2016.

1

## I. Introduction

Relator, Citynet, LLC ("Citynet"), a West Virginia
limited liability company with its principal place of business in
West Virginia, instituted this action by filing a Qui Tam
complaint on behalf of the United States on May 7, 2014, under
seal. On June 17, 2016, the United States declined to intervene
in the case, which was then placed on the active docket. Citynet
thereafter filed the first amended Qui Tam complaint, which is the
operative complaint and will be referred to herein simply as the
complaint.

At all times relevant herein, Frontier was a West
Virginia corporation with its principal place of business in West
Virginia; Kenneth Arndt was a citizen of West Virginia and General
Manager and Senior Vice President of Southeast Region at Frontier
Communications Corporation; Dana Waldo was a citizen of West
Virginia and Senior Vice President and General Manager of
Frontier; Mark McKenzie was a citizen of West Virginia and
employee of Frontier; Kelly Goes was a citizen of West Virginia
and Secretary of the West Virginia Department of Commerce ("DOC");
and Jimmy Gianato was a citizen of West Virginia and Director of
the West Virginia Division of Homeland Security and Emergency
Management. First Amended ("Am.") Qui Tam Complaint ("Compl.") at

¶¶ 8-11, 13-14.  Gale Given was employed as Regional President of Verizon covering the state of West Virginia from July 1, 2010, to July 1, 2012, when she became the West Virginia State Technology Officer.  Id. at ¶ 12.

In the complaint, Citynet alleges nine counts under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et. seq.  Counts I through IV allege the presentation of false claims, § 3729(a)(1)(A); Counts V through VIII allege the making of false records, § 3729(a)(1)(B); and Count IX alleges a conspiracy to present false claims and make false records, § 3729(a)(1)(C).  Counts I through III, V through VII, and IX are against all defendants, while Counts IV and VIII are against only Frontier and Mr. McKenzie.

Citynet alleges that under the American Recovery and Reinvestment Act ("ARRA"), which became law in February 2009, $4,700,000,000 in federal funds were appropriated to the Broadband Technology Opportunities Program ("BTOP") in order to expand broadband technology.  First Am. Qui Tam Compl. at ¶ 1.  Citynet claims that the grant program "was designed to allow for the construction of open access middle-mile broadband networks."  Id.

Citynet contends that Frontier, Mr. Arndt, Mr. Waldo, Mr. McKenzie, Ms. Goes, and Mr. Gianato assisted the West Virginia Executive Office ("the WVEO") in the submission of its application for $126,323,296 in funds from the BTOP grant for a project titled "West Virginia Statewide Broadband Infrastructure Project — Middle-mile." Id. at ¶¶ 2, 27. According to Citynet, the WVEO grant application contained numerous misrepresentations, some of which were based on information provided to WVEO by Frontier and its representatives. Id. at ¶ 2. During the application process, thirty-four proposals, including one from Citynet, were submitted to the National Telecommunications and Information Administration ("the NTIA") for consideration under BTOP. Id. at ¶ 22. In addition, Frontier as well as its subsidiary, Citizens Telecommunications Company of West Virginia ("CTC"), submitted proposals to fund last mile projects, which would provide broadband fiber to Community Anchor Institutions ("CAIs"). Id. at ¶¶ 24, 26.

The WVEO proposal contained three parts: "1) the provision of 1,064 Cisco routers to each of the CAIs; 2) the construction of, and upgrade to, the State's emergency microwave tower system; and 3) the construction of a 2,429 mile 'open-access' Middle-Mile network that would provide broadband service

4

to the 1,064 CAIs throughout the state." Id. at ¶ 28. According
to Citynet, the WVEO application, at Ms. Goes' direction, took
Frontier's and CTC's last mile applications, with Frontier's
knowledge, and simply "regenerated them as its own Middle-Mile
project in order to make it more attractive to the NTIA." Id. at
¶ 30. Specifically, Citynet alleges that Frontier, Mr. McKenzie,
Ms. Goes, Mr. Gianato, and others, helped to prepare the WVEO
grant application with the intent that Frontier would receive the
grant funds, if awarded to the WVEO. Id. at ¶ 31.

     In addition, Frontier and Verizon also helped the state
determine the amount of new fiber to be constructed if the grant
was awarded to the WVEO. Id. at ¶ 32; see Ex. 5 to First Am. Qui
Tam Compl. (Emails between Mark Luker and Jimmy Gianato regarding
the amount of fiber to be constructed, stating, in part, "Based on
the estimates from Verizon and Frontier, the fiber is new fiber
that does not exist today"). While the grant applications were
being submitted, Frontier was in merger negotiations with Verizon,
and both Frontier and Verizon further assisted the State in
drafting its application by providing construction plans and
engineering information to the WVEO. First Am. Qui Tam Compl. at
¶ 35. In fact, during the merger negotiations between Verizon and
Frontier, Frontier and the state had contemplated that it would

receive a grant, and that a considerable portion of it would go to Frontier.  Id. at ¶ 36.  On January 14, 2010, the State informed Frontier that it would be required to make a capital investment of $250-$300 million in West Virginia if the merger were to be approved by the West Virginia Public Service Commission.  Id. at ¶ 37; see also Ex. 7 to First Am. Qui Tam Compl. (Email from Dan McCarthy to Kelley Goes regarding the capital planned when Frontier takes control of Verizon's West Virginia Operations).

Citynet alleges that the WVEO application contained false statements that were included to insure that the state would receive the grant and that Frontier, Mr. Arndt, Mr. McKenzie, Ms. Goes and Mr. Gianato and others caused the false statements in the WVEO grant application.  First Am. Qui Tam Compl. at ¶ 38. Citynet first alleges that the WVEO grant application misrepresented that "the fiber would comprise a single interconnected network by connecting each CAI to Frontier's local central offices, which in turn would allow other service providers to connect at the Frontier Central Office to provide their Last-Mile services to consumers."  Id. at ¶ 39.  By connecting the fiber from CAIs to central offices, which are the locations that Frontier maintains equipment to route calls to and from end users, other service providers would have been able to connect at the

central office to provide last mile services to consumers.  Id. at

¶ 40.  Citynet also alleges that the WVEO application

misrepresented that no part of the "'service layer' (i.e. Last-

Mile)" would be funded from the grant.  Id. at ¶ 41.

Citynet next alleges that the WVEO application

misrepresented that the 1,064 CAIs in the application did not

already have fiber service when in fact 416 of the CAIs "already

had existing fiber, no longer were in existence or had received

other stimulus," meaning that only 648 CAIs needed new fiber.  Id.

at ¶¶ 43-44.  Because only 648 CAIs needed new fiber, the amount

of new fiber miles to be built decreased from 2,429 in the

application to 915 and then was decreased again to 536.  Id. at ¶

45.

Citynet also contends that the decreased figure of 536

miles of fiber to be built was inflated because miles were "double

counted" and the application also misrepresented the distances of

fiber necessary to reach many of the CAIs.  Id. at ¶ 45.

Specifically, Citynet states that the estimation of fiber to be

built on "hundreds of" CAIs were grossly inflated.  Id. at ¶ 46.

For example, Citynet contends that the WVEO application estimated

that 73,250 feet of new fiber would be required to provide

broadband service to the CAI "Hygenia Facilities Foundation" in

7

Boone County, but that the pertinent location construction request ("LCR") indicates that only 1,201 feet of fiber was constructed. Id. The double-counting of miles that Citynet alleges refers to the fact that the miles of fiber was inflated in the application by including the miles to connect the Central Office to two CAIs, when only one CAI was directly connected to the Central Office. Id. at ¶ 47. For example, while the Martinsburg Correctional Center in Berkeley County is located next to the Eastern Regional Jail, Frontier estimated to the state that it would take 10,000 feet of fiber to connect to the Correctional Center and 10,000 additional feet of fiber to connect to the Eastern Regional Jail. Id. at ¶ 48. Instead, Citynet alleges that it only took 6,650 feet of fiber to connect to the Correctional Center and 794 feet of fiber to connect the Eastern Regional Jail to the Correctional Center. Id. "By double-counting the build back to the Central Office for both jobs," Citynet alleges that "Frontier inflated the estimated mileage by 10,000 feet on this job alone." Id. Citynet contends that the amount of new fiber needed was double-counted on at least fifty-eight projects. Id. at ¶ 50.

Finally, Citynet contends that the proposed fiber distances for the CAIs were also misrepresented in the WVEO application by "simply inputting the same number for several

8

projects." Id. at ¶ 51. For example, Citynet alleges that the
WVEO application had thirty-six CAIs that required the same 4,390
feet of new fiber, with five new poles, 3,882 feet of aerial fiber
and 508 feet of buried fiber. Id. at ¶¶ 51-52.

Citynet also alleges that defendants misrepresented that
a middle mile network did not exist in West Virginia, when in
actuality, Mr. Arndt had informed the state representatives that
"90% of the stimulus project either existed or would be completed
shortly after the Frontier acquisition of Verizon." See Ex. 11 to
First Am. Qui Tam Compl. (Email from Kenneth Arndt to Kelley Goes,
Jimmy Gianato and others stating that "90% of the stimulus project
either exists or will be completed shortly after the acquisition
is closed"). Additionally, defendants certified that the project
complied with the "Notice of Funds Availability and Solicitation
of Applications" ("NOFA") requirements because no private entity
could afford to build the $42,000,000 proposed network and that it
would not be built but for the grant. First Am. Qui Tam Compl. at
¶ 54. Despite this certification, defendants knew that Frontier
had already committed to spend $279,000,000 in West Virginia to
upgrade facilities and infrastructure so that the Verizon merger
would be approved. Id.

Other misrepresentations that Citynet claims defendants made in the WVEO application include the statement that the broadband services could be resold by the state to businesses and individuals when they could not be resold, meaning that "the CAIs that received broadband under the WVEO project would be the ultimate end-user of only Frontier/ Verizon services which in turn made the project a Last-Mile project." Id. at ¶ 55. Also, while defendants stated that the WVEO application was a middle mile solution, Ms. Goes advised Citynet that $40 million of the grant funds would be given to Frontier "to construct 'tails' to government facilities from the nearest Frontier hub or similar facility and that the construction of the 'Last-Mile' tails would constitute the full extent of fiber construction under the WVEO's plan." Id. at ¶ 56. Citynet claims that "the overall effect of the misrepresentations in the WVEO grant application led to the grant being awarded to the WVEO for the sole benefit of Frontier." Id. at ¶ 57.

Around February 12, 2010, the WVEO was awarded $126,323,296 from the BTOP Grant for the WVEO grant application entitled "West Virginia Statewide Broadband Infrastructure Project — 'Middle-Mile.'" Id. at ¶ 58. By accepting the grant, the recipient (here, the WVEO) agreed to comply with certain terms and

conditions, including: "1) the [DOC] Financial Assistance Standard Terms and Conditions; 2) Award Specific Special Award Conditions; 3) Line Item Budget; 4) 15 C.F.R. Part 24, Uniform Administrative Requirements for Grants and Agreements to States and Local Governments; 5) OMB Circular A-87, Cost Principals for State, Local and Indian Tribal Governments; 6) OMB Circular A-133, Audits of States, Local Governments, and Non-Profit Organizations; 7) [DOC] Pre-Award Notification Requirements for Grants and Cooperative Agreements; and 8) DOC American Recovery and Reinvestment Act Award Terms." Id. at ¶ 59. The Special Award Conditions stated "This award supports the work described in the recipients proposal entitled West Virginia Statewide Broadband Infrastructure Project – 'Middle Mile' dated 8-20-09 and revision dated 2/5/10 for budget narrative which is incorporated into the award by reference." Id. at ¶ 60.

According to Citynet, the proposed budget narrative contained potential categories of costs of the project to be identified by the applicant, with a summary of the items in each category. Id. at ¶ 61. The addendum to the Budget Narrative provided that, "If indirect costs . . . and/or fringe benefits are included in the budget, please provide a copy of your existing Negotiated Indirect Cost Recovery Agreement (NICRA), if available.

11

If the NICRA is not available or is not consistent with the rates/calculations in the budget, please provide an explanation of how the amounts were calculated. Please clearly list the manner in which indirect costs are calculated in the budget." Id. at ¶ 62. No indirect costs were identified in the WVEO grant application. Id. at ¶ 63.

In addition, other terms and conditions that the WVEO agreed to comply with upon receipt of the grant funds, including the DOC Financial Assistance Standard Terms and Conditions, the ARRA Award Terms, 74 FR 33104, and the DOC Pre-Award Notification Requirements for Grants and Cooperative Agreements, did not permit payment of indirect costs not included in a line-item budget. Id. at ¶¶ 64-66. Citynet alleges that Frontier was a sub-recipient of the grant pursuant to a Memorandum of Understanding ("MOU") entered between the parties on October 1, 2010. Id. at ¶¶ 69-70. The MOU stated that if awarded the grant, Frontier as a sub-recipient of the grant would construct 915 miles of fiber contemplated in the WVEO application, and would "establish a middle-mile broadband network to over 1,000 points of interest throughout West Virginia." Id. at ¶¶ 70-71. As a sub-recipient of the grant, Frontier also agreed to comply with the Special Award Conditions, all other laws, rules and regulations that

governed the grant award and with all accounting requirements in the NOFA, as well as to ensure that the WVEO would be invoiced for eligible grant costs and that costs not eligible under the grant would be billed to the WVEO separately. Id. at ¶¶ 72-74.

Citynet alleges that Frontier did not construct the middle mile network proposed in the WVEO application and that it agreed to construct in the MOU, but instead it began to build the last mile project it proposed in its joint application with CTC, which was not given funds under the BTOP grant. Id. at ¶ 75. According to Citynet, Frontier did not need to build the 915-mile network that was proposed in the WVEO application because a "vast majority of the proposed Middle-Mile network already existed." Id. at ¶ 76. Because Frontier did not build the existing middle mile network with funds from the grant, the "open access" requirement did not apply to it, meaning that Frontier could deny its competitors access to the existing network. Id. at ¶ 76. Citynet further alleges that Frontier did not want to build an open-access middle mile network because "it would allow competition from other broadband services providers" which "would be catastrophic to Frontier's business." Id. at ¶ 77. Instead of constructing fiber from one of its Central Offices to another Central Office, or from the CAI back to the Central Office, as

provided for in the WVEO application, Citynet alleges that
Frontier "merely constructed fiber from the CAI to Frontier's
nearest utility pole (i.e., driveways to local streets)." Id. at
¶ 78. Citynet alleges that the decision to do this was
"unilaterally made by [Mr.] Gianato." Id. at ¶ 79.

In support of the contention that the WVEO grant
application proposed building fiber from Central Office to each
CAI, Citynet alleges that "areas of potential affect maps" ("APE
maps") were provided to the NTIA that identified the routes for
the fiber to be built to each CAI and the footage of fiber that
would be required for each CAI. Id. at ¶ 80. The APE maps showed
that fiber would be built from the Central Office to the CAI. Id.
at ¶ 81. After the construction was completed, Frontier submitted
"as-built" maps that were not typically used in the industry,
which showed that the fiber was not built back to the Central
Office, as proposed, but instead, a "'service drop' was installed
from the CAI to the nearest utility pole." Id. at ¶¶ 82-83. By
using the "service drop" method instead of building the fiber back
to the Central Office, "the fiber built [was rendered] useless to
third parties thus defeating the open access conditions set forth
in the grant award." Id. at ¶ 84.

Citynet contends that Frontier admitted to the Federal Communications Commission that the facilities constructed with the grant funds were last mile and not middle mile facilities. Id. at ¶ 85; see Ex. 14 to First Am. Qui Tam Compl. (Comments of Frontier before the Federal Communications Commission).

Citynet also alleges that Frontier "billed the . . . grant for material and labor it did not provide, and for fiber lengths that were not constructed." First Am. Qui Tam Compl. at ¶ 86. One way Frontier did this was by using excessive maintenance coils to conceal the fact that it did not construct the fiber it alleged it did. Id. at ¶ 87. For example, for one CAI, Frontier billed the state for constructing 1,380 feet of fiber, but its engineering map shows that it only built 735 feet of fiber and placed an additional 600 feet of fiber in maintenance coils. Id. at ¶ 88. Citynet alleges that Frontier routinely placed excessive amounts of fiber in maintenance coils in order to "inflate its invoices in an attempt to draw down the surplus BTOP funds." Id. at ¶ 90. As a result, Frontier used the WVEO grant funds to "1) expand its existing network within its service territory; 2) ensure that its competitors would not have access to the network; and 3) lock the State (the CAIs) into doing business with Frontier in perpetuity." Id. at ¶ 91.

In total, Frontier submitted invoices totaling
$41,531,832.25 to the state.  Id.  Although Frontier only built
590 miles of fiber, the total cost was $856,939 more than the
amount Frontier represented it would cost to build the 1,793 miles
of fiber contemplated in the grant application.  Id. at p. 18 n.1.
In their own grant applications, Frontier and CTC estimated that
fiber construction would cost $24,816 per mile, but Frontier
received triple that amount for the 536 miles of fiber it built.
Id. at ¶ 93.  According to Citynet, Frontier "devised a plan to
expend all of the $42,000,000 of the budgeted BTOP funds by: 1)
charging for impermissible 'loadings' that were nothing more than
prohibited indirect costs; 2) fabricating the amount of fiber
built by utilizing maintenance coils; 3) fabricating the amount of
fiber built after the length of the maintenance coils had already
been considered in total; 4) double-billing for 'Facility Build-
Outs' that were already contemplated as part of the original
construction estimate; and 5) billing for inappropriate 'invoicing
fees' that were not allowed under the grant."  Id. at ¶ 92.

Ms. Given and Mr. Gianato allegedly assisted Frontier in
this plan by: "1) knowingly approving improper 'loading' and
'invoice processing fee' charges; 2) failing to verify Frontier's
invoices and the corresponding charges; 3) failing to verify that

16

Frontier completed the work billed for; and 4) purposefully
holding Frontier's invoices for up to eighteen (18) months at a
time before processing them so that the other service providers
would not be able to determine whether there would be surplus BTOP
funds available." Id. at ¶ 94.  According to Citynet, most of
these events occurred after Ms. Given became the State Technology
Officer.  Id.

    Citynet alleges that Frontier "caused the federal
government to pay 365 Frontier invoices that included prohibited
indirect costs." Id. at ¶ 95.  Citynet contends that because the
WVEO application did not include indirect costs on the line item
budget, it was prohibited from collecting it under the NOFA, ARRA
Award Terms, 74 FR 33104 and the Special Award Conditions.  Id. at
¶ 101.  Frontier allegedly attempted to obtain reimbursement for
indirect costs before Ms. Given became the Chief Technology
Officer, but these requests were denied by Col. Michael
Todorovich.  Id. at ¶ 96.  He advised the Grant Implementation
Team and the West Virginia Office of Technology ("WVOT") that
indirect costs were not reimbursable under the grant.  Id.; see
Ex. 17 to First Am. Qui Tam Compl. (Memorandum from Michael
Todorovich, PI/PD, regarding Reimbursement Process dated February
14, 2012).  Col. Todorovich additionally refused access to the

17

grant funds except for payment of construction that was already
completed.  First Am. Qui Tam Compl. at ¶ 97.

      According to Citynet, the WVOT developed a protocol that
was used to process the vendor invoices that were submitted for
payment from the grant funds.  Id. at ¶ 98.  The process provided
that the vendor would first submit the invoice for review by the
WVOT, where a WVOT employee would match it against the original
LCR and approve it.  Id.  Next, the invoice was sent to Col.
Todorovich, who would ensure that the invoice was properly
approved by the WVOT and that there were sufficient grant funds to
pay the invoice.  Id.  The invoice was sent to the Governor's
accountant for review and then was entered into the Department of
Treasury's Automated Standard Application for Payments ("ASAP").
Id.  Once the invoice is entered into ASAP, the funds were
dispersed to the WVOT, and it then forwarded the funds to
Frontier.  Id.

      On July 1, 2012, Ms. Given, the former Regional
President of Verizon for the area covering West Virginia, was
appointed as the new State Technology Officer.  Id. at ¶¶ 12, 99.
She immediately took control of approving Frontier's invoices for
the grant project.  Id.  After Ms. Given became the State
Technology Officer, Citynet alleges that Frontier began submitting

18

invoices with a "Loadings" charge.  Id. at ¶ 100.  According to
Frontier's invoices, the loadings charge was for "allocated
indirect costs such as vehicles, accounting, administration, etc."
Id. at ¶ 101 (emphasis omitted).  Citynet contends that the
loadings charge was an indirect cost, which was in violation of
the various award conditions previously mentioned.  Id.  Despite
being an indirect charge unauthorized under the grant, Ms. Given
approved the Frontier invoices containing the loading fee, which
in some instances was higher than the original cost estimate for
the entire build.  Id. at ¶¶ 102-103.  In total, Frontier
submitted 365 invoices containing the improper loadings fee,
totaling $4,553,387.31.  Id. at ¶ 104.  The state budget and the
budget narrative provided by the state did not include indirect
costs and the grant award was not amended to permit indirect costs
to be reimbursed by the grant.  Id. at ¶ 106.

Citynet also contends that Frontier submitted 327
invoices for payment from grant funds that included facility build
out fees and invoice processing fees that were unlawful.  Id. at ¶
107.  The facility build out ("FBO") fees included on the Frontier
invoice allegedly "consisted of the cost of construction inside
the CAI to allow the facility to accept the newly placed fiber."
Id. at ¶ 108.  Citynet alleges that once Ms. Given was hired as

the State Technology Officer, Frontier began submitting invoices

with the FBO charge.  Id. at ¶ 109.  While Frontier claims that

the FBO charge was not part of the original grant estimate because

"the need for the FBO was not discovered until the project was

under way," Citynet contends that the WVEO listed "DMARC Const.

Cost" in the original grant proposal, with a unit cost of $9,750

for 250 units, which was the equivalent of FBO costs, and

therefore was part of the original estimate in the WVEO proposal.

Id. at ¶¶ 109-10.  Citynet contends that Frontier "created the

fiction" that the charge was not originally part of the estimate

so that they could be double-billed for the "DMARC Const. Cost"

and the FBO costs.  Id. at ¶ 111.

Frontier also allegedly added "significant 'invoice

processing fees'" to the FBO invoices after Ms. Given became the

State Technology Officer.  Id. at ¶ 112.  Mr. McKenzie allegedly

provided the state with a list of the costs associated with

processing a FBO invoice.  Id. at ¶ 113.  In the breakdown of

costs, Mr. McKenzie claimed it took sixteen employees four hours

to process one FBO invoice, at a cost of $1,808 or $452 per hour

to Frontier.  Id.; see also Ex. 20 to First Am. Qui Tam Compl.

(Letter from Mark McKenzie to Gale Given dated January 29, 2013

regarding "Frontier Incremental Processing Costs - FBO Invoices").

On February 25, 2013, Mr. Waldo advised Ms. Given that it would cost Frontier $596,640 to process 330 FBO invoices. First Am. Quit Tam Compl. at ¶ 114. Since the state had paid the full amount for 27 invoices, Mr. Waldo additionally advised Ms. Given that it would only charge $1,340.20 per invoice, or $335.05 per hour, for the remaining invoices. Id.; see also Ex. 21 to First Am. Qui Tam Compl. (Letter from Dana Waldo to Gale Given dated February 25, 2013 regarding "invoicing for BTOP Projects Including Facilities Build-Out Work"). Frontier charged the invoice fee in several instances when it performed no work. First Am. Qui Tam Compl. at ¶ 115. In total, Frontier submitted 84 invoices with a 1,808 invoice fee and 243 invoices with a $1,340 invoice fee, totaling $593,888.20, despite the fact that the processing fee is an indirect cost that was prohibited under the terms of the grant award. Id. at ¶¶ 116-119.

Citynet also alleges that Frontier "and/or" Ms. Given and Mr. Gianato held hundreds of invoices for months, which caused other service providers to be unsure whether surplus BTOP funds would be available. Id. at ¶ 120. Once Ms. Given began working at the WVOT, the WVOT held the invoices "until it could rush the processing and approval of a large number of the invoices at one time." Id. at ¶ 121. Additionally, the state began to pay a

$5.00 processing fee per invoice so that each of Frontier's invoices would be paid within twenty-four hours of its approval by Ms. Given's office.  Id. at ¶ 122.

Citynet also alleges that "mitigation plan" fraud took place during the course of construction.  Id. at ¶ 123.  According to it, the NTIA asked the WVEO and Frontier to develop a "mitigation plan" so that the project construction would be completed on schedule.  Id. at ¶ 124.  Frontier drafted the mitigation plan, which Citynet alleges falsely misrepresented that the construction to the CAIs was delayed because of environmental issues and because of a fiber shortage from the 2011 tsunami in Japan.  Id. at ¶ 125.  As a result, the mitigation plan stated that due to environmental issues and fiber shortage, a reduction of CAIs receiving fiber was necessary, thereby reducing the 1,064 CAIs to 668 and the 915 miles of fiber to 590.  Id.  In reality, the reduction in the number of CAIs and the miles of fiber to be built was not a result of delays, but because the CAIs already had fiber when the WVEO grant application was submitted.  Id. at ¶ 126.

Citynet finally contends that Mr. Waldo made misrepresentations about the grant award.  First, he stated that West Virginia's national ranking for broadband connectivity would

22

rise from being one of the bottom five states to one of the top five states after the project was completed. _Id._ at ¶ 127. Instead, West Virginia was ranked 48th in broadband access by the FCC prior to the grant award, and 53rd after the completion of the grant project, behind every other state, the District of Columbia, Guam and Puerto Rico. _Id._ at ¶ 131. Mr. Waldo also misrepresented to the West Virginia Legislature that Frontier had constructed a middle mile network and that it had negotiated several interconnection agreements with broadband wholesalers and last mile providers for them to use the middle mile network. _Id._ at ¶ 128. In its quarterly BTOP report, it was revealed that no agreements were being negotiated or were ever entered into with broadband wholesalers or last mile providers. _Id._ at ¶ 129.

## II. The Complaint

Based on the foregoing facts, Citynet's complaint alleges nine violations of the False Claims Act. Count I alleges that defendants violated 31 U.S.C. § 3729(a)(1)(A) by "knowingly present[ing], or caus[ing] to be presented, to the United States Government, at least 646 false or fraudulent claims for payment or approval by seeking payment from funds restricted to an approved NTIA grant award for construction of a . . . middle-mile network

for work that Frontier provided constructing a non-approved Last-Mile project." Id. at ¶ 134. It additionally alleges that Frontier "authorized, ratified and benefited from all of the violations of the False Claims Act committed by its various officers, agents and employees." Id. at ¶ 135. As a result, Citynet alleges that the government and the public have been damaged in an amount not less than $41,531,832.25. Id. at ¶ 136.

Counts II through IV also allege violations of § 3729(a)(1)(A). Count II alleges a violation for defendants "knowingly present[ing], or caus[ing] to be presented, to the United States Government, at least 365 false or fraudulent claims for payment or approval by seeking payment of no less than $4,553,387.31 in prohibited Loadings and Indirect Costs under the BTOP award grant." Id. at ¶ 141. Due to the violation, Citynet alleges that the government and the public have been damaged in the amount of $4,553,387.31. Id. at ¶ 143. Count III alleges that defendants violated § 3729(a)(1)(A) by knowingly presenting or causing to be presented to the government, 327 false and fraudulent claims for payment by seeking $593,888.20 in prohibited FBO Invoice Fees and Indirect Costs under the grant award. Id. at ¶ 148. Count IV alleges that Frontier and Mr. McKenzie knowingly presented or caused to be presented to the government false and

fraudulent claims by seeking payment for materials and services not provided for under the grant award.  Id. at ¶ 155.  The materials and services include, but are not limited to: 1) excessive maintenance coils in the "as-built" amounts; 2) falsification of the length of the fiber build; and 3) falsification of the number of fiber strands provided on jobs. Id.

Counts V through VIII allege violations of § 3729(a)(1)(B).  Count V alleges that "[d]efendants knowingly made, used, or caused to be made or used, 646 false records or statements material to false or fraudulent claims that were presented to [the government] for payment from funds restricted to an approved NTIA grant award for construction of a mile middle-mile network for work that Frontier provided constructing a non-approved Last-Mile project."  Id. at ¶ 162.  Count VI alleges a violation of § 3729(a)(1)(B) for defendants knowingly making, using, or causing to be made or used, 365 false records or statements material to false or fraudulent claims that were presented to the government for payment of prohibited Loadings charges and Indirect Costs under the grant.  Id. at ¶ 169.  Count VII alleges a violation for knowingly making, using or causing to be made or used, 327 false records or statements material to false

or fraudulent claims presented to the government for payment of prohibited FBO Invoicing Fees under the grant. _Id._ at ¶ 176. Count VIII alleges that Frontier and Mr. McKenzie made, used or caused to be made or used, false records or statements material to false or fraudulent claims presented to the government for payment for materials and services not provided under the grant. _Id._ at ¶ 183.

Count IX alleges a conspiracy by defendants to commit violations of § 3729(a)(1)(A) and (B), in violation of § 3729(a)(1)(C). _Id._ at ¶ 190. It alleges that defendants engaged in conduct including "1) providing false records and information for use in the State's grant application and subsequent claims for payment; 2) falsifying the need for a Mitigation Plan; 3) engaging in conduct to hide the fraudulent claims submitted to the United States from being discovered; 4) assisting other Defendants in submitting fraudulent claims; 5) agreeing to engage in a pattern of conduct to allow the fraudulent claims to be submitted to, and paid by, the United States; and 6) advising other Defendants on how to submit fraudulent claims to be paid by the United States." _Id._

In all Counts, Citynet seeks three times the amount of damages sustained by the government, and a civil penalty for each

violation, both pursuant to § 3729(a)(1).  <u>Id.</u> at ¶ 193.  Citynet

additionally seeks its fees and costs pursuant to § 3729(a)(3).,

all statutory, legal, and equitable relief to which it is

entitled, pre and post-judgment interest, and any other relief the

court deems appropriate.  <u>Id.</u> at ¶ 194; <u>id.</u> at p. 32.

### III. The Motions to Dismiss

The State Employees, Kelley Goes (improperly named

"Kelly" in the complaint), Jimmy Gianato, and Gale Given, filed a

joint motion to dismiss.  The State Employees argue that the

complaint should be dismissed as to them because: (1) they are not

persons subject to liability under the False Claims Act; (2) they

are immune from suit pursuant to the Eleventh Amendment; (3) they

are entitled to qualified immunity and are therefore immune from

suit; and (4) that Citynet's claims are jurisdictionally barred

because they are based on public information.  Defendants' Goes,

Gianato, and Given's Memo. in Supp. of Mot. to Dismiss ("State

Employees' Memo. in Supp. of Mot. to Dismiss").

The Frontier Defendants, Frontier, Kenneth Arndt, Dana

Waldo and Mark McKenzie, filed a separate joint motion to dismiss.

They allege that the complaint should be dismissed as to them

because: (1) all claims have failed to state a claim pursuant to

27

Fed. R. Civ. P. 12(b)(6); (2) Counts one and five are subject to dismissal pursuant to the False Claim's Act public disclosure bar; and (3) Count nine does not plead sufficient facts in order to satisfy the plausibility standard and the particularity standard of Fed. R. Civ. P. 9(b). Frontier Defendants' Memo. in Supp. of Mot. to Dismiss at 1-2.

Citynet responded to both motion to dismiss, to which both sets of defendants have replied. In addition, the court granted Citynet leave to file a surreply to Frontier's reply, to which Frontier responded.

On June 21, 2017, Citynet filed a motion to file a second surreply in opposition to the Frontier Defendants and Gale Given's motion to dismiss. In the second surreply, Citynet wishes to discuss the Office of Inspector General's June 2017 report ("OIG Report") which they contend found that "Frontier charged invoice processing fees that were unreasonable, unallowable and unsupported, and that Frontier built a significantly greater amount of maintenance coils than had been previously disclosed." Citynet's Mot. to File a Second Surreply at 1-2. Citynet argues that the court should take judicial notice of the OIG Report for purposes of the pending motions to dismiss. Id. at 3 (citing Fed. R. Evid. 201 and United States v. Savannah River Nuclear Sols.,

LLC, No. 1:16-cv-00825-JMC, 2016 WL 7104823, at *8 (D.S.C. Dec. 6, 2016) (finding that a court may take judicial notice of OIG Report findings)).

The State Employees and the Frontier Defendants both filed responses in opposition to Citynet's motion to file a second sur-reply to which Citynet replied. The State Employees state that the OIG Report is not relevant to the arguments set forth in their motion to dismiss and actually supports their argument that the claims in the complaint were publicly disclosed. State Employees' Resp. to Mot. to File Surreply at 3. Because the OIG Report was released after Citynet's complaint was filed, it cannot qualify as a public disclosure. The Frontier Defendants contend that while the court can take judicial notice of the OIG Report itself, it may not take judicial notice for the truth of the information contained in the report.

Because the court has reviewed the OIG Report and determined its use at this stage would not change the court's ruling on the motions to dismiss, the court need not reach the determination as to whether the court may take judicial notice of the facts contained therein. Accordingly, Citynet's motion to file a second surreply is denied.

# IV. Applicable Law

Federal Rule of Civil Procedure 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing . . . entitle[ment] to relief." See also Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007). Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957), overruled on other grounds, Twombly, 127 S. Ct. at 1969)); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007). Additionally, the showing of an "entitlement to relief" amounts to "more than labels and conclusions." Twombly, 127 S. Ct. at 1965. It is now settled that "a formulaic recitation of the elements of a cause of action will not do." Id.; Giarratano v. Johnson, 521 F.3d 298, 304 (4th Cir. 2008).

The complaint need not, however, "make a case" against a defendant or even "forecast evidence sufficient to prove an

element" of the claim. Chao v. Rivendell Woods, Inc., 415 F.3d
342, 349 (4th Cir. 2005) (quoting Iodice v. United States, 289
F.3d 270, 281 (4th Cir. 2002)).  Instead, the opening pleading
need only contain "[f]actual allegations . . . [sufficient] to
raise a right to relief above the speculative level."  Twombly,
127 S. Ct. at 1965; Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949
(2009) (noting the opening pleading "does not require 'detailed
factual allegations,' but it demands more than an unadorned, the-
defendant-unlawfully-harmed-me accusation").  Stated another way,
the complaint must allege "enough facts to state a claim to relief
that is plausible on its face."  Twombly, 127 S. Ct. at 1974;
Giarratano, 521 F.3d at 302.  The decision in Iqbal provides some
guidance concerning the plausibility requirement:

> A claim has facial plausibility when the plaintiff
> pleads factual content that allows the court to draw the
> reasonable inference that the defendant is liable for
> the misconduct alleged. . . .
>
> . . . But where the well-pleaded facts do not permit the
> court to infer more than the mere possibility of
> misconduct, the complaint has alleged - but it has not
> "show[n]" - "that the pleader is entitled to relief."

129 S. Ct. at 1949-50.

       As noted in Erickson, the Supreme Court has consistently
interpreted the Rule 12(b)(6) standard to require a district court
to "accept as true all of the factual allegations contained in the

31

complaint." 127 S. Ct. at 2200 (quoting Twombly, 127 S. Ct. at 1965); see also S.C. Dep't of Health & Envtl. Control v. Commerce & Indus. Ins. Co., 372 F.3d 245, 255 (4th Cir. 2004) (quoting Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002)). The court is additionally required to "draw[] all reasonable . . . inferences from those facts in the plaintiff's favor." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

## V. Discussion

### A. Persons under the False Claims Act

The State Employees first argue that as employees of the state and state agencies, they are not "persons" under the False Claims Act, and that they are therefore not subject to liability under it. They contend that although they are named in the complaint individually, the specific allegations in the complaint refer to the state and the West Virginia Executive Office, "[i]n an attempt to circumvent its inability to sue the State of West Virginia pursuant to the FCA." State Employees' Memo. in Supp. of Mot. to Dismiss at 6. Although they are named individually in the complaint, the State Employees further contend that as state officials, the allegations against them must be for individual or

32

"unofficial" activity, and Citynet has not alleged that they have acted outside of their official duties.  Id. at 7.

In support of this argument, the State Employees cite to Will v. Michigan Department of State Police, 491 U.S. 58 (1989), for the proposition that state officials acting in their official capacities "are not 'persons' for the purposes of law suits brought pursuant to federal statutes."  State Employees' Memo. in Supp. of Mot. to Dismiss at 7.  They also cite to the Eighth Circuit case of United States ex rel. Gaudineer & Comito LLP v. Iowa, 269 F.3d 932 (8th Cir. 2001), where the court determined that a state employee, sued in his individual capacity, was not a person subject to suit under the FCA when the plaintiff failed to allege that the employee was not acting outside of their official duties.  The State Employees contend that here, Citynet has similarly failed to allege that they acted outside of their official duties and that they are therefore not persons under the FCA.  State Employees' Memo. in Supp. of Mot. to Dismiss at 8-9.

In response, Citynet states that it has very explicitly sued the State Employees in their individual, not official, capacities because the State Employees "acted outside of their statutory authority when they engaged in the fraudulent activity set forth in the First Amended Complaint."  Citynet Resp. to State

Employees' Mot. to Dismiss at 3. As a result, Citynet contends
that it is suing the State Employees in only their individual
capacities. Id. at 7.

As Citynet noted in its response, its claims against the
state employees are in their individual, not official capacity.
Under the FCA, "any person who . . . knowingly presents, or causes
to be presented, a false or fraudulent claim for payment or
approval . . . is liable to the United States Government." 31
U.S.C. § 3729. In Vermont Agency of Natural Resources v. United
States ex rel. Stevens, the Supreme Court determined that state
and state agencies were not persons within the meaning of the FCA,
and therefore were not subject to liability under it. 529 U.S.
765, 781 (2000). The Court did not address whether state
employees, sued either in their individual or official capacity,
are persons under the FCA.

The Fourth Circuit has not addressed whether a state
official sued in his individual capacity is a person subject to
liability under the FCA. As the state employees note, in
Gaudineer, the Eighth Circuit determined, in a 2-1 panel decision,
that in order to state a claim against a state employee in his
individual capacity, the alleged conduct of the defendant must be
"outside of [his] official duties." 269 F.3d at 937 (citing Bly-

<u>Magee v. California</u>, 236 F.3d 1014, 1016 (9th Cir. 2001)).

According to the court, because the plaintiff did not allege "the

extent and nature of [the state employee's] duties, the mere

assertion that he issued standards that conflicted with state law

does not allege actions outside his official duties." <u>Id.</u> As a

result, the plaintiff failed to state a FCA claim against the

state employee.[1] <u>Id.</u>

In dissent, Judge Gibson stated that he would hold "that

state officials may be sued in their individual capacity under the

False Claims Act." <u>Id.</u> at 939. He made this determination based

on the decision of the Supreme Court in <u>Hafer v. Melo</u>, where the

Court ruled that "state officials, sued in their individual

capacities, are 'persons' within the meaning of § 1983." <u>Id.</u> at

938 (quoting <u>Hafer v. Melo</u>, 502 U.S. 21, 31 (1991)). Judge Gibson

found it persuasive that the Court "expressly rejected any

distinction based on whether the actions at issue were within the

scope of the official's authority," reasoning that to rule

---

[1] Some courts permit a plaintiff alternatively to allege that the
state official personally benefited from the conduct in order to
be liable under the FCA. <u>See</u> <u>Alexander v. Gilmore</u>, 202 F. Supp.
2d 478 (E.D. Va. 2002) (citing, <u>inter</u> <u>alia</u>, <u>Smith v. United
States</u>, 287 F.2d 299 (5th Cir. 1961) (finding that plaintiff
failed to state a FCA claim because it contained no claims that
the state employees were acting outside their official capacities
or that they were converting funds for their personal use).

otherwise would "absolutely immunize state officials from personal liability for acts within their authority . . . . Yet our cases do not extend absolute immunity to all officers who engage in necessary official acts." Id. (quoting Hafer 502 U.S. at 28). In light of the Court's decision in Hafer, Judge Gibson would similarly permit FCA claims against state officials in their individual capacity irrespective of whether those acts occurred within their official duties.

The Ninth Circuit followed the approach of Judge Gibson's dissent in confronting the same issue. In Stoner v. Santa Clara County Office of Education, the Ninth Circuit reversed the decision of the district court, which found that plaintiff failed to state a FCA claim against state employee defendants sued in their official capacities because the plaintiff could not allege that their actions were outside of their official duties. 502 F.3d 1116, 1123 (9th Cir. 2007).[2]  The court concluded that because the Supreme Court has defined "persons" to include "natural persons," state employees sued within their personal

---

[2] Although facially at odds, the Ninth Circuit's decision in Stoner is consistent with its decision in Bly-Magee. In Bly-Magee, the defendants sued in their individual capacities under the FCA were otherwise shielded by absolute prosecutorial immunity. See 236 F.3d at 1018. Consequently, the Bly-Magee defendants' conduct must have been outside their official duties in order to defeat their absolute immunity. See id.

capacities were persons under the FCA.  See id. at 1124 (citing

Cook Cty. v. United States ex rel. Chandler, 538 U.S. 119, 125

(2003)).  The plaintiff "need not allege that the individual

defendants personally profited from such false submissions.

Nothing in § 3729(a)(1) requires the person knowingly making a

false submission to obtain a personal benefit from the wrongful

act."  Id.  The court stated that it disagreed with "Gaudineer to

the extent the reasoning of [the case] cannot be reconciled with

the plain language of the statute."  Id.

        The court finds the rationale of the Ninth Circuit and

Judge Gibson in Gaudineer to be more persuasive.  The text of the

FCA contains no indication that a plaintiff must state more in

pleading a FCA claim against a state official sued in his personal

capacity.  Guidance from the Supreme Court in the context of §

1983 claims similarly advises that state officials can be sued in

their individual capacities for activities during the course of

their official duties.  Finally, requiring a state official to

take action outside of his official capacity would "absolutely

immune state officials from personal liability for acts within

their authority and necessary to fulfilling government

responsibilities," which is "contrary to the principles of the

Supreme Court's well-established public employee immunity

jurisprudence." See Hafer, 502 U.S. at 28; see also Stoner, 502 F.3d at 1125 (citing Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982)). Accordingly, the state employees sued in their individual capacities are persons under the FCA, and as such, are subject to liability under it. This determination does not affect the entitlement of the State Employees to qualified immunity, discussed below.

## B. Eleventh Amendment Immunity

The State Employees next argue that the Eleventh Amendment bars the plaintiff's suit against them, insisting that although the State is not a named party in the complaint, the allegations refer directly to the State or an agency of the state. Memo. in Supp. of Mot. to Dismiss at 9. The State Employees argue that because the allegations in the complaint refer to official actions taken by them, or allegations against the State directly, sovereign immunity bars the FCA claims. Id. at 9. In response, Citynet contends that because it has decided to sue the state employees in their individual capacities and because it is not seeking damages or any relief from the State, the claims are not

barred by the Eleventh Amendment.  Citynet Resp. to State

Employees' Mot. to Dismiss at 3-4.[3]

    The Eleventh Amendment "bars 'citizens from bringing

suits in federal court against their own states.'"  Bragg v. W.

Va. Coal Ass'n, 248 F.3d 275, 291 (4th Cir. 2001) (internal

citations omitted).  The Amendment further acts as a bar where the

suit is against a state official but the State is the real party

in interest.  Id.  Eleventh Amendment immunity is "an essential

element of the constitutional design" inasmuch as it "accords the

States the respect owed them as members of the federation" and

"protects the States' ability to govern in accordance with the

will of their citizens."  Id. (internal citations omitted).  As

noted by our court of appeals, Eleventh Amendment immunity is not

absolute: "A State's immunity to suit in federal court is subject

to well established and important exceptions."  Id. (citing S.C.

State Ports Auth. v. Fed. Maritime Comm'n, 243 F.3d 165 (4th Cir.

2001)) (enumerating six exceptions to Eleventh Amendment

immunity).

---

[3] Citynet alternatively argues that the State has waived its
Eleventh Amendment immunity protections.  Citynet Resp. to State
Employees' Mot. to Dismiss at 4.  Because the court has determined
that the allegations against the State Employees in their
individual capacity does not invoke the Eleventh Amendment, the
court need not reach this argument.

"An individual capacity suit for damages against state officials alleged to have personally violated § 3729 does not implicate the principles of state sovereignty protected by <u>Stevens</u> and our Eleventh Amendment jurisprudence because such an action seeks damage from the individual defendants rather than the state treasury." <u>Stoner</u>, 502 F.3d at 1125 (citing <u>Alden v. Maine</u>, 527 U.S. 757 (1999)).

"Where a plaintiff seeks to hold individual employees personally liable for their knowing participation in the submission of false or fraudulent claims to the United States government, the state is not the real party in interest, and the Eleventh Amendment poses no barrier to such a suit." <u>Stoner</u>, 502 F.3d at 1125 (citing <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 101 (1984) and <u>Hafer</u>, 502 U.S. at 30-31) (internal citations omitted). Accordingly, because here, plaintiff has sued the State Employees in their individual capacity and is not seeking damages from the state, the Eleventh Amendment does not bar its claims against them.

### C. Qualified Immunity

The doctrine of qualified immunity protects government officials from actions for civil damages to the extent that the

officials do not violate clearly established constitutional rights. See Harlow, 457 U.S. at 818. Because it is an immunity, and not merely a defense, it shields government officials from not only liability but also from the burdens of trial and preparing, and so it is to be addressed by the court at an early stage of the litigation. Hunter v. Bryant, 502 U.S. 224, 227 (1991); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). "[I]t is effectively lost if a case is erroneously permitted to go to trial." Mitchell, 472 U.S. at 526.

In general, government officials are entitled to qualified immunity from liability for discretionary actions unless a claim against an official satisfies a two-prong test: "(1) the allegations underlying the claim, if true, substantiate the violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have known." Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006) (internal citations and quotations omitted).

As for the first prong, the court discusses below Citynet's FCA claims against the State Employees that survive the State Employees' Rule 12(b)(6) motion to dismiss. Consistent with that discussion, the court finds that Citynet has alleged that the

State Employees violated the FCA to the extent detailed below. The first prong is thus satisfied.

Conversely, the court finds that it cannot conclude whether Citynet's claims satisfy the second prong. As a consequence, despite the principles urging the court to make as early decision as feasible on the issue of qualified immunity, the determination of whether the State Employees are entitled to the defense must be deferred until a later time in light of evidentiary development, such as at the summary judgment stage.

Under the second prong, a government official is not entitled to qualified immunity "if the contours of the right [are] sufficiently clear so that a reasonable [government official] would have understood, under the circumstances at hand, that his behavior violated the right." Bailey v. Kennedy, 349 F.3d 731, 741 (4th Cir. 2003) (internal quotation marks omitted and alteration in original). "The 'salient question' is whether the state of the law at the time of the events in question gave the officials 'fair warning' that their conduct was un[lawful]." Ridpath, 447 F.3d at 313 (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)). Even in areas where the law provides only general statements as to conduct prohibited, "officials can still be on notice that their conduct violates established law even in novel

factual circumstances" if the general statement of law applies to the conduct with "obvious clarity." Id. (quoting Hope, 536 U.S. at 741).

The applicable law here is the FCA, 31 U.S.C. § 3729(a)(1)(A) to (C). The Fourth Circuit holds that "[t]he test for [FCA] liability . . . is (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 788 (4th Cir. 1999). Regarding the second element, the requisite scienter, the FCA employs the term "knowingly." See, e.g., § 3729(a)(1)(A). A defendant acts "knowingly" in three separate circumstances: the defendant either "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." § 3729 (b)(1)(A)(i) to (iii).

The FCA is clearly established inasmuch as the FCA was enacted in 1863 to prevent fraud by contractors who were providing the Union Army with supplies during the Civil War, see Vt. Agency of Nat. Res., 529 U.S. at 768; the federal courts are replete with

43

cases considering the FCA; and the conduct underlying any FCA claim is essentially the same, namely, a fraud. Thus, the question at the second prong of the qualified immunity analysis becomes whether a reasonable person would have recognized that he knowingly perpetrated a material fraud and received government money as a result of doing so. That question interplays with the scienter element already embedded within the FCA. At one end, a reasonable person with "actual knowledge" of his fraud would doubtlessly know that the fraud he perpetrates is wrong. At the other end, whether a reasonable person "act[ing] in reckless disregard of the truth" would recognize that his actions constitute a fraud under the FCA is a much closer issue.

    While the complaint sufficiently alleges that the defendants acted with the requisite scienter, the court cannot at this juncture decide the level of scienter with which the State Employees acted in allegedly violating the FCA. That obfuscates the qualified immunity analysis as set forth above, and the qualified immunity decision consequently must be deferred until a time when the court can make an informed decision based upon the evidence.

## D. Public-Disclosure Bar

The State Employees contend that Citynet is prohibited from pursuing all nine counts contained in the complaint due to the public-disclosure bar contained in the FCA.  The Frontier Defendants contend that, as to them, Counts I and V only are barred by this provision.

### 1. Applicable Law

The public-disclosure bar is a limit on qui tam suits that "disqualifies private suits based on fraud already disclosed in particular settings – such as hearings, government reports or news reports – unless the relator meets the definition of an 'original source' under the FCA."  <u>United States ex rel. Beauchamp v. Academi Training Ctr., LLC</u>, 816 F.3d 37, 39 (4th Cir. 2016) (citing 31 U.S.C. § 3730(e)(4)).

Prior to 2010, the public-disclosure bar read as follows:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the Person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A)(2005).  Our court of appeals has

interpreted this version of the public-disclosure bar as a

"jurisdictional limitation, . . . [which] if applicable, divest[s]

the district court of subject-matter jurisdiction over the

action."  United States ex rel. May v. Purdue Pharma L.P., 737

F.3d 908, 916 (4th Cir. 2013).

Effective March 23, 2010, Congress amended the FCA,

revising the public-disclosure bar.  This provision now provides:

> The court shall dismiss an action or claim under this
> section, unless opposed by the Government, if substantially
> the same allegations or transactions as alleged in the action
> or claim were publicly disclosed—
>
>> (i) in a Federal criminal, civil, or administrative
>> hearing in which the Government or its agent is a party;
>>
>> (ii) in a congressional, Government Accountability
>> Office, or other Federal Report, hearing, audit, or
>> investigation; or
>>
>> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the
> person bringing the action is an original source of the
> information.

31 U.S.C. § 3730(e)(4)(A) (2010).  As discussed by our court of

appeals, the 2010 FCA amendments "significantly chang[ed] the

scope of the public disclosure bar," by, among other things,

deleting the "jurisdiction-removing language previously contained

in § 3730(e)(4) and replac[ing] it with a generic, not-obviously-

jurisdictional phrase, making it clear that the public-disclosure
bar is no longer a jurisdiction-removing provision." <u>United
States ex rel. Beauchamp</u>, 816 F.3d at 39.  Pre-amendment,
determining whether the public-disclosure bar precludes a
plaintiff's claims is decided under Rule 12(b)(1) for lack of
subject matter jurisdiction; post-amendment, it is treated as a
motion to dismiss pursuant to Rule 12(b)(6).[4]  <u>Id.</u> at 40 (citing
<u>United States ex rel. Osheroff</u>, 776 F.3d at 810).

        In addition to the deletion of the jurisdiction-removing
language, the 2010 amendments

> also changed the required connection between the plaintiff's
> claims and the public disclosure.  Under the prior version, a
> qui tam action was barred only if it was "based upon" a
> qualifying public disclosure, a standard [our court of
> appeals] interpreted to mean that the plaintiff must have
> "actually derived" his knowledge of the fraud from the public
> disclosure.  <u>United States ex rel. Siller v. Becton Dickinson
> & Co.</u>, 21 F.3d 1339, 1348 (4th Cir. 1994), superseded on
> other grounds as recognized in <u>May</u>, 737 F.3d at 917.  "As
> amended, however, the public-disclosure bar no longer
> requires actual knowledge of the public disclosure, but
> instead applies if substantially the same allegations or
> transactions were publicly disclosed." <u>May</u>, 737 F.3d at 917.

---

[4] In determining whether the claims in the complaint are publicly
disclosed, the parties cite to a number of exhibits not contained
in the complaint.  The court may consider documents attached to
the complaint, and may take judicial notice of the newspaper
articles and matters of public records in order to determine
whether the allegations in the complaint were publicly disclosed
in those documents.  <u>See United States ex rel. Osheroff v. Humana
Inc.</u>, 776 F.3d 805, 811 (11th Cir. 2015).

United States ex rel. Beauchamp, 816 F.3d at 40.

Our court of appeals has additionally instructed that the 2010 FCA amendments do not apply retroactively to causes of action that arose before March 23, 2010, the effective date of the 2010 amendments.  See United States ex rel. May, 737 F.3d at 918.

In this case, the complaint contains allegations that span from 2009 to 2014.  In its motion to dismiss, the Frontier Defendants use the 2010 FCA amendments to argue that Citynet's claims contain "substantially the same allegations" as those in the purported public disclosures.  See Frontier Defendants' Memo. in Supp. of Mot. to Dismiss at 18.  The State Employees appear to assert that the pre-2010 version of the public-disclosure bar applies to Citynet's claims.  See State Employees Memo. in Supp. of Mot. to Dismiss at 12-13 (stating that Citynet's claims are "jurisdictionally barred" pursuant to the public-disclosure bar).  Citynet contends that the 2010 amendments apply to its claims.  See Citynet Resp. to Frontier Defendants' Mot. to Dismiss at 7; Citynet Resp. to State Employees' Mot. to Dismiss at 12.  In the briefing on the motion to dismiss, none of the parties has given a rationale for the application of one version of the statute over another, given that the allegations in the complaint span from 2009 to 2014.

Our court of appeals has not instructed district courts how to analyze the public-disclosure bar when conduct alleged in a complaint spans the pre- and post-amendment effective date.  See United States ex rel. Beauchamp, 816 F.3d at 39-40 (stating that "[t]wo versions of the public-disclosure bar are relevant to this appeal given the timeframe of the alleged underlying fraud" which began in 2007 and extended through 2010, but declining to address whether the public-disclosure analysis should be split between the current and former versions of the statute depending on when the conduct occurred because the distinction did not affect the outcome of the case).  But see United States ex rel. Saunders v. Unisys Corp., No. 1:12-cv-00379 (GBL/TCB), 2014 WL 1165869, at *4 (E.D. Va. Mar. 21, 2014) (applying the 2010 FCA amendments when the purported public disclosures were made after the effective date of the amendments even though part of the alleged underlying fraud took place prior to the effective date of the amendments).  Because the 2010 amendments are not retroactive, the court applies the pre-2010 version of the statute to the conduct alleged that occurred prior to March 23, 2010 and the 2010 amendments to the conduct that occurred after March 23, 2010.

2. Application

         The Frontier Defendants cite to a number of newspaper
articles relating to the NTIA project as well as Citynet's formal
protest of the grant award.  See Exs. C, D, E, F, G, H to Frontier
Defs.' Mot. to Dismiss; Ex. 17 to Qui Tam Compl.; Exs. I, J, K to
Frontier Defs.' Reply.  The State Employees cite to the following:
NTIA's response letter to Citynet's formal protest; a letter from
Mr. Gianato to John Shimkus, the Chairman of the Subcommittee on
Environment and Economy Committee on Energy and Commerce in the
United States House of Representatives; a Legislative Audit
regarding the failure of the State to comply with purchasing laws
in the BTOP tower project; and a case study report of the social
and economic impacts of the BTOP project.  See Exs. A-D to State
Employees' Mot. to Dismiss.  The State Employees additionally
contend that the exhibits to the amended complaint "consist of
public documents, which were submitted to State and Federal
governmental bodies, or were otherwise made available to the
public."  See State Employees' Memo. in Supp. of Mot. to Dismiss
at 12-13.

         The court must first determine whether the documents to
which the defendants cite are public disclosures within the
meaning of the FCA.  As noted by our court of appeals,

> Under the prior version of the statute, disclosures in
> federal <u>and</u> state trials and hearings qualify as public
> disclosures, <u>see</u>, e.g., <u>McElmurray v. Consol. Gov't of
> Augusta-Richmond Cty.</u>, 501 F.3d 1244, 1252 (11th Cir. 2007),
> and disclosures in federal and state reports, audits, or
> investigations likewise constitute public disclosures, <u>see
> Graham Cty. Soil & Water Conservation Dist. v. United States
> ex rel. Wilson</u>, 559 U.S. 280, 301 (2010).  After the
> amendments, however, only disclosures in federal trials and
> hearings and in federal reports and investigations qualify as
> public disclosures.  <u>See</u> 31 U.S.C. §§ 3730(e)(4)(A)(i) & (ii)
> (2010).

<u>United States ex rel. May</u>, 737 F.3d at 917 (emphasis in original

and second full citation added).  Second, the disclosure must have

been made public prior to the filing of the complaint.[5]  <u>See</u>

<u>United States ex rel. Wilson v. Graham Cty. Soil & Water

Conservation Dist.</u>, 528 F.3d 292, 299 (4th Cir. 2008), <u>overruled

on other grounds by Graham Cty.</u>, 559 U.S. 280.  Finally, to

qualify under either version of the FCA, the disclosure must

reveal "allegations or transactions" of fraud, or "a false state

of facts and a true state of facts from which fraudulent activity

may be inferred."  <u>United States ex rel. Springfield Terminal Ry.

Co. v. Quinn</u>, 14 F.3d 645, 653-54 (D.C. Cir. 1994); <u>United States

ex rel. Davis v. Prince</u>, 753 F. Supp. 2d. 569, 582 (E.D. Va. 2011)

---

[5] Courts have interpreted "publicly disclosed" to mean the
documents are "generally available to public" or placed "in the
public domain."  <u>See</u> <u>Graham Cty.</u>, 528 F.3d at 307; <u>United States
ex rel. Poteet v. Bahler Med., Inc.</u>, 619 F.3d 104, 110 (1st Cir.
2010); <u>United States ex rel. Feingold v. AdminaStar Fed., Inc.</u>,
324 F.3d 492, 495 (7th Cir. 2003); <u>Springfield</u>, 14 F.3d at 654.

("[T]o qualify as a 'public disclosure,' a disclosure must reveal an allegation of fraud, or a false and true state of facts from which fraud may be inferred.").

Under both versions of the FCA, the newspaper articles submitted by the Frontier Defendants qualify as "news media." Accordingly, the documents put forward by the Frontier Defendants qualify as public disclosures under both versions of the FCA. In addition, Citynet concedes that its formal protest of the BTOP grant award qualifies as a federal administrative hearing.

As to the documents provided by the State Employees, Citynet additionally concedes that Exhibit A, the letter from Mr. Strickling of the United States DOC, and Exhibit D, the Broadband Technology Opportunities Program Evaluation Study, are public disclosures because they were generated by the federal government. See Citynet's Resp. to Frontier Defs. at 13. Because of this, they qualify as public disclosures under both versions of the FCA.

Citynet contends that Exhibits B and C provided by the State Employees are not public disclosures under the post-2010 version of the FCA because they were generated from state agencies. Id. Although the State Employees' Exhibit B is a letter written by Mr. Gianato, who is a state employee, it was

written to the U.S. House of Representatives Chairman of the
Subcommittee on Communications and Technology and to the Chairman
of the Subcommittee on Environment and Economy Committee on Energy
and Commerce, about the West Virginia Broadband Infrastructure
Project.  Because it was in response to questions posed about the
project by members of these committees, it qualifies as a federal
hearing or investigation under the post-2010 amendments and
additionally as a state report under the pre-2010 version of the
FCA.

Exhibit C is a Special Audit Report from the West
Virginia Legislature.  Because it was generated by the West
Virginia Auditor, it is a public disclosure under the pre-2010
version of the FCA, but not the post-2010 version of the FCA.
Exhibit D is a BTOP Evaluation Study, which was submitted to the
Department of the Interior.  It is a public disclosure under both
versions of the FCA.

Although Exhibits B, C, and D are public disclosures
under one or both versions of the FCA, they need not be discussed
further inasmuch as they do not contain any allegations or
transactions of fraud contained in the complaint.  Exhibit B,
which is a letter from Mr. Gianato to Chairmen Walden and Shimkus
of the United States House of Representatives, supplements earlier

responses regarding the purchase of routers for the West Virginia Statewide Broadband Infrastructure Project. While a portion of the grant funds were used to purchase routers for CAIs, no fraud alleged in the complaint relates to that portion of the project. Exhibit C is a state legislative audit relating to the failure of the state to comply with purchasing laws when it constructed 17 microwave towers under the grant project. Like the router portion of the grant project, none of the allegations of fraud contained in the complaint relate to the building of microwave towers.

Exhibit D is a case study report that examined the social and economic impacts of the BTOP grant funds in West Virginia and was "not an evaluation of the Executive Office of the State of West Virginia, its partners, or its subgrantees." See Ex. D to State Employees' Mot. to Dismiss at 2. The three purposes of the study were to: (1) identify how the grantee maximized the impact of the BTOP investment; (2) identify successful techniques, tools, materials and strategies used to implement the project; and (3) identify any best practices and gather evidence from third parties, such as consumers and anchor institutions as to the impact of the project. Id. The study does not address any of the allegations of fraud contained in the complaint.

As noted, the State Employees additionally contend that all exhibits attached to the complaint "consist of public documents, which were submitted to State and Federal governmental bodies, or were otherwise made available to the public." State Employees' Mem. at 13. The State Employees do not further explain which exhibits to the complaint they allege are public disclosures, or explain how they qualify as hearings, reports, investigations or news media under either version of the FCA. The State Employees appear to assert that any documents that were available to the public qualify as a public disclosure under the FCA. This is not the case; as noted, the documents must fall into one of the categories previously discussed under the pre-amendment or post-amendment FCA. As a result, the argument that many of these documents qualify as public disclosures can be dismissed summarily because they do not meet the requirements for a public disclosure.

As noted, under the pre-2010 FCA, disclosures in reports, hearings, audits or investigations by a state or a state agency qualify as a public disclosure. Under the post-2010 FCA, the disclosures must be made in a federal forum to constitute a public disclosure. See 31 U.S.C. 3730(e)(4)(A). Accordingly, of the documents attached to Citynet's complaint, only Exhibit 14,

which is a documents containing the Comments of Frontier before the FCC, and Exhibit 23, a news article titled "Let's bring broadband to all West Virginians," qualify as public disclosures.

Under the pre-2010 FCA, the remaining exhibits attached to the complaint must meet the requirements of administrative reports in order to qualify as a public disclosure because they do not qualify as a hearing or news media.  See Graham Cty., 559 U.S. 280 (finding that "administrative" in the pre-2010 FCA is not limited to only federal governmental agencies).  The Supreme Court, in Schindler Elevator Corp. v. United States ex rel. Kirk, interpreted "report" in the FCA broadly to its ordinary meaning, to mean "something that gives information" or a "notification," or "an official or formal statement of facts or proceedings."  563 U.S. 401, 407 (2011).  Even when applying this broad definition, many of the exhibits which the State Employees argue qualify as public disclosures must be eliminated because they are not documents created by a (state or federal) governmental agency that meet the definition of "report."  The court will address the documents that may fit this definition within the context of the specific Counts of the complaint.

<u>a. Counts I and V: Last Mile Project</u>

In Counts I and V of the complaint, Citynet alleges that the state's BTOP grant application represented that it would build a middle mile network where Frontier was to construct fiber from Central Office to Central Office or from the CAI back to the Central Office, so that other providers could connect into the network, but instead Frontier "merely constructed fiber from the CAI to Frontier's nearest utility pole (i.e., driveways to local streets) which rendered it useless to other providers.

i. Public Disclosures

As discussed, in order to qualify as a public disclosure, the documents in question must fit into one of the categories listed in section 3730(e)(4)(A), must be publicly disclosed, and must disclose allegations or transactions of fraud, or contain information from which the fraud can be inferred.

As noted, a number of newspaper articles to which the Frontier Defendants cite as well as Citynet's formal protest of the grant award qualify as public disclosures under both versions of the FCA as "news media" and as a federal administrative hearing. <u>See</u> Exs. C, D, E, F, G, H to Frontier Defs.' Mot. to

Dismiss; Ex. 17 to Qui Tam Compl.; Exs. I, J, K to Frontier Defs.'
Reply.

It is also clear that at least some of these documents
contain the allegations or transactions of fraud alleged in the
complaint regarding the building of a middle mile network.  The
Frontier Defendants' Exhibits C and D only allege that Frontier
will own the network once built, not that they are building a last
mile network instead of the middle mile network provided for in
the State's grant application.  See Frontier Defs.' Ex. C, D.
However, other articles to which the Frontier Defendants cite
contain allegations regarding Frontier's intent to or their later
actions to create a last mile instead of a middle mile network.
Most tellingly, Citynet's formal protest of the BTOP award to the
NTIA dated September 9, 2010 states that

> Secretary Goes has advised Citynet that approximately $40
> million of the BTOP funds will be given to Frontier
> Communications (as the successor-in-interest to Verizon) to
> construct "tails" to government facilities only from the
> nearest Frontier hub or similar facility.  The "tails" will
> be "last mile" fiber facilities, not middle mile fiber
> facilities, and will constitute the full extent of fiber
> construction under the EOWV's [sic] plan.  Once constructed,
> the government agencies will have the ability to order
> services from Frontier, and only Frontier pursuant to the
> already existing [Multiprotocol Label Switching] contract
> between the State of West Virginia and Frontier.
>
> . . . .

The NOFA also requires that the network resulting from the
expenditure of BTOP funds be "open." This requirement is
highly problematic in this situation on at least two
fronts. First, given that Frontier will only be
constructing "tails" or last mile facilities, there are no
facilities for other carriers to connect to as the result
of this purported "middle mile" project in violation of the
scalability requirement of the NOFA.

Second, and more troubling, is the EOWV's [sic] position that
the network is "open" simply because Frontier will permit
other entities to use the resulting facilities pursuant to
the terms of existing interconnection agreements. . . .
[O]ther potential competitors such as cable companies will
have no ability to access the fiber since they do not have
interconnection agreements with Frontier.

Ex. 17 to Qui Tam Compl. at 2, 4; see also Frontier Defs.' Ex. G

(United States DOC Response to Martin's Letter dated November 29,

2010). Newspaper articles provided by Frontier contain similar

statements. Exhibit E, an October 15, 2010 article in the

Charleston Daily Mail, reported on Martin's sending of the

aforementioned formal protest of the grant award and stated

"Martin claimed that although the state said it would use the

federal money to build a 'middle-mile' fiber optic network

competitors could connect to, it actually plans to award about $40

million to Frontier Communications Corp. to build 'last mile'

fiber facilities." See also Frontier Defs.' Ex. F (October 14,

2010 Charleston Gazette article reporting on same); Frontier

Defs.' Ex. H (December 2, 2010 Charleston Daily Mail article

reporting on the U.S. Dep. of Commerce's Response to Martin).

Newspaper articles presented by the Frontier Defendants after the broadband expansion had been completed contain similar allegations pertaining to the network as built. Exhibit I, a March 22, 2013 Charleston Gazette article states that a consulting firm hired by West Virginia Governor Tomblin's administration found that the broadband expansion project created an "unintended monopoly" for Frontier and stated that the "fragmented 'last-mile' network runs fiber 'tails' from public facilities to street-corner telephone poles. The network doesn't connect the public buildings to each other, or back to Frontier's 'central offices,' telecommunication hubs where other broadband providers could access the network." See also Frontier's Ex. J (December 10, 2013 Charleston Gazette article) and Frontier's Ex. K (March 13, 2014 The Pocahontas Times article) (both containing Martin's critique of the broadband expansion project as building a last mile instead of a middle mile network).[6] The court thus finds that the

_____

[6] As discussed, the court has reviewed the documents alleged by the State Employees to constitute public disclosures that allege the fraud contained in Counts I and V. With the exception of Exhibit A, which is the same as the Frontier Defendants' Exhibit G (Response to Martin's Formal Protest of Grant Award), none of those that qualify as public disclosures contain the allegations regarding the building of a last mile network instead of a middle mile network. Accordingly, the court need not further discuss the documents alleged by them to be public disclosures pertaining to these counts.

abovementioned exhibits contain the allegations of fraud contained in the complaint.[7]

ii. "Based Upon" / "Substantially the Same Allegations or Transactions"

The court next must determine whether, under the pre-2010 version of the FCA, the allegations regarding the building of the last mile network are "based upon" the public disclosures, and under the current version of the FCA, whether "substantially the same allegations or transactions" are publicly disclosed.

Pre-2010 FCA

As discussed, under the pre-2010 version of the FCA, our court of appeals has interpreted "based upon" to mean that the relator has actually derived the allegations in the complaint from the public disclosure. United States ex rel. Beauchamp, 816 F.3d at 40.

---

[7] Citynet does not allege that the mentioned documents have not been disclosed to the public. Inasmuch as the newspaper articles were published in three separate newspapers and Citynet's Formal Protest and the Response were described in those articles, the court finds that they were "generally available to the public" and were placed "in the public domain" so that they were sufficiently publicly disclosed within the meaning of the FCA.

In its response to the motions to dismiss, Citynet attached an affidavit of Christopher G. Morris, which explains how Citynet uncovered the allegations contained in the complaint.  <u>See</u> Ex. 2 to Citynet's Resp. to Frontier Defs.' Mot. to Dismiss.  The court will refer to the affidavit in determining whether Citynet's allegations are "based upon" the public disclosures to which the defendants cite.

It is clear from the Morris affidavit as well as the public disclosures themselves that have been discussed that Citynet had independent knowledge of the allegations pertaining to the building of a last mile network.  Citynet itself alleges that its knowledge was obtained "from a grueling multi-year independent investigation of the Defendants' fraud that cost it countless man hours and tens of thousands of dollars."  Citynet's Resp. to Frontier Defs.' at 12.  The Morris affidavit states that Citynet interviewed a member of the Grant Implementation team "who confirmed [that] the original plan of construction following the submission of the ["WVEO"] application was to build fiber from the Frontier Central Offices to the Community Anchor Institutions."  Morris Aff., ¶ 5.  The Morris affidavit also states that "Citynet reviewed a portion of Frontier's proprietary route and plate maps

as [sic] Frontier's corporate headquarters . . . to identify specifically what Frontier built with BTOP funds." Id. ¶ 15.

That Citynet had independent knowledge of the allegations pertaining to defendants' building of a last mile network is further evidenced by the fact that all the exhibits the court has determined contained allegations of fraud relating to Counts I and IV contain information from Martin, Citynet's CEO. Since Martin provided the information in the articles and formal protest, it is abundantly clear that Citynet had independent knowledge of these allegations of fraud. Accordingly, the court finds that Citynet has met its burden in establishing that the allegations in Counts I and V are not based upon public disclosures and are not barred under the pre-2010 version of the FCA.

### Post-2010 FCA

Under the post-2010 FCA, the court must determine whether "substantially the same allegations or transactions as alleged in the action" were publicly disclosed. See 31 U.S.C. § 3730(e)(4)(A) (2010). The Fourth Circuit has not had occasion to interpret the "substantially the same" language. Inasmuch as other circuits interpreted the pre-2010 FCA language to mean "substantially the same," the court can look to other circuit

authority under either version of the FCA to understand the
meaning of this phrase.  In making this inquiry, other circuits
look to whether the disclosures provide enough information so that
the government could "investigate the case and . . . make a
decision whether to prosecute" or so that the information would
"alert[] law-enforcement authorities to the likelihood of
wrongdoing."  United States ex rel. Davis v. District of Columbia,
679 F.3d 832, 836 (D.C. Cir. 2012) (internal citations and
quotations omitted); see United States ex rel. Advocates for Basic
Legal Equal., Inc. v. U.S. Bank, N.A., 816 F.3d 428, 431 (6th Cir.
2016) ("If the disclosure puts the government on notice of the
possibility of fraud surrounding the . . . transaction, the prior
disclosure is sufficient.") (internal citations and quotations
omitted); United States v. Alcan Elec. & Eng'g, Inc., 197 F.3d
1014, 1019 (9th Cir. 1999) (stating that the public disclosure bar
was triggered when the public disclosures "contained enough
information to enable the government to pursue an investigation
against [the defendant]").

        The court finds that the newspaper articles and
Citynet's formal protest of the grant award contain sufficient
detail from which the government could investigate and make a
decision whether to prosecute defendants for their alleged

building of a last mile network.  The public disclosures state that persons at Frontier, who helped write the grant proposal, planned to build and indeed did build a last mile network to which competitors were unable to connect instead of the middle mile network they purportedly alleged they would build in the grant application.

Citynet argues that at least some of the public disclosures cannot contain substantially the same allegations of fraud because they pre-dated the building under the grant project. Citynet's Resp. to Frontier Defs.' at 11-12.  To the extent those public disclosures are predictions, that Citynet itself alleges came true, they may qualify under the "substantially the same" test.  The government had enough information to determine whether defendants built the last mile network Citynet claimed it would build, or the middle mile network allegedly provided in the WVEO grant application.  Moreover, as discussed above, allegations contained in public disclosures after the grant project was completed contained similar allegations that Frontier indeed built a last mile network.  Accordingly, the public disclosures put the government on notice as to the allegations of fraud and required no more detail for them to investigate and decide whether to prosecute defendants.

iii. Original Source Exception

Citynet argues that even if substantially the same allegations are alleged in the complaint as in the public disclosures, it is an original source of the information contained in Counts I and V, so that the public disclosure bar is inapplicable. See Citynet's Resp. to Frontier Defs.' at 12. As defined in the post-2010 FCA, an "original source" is an individual who either "(i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section."[8] 31 U.S.C. § 3730(e)(4)(B).

Citynet argues that it is an original source under both exceptions contained in Section 3730(e)(4)(B). However, as noted by the Frontier Defendants, Citynet cannot claim that it meets the first original source definition inasmuch as it has not alleged that it has "voluntarily disclosed to the Government the

---

[8] The observably incorrect sequence of numbering in (i) and (2) appears in the statute. See 31 U.S.C. § 3730(e)(4)(B).

information on which the allegations or transactions in a claim are based . . . prior to a public disclosure." Id. (emphasis added). Citynet only alleges that it voluntarily provided its information to the government before it filed suit, not before the public disclosures were made. Citynet Resp. to Frontier Defs.' at 15. Therefore, although it appears that Citynet was the source of some of the public disclosures, because such information was not provided to the government before the disclosures were made, Citynet is not an original source under 31 U.S.C. § 3730(e)(4)(B)(i).

Citynet asserts that it has knowledge that is "independent of" and "materially adds to" the public disclosures under Section 3730(e)(4)(B)(2). As discussed, Citynet alleges that its knowledge of the alleged fraud came from a "grueling multi-year independent investigation" that is outlined in the complaint.[9] Citynet has thus adequately alleged that it has knowledge "independent of" the public disclosures previously discussed.

---

[9] Citynet's investigation is also outlined in the Morris affidavit. However, the court may not rely on this document in ruling on the post-2010 FCA public disclosure bar, as it is treated as a motion to dismiss pursuant to Rule 12(b)(6). United States ex rel. Beauchamp, 816 F.3d at 39.

Citynet also maintains that it has added to the public disclosures by "materially contribut[ing]" the "who, what, when, where and how of the events at issue."  Citynet Resp. to Frontier Defs.' at 13 (citing United States ex rel. Paulos v. Stryker Corp., 762 F.3d 688, 694 (8th Cir. 2014) and United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC, 812 F.3d 294, 304-06 (3rd. Cir. 2016)).  However, in listing what it has materially contributed to the public disclosures, Citynet lists items such as the providing of excessive maintenance coils and charging of improper indirect costs, which are not contained in Counts I and V.  See Citynet Resp. to Frontier Defs.' Mot. to Dismiss at 13-14.  The court cannot say that Citynet has materially contributed to these public disclosures.  While Citynet has made allegations pertaining to fraud relating to other parts of the grant application and billing, these do not "materially add" to the Count I and Count V allegations.  The public disclosures described above contained information that Frontier and its employees did not plan to build the middle mile network contemplated in the WVEO grant application but instead intended to build and indeed built a last mile network that was inaccessible to competitors.

Citynet also maintains that it relied on more information than that which was contained in the alleged public disclosures in filing the complaint. Citynet Resp. to Frontier Defs.' Mot. to Dismiss at 14. However, that Citynet conducted its own investigation to discover the information does not alter the court's analysis that it has not materially added to the public disclosures. Accordingly, Citynet's Counts I and V must be dismissed under the post-2010 FCA.

Inasmuch as Citynet's last mile network claims are not jurisdictionally barred under the pre-2010 FCA, but do not survive the motion to dismiss under the post-2010 FCA, the court ORDERS that Counts I and Counts V be, and they hereby are, dismissed with respect to Citynet's allegations of conduct occurring after the 2010 amendments to the FCA.

b. Counts II, III, VI, and VII: Billing of Prohibited Indirect Costs

The State Employees contend that the allegations contained in Counts II, III, VI, and VII were publicly disclosed.[10]

---

[10] Because the State Employees are not named in Counts IV and VIII and because the Frontier Defendants do not argue that the allegations in those counts were publicly disclosed, the court will not evaluate whether the allegations contained in those counts were publicly disclosed.

These Counts contain similar claims that defendants knowingly billed the BTOP grant fund for costs that were prohibited under the terms of the grant award. Counts II and VI relate to the billing for loadings costs which were for "allocated indirect costs such as vehicles, accounting, administration, etc." First Am. Qui Tam Compl. at ¶ 101. Counts III and VII allege that defendants billed for Facility Build Out and Invoice Fees that were prohibited indirect costs under the terms of the grant award. Id. at ¶¶ 148, 176. The alleged FBO fee was the cost to construct inside the CAI to "allow the facility to accept the newly placed fiber." Id. at ¶ 108. Citynet alleges that this fee was included in the original invoice estimates under "DMAR Const. Cost" so that Frontier double charged for this cost, which the State Employees approved. Id. at ¶ 111-112. Frontier additionally billed for significant "invoice processing fees" to each of the FBO invoices, which is an indirect cost prohibited under the BTOP grant award. Id. at ¶ 119.

As discussed previously, the State Employees provided four documents (Exhibits A through D) which they contend publicly disclose all allegations against them contained in the complaint. They additionally argue that the newspaper articles proffered in

the Frontier Defendants' memorandum in support of their motion to dismiss and the exhibits attached to the complaint additionally constitute public disclosures which bar Citynet's claims.  The court will analyze the documents to determine whether they: (1) qualify as public disclosures under the pre-amendment and post-amendment version of the FCA; (2) have been actually disclosed to the public; and (3) contain allegations or transactions relating to the fraud alleged in these four Counts or information from which fraud may be inferred.

The court need not discuss the State Employees' Exhibits B, C, and D, because the court has already concluded that they do not contain any allegations of fraud alleged by Citynet.

As noted, the State Employees' Exhibit A qualifies as a federal administrative hearing under both versions of the FCA, and the newspaper articles provided by the Frontier Defendants in their motion to dismiss qualify as "news media."  But because none of these documents contain allegations pertaining to defendants' knowingly billing the grant fund for improper indirect costs or loadings fees, they do not publicly disclose the allegations in these Counts.  Exhibit A, which is the U.S. DOC's response to Martin's formal protest of the grant award, responds only to Martin's assertions that defendants were planning to build a last

mile network that would not be accessible to other broadband providers.  The news articles provided by Frontier similarly do not discuss defendants' billing for improper fees under the grant, nor do they mention the grant billing process at all.

Many of the documents attached to Citynet's complaint clearly do not qualify as public disclosures or do not contain allegations of fraud pertaining to these Counts in the complaint so that they need not be discussed in detail.  Of the Exhibits attached to the complaint, only Exhibits 12, 17, 18, 19, 20, 21, and 22 will be discussed because they can be said to relate to defendants' alleged improper billing.

Exhibit 12 is a "working draft" for the WVEO's BTOP Budget Narrative Template.  Because it very clearly states that it is a "working draft only," the court cannot say that it qualifies as a state administrative report under the pre-2010 FCA, and it does not appear to meet any other category of public disclosures.

Exhibit 17 is a memorandum from Todorovich dated February 14, 2012, which states, among other things, that "indirect costs may not be reimbursed" under the BTOP grant.  This memorandum qualifies as a public disclosure under the pre-2010 FCA as an administrative report.  Although it does not contain an

allegation of fraud, it contains part of an inference of fraud —
the true state of facts, which is that indirect costs are not
properly reimbursable under the BTOP grant.[11]

Exhibit 18 is a state of West Virginia invoice cover
sheet, which is attached to an invoice that the cover sheet
authorizes.  The attached invoice contains a loadings fee.
Exhibit 19 is a chart prepared by Citynet that details the
invoices submitted by Frontier containing loadings fees and
Exhibit 22 is a chart prepared by Citynet that details invoices
submitted by Frontier containing invoice processing fees.
Inasmuch as the invoice cover sheet authorizes the attached
invoice, it is a state administrative report under the pre-2010
FCA because it is "something that gives information" and serves as
a "notification" that the invoices were approved.  While Exhibits
19 and 22 themselves are not public disclosures, it is unclear
whether they were created using invoices attached to a similar
authorization for payment by the state which would likewise
qualify as administrative reports.

---

[11] For the purposes of this section, the court assumes that the
Todorovich memorandum is publicly available, though the parties do
not state its origin.  Whether it is publically available is
immaterial, because, as will discussed below, the State Employees
have failed to provide the missing piece required to create the
necessary inference of fraud for these claims.

However, the invoices do not meet the second requirement of a public disclosure because it does not appear that they have been publicly disclosed. According to the Morris affidavit, "Citynet . . . independently obtained copies of every Frontier invoice submitted to the State for work it provided under the fiber network component of the BTOP Grant. Upon information and belief, these invoices were not provided to any other entity other than Citynet prior to the filing of this lawsuit." Morris aff., ¶ 12. From this statement, it can be inferred that Citynet obtained the invoices from Frontier, and that the invoices are not "generally available to the public" or have otherwise been placed "in the public domain." Defendants have not disputed this contention. Because Citynet has made an unrebutted showing that the invoices were not publicly available, at this stage, the court finds that Citynet has met its burden in establishing that the invoices, and therefore Exhibits 18, 19, and 22, are not public disclosures under the pre-2010 version of the FCA.[12]

---

[12] Even if the invoices were publicly disclosed, the court finds that Citynet has independent knowledge that materially adds to the disclosures. Citynet has explained that, under the terms of the grant, these indirect costs were not to be billed. It has established that Frontier, as sub-grantee, was bound by these terms, and has provided the motive for the improper billing: to ensure that the entirety of the grant funds would be exhausted so that none could be used by its competitors. Citynet has provided

Exhibit 20 is a letter written from McKenzie to Given dated January 29, 2013.  The letter details Frontier's invoice processing costs.  Exhibit 21 is a letter written from Waldo to Given that details invoicing under the grant for FBO fees.  Because the letters were written by persons at Frontier they cannot qualify as a state administrative report under the pre-2010 FCA, and do not appear to otherwise fit into one of the public disclosure categories.  Therefore, these letters do not qualify as public disclosures.

Because none of the exhibits claimed by the State Employees to publicly disclose the allegations in Counts II, III, VI, and VII meet all three requirements to qualify as a public disclosure under the pre-2010 or post-2010 version of the FCA, the court need not determine whether the allegations contained therein are based upon or are substantially similar to the allegations in these claims.[13]  Accordingly, the public disclosure bar does not prevent Citynet from bringing these claims.

_____

evidence that defendants had notice that Frontier was not to bill the grant for indirect costs.

[13] Because the billing under the BTOP project did not likely begin until after March 23, 2010, the effective date of the 2010 FCA amendments, it may be the case that the court need only examine whether the allegations in these claims were publicly disclosed pursuant to the post-2010 version of the FCA.  Because the pleadings do not disclose when the alleged improper billing began,

c. Count IX: Conspiracy

       In Count IX, Citynet alleges that defendants conspired

to violate sections 3729(a)(1)(A) and (B) by engaging in conduct

including: "1) providing false records and information for use in

the State's grant application and subsequent claims for payment;

2) falsifying the need for a Mitigation Plan; 3) engaging in

conduct to hide the fraudulent claims submitted to the United

States from being discovered; 4) assisting other Defendants in

submitting fraudulent claims; 5) agreeing to engage in a pattern

of conduct to allow the fraudulent claims to be submitted to, and

paid by, the United States; and 6) advising other Defendants on

how to submit fraudulent claims to be paid by the United States."

First Am. Qui Tam Compl. at ¶ 190.

       As with Counts II, III, VI, and VII, the disclosures

cited by the State Employees and the newspaper articles cited by

the Frontier Defendants in their motion to dismiss do not relate

_____

the court analyzed the documents under both versions of the FCA.
With the exception of the newspaper articles and the State
Employee's Exhibit A, which clearly do not disclose the
allegations of fraud in these claims, none of the other exhibits
claimed by the State Employees that pertain to these claims
qualify as a public disclosure under the post-2010 version of the
FCA because they were not disclosed in a federal forum, as is
required under the post-2010 version of the FCA.  Accordingly,
these claims are not publicly disclosed pursuant to the post-2010
FCA.

to the conspiracy alleged in Count IX and need not be discussed further.  As to the exhibits to the complaint, the court will only discuss the ones that could be said to refer to the fraud contained in Count IX.

Exhibits 1-3 are grant applications submitted by Frontier, Citizens Telecommunications Company of West Virginia, and the WVEO to the BTOP project.  While Exhibit 3, the WVEO grant application, may qualify as a state administrative report under the broad definition in the pre-2010 FCA, Exhibits 1 and 2 cannot qualify as administrative reports because they were not created by a state agency.  Citynet's complaint alleges that the WVEO grant application contains misrepresentations; but in order to qualify as a public disclosure containing an inference of fraud, the State Employees must point to an additional public disclosure that contains the true statements from which the fraud may be inferred.

Exhibit 6, a sheet prepared by Goes, states the terms that "All BTOP grant actions must adhere to."  It qualifies as an administrative report, but does not contain any allegations or inferences of fraud.

Exhibits 4, 5, 7, and 11, are emails between Frontier and State Employees, which Citynet acknowledges it obtained via

state FOIA requests.[14]  Because they were obtained through a State

FOIA request, they qualify as a state administrative report, which

makes them public disclosures under the pre-2010 version of the

FCA only.[15]  Because the emails are available pursuant to a state

FOIA request, they are publicly available.  However, the court

cannot say that the emails contain the same allegations or

transactions of fraud that is alleged in Count IX.  While the

emails contain information Citynet utilized in Count IX, they do

not contain information from which the government could

investigate and determine to prosecute the defendants.

---

[14] The court has analyzed the emails obtained by Citynet via state
FOIA requests only under the conspiracy claim even though the
allegations can be said to be used in other claims in the
complaint.  To the extent that the State Employees rely on the
emails to prove that the other Counts of the complaint were
publicly disclosed, the court finds that the emails alone do not
contain allegations of fraud. In addition, the State Employees
have failed to point to other public disclosures that contain the
missing link from which fraud may be inferred.  Moreover, the
court has determined that the information Citynet has obtained
from its independent investigation materially adds to the public
disclosures such that it qualifies as an original source.

[15] While the State Employees contend that many of the exhibits
attached to the complaint were obtained via a state FOIA request,
the Morris affidavit states that only the emails were obtained by
FOIA request "to various state agencies."  Morris aff., ¶¶ 10-11.
Inasmuch as the State Employees provide no evidence that other
exhibits were obtained by FOIA requests, the court concludes at
this juncture that only the emails are public disclosures under
the pre-2010 version of the FCA.

Exhibits 8, 9, 10, and 16 are various charts prepared by Citynet. Exhibit 8 lists fiber that was already built prior to WVEO's receiving of grant funds as well as fiber that was never built with grant funds. Exhibits 9 and 10 list projects where the amount of fiber needed for some sites was double counted or misrepresented. Exhibit 16 lists projects where excessive maintenance coils were used. The Morris affidavit states that the information regarding the actual amount of fiber built was gained from reviewing Frontier's "proprietary route and plate maps as [sic] Frontier's corporate headquarters in West Virginia on February 24, 2014." Morris Aff., ¶ 15. The maps, which were reviewed at Frontier's headquarters, do not fit into any of the public disclosure categories under either version of the FCA and additionally do not appear to have been disclosed to the public.

d. Conclusion

Accordingly, the court finds that Count I and Count V are publicly disclosed under the post-2010 version of the FCA only. The court additionally has determined that Counts II, III, VI, VII, and IX have not been publicly disclosed under either version of the FCA.

## E. Failure to State a Claim

The Frontier Defendants next argue that all nine Counts of the complaint fail to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).  The court will first address each claim as it pertains to Frontier, and then address the allegations as they relate to the Frontier employees, McKenzie, Waldo and Arndt.  Finally, as was previously discussed, because the court has declined to extend qualified immunity to the State Employees, the court will analyze whether the complaint states claims as to them, inasmuch as the State Employees argued that the complaint does not allege that they violated the False Claims Act.

### 1.  Claims Against Frontier

### a. Counts I and V

As noted, Counts I and V pertain to the defendants' alleged building of a last mile network instead of the middle mile network that was proposed in the WVEO grant application.[16]

---

[16] The court has already determined that Counts I and V must be dismissed with respect to allegations of conduct occurring after the 2010 amendments to the FCA.  Thus, the court analyzes Counts I and V here in light of that decision.

The Frontier Defendants first allege that the NTIA and the NOFA did not prohibit use of grant funds for last mile connections and that Frontier's work complied with the terms of the BTOP grant. Frontier Defs.' Mem. at 24. However, whether the grant funds were permitted to be used to create a last mile network is of no importance; Counts I and V allege that the WVEO grant application, which was completed by defendants and approved by the NTIA, claimed the grant money would be used to create a middle mile network and that defendants instead used that money to construct a last mile network. See First Am. Qui Tam Compl. at ¶¶ 133-139; 161-167. Review of the WVEO grant application demonstrates that the application mentions the term "middle-mile" a number of times such that Citynet's allegations that the network was intended to be a middle mile network that other providers could tap into and create their own service layer is credible at this stage in the pleadings. Moreover, although the Frontier Defendants claim that the network they constructed fit within the parameters of a "middle-mile network," the complaint sufficiently alleges that the network built was not the middle mile network alleged in the WVEO application. Whether this network was actually built in accordance with the plan set forth in the WVEO

grant application is not appropriately determined at the motion to dismiss phase.

The Frontier Defendants next contend that Citynet has not alleged that "Frontier made or caused any misrepresentations that would give rise to a claim under the False Claims Act." Frontier Defs.' Mem. in Supp. of Mot. to Dismiss at 25. In support of this argument, the Frontier Defendants argue that the complaint does not allege that Frontier misrepresented the type of infrastructure it built, that the State directed and approved the work completed by Frontier under the contract between the two parties, and that Citynet did not allege that Frontier falsely certified compliance with a contractual requirement related to the middle mile network. Id. at 25-26.

The Fourth Circuit has stated that "false claims" under the FCA should be interpreted broadly. See Harrison v. Westinghouse Savannah River Cop., 176 F.3d 776 (4th Cir. 1998). As noted by Citynet, a party who causes false claims to be submitted may be liable under the FCA even if that party did not itself submit the false claim. See United States ex rel. Tran v. Comput. Scis. Corp., 53 F. Supp. 3d 104 (D.D.C. 2014).

As argued by Citynet, the complaint alleges that as a "sub-recipient" of the grant, the Frontier Defendants caused a number of false statements in the grant application that "were designed to insure the BTOP grant be awarded and the ultimate beneficiary was Frontier." Citynet's Resp. to Frontier Defs.' Mot. to Dismiss at 18. Contrary to the Frontier Defendants' allegations, one misrepresentation alleged in the complaint was that fiber would be built from the Central Offices of Frontier to the CAIs, when instead Frontier built fiber from the CAI to the nearest utility pole.[17] See First Am. Qui Tam Compl. at ¶¶ 78-83. The complaint additionally alleges that the Frontier Defendants caused the false statements contained in the WVEO application. See id. at ¶ 38. That the State approved Frontier's work under the grant does not affect the Frontier Defendants' liability for alleged misrepresentations regarding the middle mile network that caused the grant to be awarded to the State, and Frontier as its sub-recipient. The court finds that Counts I and V sufficiently allege that Frontier, by assisting in the WVEO grant application,

---

[17] In their reply to Citynet's response to their motion to dismiss, the Frontier Defendants claim that Citynet is alleging a new fraudulent inducement theory in its response. Frontier Defs.' Reply at 5. However, the complaint specifically alleged that the WVEO grant application contained misrepresentations pertaining to the building of the middle mile network so that the funds would be awarded to the WVEO and Frontier as its sub-recipient. First Am. Qui Tam Compl. at ¶¶ 53-57,75-83.

made false statements that it would build a middle mile network and, instead, built a last mile network, and that those statements related to a claim for payment under the grant.

The Frontier Defendants next argue that Citynet has failed to allege materiality. Frontier Defs.' Mem. in Supp. of Mot. to Dismiss at 26. According to them, because the NTIA paid the grant invoices, despite the fact that Citynet raised its allegations in a formal protest submitted to the NTIA on September 9, 2010, Citynet cannot allege that the misrepresentations relating to the middle mile network were material. Id. at 27. Citynet argues that the formal protest could not have advised the NTIA of the misrepresentations in the WVEO grant application because Citynet's Formal Protest letter challenged the WVEO grant project as proposed, while the complaint challenges it as built. See Citynet's Resp. to Frontier Defs.' at 20-21.

While Citynet's formal protest letter certainly makes the prediction that defendants would not spend the money in the manner laid out in the WVEO grant application, the Frontier Defendants cannot overcome the assertions in the complaint that the NTIA was unaware that defendants built a last mile network when the network had not yet been built. In addition, as noted, Citynet additionally asserts in the complaint that defendants

misrepresented that the project could not be built "but for" federal funds, which certification was a requirement to be eligible for the grant, when defendants knew that 90 percent of the project would be built soon after the submission of the WVEO application.  Citynet's Resp. to Frontier Defs.' Mot. to Dismiss at 21.  The court agrees that these, among other misrepresentations alleged in the complaint, are sufficient to allege materiality.

Accordingly, Counts I and V sufficiently allege violations of the FCA as to Frontier.

## b. Counts II, III, VI, and VII

The Frontier Defendants next allege that Counts II, III, VI, and VII of the complaint fail to state a claim for a number of reasons.

First, the Frontier Defendants argue that Citynet's allegation that Frontier's indirect costs were not reimbursable under the BTOP grant is false.  Frontier Defs.' Mem. in Supp. of Mot. to Dismiss at 28.  They claim that as a commercial organization, Frontier was permitted to recover its own indirect costs.  Id.  In response, Citynet cites to the terms and conditions applicable to the entity awarded the grant, including

the "DOC Assistance Standard Terms and Conditions" which state
"Indirect costs will not be allowable charges against the award
unless specifically included as a cost item in the approved budget
incorporated into the award." Ex. 3 to Citynet's Resp. to
Frontier Defs.' Mot. to Dismiss at 3. Because the WVEO Budget
Narrative did not include indirect costs, Citynet alleges that
they were impermissible. Citynet's Resp. to Frontier Defs.' at
24-25. Citynet additionally contends that the Federal Acquisition
Regulations, to which the Frontier Defendants cite as permitting
Frontier to receive indirect costs, is not identified in the
applicable Award Grant Terms and Conditions and is not checked as
an applicable term and condition on the grant award. Id. at 26.

The Frontier Defendants also attempt to argue that
Frontier's indirect costs were negotiated with the State as set
forth in the Multiprotocol Label Switching Contract and the MOU
entered into with Frontier. Frontier Defs.' Mem. in Supp. of Mot.
to Dismiss at 28-29. However, Citynet alleges that as a sub-
recipient of the grant award, Frontier agreed to comply with terms
and conditions that prohibit the reimbursement for indirect costs
that were not included in the State's line-item budget. The court
agrees that Citynet has adequately alleged that indirect costs
were not reimbursable under the terms that the grant recipient,

the WVEO, and the sub-recipient, Frontier, agreed to in accepting the grant award.  Whether these costs were in fact reimbursable is a question of fact not properly decided at this stage.  Citynet has additionally alleged that despite the fact that indirect costs were not reimbursable, defendants made false claims for payments based upon them.

The Frontier Defendants also argue that despite whether or not the indirect costs were ultimately reimbursable from the grant award, Frontier "was entitled to invoice West Virginia for the indirect costs, included as separate line items" on the invoices.  Frontier Defs.' Mem. in Supp. of Mot. to Dismiss at 29, n.20.  While it may be true that the State could have paid Frontier directly for its indirect costs and not sought reimbursement from the grant funds for these fees, the complaint alleges that Frontier billed for these fees so that the entire amount of the grant funds would be expended and could not go to other recipients.  From this it can be inferred that Frontier was aware that grant funds were being used to pay these costs and not the State itself.

The Frontier Defendants next assert that these claims must be dismissed because Citynet does not allege that Frontier misrepresented the costs included in its invoices.  According to

them, because the indirect costs were not concealed on the
invoices and Citynet has not alleged any "objective falsehoods" on
the Frontier Defendants' part, Citynet cannot establish the
falsity required for a FCA violation.  Frontier Defs.' Mem. in
Supp. of Mot. to Dismiss at 29-30; Frontier Defs.' Reply at 8.

          In response, Citynet asserts that the complaint sets
forth that the Frontier Defendants "engaged in a fraudulent course
of conduct in order for Frontier to get reimbursed for indirect
costs not reimbursable under the BTOP grant."  Citynet Resp.to
Frontier Defs.' at 27-28.  Indeed, the complaint alleges that
Frontier's goal was to expend the entirety of the grant funds it
was awarded through the WVEO grant so that other grant applicants
would not receive any of the excess funds.  First Am. Qui Tam
Compl. at ¶ 96.  The complaint also alleges that Ms. Given began
knowingly approving improper loading fees and invoice processing
fees when she began working for the State even after defendants
were advised that indirect costs were not reimbursable under the
grant.  Id. at ¶¶ 96, 99, 106.

          The court finds that these allegations sufficiently
allege that indirect costs were not reimbursable under the grant,
that Frontier knew that indirect costs were not reimbursable but
submitted invoices to the government that contained indirect costs

as a measure to ensure that there were no excess funds that competing broadband companies could receive.  These allegations amount to more than "a run-of-the-mill breach of contract action" that the Frontier Defendants assert is alleged.  See Frontier Defs.' Mot. to Dismiss at 29.  That the indirect costs were listed on the invoices and were not concealed does not change this analysis; the complaint alleges that Frontier invoiced and received from the government "money the government otherwise would not have paid."  See Chesbrough v. VPA, P.C., 655 F.3d 461, 467 (6th Cir. 2011).

The court accordingly finds that Counts II, III, VI, and VII sufficiently allege violations of the FCA against Frontier.

## c.  Counts IV and VIII

The Frontier Defendants next allege that Counts IV and VIII must be dismissed because they fail to allege falsity. Frontier Defs.' Mot. to Dismiss at 30.  These claims relate to the allegations that Frontier and Mark McKenzie billed for materials and services that were not provided.  First Am. Qui Tam Compl. at ¶¶ 155, 183.  According to the Frontier Defendants, the location construction requests were simply estimates and requests for approval to begin work, and were not invoices.  Frontier Defs.'

Mem. in Supp. of Mot. to Dismiss at 30. When Frontier billed the State for the actual work performed, it explained differences between the estimates in the LCRs. Id. The Frontier Defendants also claim that Citynet has not alleged "a single instance where Frontier billed the State for labor and materials that were not in fact provided." Id. at 30-31. Finally, the Frontier Defendants contend that Citynet has failed to allege any misrepresentations associated with its allegations that Frontier used excessive maintenance coils on site or that it falsified the number of fiber strands it provided on multiple jobs. Id. at 31; id. at 31, n. 21.

In response, Citynet first contends that the Frontier invoices do not show what Frontier billed for the actual work performed because the invoices do not show how much fiber was built on each project. Citynet Resp. at 30 (citing to Ex. 6 to the Resp.). As a result, determining the amount of fiber built on each project, requires looking to the LCR. Id. Moreover, Frontier updated the LCRs to show how much fiber was built on each project, so that the State could compare the invoice to the LCR to ensure that the fiber amount matched, but Frontier did not always explain the difference in the invoice when the amount of fiber was modified. Id.

Citynet also argues that the engineering maps (sometimes referred to as route and plate maps) which it references do not contain the same amounts of fiber built as is listed on the invoices and LCRs.  Id.  Contrary to the Frontier Defendants' assertions otherwise, Citynet does not contend that the LCRs reflect the true amount of fiber built.  Frontier Defs.' Reply at 9.  The complaint alleges that the engineering maps, which Citynet was only able to examine and not make copies of, illustrate the true amount of fiber that was built, and demonstrate that Frontier built a lesser amount of fiber than it billed for on the LCRs and invoices.  Id.  Citynet attached a chart to the complaint that listed examples where Frontier charged for fiber that was not built.  The court finds that, at this stage, Citynet has sufficiently alleged that the LCRs with the invoices submitted to the State misrepresented the amount of fiber Frontier built, as compared to Frontier's engineering maps, which stated the amount of fiber that was actually built.

The Frontier Defendants also incorrectly asserts that there are no misrepresentations pertaining to excessive maintenance coils in the complaint.  The complaint alleges that Frontier used excessive maintenance coils to inflate the number of fiber miles it built and billed the grant for the excess fiber

coils as if it were building the fiber, not hanging it on utility poles.  Citynet included as an exhibit a chart which identifies thirty projects where excess maintenance coils were used.  The allegations, if proven, would support a finding that Frontier did not build the fiber it claimed it would build, and instead coiled excessive fiber in maintenance coils in order to bill down the grant funds.  See Ex. 16 to First Am. Qui Tam Compl.  The court finds that on these facts, Counts IV and VIII allege violations of the FCA by Frontier.

d. Count IX

The Frontier Defendants also argue that Citynet has failed to plead that the Frontier Defendants conspired to violate the FCA with particularity.  See Frontier Defs.' Mem. in Supp. of Mot. to Dismiss at 31.

The Frontier Defendants correctly point out that a relator must allege when the conspiracy began, who entered into it, and what overt acts were committed in furtherance of it.  See United States ex rel. Ahumada v. Nish, 756 F.3d 268, 282 (4th Cir. 2014).

The Frontier Defendants first allege that Citynet cannot plead a conspiracy because it has failed to demonstrate an

underlying violation of the Act.  However, as is discussed above, the court has found that Citynet has adequately alleged violations of the FCA in other Counts in the complaint.

Next, the Frontier Defendants allege that Citynet has failed to allege any facts in support of the conspiracy.  Frontier Defs' Mem. in Supp. of Mot. to Dismiss at 32.  According to them, Citynet "never ties those misrepresentations to alleged violations of the False Claims Act."  The Frontier Defendants also argue that the overt acts listed in the complaint "have nothing to do with the claimed violations" of the FCA because they do not allege materiality and are not supported by factual allegations.  Id. at 32-33.

In response, Citynet contends that the complaint contains the following allegations that support its claim of conspiracy to violate the FCA: "1) the defendants participated in a scheme to defraud the NTIA by obtaining middle-mile funds to build a last-mile network; 2) Frontier assisted the State in identifying the CAIs to receive fiber under the grant as well as the number of miles of fiber needed to reach the CAIs; 3) Defendants Arndt, McKenzie, and Frontier caused numerous false statements to be made in the Grant Application to ensure that the NTIA awarded the State BTOP money[;] 4) Frontier devised a plan to

expend all $42 [million] of the grant though fraudulent invoices containing prohibited indirect costs, FBO charges and invoice-processing fees; and 5) Defendant Given assisted Frontier in its scheme by processing Frontier's fraudulent invoices with no oversight." Citynet Resp. to Frontier Defs.' Mot. to Dismiss at 33. Citynet also argues that it identified the misrepresentations made by defendants in the application, as is discussed more thoroughly above.

The court agrees that Citynet has sufficiently set forth the who, what, and when of the conspiracy with adequate particularity. The complaint alleges that defendants worked together to prepare the WVEO grant and prepared it containing a number of misrepresentations so that it would be awarded and with the knowledge that Frontier would become a sub-recipient of the grant. Once awarded, it is alleged that the defendants did not build the network that the grant stated they would build, but built substantially less miles of fiber because the network was already mostly built, and additionally worked together, with the Frontier Defendants submitting and the State Employees approving invoices containing impermissible invoice fees, so that the grant money would be expended and not given to other applicants who applied for grant funds.

The court finds that these allegations, if proven, give rise to the inference that defendants had an implied agreement to violate the FCA, and that Citynet has alleged overt acts committed in furtherance of the conspiracy.

### 2. Allegations against Arndt, Waldo and McKenzie

The Frontier Defendants argue that the allegations contained in the complaint against Arndt, Waldo, and McKenzie "are particularly weak." Frontier Defs.' Mem. in Supp. of Mot. to Dismiss at 33. In response, Citynet focuses on overt acts in the complaint that are alleged to be committed in furtherance of the conspiracy to violate the FCA and do not focus on the other claims against Arndt, Waldo, and McKenzie. See Citynet Resp. to Frontier Defs.' Mot. to Dismiss at 34.

As to defendant McKenzie, the complaint alleges that he assisted with the submission of the WVEO grant application with the intent that Frontier be the actual recipient of the grant funds awarded to the WVEO. First Am. Qui Tam Compl. at ¶ 31. The complaint also alleges that McKenzie caused the false statements in the WVEO grant application to ensure that the funds would be awarded. Id. at ¶ 38. McKenzie also allegedly submitted false invoices, signed the inaccurate LCRs, sought payments for services

and materials not permitted under the grant award, and provided a list of costs for processing each invoice.  Id. at ¶¶ 6, 88-91, 113.

As to defendant Arndt, the complaint alleges that Arndt assisted in making false statements in the WVEO application to ensure the funds would be awarded and that Arndt knew that 90 percent of the proposed WVEO project existed or would soon be completed without the assistance of grant funds.  Id. at ¶¶ 38, 53.

The complaint alleges that defendant Waldo assisted with the submission of the WVEO application, that Waldo assisted McKenzie in negotiation of the improper invoice processing fees that were ultimately contained in the invoices submitted to the State for payment, and that Waldo misrepresented the amount of fiber to the West Virginia legislature that was included in the maintenance coils.  Id. at ¶¶ 2, 114, 115.

The court finds that the allegations state a claim against McKenzie, Waldo, and Arndt as to Counts I and V of the complaint.  As noted, the complaint alleges that Waldo and McKenzie assisted with the submission of the WVEO grant application, that Arndt and McKenzie caused the false statements

in the application pertaining to the building of a middle mile network so that the funds would be awarded, and that Arndt was aware that 90 percent of the stimulus project would be completed shortly.  These facts sufficiently allege that Arndt, McKenzie, and Waldo participated in the submission of the grant application, and caused and were aware of misrepresentations that were made so that Frontier would receive funds as a sub-recipient of the WVEO grant award.

The court finds that Counts II and VI state a claim against defendant McKenzie but not Waldo or Arndt.  The complaint alleges that McKenzie sought payment for services and materials not permissible under the grant award, which including the alleged improper loading fees, but contains no similar allegations the Waldo or Arndt sought payment for loadings fees that were not reimbursable under the grant award.

Counts III and VII state a claim against McKenzie and Waldo, but not Arndt.  The complaint contains allegations that McKenzie and Waldo negotiated the improper invoice-processing fees that were not added to the invoices until after defendant Goes became employed by the State and that they billed for this fee even though they were aware that a State employee stated that indirect costs were not reimbursable under the grant award.

Because no similar allegations are made against Arndt, the
complaint fails to state a claim against him as to Counts III and
VII.

Counts IV and VII state a claim against McKenzie.  The
complaint alleges that McKenzie submitted false invoices, signed
inaccurate LCRs and sought payment for services and materials not
permitted under the grant award, and provided a list of costs for
processing each invoice.  Id. at ¶¶ 6, 88-91, 113.  These
statements sufficiently allege that McKenzie billed for, among
other things, more fiber than was actually built, and excessive
maintenance coils.

The court additionally finds that Citynet has adequately
alleged each of McKenzie's, Arndt's, and Waldo's role in the
conspiracy to violate the FCA and overt acts in furtherance of the
conspiracy.

3. Allegations against the State Employees

The court will consider the allegations pertaining to
each of the State Employees and determine whether the seven Counts
in the complaint state a claim against them.

The complaint alleges that Gianato and Goes, along with
others including McKenzie and Frontier participated in preparing
the WVEO grant application with the intention that Frontier be the
recipient of the grant funds.  First Am. Qui Tam Compl. at ¶ 31.
The WVEO, at the direction of Goes and with Frontier's knowledge,
took Frontier's last mile BTOP application and regenerated it as
their own to make it more attractive to the NTIA.  Id. at ¶ 30.
When asked by the NTIA, Gianato represented that the fiber
estimates included in the WVEO grant application was for new fiber
that did not already exist.  Id. at ¶ 32.  The WVEO, Goes,
Gianato, and Frontier were aware that middle mile projects
received special priority under the NOFA.  Id. at ¶ 34.  Goes,
Gianato, and others caused false statements in the WVEO
application, including: 1) a middle mile network would be built;
2) no part of the service layer would be funded by the grant; 3)
the CAIs did not already have fiber service; 4) no middle mile
network existed in West Virginia; 5) the number of fiber miles
needed for service and the distances to the CAIs; 6) the project
complied with NOFA because no private entity could afford to build
the network; and 7) broadband services purchased by the State

could be resold to individuals and private businesses.  <u>Id.</u> at ¶¶ 38, 40-57.

While the grant application contemplated a middle mile network, to which other competitors could connect, Gianato made the unilateral determination to approve the decision not to build the fiber back to the Central Offices.  <u>Id.</u> at ¶ 79.

The court finds that these allegations set forth claims pursuant to Counts I and V that Gianato and Goes, but not Given, violated the FCA.  These allegations set forth that Goes and Gianato participated in applying for the BTOP grant, which they knew contained misrepresentations.  While they planned to build a last mile network to benefit Frontier, they submitted a grant application for a middle mile project because they knew it would be more favorable.  In addition, Gianato unilaterally permitted Frontier not to build the fiber back to the Central Offices. Accordingly, Citynet has alleged that Gianato and Goes presented or caused to be presented, and used or caused to be used, false records or statements pertaining to the building of a middle mile network.  Because there are no allegations against Given that pertain to the misrepresentations in the grant application pertaining to the building of the middle mile network, these claims must be dismissed against her.

## b. Counts II, III, VI, and VII

The complaint alleges that Given and Gianato assisted in the plan to ensure that all the grant funds were expended for Frontier's benefit so that its competitors could not utilize the remaining funds by, inter alia,: knowingly approving improper "loading" and "invoice processing fee" charges and purposefully holding Frontier's invoices for up to eighteen months at a time so that other providers would not be able to determine whether surplus funds would be available. Id. at ¶ 94. Most of these changes occurred after Given became the Chief Technology Officer. Id. at ¶ 94. Gianato originally requested that Col. Todorovich create a "bucket of money" that could be accessed without oversight, but he refused to allow it. Id. at ¶ 97. However, once Given became Chief Technology Officer, Given took exclusive control over approving Frontier's invoices. Id. at ¶ 100. Thereafter, Frontier began submitting, and Given began approving, invoices with loadings charges, FBO charges, and significant invoice processing fees. Id. at ¶¶ 100-119. These charges were indirect costs which were not permitted under the grant and which Col. Todorovich previously refused to approve. Id. at ¶¶ 96, 106. In addition, once Given arrived, she along with Gianato held hundreds of invoices for months, which prevented other providers

from determining whether surplus funds would be available, and caused the State to rush payment of Frontier's invoices.  Id. at ¶¶ 120-122.

The court concludes from these facts that Citynet adequately alleged that Gianato and Given accepted Frontier's invoices containing impermissible indirect costs, and billed them to the grant fund knowing that they were impermissible. Accordingly, the court finds that Counts II, III, VI, and VII state a claim against Gianato and Given.  Because the complaint does not likewise allege that Goes was involved in the billing process, or was aware of the invoices containing the impermissible indirect costs, these counts must be dismissed as to her.

## c. Count IX

Count IX alleges that defendants conspired to violate the FCA.  The complaint alleges acts committed by Gianato, Goes, and Given in furtherance of the conspiracy, including their inclusion of misrepresentations in the WVEO grant award so that the funds could go to Frontier, and the billing of improper fees after notice that they were impermissible in order to expend the grant funds.  For these reasons, and the reasons set forth in the court's earlier discussion regarding the conspiracy claim, the

court finds that Count IX alleges a cause of action as to Gianato, Goes, and Given.

### 4. Summation

Accordingly, the court finds that the complaint fails to state a claim against Waldo in Counts II and VI; Arndt in Counts II, III, VI, and VII, Given in Counts I and V; and Goes in Counts II, III, VI, and VII.

## VI. Conclusion

For the reasons set forth above, the court accordingly ORDERS that:

1.   The motion to file a second surreply, filed by Citynet on June 21, 2017 be, and it hereby is, denied;

2.   The Frontier Defendants' motion to dismiss be, and it hereby is, granted to the extent set forth below, and is otherwise denied;

3.   The State Employees' motion to dismiss be, and it hereby is, granted to the extent set forth below, and is otherwise denied;

4.    Counts I and V of the complaint be, and they hereby are, dismissed with respect to Citynet's allegations of conduct occurring after the 2010 amendments to the FCA;

5.    Counts I and V of the complaint be, and they hereby are, dismissed as to defendant Given for failure to state a claim;

6.    Counts II and VI be, and they hereby are, dismissed as to defendants Waldo, Arndt, and Goes for failure to state a claim; and

7.    Counts III and VII be, and they hereby are, dismissed as to defendants Arndt and Goes for failure to state a claim.

The Clerk is directed to transmit copies of this memorandum opinion and order to counsel of record and any unrepresented parties.

ENTER: March 30, 2018

John T. Copenhaver, Jr.
United States District Judge