## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| **CITYNET, LLC**, on behalf of the United States of America, | ) ) ) | |
| Plaintiff/Relator, | ) ) | **Civil Action No.: 2:14-CV-15947** |
| v. | ) ) | |
| **FRONTIER WEST VIRGINIA INC.**, a West Virginia corporation, **KENNETH ARNDT**, individually, **DANA WALDO**, Individually, **MARK McKENZIE,** Individually, **JIMMY GIANATO**, individually, and **GALE GIVEN**, individually, | ) ) ) ) ) ) ) ) ) | **Judge: Copenhaver** |
| Defendants. | ) | |

## <u>INTEGRATED PRETRIAL ORDER</u>

Pursuant to the Court's Scheduling Order and Local Rule of Civil Procedure 16.7(b), Plaintiff Citynet, LLC and the Frontier Defendants (Frontier West Virginia Inc., Kenneth Arndt, Dana Waldo and Mark McKenzie) submit this proposed Integrated Pretrial Order.

**I.      Rule 26(a)(3) Disclosures**

Each party filed their respective Rule 26(a)(3) disclosures on August 24, 2022. The parties' disclosures and objections are attached hereto as Exhibits A through D.

**II.      Contested Issue of Law to be ruled upon before trial**

      A.   Frontier's Motion for Partial Summary Judgment [ECF 222]; Citynet's Response in Opposition [ECF 233]; Frontier Defendants' Reply in Support [ECF 235];

      B.   State Defendants' Motion for Summary Judgment [ECF 378]; Citynet's Response in Opposition  [ECF 396], State Defendants' Reply [ECF 400];

      C.   Frontier Defendants' Motion for Summary Judgment [ECF 380]; Citynet's Response in Opposition [ECF 393]; Frontier Defendants' Reply [ECF 402];

D. Citynet's Motion for Partial Summary Judgment [ECF 382]; Response in Opposition by State Defendants [ECF 391]; Response in Opposition by Frontier Defendants [ECF 392]; Citynet's Reply to State Defendants' Response [ECF 404]; and Citynet's Reply to Frontier Defendants' Response [405];

E. Motions in Limine:

    i.  Citynet's Motions:

        1.  Citynets Motion in Limine to Preclude Erroneous Arguments Regarding Suttle & Stalnaker PLLC [ECF 427];

        2.  Citynet's Motion in Limine to Exclude the Expert Testimony of James Thomas [ECF 428];

        3.  Citynet, LLC's Motion in Limine for an Adverse Inference Regarding the Frontier Defendants' Missing Maps [ECF 429];

        4.  Citynet's Motion in Limine to Exclude Evidence of Audits [ECF 430]; and

        5.  Citynet's Motion in Limine to Exclude Certain Emails as Inadmissible Hearsay [ECF 432].

ii. Frontier Defendants' Motions:

1. Frontier Defendants' Motion in Limine #1: To Exclude Damages Theories And Evidence Not Disclosed Until After The Close Of All Discovery Including Expert Depositions [ ECF 422];

2. Frontier Defendants' Motion in Limine #2: To Exclude Evidence, Testimony, And Argument Sounding In Antitrust, Interconnection, Or Competition Claims [ECF 423];

3. Frontier Defendants' Motion in Limine #3: To Exclude Todorovich's Testimony About A Conversation He Did Not Hear [ECF 424];

4. Frontier Defendants' Motion in Limine #4: To Exclude Misrepresentations About The State's Grant Application [ECF 425];

5. Frontier Defendants' Motion in Limine #5: Regarding State Defendants' Motions In Limine [ECF 426].

## III.   Brief statement of the case

### A.   **Plaintiff's Statement**

This case involves alleged violations of the False Claims Act by Defendants, Frontier West Virginia, Inc., Kenneth Arndt, Dana Waldo and Mark McKenzie ("the Frontier Defendants")[1]

---

[1] Kelley Goes was dismissed without prejudice from the case on March 30, 2018 [ECF 93]. Recently, Citynet and the State Defendants, Jimmy Gianato and Gale Given announced that the claims between them have been resolved subject to further discussions between them and counsel for the United States of America on distribution of the same. Due to the late hour of this agreement, Citynet proposed to the Frontier Defendants that they obtain a short extension of the deadline to file this Integrated Pretrial Report so that the parties could adequately amend their respective submissions to the same to reflect the change this agreement would bring to the trial of this matter. The Frontier Defendants would not agree to do so. Accordingly, Citynet respectfully reserves the right to seek leave to amend its portions of this document should it determine additional information needs added or modified once the State Defendants are dismissed from the case.

regarding the application of the West Virginia Executive Office to the National Telecommunications and Information Administration ("NTIA") for funds distributed pursuant to the Broadband Technology Opportunities Program ("BTOP"). The parties' dispute centers on how the representatives with the State of West Virginia and the Frontier Defendants obtained the BTOP grant, used the funds from the grant, and administered the network built with grant funds. Citynet contends that the Frontier Defendants colluded with individuals from the State of West Virginia to unlawfully obtain the BTOP grant, fraudulently obtain money from the grant for indirect charges and profit, and close off the network built with BTOP funds, which was intended to be an open access middle mile network that would foster competition and spur additional build-out of broadband into the communities of West Virginia.

The Frontier Defendants were subrecipients of a BTOP grant issued by the NTIA to the Executive Office of the State of West Virginia ("WVEO"). The operative pleading is Plaintiff's First Amended Qui Tam Complaint [ECF. No. 30]. Citynet asserts nine causes of action:

Count I: 31 U.S.C. § 3729(a)(1)(A) – Defendants knowingly presented, or caused to be presented, to the United States Government, at least 631[2] false or fraudulent claims for payment or approval by seeking payment from funds restricted to an approved NTIA grant award for construction of middle-mile network for work Frontier conducted constructing a non-approved last mile project.

Count II: 31 U.S.C. § 3729(a)(1)(A) – Defendants knowingly presented, or caused to be presented, to the United States Government, at least 624 false and fraudulent claims for payment

---

[2] The number of claims in the First Amended Complaint has been changed in this document to reflect information produced in discovery.

or approval by seeking payment of no less than $4,553,387.31[3] in prohibited Loadings and Indirect Costs under the BTOP award grant.

Count III: 31 U.S.C. § 3729(a)(1)(A) – Defendants knowingly presented, or caused to be presented, to the United States Government, 329 false and fraudulent claims by seeking payment for $593,888.20[4] in prohibited FBO Invoicing Fees and Indirect Costs under the BTOP award grant.

Count IV: 31 U.S.C. § 3729(a)(1)(A) – Defendants Frontier and Mr. McKenzie knowingly presented or caused to be presented, to the United States Government, false and fraudulent claims by seeking payment for materials and service that were not provided under the BTOP award grant, including, but not limited to: 1) including excessive maintenance coils in the "as-built" amounts; 2) falsifying the total length of fiber built; and 3) falsifying the number of fiber strands provided on multiple jobs.

Count V: 31 U.S.C. § 3729(a)(1)(B) – Defendants knowingly made, used, or caused to be made or used, 631 false records or statements material to false or fraudulent claims that were presented to the United States Government for payment from funds restricted to an approved NTIA grant award for construction of a middle-mile network that Frontier conducted constructing a non-approved last mile project.

Count VI: 31 U.S.C. § 3729(a)(1)(B) – Defendants knowingly made, used, or caused to be made or used, 624 false records or statements material to false or fraudulent claims that were

---

[3] As described in its Motion for Partial Summary Judgment, Citynet believes the actual recoverable amount is $7,075,580.19 or more.
[4] As described in Citynet's Motion for Partial Summary Judgment, the actual number at issue appears to be $461,106.94.

presented to the United States Government for payment of no less than $4,553,387.31[5] in prohibited Loadings and/or Indirect Costs under the BTOP grant award.

Count VII: 31 U.S.C. § 3729(a)(1)(B) – Defendants knowingly made, used, or caused to be made or used, 329 false records or statements material to false or fraudulent claims that were presented to the United States Government for payment of no less than $593,888.20 in prohibited FBO Invoicing Fees and/or Indirect Costs under the BTOP award grant.

Count VIII: 31 U.S.C. § 3729(a)(1)(B) – Defendants Frontier and McKenzie knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims that were presented to the United States Government for payment of materials and services that were not provided under the BTOP award grant, including but not limited to, 1) excessive maintenance coils in the "as-built" amounts; 2) falsifying the total length of fiber built; and 3) falsifying the number of fiber strands provided on multiple jobs.

Count IX: 31 U.S.C. § 3729(a)(1)(C) – Defendants conspired to violate 31 U.S.C. § 3729(a)(1)(A) and (B) by engaging in conduct, including, but not limited to: 1) providing false records and information for use in the State's grant application and subsequent claims for payment; 2) falsifying the need for a Mitigation Plan; 3) engaging in conduct to hide the fraudulent claims submitted to the United States from being discovered; 4) assisting other Defendants in submitting fraudulent claims; 5) agreeing to engage in a pattern of conduct to allow the fraudulent claims to be submitted to, and paid by, the United States; and 6) advising other Defendants on how to submit fraudulent claims to be paid to the United States.

---

[5] As with Count II, the number of claims and the amount of impermissible charges is greater due to information gathered in discovery. Citynet believes the amount of impermissible charges to be $7,075,580.19 or more.

For each count, Citynet seeks a civil penalty of not less than $5,500 and not more than $11,000 for each of the false claims (false or fraudulent claims for payment; false or fraudulent claims for payment of Loadings and Indirect Costs; false or fraudulent claims for payment of FBO Invoicing Fees and Indirect Costs; false or fraudulent claims for payment for excessive maintenance coils, payments predicated on false mileage claims, and payments predicated on fraudulently inflated numbers of fiber strands provided on multiple jobs) submitted to the United States pursuant to 31 U.S.C. § 3729(a)(1). Citynet also seeks three times the amount of damages sustained by the United States and its fees and costs related to this suit. *See* 31 U.S.C. §§ 3729(a)(1); (a)(3).

### B.   Frontier Defendants' Statement

These claims arise out of a grant from the federal Broadband Technologies Opportunity Program (BTOP) that Citynet wanted and applied for, but did not get. After the grant was awarded to the State instead—and after the State engaged Frontier to build the project—Citynet launched an aggressive campaign to derail the project, including a formal protest to the granting agency, the Department of Commerce's National Telecommunications and Information Administration (NTIA). That protest was formally rejected. Citynet's primary objection to the grant is that it did not build the particular infrastructure that Citynet wanted to build. The infrastructure Citynet wanted to build would have provided Citynet opportunity to obtain more customers and earn more money. The State and NTIA decided to go a different direction.

Frontier agreed to build the needed network facilities for the State under the State grant award. In that regard, Frontier became a subrecipient of the grant on the explicit condition, set forth in writing under in a Memorandum of Understanding (MOU) with the State, that any costs not compensable under the BTOP grant, if any, would still be paid to Frontier by the State under

the MPLS contract.  In other words, the State agreed that Frontier would be paid all of its charges associated with the grant, either from the grant funds or from the State.

Citynet alleges that the State and Frontier worked together to draft the State's grant application. But Frontier did not help the State write its grant application or participate in developing the State's grant application in any way.  Moreover, the fiber facilities constructed were as described in the State's application. Any adjustments during construction were consistent with the State's application and approved by both the State and NTIA. From beginning to end, the entire project was subjected to pervasive oversight and ongoing monitoring by the State and NTIA.

Frontier's charges were all proper. Frontier's charges were subject to review by the State's auditor (Ernst & Young) and also independently audited by Frontier's auditor (KPMG). The State's auditor expressly approved Frontier's loadings charges. KPMG noted no issues with Frontier's submission of the loadings charges for payment by the grant. The "loadings" in question are $4.24 million. In addition to the loadings charges, two additional categories of Frontier's charges are challenged by Citynet. First, Frontier's facilities build-out (FBO) charges were charges for Frontier's oversight and invoice processing of third-party contractors retained to perform the needed work inside the premises of the customer premises. That amount was $465,000. The State and NTIA approved these charges during the project. Second, consistent with industry standard, Frontier installed "maintenance coil" or "slack" fiber at intervals along the network. This fiber is used for repairs or when additional fiber is needed to serve new customer. The amount in dispute for this component is $244,200. The State and NTIA approved these charges during the project. KPMG found Frontier compliant in all material respects with the project guidelines and generally accepted accounting principles.

Frontier Defendants refer to and incorporate their summary judgment filings as setting forth all elements of proof required under Citynet's claims.[6]

**Citynet's Objections to the Frontier Defendants' Statement**

Objection One: The Frontier Defendants contend that the State and the Frontier Defendants agreed "that any costs not compensable under the BTOP grant, if any, would still be paid to Frontier by the State under the MPLS contract." That is an inaccurate and incomplete reading of the agreement. The MOU specifically required the Frontier Defendants to "separately invoice EOWV for other costs that are not eligible under the Grant." Every invoice the Frontier Defendants submitted was designated for "Project Billing for BTOP Funding," and it never submitted separate invoices for costs that were not compensable under the BTOP grant.

Objection Two: The Frontier Defendants contend, "Frontier did not help the State write its grant application or participate in developing the State's grant application in any way." That is inaccurate, and the application itself demonstrates this. The application itself notes, "Weekly, senior leadership from both Verizon and Frontier meet with the West Virginia Secretary of Commerce regarding broadband initiatives and planning for West Virginia." [ECF No. 30-3] at 26. The Frontier Defendants' 30(b)(6) deponent admitted that state officials met with representatives from Frontier numerous times as the state prepared its grant application, and several of those times the parties discussed applications for the BTOP grant. The Frontier Defendants also met with Defendant Gianato and provided him with latitude and longitude information for coverage mapping purposes. The Frontier Defendants' 30(b)(6) deponent admitted that this information was part of what the state of West Virginia needed to submit its BTOP grant

---

[6] The Frontier Defendants have not made objections to Citynet's Statement of the Case, as Citynet has done below. The Frontier Defendants' position is that such objections are not contemplated by any applicable Rules or the Court's Scheduling Order, and thus are both unnecessary and improper.

application. Several emails show that the Frontier Defendants were actively meeting with the State of West Virginia, and the parties repeatedly discussed BTOP funding. Therefore, to the extent the Frontier Defendants contend they did not help "in developing the State's grant application in any way," the evidence—and their 30(b)(6) deponent's testimony—refutes that contention.

Objection Three: The Frontier Defendants misrepresent the scope of the audits in this case. The "approval" that the Frontier Defendants rely came after the Frontier Defendants had been submitting invoices on the BTOP grant for 18 months or more.  More importantly, the state's auditor did not expressly approve the "loadings" charges; instead, Gale Given "made a case" to the auditor to find that the charges were permissible.  The auditor, however, expressly cautioned the state that "you do have a responsibility to bill to the government only those costs billed by Frontier that are allowable per the cost principles (see 31.205-1 through 31.205-52). Also, you are responsible for assessing Frontier's costs to ensure it is not making a profit on the project but is rather billing only its costs." There is no evidence that KPMG ever reviewed the allowability of indirect costs during its audit; however, several times it cautioned the Frontier Defendants that indirect costs were not allowable under the BTOP grant. Indeed, the evidence shows Mark McKenzie sought a letter from the State stating the charges were payable.  Therefore, no auditor or audit ever expressly determined "loadings" were a permissible cost under the BTOP grant, and no auditor "approved" of it before the Frontier Defendants assessed those charges.

Objection Four: While Frontier seeks to create a dispute as to the amount of the Loadings, the evidence demonstrates that the amount is $7,075,580.19. While the OIG report determined the amount of disallowed loading to be $ 4.24 million, documents produced in this case show the amount is more given the method in how Frontier calculated the charges.

<u>Objection Five</u>: The State and NTIA never "approved" the Frontier Defendants' FBO charges. Instead, they approved costs described in a letter prepared by Defendant McKenzie that the Frontier Defendants contended were accurate representations of their invoice processing costs. But Defendant McKenzie admitted that he had no documentation to support the fictitious charges in the letter, the letter's described costs closely lined up with internal profit projection charts, and the OIG expressly determined the costs were unsupported and unreasonable.

<u>Objection Six:</u> The Frontier Defendants falsely contend "the fiber facilities constructed were as described in the State's application." The State's application contemplated a robust middle-mile network that would push broadband deeper into rural, unserved areas of West Virginia. The Frontier Defendants did not build that—they built "last-mile tails" from existing poles to community anchor institutions. These short tails are not middle-mile network, and they did not meaningfully extend broadband into unserved areas of West Virginia.

<u>Objection Seven:</u> The State and NTIA never approved maintenance coil expenditures. A witness from the state expressly stated that the state did not know the Frontier Defendants were using maintenance coil footage to inflate footage estimates in its build outs. Nor is there evidence that KPMG knew of or opined on this issue.

## IV.    Brief summary of material facts and theories of liability or defense

### A.    Plaintiff

On August 20, 2009, the WVEO, with the assistance of the Frontier Defendants, applied for grant funding under the federal BTOP funded by the American Recovery and Investment Act ("ARRA"). The WVEO's application included three components, two of which are at issue here: (1) construction of a middle mile fiber network to connect 1,064 community anchor institutions ("CAIs") and (2) construction of a fiber network to link the National Radio Astronomy

Observatory ("NRAO") in Greenbank, West Virginia, to West Virginia University in Morgantown. Pursuant to the operative Notice of Funds Availability for this grant project, a "Middle Mile" project is defined as a "broadband infrastructure project that does not predominantly provide broadband service to end users or to end-user devices, and may include interoffice transport, backhaul, Internet connectivity, or special access." [ECF 380-27] at 33019.

Frontier began evaluating the opportunities available through the ARRA when the law was passed in February 2009. From that time until May 2009, Frontier deployed personnel to evaluate the requirements of the grant funding and to identify potential projects. During this same time, Frontier began negotiating with Verizon to buy the landline business in 13 states, including West Virginia. On or about May 13, 2009, Frontier and Verizon announced that they had entered into multi-billion agreement which would make West Virginia the largest market Frontier owned at the time. Because the transaction involved regulated entities, the deal had to be approved by Federal and State regulators.

Shortly after the deal was announced, Frontier sent multiple executives, including then Chief Executive Officer, Maggie Wilderotter, Chief Operating Officer Dan McCarthy, Ken Mason, who was the Vice President of Regulatory or Government Affairs for Frontier, and other Frontier representatives to West Virginia to meet with then Governor Manchin, Secretary of Commerce Kelley Goes and Defendant Gianato. The first documented meeting happened on June 8, 2009. At that time, Frontier was advised by Ms. Goes that the State's stimulus application was very important, but frustrating. Later, on July 8, 2009, Kelley Goes sent an email to Michael Swatts, a general manager for Frontier, asking Frontier to provide the state with data sufficient to map areas that were unserved or underserved by broadband internet. The June 8, 2009 meeting was followed by an email to Ms. Goes on June 12, 2009 wherein Ken Mason inquired whether

"there is anything Frontier can be doing now to assist you and the State with planning and applying for broadband funding that will be available through the NTIA."

On July 16, 2009, Frontier's Chief Operating Officer, Dan McCarthy, met with Governor Manchin to discuss these stimulus plans. A memo prepared ahead of that meeting provided Mr. McCarthy with information on Frontier's efforts to gather information that would be useful to address the concerns of Ms. Goes regarding the stimulus application. Thereafter, on July 20, 2009, Mr. Mason invited Ms. Goes and Defendant Gianato to a meeting scheduled to take place on July 22, 2009 with Frontier engineers and a consultant hired to assist Frontier with the stimulus funding. Ms. Goes attended the meeting by phone, and the parties discussed in detail what was needed to complete the application. They also discussed information related to a potential fiber project involving community anchor institutions. Shortly thereafter, Colonel Michael Todorovich was asked to write the grant application for the State of West Virginia. The plan for the project was already decided and provided to him by Ms. Goes and Mr. Gianato, and it reflected the information passed from Frontier to West Virginia state officials.

Indeed, ten days before the WVEO submitted its application for stimulus funding, the Frontier Defendants presented West Virginia's Secretary of Commerce, Kelley Goes, with a PowerPoint detailing a middle mile project that was nearly identical to the one described in the WVEO's application. In fact, the WVEO's application specifically contemplated that Frontier would construct the fiber portions of the project through the State's competitively bid MPLS contract. The application repeatedly represented that the fiber built with BTOP funds would be "middle mile" infrastructure. That was not the case; instead, the Frontier Defendants intended to build off of their existing network. Beyond misrepresenting the scope of the network it intended to help the state build with BTOP funds, the Frontier Defendants and representatives with the State

13

falsely stated that the project was "shovel ready." Most of the fiber routes constructed with BTOP funds were not finalized until over a year after the WVEO was awarded its BTOP grant.

They further misrepresented that the fiber constructed would become part of single interconnected network connecting 1,064 Community Anchor Institutions over 2,429 miles. The amount of fiber included double counted miles in order to inflate the number to be built. They further misrepresented that no part of the service layer would be serviced by the fiber construction, and that the new fiber would create gateways for other service providers to build into the community. The BTOP program required applicants certify that the entities did not have fiber. Ultimately, only 648 of the 1,064 institutions needed fiber. After the grant was awarded, the number of miles were reduced to 900 miles and ultimately Frontier represented it constructed 590—or less—miles of fiber for the 648 CAIs and approximately 65 miles for the NRAO build. Finally, they misrepresented that services connected to the fiber could be resold, when in reality, that was not permitted.

Even after the WVEO submitted its application, the Frontier Defendants and the State Defendants continued to cooperate to obtain the grant. As the state awaited the NTIA's ultimate decision on the grant, the NTIA continued communicating with Mr. Gianato regarding the grant application. It specifically asked Mr. Gianato whether the 2,429 miles of fiber proposed by the project were new fiber or fiber built off an existing network. Mr. Gianato stated that Verizon and Frontier engineers told him that "the fiber is new fiber that does not exist today. It includes fiber to the facility." That was a misrepresentation. Ultimately, the Defendants did not advise the NTIA that only 10% of the fiber constructed by the Frontier Defendants for the BTOP grant ran from the CAIs back to a Frontier Central Office ("CO"), and it was built off of privately owned fiber that pre-existed the BTOP grant—not new fiber. According to a key witness Colonel Michael

Todorovich, this change conflicted with the original application submitted by the WVEO.

Mr. Gianato also approved a deviation from the BTOP grant that the Frontier Defendants intended to implement all along. Specifically, Mr. Gianato permitted the Frontier Defendants to build short tails to CAIs, instead of building infrastructure from a CO to the CAIs. Mr. Gianato did so under the auspice that this deviation would prevent "overbuild" despite his representations to the NTIA prior to grant approval that the Frontier Defendants had no existing infrastructure to the CAIs. This material change resulted in short runs of fiber that rendered it cost prohibitive for competitors to construct interconnections into the open access BTOP fiber. On February 12, 2010, the WVEO was awarded $126,323,296.00 in BTOP funding. The grant funding the WVEO received was subject to terms and conditions, including a prohibition on undisclosed indirect costs. Neither the WVEO's line-item budget nor any of its budget amendments included line items for indirect costs. After the WVEO was awarded the grant, it was placed on "reimbursement only" status. This meant that it was awarded the entirety of the grant was placed into an account prior to invoices being submitted, and it was permitted to draw down these funds as the Frontier Defendants submitted individual invoices. Prior to signing on as an official subrecipient of the BTOP grant, Frontier employees were informed that, if Frontier was selected as a subrecipient, it would have to ensure that its invoicing covered only eligible costs, i.e., those related to broadband deployment. Frontier was also made aware in February 2010 that the BTOP funding had a "No Profit" requirement. Frontier signed a Memorandum of Understanding ("MOU") with the WVEO on October 19, 2010, wherein it agreed to serve as WVEO's subrecipient under the BTOP grant. In this MOU, Frontier agreed to comply with all applicable rules and regulations of the NTIA. Further, Frontier agreed to invoice WVEO for "eligible costs under the Grant, as defined in the NOFA."

Although the MOU permitted Frontier to invoice costs that were not eligible under the grant, it was required to separately invoice WVEO for those costs. Frontier did not submit separate invoices to WVEO. Instead, all of its invoices were specifically directed to "Project Billing for BTOP." All Frontier invoices were paid using BTOP grant monies.

The fiber portion of the BTOP project was broken up into individual projects for 645 CAIs and five segments built to the NRAO. Frontier submitted at least one invoice for reimbursement for each of its builds to CAIs and for the five NRAO segments. Once these invoices were received, various representatives from the State of West Virginia would review and approve them. Once approved, the invoice was sent to the WVEO, which entered the amount to be drawn down from the federal government. The State of West Virginia drew down federal funds to reimburse Frontier for all invoiced costs, including for unpermitted indirect costs, which Frontier disguised as "Loadings." Loadings were allocated indirect costs such as vehicles, accounting, and administration, and were not limited to Frontier's work on the BTOP grant but instead provided a general overhead cushion for Frontier's work across other projects.

While the BTOP grant was being administered, the Frontier Defendants were subjected to two program-specific audits. The first program-specific audit covered a period from November 1, 2010 through October 31, 2011.  During the audited time period, Frontier did not issue any BTOP invoices, rendering this first audit irrelevant to the issues in this case.  However, during January 2012 in connection with the first audit, Frontier's auditor, KPMG, told the Frontier Defendants that they would need approval from the Department of Commerce before they could draw down BTOP funds to cover indirect costs. The Frontier Defendants never gained this approval. Despite this, 624 of the Frontier Defendants' 631 invoices sought reimbursement for "loadings," an admitted indirect cost that accounted for the company's overall overhead expenses. Several of the

Frontier Defendants' initial invoices did not disclose these loadings charges. It was only in July 2012, after Defendant Given, a former industry executive, was hired by the state of West Virginia, that loadings were clearly disclosed on Frontier's invoices. Defendant Given did not consult anyone regarding federal prohibitions on indirect costs prior to paying invoices with clearly designated loadings fees.

From December 2011 through September 2013, the invoices submitted by the Frontier Defendants varied based on the amount of attention paid by the State Defendants and the WVEO to their contents. Initially, Frontier's invoices were not itemized and only included an amount due. After the West Virginia State Auditor's office objected, the Frontier Defendants began including explanations for projects that were higher than the amount listed on the Location Construction Request ("LCR") documents approved by the State of West Virginia for each CAI. During the time period at issue in this case, the Frontier Defendants submitted 624 invoices with Loadings charges, whether explicitly shown on the face of the invoice or not. At least 90 invoices submitted by the Frontier Defendants do not have Loadings as a separate line item.

Despite agreeing that it would abide by the NTIA's regulations and would not seek a profit for its BTOP work, the Frontier Defendants submitted 624 invoices to the State of West Virginia that included $7,075,580.19 in Loadings. These impermissible Loadings were ultimately reimbursed with federal BTOP funds through the WVEO's administration of its BTOP grant award and enabled the company to defray its overall operating expenses with federal grant funding.

In addition to the over $7 million in impermissible loadings charges, the Frontier Defendants used Facility Build Out ("FBO") work as an impermissible profit center in violation of the terms governing the BTOP grant. FBO work was done by subcontractors hired by the Frontier Defendants. The Frontier Defendants then invoiced the State of West Virginia for the

subcontractors' work.

Until November 2012, the FBO invoices prepared by the Frontier Defendants contained a 35.2% markup on FBO charges. The Frontier Defendants repeatedly referred to the FBO markup as a "revenue opportunity" and a "profit' mechanism, and an employee, Kathy Leggett, was praised for creating the 35.2% markup benchmark in September 2011. Ms. Leggett admitted during a deposition in this case that this percentage was an indirect cost.

Gale Given and the Frontier Defendants worked together to ensure the Frontier Defendants would continue to be paid a markup on their FBO charges. Although Ms. Given objected to the 35.2% markup, she indicated that she wanted to ensure the Frontier Defendants continued receiving markup payments for FBO work. To ensure they continued receiving markup payments, the Frontier Defendants crafted a letter with a multi-step process that purported to show Frontier spent four hours processing its each invoice, with $452 charged per hour. Defendant McKenzie admitted there was no documentation to support this letter. Instead, the charges described in the letter were created to back into profit projections prepared by Billy Jack Gregg. The state ultimately agreed to pay a flat per-invoice fee close to the described in the Frontier Defendants' fictitious letter. Ultimately, the Frontier Defendants submitted 329 invoices with FBO charges totaling $461,106.94.

Ms. Given, Chief Technology Officer for the State of West Virginia, abdicated her duties to administer the BTOP grant and ensure the grant's subrecipient, Frontier, was appropriately invoicing the EOWV for BTOP funds. Ms. Given did not familiarize herself with any of the regulatory requirements for implementing the BTOP grant, nor did she scrutinize the Frontier Defendants' invoices. After receiving complaints from other state employees about the invoices the Frontier Defendants submitted, Ms. Given tried to determine how to persuade the NTIA that

the indirect charges on the invoices were actually direct. Colonel Todorovich characterized Ms. Given's conduct as advocating for these charges to be paid.

The Frontier Defendants also charged WVEO for excessive amounts of maintenance coils. Defendant McKenzie estimated that $242,073 was charged for the 37 miles of maintenance coils placed with BTOP funds. However, based on the Frontier Defendants' own calculations, and Citynet's expert witness's estimate that as much as nine percent of the fiber laid was in maintenance coils, the cost to the State of West Virginia totaled between $2,051,280 and $2,379,484.80. In addition to inflating its fiber mileage with excessive maintenance coils, the Frontier Defendants likely did not build all of the fiber they were paid for from the BTOP grant funding. The number of fiber miles constructed by Frontier falls short of the number they prepared LCRs for and were paid. The extent of the fiber shortage will likely be ascertainable once Citynet has the opportunity to review the Frontier Defendants produce the OTDR documents the Court ordered the Frontier Defendants to produce by August 23, 2022. Regardless of whether it was through excessive maintenance coils or actually falsified fiber lengths, it is clear that the WVEO used federal funds to reimburse the Frontier Defendants for fiber that was not actually constructed.

Perhaps the Frontier Defendants' most offensive violation of the federal guidelines and regulations governing the BTOP grant relates to their concerted effort to block the BTOP grant's critical goal: open broadband access to all West Virginians at affordable rates and competitive speeds. The terms of the grant required the BTOP network the Frontier Defendants constructed to be accessible and open to the Frontier Defendants' competitors. However, as early as March 2010, Frontier employees considered whether Frontier could refuse to open up the network that would be built with stimulus funding.

The Frontier Defendants also blocked its competitors from accessing surplus BTOP

funding shortly before the project's scheduled end date. Once the Frontier Defendants learned that other telecommunications companies were permitted to propose plans to utilize surplus funds, Defendant Ken Arndt directed Frontier employees to immediately petition the NTIA and the West Virginia Office of Technology for information it could use against Citynet's proposal. The Frontier Defendants also attempted to accelerate and increase the drawdown of the BTOP funds by proposing supplemental CAIs. Ultimately, the Frontier Defendants successfully blocked use of these surplus funds, and West Virginia was required to return all excess BTOP funds.

Due to these actions, the Frontier Defendants are liable for hundreds of violations of the False Claims Act and for conspiring to violate federal law by, among other actions, providing false records and information to the United States Government, making false or fraudulent claims to the United States Government, and agreeing to engage in a pattern of conduct to hide the fraudulent claims submitted to the United States Government. Each invoice submitted by the Frontier Defendants contained false or fraudulent information and resulted in the payment of improper charges with federal BTOP funding.   Accordingly, Citynet is entitled to damages for the Defendants' violations, including treble damages reflecting three times the damages sustained by the United States, penalties for each violation, and its attorney's fees and costs in the prosecution of this matter. 31 U.S.C. § 3729(a)(1); (a)(3).

B.    **Frontier Defendants**

Summary of Material Facts

In the summer of 2009, the NTIA solicited applications for federal grant monies for broadband infrastructure projects. The State of West Virginia (through its Executive Office, referred to as "the State"), Frontier, Citizens Telecommunications Company (a Frontier affiliate), and Citynet, among others, all submitted competing applications. Ultimately, the NTIA approved

the State's application and denied those submitted by Frontier, Citizens, and Citynet.

The State's plan consisted of three parts: (a) fiber connections to "Community Anchor Institutions" (CAIs), such as schools, libraries, hospitals, public safety agencies, and jails; (b) a fiber connection from West Virginia University to the National Radio Astronomy Observatory in Green Bank; and (c) improvements to the State's emergency services microwave tower system. The general objectives and framework of the State's application came from direction of then-Governor Manchin and were consistent with the goals of the federal funding. A team of State officials—known as the Grant Implementation Team—was appointed to prepare undertake the project.

Every witness involved in drafting the application testified that Frontier had no role in preparing the application. The State obtained some engineering and cost data from Verizon and communicated with Verizon employees, but not Frontier. The absence of Frontier's involvement in the State's application is borne out by the reaction of Frontier executives to news of NTIA approving the State's application. They had little to no knowledge of the contents of the State's application and questioned what role they would have in the grant projects.

Citynet disagreed with NTIA's decision to fund the State's project and filed a formal protest with NTIA.  NTIA rejected Citynet's protest, reiterating its decision that the State's plan met the objectives of the federal program. Those same rejected arguments are at the heart of Citynet's fraudulent inducement claims.

The State planned to use its omnibus Internet-service (MPLS) contract to build the fiber network. This was necessary because the State itself did not have the ability to construct fiber lines itself and there was not enough time to put the project out for bid. At the time the grant was awarded, the MPLS contract was held by Verizon. The MPLS contract was eventually transferred

21

to Frontier as part of Frontier's acquisition of Verizon assets in West Virginia. The record is clear that whichever company had the MPLS contract at the time of construction would do the construction.

When the State began making plans to begin construction of the fiber connections, NTIA advised the State to treat Frontier as a subrecipient rather than a contractor. Frontier entered into a Memorandum of Understanding (MOU) to memorialize the agreement. Pursuant to the MOU, the State agreed that work and costs not compensable under the grant, if any, would still be paid to Frontier by the State under the MPLS contract.

Frontier began construction of the facilities in the spring of 2011 and completed its work in the fall of 2013. Both the State and NTIA closely monitored Frontier's work. Representatives of the State and NTIA joined Frontier in regular conferences and meetings to discuss progress and address specific matters as needed. These included both construction and invoicing issues. In addition, NTIA officials visited the State periodically. Both the State and Frontier were required to undergo audits by independent auditing firms.

Once engineering and construction were underway, the State and  NTIA  decided that new fiber should not be built from a CAI back to the central office where fiber already existed. Rather, Frontier would begin constructing new fiber from its preexisting fiber nearest to the CAI. This was at the "adamant" insistence of the NTIA, as it avoided wasteful, duplicative fiber running directly parallel with already-built fiber. Also, it was discovered that many CAIs initially selected were already served by fiber. Frontier completed the construction according to the direction of the State and NTIA and consistent with these adjustments.

Upon completion, the project provided significant benefits to the State and its citizens. Numerous schools, libraries, law enforcement offices, and healthcare facilities are now connected

to high-speed internet. Citizens around the State have service or improved service not previously available. Astronomy research work at the Green Bank observatory and West Virginia University has been greatly aided.

Frontier submitted its invoices to the State beginning in December 2011, and the State's first withdrawal of BTOP funds to pay Frontier occurred on or about January 17, 2012. The State was responsible for charging eligible expenditures to the grant fund account from which it withdrew monies to pay Frontier. The form and content of Frontier's invoices were the subject of much discussion between State and Frontier representatives continued over the course of many months. The issues addressed included variances between estimated and actual costs on individual CAIs, charges for loadings, and FBO invoice processing fees.

"Loadings" are overarching expenses such as engineering and vehicle expenses that are allocated across projects. Frontier allocated its loadings to BTOP jobs in the same manner as it did for other work. Frontier discussed the charges with State officials. The State consulted with its independent auditor, Ernst & Young, about the charges. Ernst & Young concluded these were direct charges to the State and therefore were eligible for reimbursement from the grant. The State also asked NTIA's representative, Scott Woods, whether the loadings charges were eligible grant expenditures. Woods advised that the charges were appropriate and approved their payment. At the same time, Frontier's billings and payments were subject to independent audits by KPMG. After substantial communication between Frontier and KPMG about the details of project charges, KPMG's final project audit concluded Frontier was in compliance in all material respects with the project guidelines and generally accepted accounting principles.

After its award was granted, the State discovered that additional work inside many CAI's would be necessary to complete the fiber service connections and achieve the intended results.

This work was described as "facilities build out" (FBO). At the State's request, Frontier agreed to arrange, oversee, and manage the contractors performing FBO work, including reviewing and processing invoices. This was work Frontier did not customarily do in the ordinary course of business. The State agreed to compensate Frontier for this work. Frontier believed it had reached an agreement with the State for payment for FBO invoice processing based on 35.2% of the invoice. However, subsequently the State insisted that Frontier propose an alternative rate. The State and Frontier reached agreement on a fixed fee of $1,808 per contractor invoice, with future payments being reduced further to offset invoices already paid above that rate. As with loadings, NTIA representative Woods  told the State he considered these fees to be direct costs that were compensable.

Obviously, had NTIA's disapproved either the loadings or FBO charges in real time, the State could have made adjustments and paid those charges directly to Frontier, as provided for in the State's MOU with Frontier, and avoided this dispute. Because the MOU provided that Frontier would be paid for all of these charges regardless, Frontier had no incentive to receive payment under the federal grant as opposed to payment from the State.

Notwithstanding the scrutiny of these charges, two years after the project was completed the Office of Inspector General (OIG) reviewed whether the charges were appropriate. The OIG concluded "Frontier was transparent about the nature and amount of" of the loadings and that there was "good faith" reliance on the NTIA's approval. Nonetheless, relying on NTIA's subsequent interpretation of the regulatory guidance, the OIG concluded that a portion of the loadings charges—$4.24 million—was ineligible for reimbursement under the grant. (The OIG determined that Benefits Loadings and certain other charges were direct costs.) Regarding the FBO fees, the OIG determined the amount was not reasonable and thus the charges—$465,000—were ineligible.

The fiber build included maintenance coil. This consists of fiber that is placed in coils at various points, usually either a pole or pedestal. Maintenance coil is appropriate and necessary for multiple reasons, including repairs, future growth, a point on which all parties (and their experts) agree. There is no industry standard providing how much maintenance coil is to be used; rather, the practice is to rely upon the discretion and judgment of its engineers and operations employees in the field, who make the determinations on a build-by-build basis. The cost associated with this coil is the cost of materials, a weighted average of $1.25 per lineal foot, as the added labor associated with installing a coil is miniscule. Frontier's engineers and technicians used their judgment. While Citynet's expert questions the amount of maintenance coil on some jobs, he cannot give a definitive opinion on the impropriety of use of maintenance coil across the entire project or each project on a build-by-build basis.

Frontier Defendants did not engage in any communications in furtherance of a conspiracy or fraud, and more importantly they did not communicate other than within the corporation. The individual defendants acted in their capacity as agents of Frontier. Ken Arndt and Dana Waldo had no material involvement in the project. While they met with State officials regarding general broadband policy issues and as part of Frontier's then-contemplated purchase of Verizon land-line assets in West Virginia, they had no role in creating the State's application or the construction of facilities. Mark McKenzie was the primary point of contact for Frontier during the engineering and construction phases. He was not involved in any way until after the State's application was approved by NTIA.

<u>Theories of Defense</u>

As stated in the Frontier Defendants' Motion for Partial Summary Judgment, Citynet's fraudulent inducement claims are barred by public disclosure. Beyond that procedural defect, and

as set forth in the Frontier Defendants' Motion for Summary Judgment, Citynet cannot succeed on the merits of its claims, either.

*Counts I and V (the "Middle Mile Claims" or "Fraudulent Inducement Claims")*

The Court dismissed these claims to the extent that they arose after the 2010 amendments to the public disclosure bar. ECF No. 94 at 104. Discovery confirms that no billing was made—and thus no claims were presented—until after those amendments took place. Citynet's effort to avoid the public disclosure bar by refashioning its theory on Counts I and V as "fraudulent inducement" so that its claims are grounded in pre-2010 conduct cannot succeed. ECF No. 233. The operative timing is controlled by the date when the State submitted each "claim for money or approval," all of which occurred after the 2010 amendments. Claims cannot arise until the occurrence of the last element needed to assert them—which is an actual claim to the government for money or payment, all of which occurred after 2010. Accordingly, the Middle Mile Claims are barred by the public disclosure bar.

To the extent these claims are not barred, they nonetheless fail because the State cannot show either any material misrepresentations in the application process on which NTIA relied or that Frontier Defendants had any role whatsoever in making any representations associated with the State's grant application. Without Frontier actually contributing the supposedly fraudulent statements in the application, it cannot be held liable for them. In addition, Citynet cannot establish either scienter or materiality. Further, because these are fraudulent inducement claims, Citynet has to show a material misrepresentation with scienter <u>at the time</u> of the grant application <u>without intent to perform</u> as represented. There is no evidence of an intent to commit fraud. Because there is no evidence of such then-present intention—and because the Frontier Defendants did not make any representation in the State's application in any event—these claims fail on the merits.

*Counts II and VI (the "Loadings Claims")*

Frontier's loadings charges are direct costs to the State and are therefore eligible costs. Even if that is not correct—and it is—the argument to the contrary is based on interpretation of unclear regulations and grant rules. Thus, even if the loadings were ineligible for reimbursement, Frontier Defendants' actions were based at most on an incorrect, but reasonable and good-faith, interpretation of ambiguous rules and regulations—as concluded by the OIG and exemplified in the multiple audits and auditors approving these charges and not flagging them as ineligible charges. Accordingly, neither a false statement nor scienter can be established. Moreover, NTIA was aware of the charges and approved the charges at the time, in which case materiality cannot be established.

*Counts III and VII (FBO Claims)*

The State and NITA approved the payment of charges for FBO invoice processing. As in the case of loadings, Frontier and the State relied upon a reasonable interpretation of the grant rules, and therefore Citynet cannot establish a false statement, scienter, or materiality.

*Counts IV and VIII (Maintenance Coil Claims)*

The amount of maintenance coil used is a matter of engineering judgment and therefore this is not a matter constituting a statement of fact that can be said to be either true or false, and thus cannot form the basis of an FCA claim. *See, Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1047 (N.D. Ill. 1998); *Boisjoly v. Morton Thiokol, Inc.,* 706 F. Supp. 795, 810 (D. Utah 1988). And Citynet's expert has conceded that he can identify no specific maintenance that should not have been placed and also cannot quantify any specific damages. And in any event, Citynet has presented no expert testimony, testimony, or analysis regarding these maintenance coil claims—or any other theory that it tries to shoehorn into these counts. And as with the other claims,

Citynet cannot establish a false statement, scienter, or materiality.

*Count IX (Conspiracy)*

The conspiracy claim is wholly dependent on the underlying substantive claims. Absent proof of conduct giving rise to a cause of action under the FCA, there can be no conspiracy to violate the FCA. *United States ex rel. Godfrey v. KBR, Inc*., 360 F. App'x 407, 413 (4th Cir. 2010). In addition, communications between and among Frontier employees cannot support a conspiracy because "agents of the same principal cannot conspire with one another." *United States v. Gwinn*, 2008 U.S. Dist. LEXIS 26361, at *62, 81 (S.D.W. Va. 2008).[7]

**Citynet's Objections to the Frontier Defendants' Summary of Material Facts**

Objection One: The Frontier defendants did not submit a grant application for BTOP funding to the NTIA. Instead, they submitted an application for BIP funding to the Rural Utilities Service.

Objection Two: To the extent the Frontier Defendants contend that the framework of the State's application came from Governor Manchin and were consistent with the grant requirements, that is inadmissible hearsay.

Objection Three: The Frontier Defendants contend Frontier provided no data for the state's BTOP application. That is inaccurate, and the application itself demonstrates this. The application itself notes, "Weekly, senior leadership from both Verizon and Frontier meet with the West Virginia Secretary of Commerce regarding broadband initiatives and planning for West Virginia." [ECF No. 30-3] at 26. The Frontier Defendants' 30(b)(6) deponent admitted that state officials met with representatives from Frontier numerous times as the state prepared its grant application, and

---

[7] The Frontier Defendants have not made objections to Citynet's Summary of Material Facts, as Citynet has done below. The Frontier Defendants' position is that such objections are not contemplated by any applicable Rules or the Court's Scheduling Order, and thus are both unnecessary and improper.

several of those times the parties discussed applications for the BTOP grant. The Frontier Defendants also met with Defendant Gianato and provided him with latitude and longitude information for coverage mapping purposes. The Frontier Defendants' 30(b)(6) deponent admitted that this information was part of what the state of West Virginia needed to submit its BTOP grant application. Several emails show that the Frontier Defendants were actively meeting with the State of West Virginia, and the parties repeatedly discussed BTOP funding. Therefore, to the extent the Frontier Defendants contend they did not help "in developing the State's grant application in any way," the evidence—and their 30(b)(6) deponent's testimony—refutes that contention.

Objection Four: The NTIA did not reject the arguments at issue in this case. When Citynet filed its initial objection, both Citynet and the NTIA contemplated that the fiber built with BTOP funding would span from the central office to the community anchor institution. Indeed, the NTIA expressly stated that the project "will also fund about 2,400 miles of fiber enabling new or greatly enhanced high-speed Internet connections at more than 1,000 anchor institutions such as public safety agencies, public libraries, schools, and government offices. As discussed above, the new fiber will include connection points that will enable other Internet providers to link their residential and business customers to the Internet via the high-speed capacity funded by the grant." [ECF No. 380-24]. That did not happen—the fiber built fell short of both mileage representations and interconnection capabilities.

Objection Five: The NTIA did not "closely monitor" the project. The evidence shows that the NTIA did not even receive invoices for the project. Instead, the state received the invoices and drew down federal funding with little to no oversight from the NTIA.

Objection Six: To the extent the Frontier Defendants contend the NTIA said that fiber should be built from preexisting fiber to community anchor institutions, that is inadmissible hearsay.

Objection Seven: The state's "consultations" with its auditor are inadmissible hearsay. Beyond that, the state's auditor was retained by Defendant Given to "make a case" that loadings were direct charges, and she was only retained after the state had approved over 150 invoices containing impermissible loadings charges.

Objection Eight: Scott Woods's "approval" is inadmissible hearsay, and in any event, he later explained that no one told him what "loadings charges" actually consisted of.

Objection Nine: There is no documentary proof that the state ever agreed to a 35.2% markup on FBO invoices. The only evidence the Frontier Defendants have regarding this agreement is inadmissible hearsay from their own witnesses.

Objection Ten: Scott Woods's approval of FBO markup charges was based on a letter that Defendant McKenzie admitted was unsupported. It is also inadmissible hearsay.

Objection Eleven: The NTIA's report never attributes "good faith" to the Frontier Defendants.

Objection Twelve: Counts IV and VIII extend to far more than maintenance coil. The First Amended Complaint expressly states that these claims also encompass "falsifying the total length of fiber built."

## V.     Contested issues of fact and law

### A. Plaintiff

Citynet's Motion for Partial Summary Judgment on Counts II, III, VI and VII is fully briefed. *See* ECF #383.  The Frontier Defendants filed a Motion for Partial Summary Judgment on

Counts I, V, and IX as well as a Motion for Summary Judgment on all counts [ECF 222, 380]. The State Defendants likewise filed a Motion for Summary Judgment [ECF 378]. A decision on those motions will likely streamline the issues, including many of the contested issues of law, in the case before trial. A representative list, including issues previously briefed, is below.

**Questions of law for the Court**

1.      Whether the Frontier Defendants were paid impermissible indirect costs labeled as "Loadings"? If so, how much?

2.      Whether the Frontier Defendants were paid impermissible FBO markup charges? If so, how much?

3.      What amount of attorneys' fees and costs is Citynet entitled to under FCA?

4.      What amount of penalties are warranted for the violations of the FCA?

**Questions of fact for the jury (absent resolution of the case by summary judgment)**

5.      Did the Frontier Defendants assist the WVEO with its application for BTOP money?

6.      Did the Frontier Defendants' misrepresentations in the WVEO's BTOP grant application amount to application fraud?

7.      Did the Frontier Defendants' fiber builds contain excessive maintenance coils? If so, how much?

8.      Did the Frontier Defendants invoice BTOP grant funds for more fiber mileage than they actually built? If so, how much?

9.      Did the Frontier Defendants and the State Defendants conspire to violate federal law by 1) providing false records and information for use in the State's grant application and subsequent claims for payment; 2) falsifying the need for a Mitigation Plan; 3) engaging in conduct

to hide the fraudulent claims submitted to the United States from being discovered; 4) assisting other Defendants in submitting fraudulent claims; 5) agreeing to engage in a pattern of conduct to allow the fraudulent claims to be submitted to, and paid by, the United States; and 6) advising other Defendants on how to submit fraudulent claims to be paid to the United States?

10.     What is the amount of Citynet's recoverable damages?

**B.     Frontier Defendants**

Contested Issues of Fact

Frontier Defendants maintain no genuine issues of material fact exists for the reasons stated in the Motion for Partial Summary Judgment and Motion for Summary Judgment. Subject to and without waiving its position, in the event one or more of these motions are denied, Frontier Defendants anticipate the following are contested issues of fact:

*Counts I and V (Middle Mile Claims)*

1.     Whether any of the Frontier Defendants actively assisted the State in drafting its grant application and, if so, whether any of the Frontier Defendants made any false statement that was contained in the State's application.

2.     Whether Frontier Defendants were a party to any statements being made to the federal government for which there was no intention to actually perform as represented at the time the record or statement was made.

3.     Whether Frontier Defendants made any such statement(s) or carried out any such fraudulent course of conduct with the requisite scienter, namely whether any such Frontier Defendant had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information, or acted in reckless disregard of the truth or falsity of the information.

4.     Whether Frontier Defendants' statement(s) or course of conduct was material,

meaning whether any such false statement or course of conduct had a natural tendency to influence the NTIA and whether the NTIA acted in reliance upon such statement or course of conduct.

  5.  The amount of damages, if any, attributable to such statements or course of conduct.

*Counts II and VI ("Loadings Claims")*

  1.  Whether charges denominated as "loadings" constitute direct or indirect costs of the grant recipient, which is the State.

  2.  Whether claiming loadings on invoices under the BTOP grant is an objective statement of fact as opposed to a subjective, reasonable, and good-faith interpretation of rules and regulations.

  3.  If the loadings were ineligible for reimbursement, whether Frontier Defendants had actual knowledge of such information, acted in deliberate ignorance of the truth or falsity of the information, or acted in reckless disregard of the truth or falsity of the information.

  4.  If the loadings were ineligible for reimbursement, whether Frontier Defendants based their actions on an objectively reasonable interpretation of the relevant rules and regulations and whether Frontier Defendants had been warned away from that interpretation by authoritative guidance.

  5.  If the loadings were ineligible for reimbursement, whether Frontier Defendants' submission of the loadings charges was material, meaning the false statement or course of conduct has a natural tendency to influence agency action or is capable of influencing agency action.

  6.  If the loadings were ineligible for reimbursement, whether the NTIA had knowledge of the charges being submitted and reimbursed.

  7.  The amount of charges, if any, which were ineligible for reimbursement.

*Counts III and VII ("FBO Claims")*

1.      Whether charges for FBO invoice processing fees were eligible for reimbursement.

2.      Whether Frontier Defendants' submission of charges for FBO invoice processing fees under the BTOP grant is an objective statement of fact as opposed to a subjective, reasonable, and good-faith interpretation of rules and regulations.

3.      If the FBO invoice processing fees were ineligible for reimbursement, whether Frontier Defendants had actual knowledge of such information, acted in deliberate ignorance of the truth or falsity of the information, or acted in reckless disregard of the truth or falsity of the information.

4.      If the FBO invoice processing fees were ineligible for reimbursement, whether Frontier Defendants based their actions on an objectively reasonable interpretation of the relevant rules and regulations and whether Frontier Defendants had been warned away from that interpretation by authoritative guidance.

5.      If the FBO invoice processing fees were ineligible for reimbursement, whether Frontier Defendants' submission of the loadings charges was material, meaning the false statement or course of conduct has a natural tendency to influence agency action or is capable of influencing agency action.

6.      If the FBO invoice processing fees were ineligible for reimbursement, whether the NTIA had knowledge of the charges being submitted and reimbursed.

7.      The amount of charges, if any, which were ineligible for reimbursement.

*Counts IV and VIII ("Maintenance Coil Claims")*

1.      Whether the amount of maintenance coil installed by Frontier Defendants is excessive.

2.      Whether Frontier Defendants' conduct in installing and charging for any amount of

maintenance coil deemed excessive constitutes a false statement or fraudulent course of conduct.

3.     Whether Frontier Defendants' installation and charges for any amount of maintenance coil deemed excessive constitutes a material misrepresentation.

4.     Whether Frontier Defendants' installation and charges for any amount of maintenance coil deemed excessive was a representation made with requisite scienter.

5.     The amount of damages attributable to the amount, if any, of maintenance coil determined to be excessive.[8]

*Count IX (Conspiracy)*

1.     Whether communications occurred between the Frontier Defendants with anyone outside of Frontier pursuant to any agreement or to commit an unlawful act.

*Individual Defendants*

1.     Assuming any false claim is proven with respect to Frontier, whether Kenneth Arndt engaged in any conduct meeting giving rise to the same claim under the False Claims Act.

2.     Assuming any false claim is proven with respect to Frontier, whether Mark McKenzie engaged in any conduct meeting giving rise to the same claim under the False Claims Act.

3.     Assuming any false claim is proven with respect to Frontier, whether Dana Waldo engaged in any conduct meeting giving rise to the same claim under the False Claims Act.

<u>Contested Issues of Law</u>

Frontier Defendants refer to and incorporate the issues as set forth in its Motion for Partial Summary Judgment (ECF No. 322), Motion for Summary Judgment (ECF No. 380), Citynet's

---

[8] Citynet has never put forward any evidence, testimony, or analysis regarding its allegation that Frontier Defendants did not build as much fiber as represented. Frontier Defendants literally do not know the claims or evidence to which they are responding. To the extent that such claims are permitted to proceed, the questions of fact would be the same five set forth for maintenance coils, but as applied to these vague, evidence-less claims.

Motion for Partial Summary Judgment (ECF No. 382), the State Defendants' Motion for Summary Judgment (ECF No. 378), the Frontier Defendants' pending Motions in Limine (ECF Nos. 422, 423, 424, 425 and 426), the State Defendants' pending Motions in Limine (ECF Nos. 418, 419, 420 and 421), and Citynet's pending Motions in Limine (ECF Nos. 427, 428, 429, 430, 431 and 432). Further, to the extent that the State Defendants have or will settle with Citynet before trial, contested questions of fact or law will likely arise regarding the parameters of their settlement agreements, including disclosure to the jury, and other matters that may arise should this factual occurrence come to pass.

## VI.    Stipulations

The parties have discussed stipulations and exchanged proposed stipulations. The parties will continue to work to determine what, if any, stipulations can be agreed upon before trial.

## VII.   Unnecessary Proof

The parties refer the Court to stipulations in Section VI above.

## VIII.  Special Procedures

The parties continue to discuss how to address exhibit issues regarding redactions and documents produced under confidentiality provisions of the Agreed Protective Order. The Parties will continue to work to determine how best to address such issues so as to prevent unnecessary delay, confusion, and or disruption of trial procedures.

## IX.    Voir Dire

The parties acknowledge the procedure set forth in Local Rule 47.1, which provides that "[t]he judicial officer shall conduct the examination of prospective jurors." L.R. Civ. P. 47.1(a). The rule does permit that the judge may consult with the attorneys, "who may request or suggest other areas of juror interrogation." In keeping with Local Rule 47.1, the parties have each proposed

their own respective voir dire for the Court to ask, subject to objections as provided below, and would also be willing to conduct the voir dire if the Judge determined that was appropriate, including relevant follow-up to the inquiries below:

**A.      Plaintiff**

1.   Are any of you familiar with Citynet, LLC, or their officers, Jim Martin and Chris Morris?

2.   Are you familiar with Frontier West Virginia or Frontier Communications?

     a.   If so, how are you familiar with either of those companies?

3.   Are you familiar with Mark McKenzie, Dana Waldo, or Ken Arndt?

4.   Are you familiar with Jimmy Gianato or Gale Given?

5.   Are you familiar with any of the following individuals:

     a.   John Dunlap;

     b.   Justin McAllister;

     c.   Mary Lipford;

     d.   Colonel Michael Todorovich;

     e.   Amy Goodwin;

     f.   Kelley Goes;

     g.   Billy Jack Gregg;

     h.   Joseph Starsick;

     i.   Kenneth Mason;

     j.   Katherine Leggett;

     k.   Kathleen Abernathy;

     l.   Maggie Wilderotter;

      m.  Brian Lippold;

      n.  James Thomas;

      o.  Christopher Deweese; or

      p.  Nathan Weber?

6.  Have you, a relative, or a close friend ever been represented by, met, or otherwise become acquainted with:

      a.  Ben Bailey, Rebecca Pomeroy, Christopher Smith, Elizabeth Stryker, or the law firm of Bailey & Glasser, LLP?

      b.  Counsel for Defendants

7.  This is a civil case.  Do you understand that, in civil cases like this one are different than criminal cases?  Here, the party with the burden of proof must prove its case by a preponderance of the evidence.  Do you understand that preponderance of the evidence is a lower standard than beyond reasonable doubt?

8.  Would you have difficulty awarding money to someone for something you yourself would not have paid for? Do you have any opinions about giving others money?

9.  Would any of you have difficulty serving as a juror if the court told you that as a matter of law you would be required to award the plaintiff money?

10. This case involves the award and administration of a federal grant.  Do any of you have experience in submitting an application for a federal grant or administrating a federal grant after it is awarded?

      a.  If you have such experience, please explain what grant you worked on and in what capacity.

11. Do you think promises are important?  Do you think promises should be kept?  Ever heard the phrase "my word is my bond"?  What is your reaction to that phrase?

12. How do you feel when someone breaks a promise to you?  What do you do if you have to break a promise to someone else?

13. Do you think someone should be punished for breaking a promise?  Can you think of any situation when such punishment is warranted?

14. Do you think honesty is important?  Do you think someone should be punished for being dishonest?  Can you think of any situation when such punishment is warranted?

15. Do you believe that, when someone enters a contract, they should be required to uphold their side of the deal? Do you believe that, when a company agrees to perform a task for another, that it should be held responsible for the failure to honor that agreement?

    a.   Are there any limitations on your opinion?

16. Have you ever been involved in a contract dispute?  When?  What happened?

17. Have any of you ever been a plaintiff or a defendant in a lawsuit, [or know a relative or close friend who has been a plaintiff or a defendant in a lawsuit]? If yes:

    a.   When?

    b.   Who was the plaintiff/defendant?

    c.   Who did you sue/why were you sued?

    d.   What was the lawsuit about?

    e.   In what court?

    f.   What was the outcome of the case?

    g.   Were you satisfied with the result?

    h.   Who represented you?

i.   Who represented the other side?

18. Have any of you ever felt that you could have sued someone but instead chose not to? Do you feel like it is bad to sue someone?

19. Has anyone worked for a large corporation?

a.   If so, what was the name of the corporation and what did you do?

20. Do any of you have any opinions, negative or positive about large corporations?

21. Do any of you believe companies should be given money by the federal government to help them grow their business?

a.   If you do not believe companies should be given money, why do you feel that way?

22. Do you believe corporation that do receive money from the federal government should take special care to spend the money as the federal government intended it to be spent?

23. Do you believe that a corporation that does not spend money given by the federal government as the federal government required should give that money back?

24. Are you an attorney or do you have a close relative who is an attorney?

25. Have you, your family, or close friends ever worked for Citynet?

a.   If so, please explain in what capacity and whether you or your family member is still employed there?

b.   If you or someone you know worked for Citynet, did that employment end in termination or involve disciplinary action?

26. Have you, your family, or close friends ever worked for Frontier West Virginia?

a.   If so, please explain in what capacity and whether you or your family member is still employed there?

b. If you or someone you know worked for Frontier West Virginia, did that employment end in termination or involve disciplinary action?

27. Have you, your family, or close friends ever worked for the State of West Virginia?

a. If so, please explain in what capacity and whether you or your family member is still employed there?

b. If you or someone you know worked for the State of West Virginia, did that employment end in termination or involve disciplinary action?

**Frontier Defendants' Objections to Citynet's Proposed Voir Dire**

Frontier Defendants object to any voir dire that is argumentative, irrelevant, or duplicative of the Court's general instructions regarding duties of jurors. In addition, Frontier Defendants object to any voir dire that states or implies standard other than that required for proof of claims under the False Claims Act. In particular, Plaintiff must prove all elements under the False Claims Act, which include a high level of scienter constituting fraud, but several questions plant the seed that this case is about a breach of promise or contract. In addition, the questions misstate the evidence insofar as the grant in question was awarded to the State of West Virginia, not Frontier. Frontier Defendants object to the following voir dire suggested by Plaintiff, reserving the opportunity to raise further objections prior to voir dire being conducted.

No. 8: Irrelevant, confusing.

No. 9: Presupposes Court will enter a directed verdict in favor of Plaintiff. Duplicative of Court's general inquiry/instructions about following and applying instructions of the Court.

No. 11: Argumentative. This case requires proof of fraud, not breach of contract or promise.

No. 12: Argumentative. This case requires proof of fraud, not breach of contract or promise.

No. 13: Argumentative. This case requires proof of fraud, not breach of contract or promise.

No. 14: This is civil case for compensatory damages – references to punishment are irrelevant.

No. 15: This case requires proof of fraud, not breach of contract.

No. 21: Argumentative. Grant in this case was awarded to the State, not Frontier, and the grant was not for purposes of growing Frontier's business. This also poses risk of confusing Frontier's role in connection with grant awarded to State of West Virginia with PPP loans and corporate "bailouts."

No. 22: Argumentative. This case requires proof of fraud, not breach of contract. In addition, "special care" is not a legal duty in this circumstance. Further, the grant is to the State of West Virginia, not Frontier.

No. 23: The grant in this case is to the State of West Virginia, not Frontier.

**B.    Frontier Defendants**

1.    Have you learned, heard, or read anything about the subject matter of this trial, including news articles, Internet posts, social media posts, etc.?

   a.    If yes, have you formed any preconceived notions with regard to the Plaintiff Citynet, Frontier Communications  or any of the other Defendants?

2.    Have you, a relative, or a close friend ever been represented by, met, or otherwise become acquainted with:

   a.    Ben Bailey, Rebecca Pomeroy, Christopher Smith, Elizabeth Stryker, or the law

firm of Bailey & Glasser, LLP?

    b.      David Fenwick, Ky Owen, Lucas White, or the law firm of Goodwin & Goodwin, LLP?

    c.      Diane Sullivan, Elizabeth Ryan, or the law firm of Weil, Gotshal & Manges, LLP?

    d.      Do you know any member of the immediate families of these attorneys? Immediate family means parents, spouses, children, and in-laws.

3.      Do any of you know John T. Copenhaver, Jr., the presiding Judge in this case, or any member of my immediate family?

4.      Do you recognize any other prospective juror in the courtroom?

5.      Do you know any members of my courtroom staff, or any member of their immediate family?

6.      Do you now or have you ever purchased any phone, cable or Internet services from Citynet?

7.      (If applicable only) Have you ever had any trouble with service you've purchased from Citynet?

8.      Do you know Citynet's president and CEO, Jim Martin?

9.      Do you know Citynet's Senior vice-president Chris Morris?

10.    Do any of you have a positive view of the Plaintiff Citynet?

11.    Do you now or have you ever purchased any phone, cable or Internet services from Frontier?

12.    (If applicable only) Do you know anyone who has had trouble with their service from Frontier?

13.    Have you ever had a less than positive experience with Frontier or filed any type of

complaint, formal or informal, with or against Frontier?

14.     Do you know of anyone that has ever had a less than positive experience with Frontier or

filed any type of complaint, formal or informal, with or against Frontier?

15.     Do you have any bias prejudice for any reason against Frontier that makes you think you

would not be able to listen and view all the evidence in this case and reached a decision

based on the evidence presented to you in this courtroom?

16.     Are you familiar Mark McKenzie, Dana Waldo, or Ken Arndt?

   a.     Do you know any member of their immediate families?

17.     Are you familiar with Jimmy Gianato or Gale Given?

   a.     Do you know any member of their immediate families?

18.     Are you familiar with any of the following individuals:

   a.     John Dunlap;

   b.     Justin McAllister;

   c.     Mary Lipford;

   d.     Colonel Michael Todorovich;

   e.     Kelley Goes;

   f.     Billy Jack Gregg;

   g.     Joseph Starsick;

   h.     Katherine Leggett;

   i.     Brian Lippold;

   j.     James Thomas;

   k.     Christopher Deweese; or

   l.     Nathan Weber?

m.      Do you know any member of these individuals' immediate families?

19.    This is a civil case.  Do you understand that, in civil cases like this, the Plaintiff Citynet, has the burden of proof and must prove its case by a preponderance of the evidence?

20.    Some people dislike their cable company or their phone company. Do you think you could be fair to both Frontier and Citynet?

21.    Do you believe corporations are more likely to overcharge the government as compared with their other customers?

22.    Do any of you tend to favor the Plaintiff Citynet simply because it is suing a larger company?

23.    Do you think that someone must have done something wrong just because another person filed a lawsuit against him or her?

24.    Do you think that person is entitled to recover money  simply because they filed a lawsuit?

25.    In a civil case like this, the burden is only on the Plaintiff Citynet to prove its case; the defendants do not have to prove anything. Can you apply that burden and find against the Plaintiff at the end of the trial if you do not believe the Plaintiff Citynet has proven its case?

26.    Does anyone think that the defendants have to prove that they have not done anything wrong in this case?

27.    Would you hesitate to follow any of the Court's instructions of law, regardless of whether or not you agree with those instructions?

28.    There are multiple defendants in this case. The Court will instruct you that are to consider the evidence against each defendant separately, not lump them together. Will you have any difficulty following this instruction?

29.    Are you willing to wait until all the evidence has been presented and the court has instructed

you on the applicable law before coming to any conclusion with respect to the Plaintiff Citynet's claims?

30.    Are you willing to confine your deliberations to the evidence presented in the courtroom?

31.    In your deliberations, are you willing to abide by your convictions and not agree with other jurors solely for the sake of being congenial, if you are convinced that the opinions of the other jurors are not correct?

32.    On the other hand, will each of you be able to listen carefully and respectfully to the other juror's views, keep an open mind as you listen to what they have to say, and change your mind if you are convinced that the other jurors are right and you are wrong?

33.    If after hearing the evidence presented to you, you are satisfied that the Plaintiff Citynet has not proven by a preponderance of the evidence that any defendant is liable, would you hesitate to vote in favor of the defendants?

34.    This case involves the award and administration of a federal grant.  Do any of you have experience in submitting an application for a federal grant or administrating a federal grant after it has been awarded?

35.    If you have such experience, please explain what grant you worked on and in what capacity.

36.    Do you have auditing or accounting experience?

37.    Have you ever been involved in conducting an investigation or audit? If so, explain.

38.    Have any of you ever been a plaintiff or a defendant in a lawsuit, or a party to any judicial proceeding [or know a relative or close friend who has been a plaintiff or a defendant in a lawsuit or a party to a judicial proceeding]? If yes:

    a.    When?

b.      Who was the plaintiff/defendant?

c.      Who did you sue/why were you sued?

d.      What was the lawsuit about?

e.      In what court?

f.      What was the outcome of the case?

g.      Were you satisfied with the result?

h.      Who represented you?

i.      Who represented the other side?

39.    Do any of you have any opinions, negative or positive generally about large corporations?

40.    Are you an attorney or do you have a close relative who is an attorney?

41.    Have you, your family, or close friends ever worked for Citynet?

a.      If so, please explain in what capacity and whether you or your family member is still employed there?

b.      If you or someone you know worked for Citynet, how did that employment end?

42.    Have you, your family, or close friends ever worked for Frontier?

a.      If so, please explain in what capacity and whether you or your family member is still employed there?

b.      If you or someone you know worked for Frontier, how did that employment end?

43.    Have you, your family, or close friends ever worked for the State of West Virginia?

a.      If so, please explain in what capacity and whether you or your family member is still employed there?

b.      If you or someone you know worked for the State of West Virginia, how did that employment end?

44.     Has there been any experience in your personal life or the personal life of any member of your immediate family that you believe would influence your judgment as a fair and impartial juror?

45.     Do you know of any possible reason whatsoever why you could not serve impartially in this case, fairly weigh the evidence, and render a verdict according to the evidence and according to the law as the Court will explain it to you?

46.     Is there anything else that you feel is important for the Court to know about you that you did not already tell us?

**Citynet's Objections to the Frontier Defendants' Proposed Voir Dire:**

1.a.     Presupposes the prospective jurors have formed preconceived notions about the parties. The Court should instead ask what the jurors have learned, heard, or read, and inquire further if necessary.

6.     This proposed question is irrelevant. This case does not concern Citynet's provision of services to consumers or work under a government contract.

7.     This proposed question is irrelevant. This case does not concern Citynet's provision of services to consumers.

8.     This question is duplicative of Citynet's first proposed voir dire question. Additionally, it is improper to have a separate question regarding Jim Martin.

9.     This question is also duplicative of Citynet's first proposed voir dire question. Chris Morris should not be included in a separate question.

10.     This proposed question is argumentative. If included, this should be rephrased to include Defendant Frontier, too.

12.     The prospective jurors should be included in the scope of this question, if included.

13. This proposed question is compound and confusing. The phrase "less than positive" should be re-worded as "negative" if this question is included in voir dire.

14. This proposed question is compound and confusing. The phrase "less than positive" should be re-worded as "negative" if this question is included in voir dire.

15. This question is unnecessary and re-states an instruction that will given by the Court.

18. Amy Goodwin, Kenneth Mason, Kathleen Abernathy, and Maggie Wilderotter should be included in this list.

19. This question is unnecessary and restates an instruction that will be given by the Court in a prejudicial manner.

20. This question is unnecessary and restates an instruction that will be given by the Court in a prejudicial manner.

21. Frontier objected to numerous proposed voir dire questions on the grounds that the State of West Virginia and not it was the recipient of a federal grant. Additionally, this question is prejudicial and should not be asked.

22. This proposed question misstates the procedural posture of this case. Citynet is a relator and is suing Frontier on behalf of the United States of America. Citynet is not simply "suing a larger company" in this case.

25. This question is unnecessary and restates an instruction that will be given by the Court in a prejudicial manner.

26. This question is unnecessary and restates an instruction that will be given by the Court in a prejudicial manner.

27. This question is unnecessary and confusing.

28.     This question may no longer be necessary given the settlement of the State Defendants.

29.     This question is unnecessary and restates an instruction that will be given by the Court in a prejudicial manner.

33.     This question is unnecessary and restates an instruction that will be given by the Court in a prejudicial manner.

34.     This question is duplicative of a proposed voir dire question suggested by Citynet.

35.     This question is duplicative of a proposed voir dire question suggested by Citynet.

## X.     Number of days for trial

The parties estimate trial lasting approximately three weeks if all claims are tried. If one or more claims are dismissed, the trial is estimated to take approximately two weeks.

## XI.     Courtroom Technology

All parties intend to use courtroom technology and each will alert the Court's IT Department.

## XII.    Other matters

Frontier Defendants

Frontier Defendants have only recently learned that Citynet and the State Defendants have apparently reached a settlement. Frontier Defendants anticipate that this settlement will present issues to be addressed at the Pretrial Conference, including disclosure of the settlement agreement to the Court, Frontier Defendants and the jury, as well as issues regarding testimony of the State Defendants.

Citynet

Citynet reserves the right to object to the presentation of any evidence regarding settlement

to the jury, including but not limited to, the settlement agreement.