UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CITYNET, LLC, on behalf of
the United States of America,

     Plaintiff/Relator,

v.                    Civil Action No. 2:14-cv-15947

FRONTIER WEST VIRGINIA, INC.,
a West Virginia corporation;
KENNETH ARNDT, individually;
DANA WALDO, individually;
MARK MCKENZIE, individually;
JIMMY GIANATO, individually;
and GALE GIVEN, individually,

     Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

       Pending are three motions for summary judgment, each filed July 8, 2022. First is the summary judgment motion of defendants Frontier West Virginia, Inc. ("Frontier"); Kenneth Arndt ("Arndt"); Dana Waldo ("Waldo"); and Mark McKenzie ("McKenzie") (together, "Frontier Defendants"). Frontier Defs. Mot. Summ. J., ECF No. 380. Second is the summary judgment motion of defendants Jimmy Gianato ("Gianato") and Gale Given ("Given"). Gianato Given Mot. Summ. J., ECF No. 378. And third is the partial summary judgment motion of plaintiff/relator Citynet, LLC ("Citynet"). Citynet Mot. Summ. J., ECF No. 382.

I. Background

A. Grant application and award

As part of the American Recovery and Reinvestment Act of 2009, Congress appropriated $4,700,000,000 to the National Telecommunications and Information Association ("NTIA") to carry out the Broadband Technology Opportunities Program ("BTOP"). Pub. L. No. 111-5, 123 Stat. 115, 128 (2009).  Through BTOP, Congress aimed to "establish a national broadband service development and expansion program" through which unserved and underserved areas could gain access to broadband internet.  Id. at 512-13.

On February 12, 2010, NTIA awarded the Executive Office of West Virginia ("WVEO") $126,323,296 of BTOP grant funding.  See Financial Assistance Award No. NT10BIX5570031, https://www2.ntia.doc.gov/grantee/executive-office-of-the-state-of-west-virginia (click "Financial Assistance Award Form CD-450").  In its application, the WVEO stated that "the primary use of BTOP funding will be to extend the reach and density of broadband access throughout the state."  WVEO BTOP Application 11, https://www2.ntia.doc.gov/grantee/executive-office-of-the-state-of-west-virginia (click "Application Part 1 (Incorporated into the award by reference)").  WVEO's "strategy" to accomplish

2

that goal was, among other things, the "build out of an 'open' network middle mile solution that will provide fiber to critical community anchor tenants." Id. at 7. "Middle mile" is a category of internet infrastructure comprising the fiber optic lines that link the larger "backbone" fiber optic lines to "last mile" lines that connect to the end consumer. See Inquiry Concerning the Deployment of Advanced Telecommunications Capability, 15 FCC Rcd. 20913, 20922-23 (2000).

The WVEO proposed building a "backbone"[1] middle-mile fiber-optic network to "community anchor institutions" ("CAI") like schools, libraries, and healthcare provider centers. See id. at 3. Other internet service providers could then tap into that middle mile -- it would be "open" to competitors -- for "last mile" service directly to consumers. See, e.g., id. at 9. WVEO represented that the fiber network was "estimated to be 900 miles of new fiber." Id. at 26.

To assist in preparing the BTOP grant application and in its implementation once awarded, Kelly Goes ("Goes"),[2] Secretary of Commerce for the State of West Virginia, arranged a

---

[1] As previously noted, "backbone" and "middle mile" are separate portions of internet infrastructure. The parties, however, sometimes refer to "middle mile" as "backbone."

[2] Goes was originally a named defendant but was voluntarily dismissed from the case without prejudice. ECF Nos. 92-93.

grant team that included her; defendant Gianato, Director of the West Virginia Division of Homeland Security and Emergency Management; and Colonel Todorovich of the West Virginia National Guard.  Goes Dep. 29, 92, ECF Nos. 380-2, 393-30, 396-3, 402-15; Todorovich Dep. 19-20, ECF Nos. 380-2, 382-13, 393-1, 396-4, 402-16, 405-12; Gianato Given Ans. ¶ 14, ECF No. 224.  Goes left office in December 2010, ending her involvement with the BTOP grant.  Goes Dep. 128.  Given became part of the grant team upon her appointment as the State of West Virginia's Chief Technology Officer on June 4, 2012.  See Given Dep. 52, 54-57, 59, 71-72, ECF Nos. 379-2, 380-2, 382-23, 393-38, 396-13, 405-4.

Upon the State's request, Frontier and Verizon West Virginia Inc. ("Verizon")[3] provided technical data and estimates to the State for its grant application.  On July 8, 2009, Goes requested from Frontier and other internet service providers data on then-existing broadband access in West Virginia.  July 8, 2009, Letter, ECF No. 382-2.  Goes explained that the WVEO's grant application could be denied if the WVEO could not accurately map broadband access for the federal government.  See id.  Frontier complied with Goes' request.  See Frontier

---

[3] Frontier's purchase of Verizon was announced in May 2009. Gianato Dep. 47, ECF Nos. 379-1, 380-2, 393-13, 396-2, 402-19. The Public Service Commission of West Virginia approved the purchase on May 13, 2010.  See Purchase Approval Order, ECF No. 396-11.

Broadband Data Email Chains, ECF Nos. 394-2, 382-3, 394-3; July 15, 2009, Frontier Internal Memo, ECF No. 393-6.  Additionally, the State requested, and Frontier and Verizon provided, data and estimates on construction costs to build fiber to CAIs.  See July 26, 2009, Frontier Internal Email, ECF No. 393-8; August 6, 2009, Letter from Verizon to Goes, ECF No. 380-30; see also July 15, 2009, Frontier Internal Memo.  Todorovich and representatives of Frontier and Verizon have noted that time constraints caused the data provided and, ultimately, the WVEO's application to rely on estimates rather than precise figures. July 15, 2009, Frontier Internal Memo; August 6, 2009, Letter from Verizon to Goes; Todorovich Dep. 30-31.

Kenneth Mason, Frontier's Vice President of Government and Regulatory Affairs, testified that Frontier's role in the WVEO's grant application was merely to provide information when asked, and that Frontier did not review, revise, or participate in the drafting of the WVEO's grant application.  Mason Dep. 142-43, ECF No. 380-2; see also McCarthy Dep. 135-37, ECF No. 380-2.  Likewise, Todorovich testified that State employees wrote and developed the WVEO's grant application.  Todorovich Dep. 41-42.

During the time NTIA was considering the WVEO's application, an NTIA representative contacted Gianato twice with

questions about the WVEO's plan.  On December 9, 2009, NTIA
asked a series of questions attempting to resolve whether
"'most' of the fiber construction is in a large number of
'short' connections to anchor institutions."  December 9, 2009,
Email Chain Between Gianato and NTIA, ECF No. 393-37.  Gianato
replied that the WVEO "will need to go back to Verizon
engineering" for an answer, which "will take a long time."  Id.
The NTIA representative responded that "an off-the-cuff
estimate" would suffice.  Id.  On January 7, 2010, the NTIA
representative asked Gianato whether the fiber mileage reported
in the WVEO's grant application was "all to be constructed new
or do they include some existing fiber."  January 7, 2010, Email
Chain Between Gianato and NTIA, ECF No. 393-11.  Gianato
replied, "Based on the estimates from Verizon and Frontier, the
fiber is new fiber that does not exist today.  It includes fiber
to the facility."  Id.

        After the WVEO was awarded the grant, Arndt asked Goes
via email whether she "happen[ed] to know the amount [of the
grant] and will [Frontier] be able to play a role?"  February
17, 2010, Arndt and Goes Email Chain, ECF No. 380-19; Arndt Dep.
288-89, ECF No. 380-2.  At the same time, Frontier was having a
similar internal discussion about trying to glean details of the
WVEO's grant award and whether Frontier could assist in its

implementation.  <u>See</u> February 17, 2010, Frontier Internal Email Chain, ECF No. 380-26; February 18, 2010, Frontier Internal Email Chain, ECF No. 380-18; Arndt Dep. 286-87.  Arndt, Waldo, and McKenzie were executive-level employees of Frontier during the times relevant to the pending motions.  <u>See</u> McKenzie Decl. ¶ 3, ECF No. 380-38; Aug. 26, 2010, Waldo Commentary, ECF No. 393-28; February 17, 2010, Arndt and Goes Email Chain.

Eventually, the WVEO and Frontier agreed that Frontier would serve as the WVEO's contractor to build the middle-mile fiber network component of the BTOP grant.  <u>See</u> August 30, 2010, Frontier Internal Email Chain, ECF No. 393-29.  Todorovich explained in a letter that "[t]his portion of the grant was written in a manner utilizing the pre-existing State of West Virginia MPLS contract" previously held by Verizon and passed to Frontier with Frontier's purchase of Verizon.  October 6, 2010, Todorovich Letter, ECF No. 402-8.[4]  But "[a]s [the WVEO] started implementing the grant . . . , NTIA advised that we should treat Frontier as a sub-recipient [of the BTOP grant] rather than a contractor."  <u>Id.</u>

---

[4] "MPLS" is short for Multi-Protocol Label Switching.  <u>See</u> William Lehr, <u>Would You Like Your Internet With or Without Video?</u>, 2017 Ill. J. of Law, Tech. & Policy 73, 87 n.62 (2017). Under the MPLS contract, Frontier "provide[d] network facilities and other services to the State of West Virginia."  <u>See</u> MOU at 1, ECF No. 380-4.

Thus, in October 2010, the WVEO entered into a memorandum of understanding ("MOU") with Frontier to be the BTOP grant's subrecipient and to build the fiber network contemplated by the grant.  See MOU.  The MOU provided that Frontier would carry out its subrecipient duties under the BTOP grant pursuant to the existing MPLS contract.  Id.  But because award of the BTOP grant required acceptance of the grant terms and conditions, Frontier and the WVEO also agreed to be bound by those as well.  See id.; see also id. at 3.

The terms and conditions of the grant to the WVEO, of which Frontier became the subrecipient, include the following, as each was constituted at the time of the grant application and award:

Department of Commerce Financial Assistance Standard Terms and Conditions;

Award Specific Special Award Conditions, particular to the BTOP grant;

Line Item Budget for the BTOP grant;

15 CFR Part 24, Uniform Administrative Requirements for Grants and Agreements to States and Local Governments;

OMB Circular A-87, Cost Principles for State, Local, and Indian Tribal Governments;

OMB Circular A-133, Audits of States, Local Governments, and Non-Profit Organizations;

> Department of Commerce Pre-Award Notification
> Requirements for Grants and Cooperative Agreements, 73
> Fed. Reg. 7696 (Feb. 11, 2008); and
>
> Notice of Funds Availability ("NOFA") for BTOP grants
> and subsequent amendments, 74 Fed. Reg. 33,104 (July
> 9, 2009); 74 Fed. Reg. 41,676 (Aug. 18, 2009); and 74
> Fed. Reg. 42,644 (Aug. 24, 2009).

Among other things, these terms and conditions imposed
recordkeeping requirements and defined what costs could be
reimbursed with grant funds.

### B. Grant implementation

Gianato recalls the original intent of the BTOP grant
to have been the building of fiber from each of the identified
CAIs back to one of Frontier's various "central offices"[5] located
throughout the state.  Gianato Dep. 105, 216.  "[A]t some
point," however, the implementation plan changed.  Id. at 163.
Gianato testified that "NTIA said you can't build if fiber
already exists to a location," that is, BTOP grant funds could
not be used to "overbuild where sufficient fiber already
existed" along the route to a CAI.  Id. at 215-16.  NTIA's
overbuild limitation applied whether that fiber was owned by
Frontier or another company.  Id. at 204.  Additionally, some

---

[5] A central office essentially is a terminal where Frontier
houses equipment.  See Martin Dep. 120-21, ECF No. 380-2.

CAIs turned out to have moved or no longer existed, and other CAIs were added and dropped, such that "th[e] list was almost evolving almost till the day" fiber construction ended. Id. at 204; see also Arndt Dep. 284. Under the BTOP grant terms and conditions and the MOU, pre-existing fiber was not subject to the BTOP grant's open-access requirement. Dunlap Dep. 62-64, ECF Nos. 393-40, 396-5.

In a March 18, 2011, memorandum, Todorovich expressed to Frontier that in recent meetings he "picked up overtones" that Frontier would not be building fiber from central offices to CAIs. March 18, 2011, Memorandum from Todorovich to Frontier, ECF No. 394-4. Frontier responded, "You instructed us to use the central office as the start location . . . , with the plan that we would make appropriate modifications as we move forward. We still plan to do so. We also plan to use existing fiber where available and appropriate." March 21, 2011, Letter from Frontier to Todorovich, ECF No. 393-33.

In a July 15, 2011, memorandum sent by Frontier to the WVEO, Frontier memorialized discussions between Frontier and the WVEO regarding "duplicative fiber pulls from CAI to central offices." July 15, 2011, Email from McKenzie to WVEO, ECF No. 394-5. Frontier recounted that the BTOP grant application "does not contemplate the duplication of existing fiber facilities;"

rather, "it states that West Virginia will 'leverage its existing infrastructure' and 'leverage the current [Frontier] MPLS contract' to 'extend broadband connectivity' to anchor institutions through 'Fiber Segments' and 'handoffs to existing fiber networks.'" Id. (quoting WVEO BTOP Application within single quotation marks).  Frontier also recounted that "[d]uplication of existing backbone facilities also is not contemplated under the MOU," and that "[t]he NTIA and the State previously have stated repeatedly that their policy under the Grant was against duplication of existing fiber facilities." Id.

Todorovich testified that, based on a conversation he partly overheard, Gianato ultimately made the decision to allow Frontier not to duplicate fiber, and that the federal government was aware of that decision.  Todorovich Dep. 61-62, 64, 142. Likewise, Gianato testified that he "[does not] know" if there is written documentation of the changes to the fiber build during the grant's implementation, but that those issues were discussed and approved during phone calls with NTIA.  Gianato Dep. 164.  As noted, Gianato testified that the NTIA had a rule against fiber overbuild.  See id. at 215-16.  Ultimately, Frontier constructed 675 new miles of fiber.  McKenzie Dep. 95-97.

In addition to fiber overbuild, the July 15, 2011, memorandum also discussed apparent issues with "CAI premises conduit/entrance facilities." July 15, 2011, Email from McKenzie to WVEO. Frontier contended that prior documentation, including grant documents, the MPLS contract, and the MOU, showed "that the CAI is responsible for any conduit/entry work needed. In fact, the State allocated BTOP funding for this purpose." Id. Frontier also stated that "[its] business does not ordinarily include this type of work." Id. At some point, however, the WVEO and Frontier agreed that Frontier would perform this portion of the fiber build by hiring contractors, which was later referred to as "facilities build-out" ("FBO") work. See Gregg Dep. 127-29, ECF Nos. 380-2, 382-11, 392-2, 393-19. FBO work involved building fiber from a "meet point" outside each CAI into the CAI itself. See id. at 128-29. For example, "actually doing whatever was necessary to drill into that building and go to the closet, cabinet, whatever it was, where the service would be terminated" and the CAI could connect to the fiber network. Id. at 128.

### C. United States' alternate remedy

Pursuant to 31 U.S.C. § 3730(b)(2), Citynet's qui tam complaint was filed on May 17, 2014, in camera, sealed, and

served on the United States but not the defendants.  ECF Nos. 2-3.  The United States then moved for several extensions under 31 U.S.C. § 3730(b)(3) while it investigated Citynet's allegations to decide whether to intervene and conduct the action on its own behalf.  See ECF Nos. 4-26.  On June 17, 2016, the United States declined to intervene.  ECF No. 27.  On July 18, 2016, Citynet filed the first amended complaint, which is the operative pleading in this matter.  ECF No. 30.

Under 31 U.S.C. § 3730(c)(5), the United States has the option to pursue "any alternate remedy" in lieu of intervening in a qui tam case.  After the decision not to intervene, the United States Department of Commerce Office of Inspector General ("OIG") "continued to investigate several allegations regarding Frontier's performance as a subrecipient under the West Virginia BTOP grant."  U.S. Dep't of Com. Off. of Inspector Gen., Investigative Report No. 14-0480, at 1 (June 2017), ECF Nos. 380-28, 396-15, 404-6 [hereinafter OIG Report].  "Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to" the corresponding FCA action.  31 U.S.C. § 3730(c)(5).

The OIG issued its report in June 2017.  The OIG summarized its findings as follows:

13

> The evidence developed over the course of our
> investigation established that the [WVEO] reimbursed
> Frontier from BTOP grant funds for approximately $4.7
> million in costs that were unallowable under the
> applicable rules and regulations.

OIG Report at 1.  That $4.7 million comprised "$465,000 in fees

to process [FBO]-related invoices for work performed by

contractors" and "$4.24 million in indirect 'loadings' charges."

Id. at 1-2.

        The following is a summary of the facts described by

the OIG in reaching its conclusions.  To begin, the OIG

described the billing and payment system under the BTOP grant.

The BTOP grant provided that Frontier, as a grant subrecipient,

would submit its invoices directly to the WVEO without NTIA

review.  Id. at 7.  The BTOP grant further provided that the

WVEO could unilaterally draw down grant funds to pay Frontier.

Id.  Thus, the BTOP grant charged the WVEO with monitoring

Frontier's compliance with the grant's terms and conditions.

Id.  The WVEO maintained an internal review system to evaluate

Frontier's invoices before drawing down grant funds for

reimbursement to Frontier.  Id.[6]

---

[6] The WVEO was not completely unsupervised.  It was required to
file quarterly reports and participate in biweekly phone
conferences with NTIA to discuss the BTOP grant.  OIG Report at
7.  Frontier participated in the biweekly conferences.  Id.

14

One part of Frontier's BTOP grant responsibilities was FBO work,

> in which Frontier oversaw additional construction (build-out) within the premises of certain CAIs in order to allow for the installation of fiber optic cable.  Frontier did not perform build-out work itself, but rather subcontracted vendors to perform the work and then processed the payment for that work through the grant.

Id.  From the beginning of the grant until early 2013, Frontier charged the grant a 35.2% "markup" "on the total amount of the vendor costs on all FBO-related invoices."  Id. at 8.  Indeed, Frontier emails show that Frontier considered the markup rate as "a revenue opportunity for Frontier," id., and "profit," id. at 14.  The OIG concluded that "the 35.2% fee was seen within Frontier as distinct from its actual costs in processing the invoices."  Id. at 8.  Indeed, "no Frontier employees interviewed by the OIG could confirm that [the markup] was based on an analysis of actual Frontier costs in processing the BTOP FBO vendor invoices."  Id.

"Additionally, the OIG found no evidence that the specific amount and nature of the FBO markup were ever communicated to the State of West Virginia."  Id.  Although Frontier prepared a memorandum to the State addressing the markup rate, Frontier never sent the memorandum.  Id. at 8-9.

15

In November 2012, a State official expressed concerns over the FBO markup rate.  Id. at 9.  Frontier responded in January 2013 with a memorandum proposing the replacement of the percentage-based markup with a flat fee of $1,808.  Id.  Frontier represented that $1,808 was its average cost to process each FBO invoice, based on correspondence with the various Frontier departments involved in such processing.  Id.  The State agreed to the flat-fee proposal.  Id.  In a signed agreement between Frontier and the State, Frontier restated its assertion that $1,808 was its actual costs incurred to process each FBO invoice.  Id.

"The OIG," however, "found no evidence of any backup documentation . . . to support Frontier's [FBO] invoice processing fees."  Id. at 10.  Instead, Frontier's memorandum showed that the $1,808 cost-per-invoice was simply the quotient of the amount it had received in FBO markup fees by that time over the number of FBO invoices it had processed.  Id. at 9.  The OIG found that "Frontier's true costs appear to be nowhere close to the amount charged for processing the FBO invoices."  Id. at 14.

Still, Frontier represented that it arrived at the $1,808 by analyzing a purported eleven-step process that took four hours to complete.  Id.  But "the evidence does not support

16

that Frontier actually went through this 11-step, four-hour process for every FBO invoice." Id. at 14.  Indeed, the OIG classified the process as an "estimate" that was not based on discussions with relevant employees or analysis of relevant documents.  Id. at 14-15.  And again, the actual fixed fee itself was based on the percentage markup Frontier had already been charging the grant, which was devised before Frontier ever undertook a supposed analysis of the steps it took in processing FBO invoices.  See id. at 9-10, 14-15.

In addition to FBO processing fees ($465,000), Frontier also added loadings charges ($4,240,000) to its invoices submitted to the WVEO.  "The evidence established that 'loads' or 'loadings' represented Frontier's purported indirect costs," that is, overhead expenses, "associated with carrying out work under the BTOP project."  Id. at 10; see also id. at 11.  "The evidence also established that Frontier informed WVEO officials about the loadings charges," including that loadings were equivalent to overhead expenses or indirect costs.  Id. at 10-11; see also id. at 16.

As noted, the WVEO was responsible for ensuring Frontier's compliance with the BTOP grant's terms and conditions.  Id. at 7.  In May 2013, the WVEO obtained an opinion from "a prominent accounting firm" (Ernst & Young) on

17

Frontier's billing for indirect costs.  Id. at 11.  The
accounting firm "concluded that Frontier, as a commercial
organization, was not subject to the rules that would have
prevented a similarly situated governmental entity from
recovering its indirect costs" under the grant.  Id.  Likewise,
in 2012 and 2014, Frontier underwent audits submitted to the
NTIA in which "a major accounting firm" (KPMG) "concluded that
Frontier's performance and costs complied with all requirements
that could have a direct and material effect on the grant."  Id.
at 12.

     In addition, the WVEO corresponded with the NTIA
concerning FBO invoice processing fees and loadings charges.  In
May 2013, an NTIA official reviewed the eleven-step FBO invoice
process outlined by Frontier and "agreed with [a WVEO]
official's initial determination that the costs were direct
charges."  Id.  In June 2013, the same NTIA official and an WVEO
official discussed whether Frontier's invoice processing fees
were direct or indirect and determined that classifying them as
direct was not an issue.  Id.

     However, when interviewed by the OIG, the NTIA
official who had spoken with WVEO officials denied approving
loadings charges as reimbursable direct charges, "and stated
that he had merely opined that Frontier's FBO invoice processing

18

fees, which at times were also referred to as 'loadings,' were in fact direct charges and not indirect." Id.  Further, the official denied ever seeing invoices with "loadings," stated that he did not know what Frontier's "loadings" were, and affirmed that he never spoke with a WVEO official about loadings charges.  Id.  The official also stated that Frontier's loadings were "clearly indirect" and thus not reimbursable with BTOP grant funds.  Id.  The WVEO official who spoke with the NTIA official believed at the time that NTIA had approved Frontier's FBO and loadings charges.  Id.

Ultimately, the OIG found that "the evidence established that Frontier's FBO invoice processing fees . . . should not have been paid with BTOP grant funds."  Id. at 15. Concerning the NTIA official's approval of FBO fees, the OIG noted that "there is insufficient evidence to conclude that NTIA knowingly approved the construct and factual underpinnings of the processing fees that Frontier charged."  Id. at 16.  In fact, the OIG concluded that Frontier's memorandum detailing its eleven-step FBO invoicing process, provided to NTIA, "contained several material representations that are not supported by the facts."  Id.  "[A]t best," the OIG continued, "Frontier provided . . . incomplete information."  Id.  As for the WVEO, the OIG concluded that "the evidence shows that the WVEO consulted with

19

NTIA in good faith" about whether the FBO processing fees could be paid with BTOP grant funds.  Id.

Turning to Frontier's loadings charges, the OIG noted competing interpretations of BTOP grant documents.  Id. at 17. The OIG concluded as follows:

> Although the evidence establishes that Frontier was transparent about the nature and amount of its 'loadings' charges and that the [WVEO] (based on the latter's opinion from the accounting firm and communications with NTIA) believed that Frontier's indirect costs were reimbursable with BTOP funds, the OIG defers to NTIA's interpretation of the prevailing grant rules.

Id.  In so finding, the OIG emphasized that "the evidence shows that the [WVEO] believed in good faith that NTIA had approved the loadings charges."  Id. at 18.

Apart from FBO and loadings charges, the OIG also investigated Frontier's installation of maintenance coil, which "is the extra cable stored at a particular facility that service providers use to repair damaged fiber and to connect new fiber to the network."  Id. at 19 (quotation marks and alteration omitted).  The OIG summarized the results of its investigation as follows:

> On multiple occasions, Frontier represented to the State of West Virginia, to the public, and to the OIG that, consistent with industry standard, it had installed 100 feet of maintenance coil for every mile of BTOP fiber placed, for a total of 12 miles of maintenance coil.  The OIG's investigation, however, identified evidence calling into question the accuracy

20

>of that representation, and Frontier ultimately
>acknowledged that it installed approximately 49 miles
>of maintenance coil, or nearly four times the amount
>that it had previously asserted was installed in
>accordance with industry standards.

Id.

The OIG recounted that, in a January 2014 email

exchange between a Frontier employee and a consultant, the

consultant stated that "not only do we not know how much fiber

[Frontier] actually placed, but we don't know how much of what

we placed is coiled up on poles," that the total length of

maintenance coils appeared "4 times greater than [Frontier] told

[the State]," and that "I don't think we need to tell [the

State] unless . . . ask[ed] again." Id. at 20.  Frontier did

not tell the State about the maintenance coils, id. at 20-21,

although a Frontier employee told the OIG that it was believed

that the consultant was unqualified to opine on the length of

maintenance coils, id. at 20.

The OIG did not take a position on whether the length

of maintenance coil was within industry standards and referred

the matter to NTIA for further consideration.  Id. at 21.  The

NTIA concluded that

>only those costs associated with 12 miles of
>maintenance coil are reasonable and necessary for the
>project.  This determination is consistent with
>Frontier's previous representations to the West
>Virginia Legislature, the public and to the OIG that,
>consistent with industry standards, Frontier installed

21

> 12 miles of maintenance coil for [the BTOP grant]
> project.  . . . Thus, the costs associated with the 37
> miles of excess maintenance coil are hereby
> disallowed.

U.S. Dep't of Com. Nat'l Oceanic & Atmospheric Admin.,
Investigation Resolution Demand Letter (May 24, 2018), ECF No.
206-5.  Thus, in addition to the $4.7 million already disallowed
by the OIG for improper FBO ($465,000) and loadings ($4,240,000)
charges, the NTIA further disallowed $244,200 for excess
maintenance coils, id., for a total of $4,949,200 in disallowed
costs under the BTOP grant.  The State of West Virginia has
agreed to pay the amounts owed.  See ECF No. 185 at 2.


    D. Citynet's claims


        Citynet initiated this action on May 7, 2014, with the
filing of its qui tam complaint under the False Claims Act
("FCA"), 31 U.S.C. §§ 3729-3733.  "The [FCA] is a fraud
prevention statute."  United States ex rel. Gugenheim v.
Meridian Senior Living, LLC, 36 F.4th 173, 179 (4th Cir. 2022)
(quotation marks omitted).  It contains three causes of action
relevant to this case: an action for the presentment of a false
claim under 31 U.S.C. § 3729(a)(1)(A), an action for the making
or using of a false record or statement material to a false
claim under 31 U.S.C. § 3729(a)(1)(B), and a conspiracy claim
under 31 U.S.C. § 3729(a)(1)(C).  United States ex rel.

22

Nicholson v. MedCom Carolinas, Inc., 42 F.4th 185, 193 (4th Cir. 2022) (quotation marks and footnotes omitted).  "Roughly speaking, a presentment claim alleges that a defendant knowingly submitted a false claim to the government themselves[, a] false-record-or-statement claim alleges that a defendant knowingly made a false statement or produced a false record material to a false claim that was submitted to the government by someone else[, a]nd a conspiracy claim covers knowing agreements to do either."  Id.

Citynet alleges generally that the defendants defrauded the United States in connection with the grant in violation of the FCA.  First Am. Compl. ¶¶ 3-6, 9-12, 14, ECF No. 30.  Citynet's specific causes of action can be separated into four categories based on the facts alleged.

First, in Counts I (presentment) and V (false record), Citynet alleges that the defendants fraudulently induced the NTIA to award the grant to the WVEO by misrepresenting aspects of how they intended to use the grant funds.  See First Am. Compl. ¶¶ 133-39, 161-67.  As more fully explained in the court's memorandum opinion and order denying the Frontier Defendants' motion for partial summary judgment filed February 22, 2022, and entered contemporaneously herewith, operation of the FCA's public disclosure bar limits Counts I and V to

23

allegations of false or fraudulent conduct that occurred before March 23, 2010.  <u>See</u> 31 U.S.C. 3730(e)(4)(A) (public disclosure bar).

Second, in Counts II (presentment) and VI (false record), Citynet claims that the defendants fraudulently billed the United States for Frontier's loadings costs.  <u>See</u> First Am. Compl. ¶¶ 140-46, 168-74.  Third, Citynet asserts in Counts III (presentment) and VII (false record) that the defendants likewise fraudulently billed the United States for Frontier's FBO invoice processing costs.  <u>See id.</u> ¶¶ 147-53, 175-81. Fourth, in Counts IV (presentment) and VIII (false record), Citynet alleges that Frontier and McKenzie falsified the amount of fiber built and fraudulently charged the United States for excessive maintenance fiber coils.  <u>See id.</u> ¶¶ 154-60, 182-88. Additionally, in Count IX, Citynet alleges a conspiracy among the defendants to commit the FCA violations in Counts I through VIII.  <u>See id.</u> ¶¶ 189-94.

## II. Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to

establish the elements of a party's cause of action.  Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News
& Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d
570, 576 (4th Cir. 2010).  A "genuine" dispute of material fact
exists if, in viewing the record and all reasonable inferences
drawn therefrom in a light most favorable to the non-moving
party, a reasonable fact-finder could return a verdict for the
non-moving party.  Anderson, 477 U.S. at 248.  "When faced with
cross-motions for summary judgment, [a court must] consider each
motion separately on its own merits to determine whether either
of the parties deserves judgment as a matter of law."  Bacon v.
City of Richmond, 475 F.3d 633, 637-38 (4th Cir. 2007)
(quotation marks omitted).

          A party is entitled to summary judgment if the record,
as a whole, could not lead a reasonable trier of fact to find
for the non-moving party.  Williams v. Griffin, 952 F.2d 820,
823 (4th Cir. 1991).  Conversely, summary judgment is
inappropriate if the evidence is sufficient for a reasonable
fact-finder to return a verdict in favor of the non-moving
party.  Anderson, 477 U.S. at 248.

III. Discussion

Presentment and false-record-or-statement claims share the same four elements of proof:

(1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due.

Nicholson, 42 F.4th at 193.  FCA conspiracy requires an "agree[ment by the conspirators] that [a] false record or statement would have a material effect on the Government's decision to pay [a] false or fraudulent claim."  Id. (second and third alterations in original).  Further, FCA conspiracy is not actionable absent an underlying violation of the FCA.  United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp., 929 F.3d 721, 728-29 (D.C. Cir. 2019); United States ex rel. Godfrey v. KBR, Inc., 360 F. App'x 407, 412-13 (4th Cir. 2010).

Gianato, Given, and the Frontier Defendants seek summary judgment on all counts.  See Gianato Given Mot. Summ. J.; Frontier Defs. Mot. Summ. J.  Citynet seeks summary judgment against only the Frontier Defendants, and on only the loadings charges claims of Counts II and VI and the FBO charges claims of Counts III and VII.  See Citynet Mot. Summ. J.[7]  The court begins

_____

[7] Citynet also seeks judgment on a number of the Frontier Defendants' affirmative defenses since "they are not legally

26

with Gianato and Given before turning to the cross-motions of
the Frontier Defendants and Citynet.

        A. Gianato and Given

        At the outset, the court notes the OIG's findings that
the WVEO consulted with NTIA in good faith about reimbursement
of Frontier's FBO processing fees and loadings charges and that
the WVEO believed in good faith that NTIA had approved
reimbursement of Frontier's FBO processing fees and loadings
charges.  OIG Report at 15, 18.  Inasmuch as those findings of
good faith are conclusive on this action, 31 U.S.C. §
3730(c)(5), Citynet faces a virtually insurmountable hurdle to
prove that Gianato or Given acted with the requisite scienter to
establish FCA liability on the claims related to FBO and
loadings charges, see United States ex rel. Taylor v. Boyko, 39
F.4th 177, 198 (4th Cir. 2022) (explaining that the FCA's
scienter requirement concerns, at its furthest extent, those who

_____

viable defenses in response to an FCA claim." See Citynet Mem.
Supp. 33-34, ECF No. 383.  The court declines to address those
affirmative defenses absent evidence that the Frontier
Defendants intend to invoke them at trial.  The Frontier
Defendants state that they do not.  See Frontier Defs. Resp. 14-
15, ECF No. 392.

"fail[] to make simple inquiries" that would alert the person of the false claims).

Even so, Citynet urges the court to discount the OIG's findings because NTIA's approval of reimbursement of the loadings and FBO charges was "premised on incomplete information."  See Citynet Resp. to Gianato Given 15, ECF No. 396.  The FCA, however, "is not intended to punish honest mistakes."  United States ex rel. Ubl v. IIF Data Sols., 650 F.3d 445, 452 (4th Cir. 2011).  An honest mistake is precisely what the OIG found happened in this case concerning the WVEO's decision to reimburse loadings and FBO charges.

Therefore, Gianato and Given are entitled to summary judgment on Citynet's loadings costs claim (Counts II and VI) and FBO invoice processing costs claim (Counts III and VII).[8] Inasmuch as those are the only FCA violations alleged against Given, Given is also entitled to summary judgment on Citynet's conspiracy claim (Count IX).

The only remaining claims are against Gianato for misrepresentation of the network the WVEO intended to build (Counts I and V) and conspiracy (Count IX).  Gianato solely

---

[8] Indeed, Citynet does not contest summary judgment in Gianato's favor on the loadings and FBO invoice processing costs claims.

focuses on his scienter, or lack thereof.  See Gianato Given
Mem. Supp. 9-12, 14-15.  "[A] person acts with the requisite
scienter if they (1) have 'actual knowledge of the [falsity of
the] information'; (2) act 'in deliberate ignorance of the truth
or falsity of the information'; or (3) act 'in reckless
disregard of the truth or falsity of the information.'"  Taylor,
39 F.4th at 197 (quoting 31 U.S.C. § 3729(b)(1)(A)).  "[N]o
proof of specific intent to defraud" is required to establish
scienter.  31 U.S.C. § 3729(b)(1)(B).

        Gianato argues that Citynet has failed to "establish[]
that [he] knew BTOP grant funds would be used to construct any
part of a network that was not considered middle-mile."  Gianato
Given Mem. Supp. 10.  Gianato contends that he "had no reason to
question" Frontier's and Verizon's estimates, that he told NTIA
that the proposed fiber build was based upon those third-party
estimates by Frontier and Verizon, and that adjustments during
grant construction were made with NTIA's knowledge and approval
because of changing project needs.  See id.; Gianato Given Reply
5-6, ECF No. 400.

        "Citynet's claim [against Gianato] is premised on the
fact that [he] represented" in the January 7, 2010, email with
an NTIA official "that the state intended to build middle mile
infrastructure when," Citynet contends, "[the state] intended to

and did rubber stamp the Frontier Defendants' project regardless of what it built." Citynet Resp. to Gianato Given 14-15.  As proof, Citynet offers evidence of a purported "quid pro quo." Id. at 14.  Specifically, Citynet points to evidence that Frontier expedited fiber construction in McDowell County, Gianato's home county, at Gianato's urging.  See id. (citing February 1, 2012, Email Chain Between Gianato and Frontier, ECF No. 396-10).  More generally, Citynet accuses Gianato as having "acquiesced in [the Frontier Defendants'] desires on the BTOP project as a de facto reward for [their] investment" in West Virginia.  Id.  The evidence, Citynet argues, demonstrates that "[w]hen the Frontier Defendants wanted to misrepresent the scope of infrastructure that existed to the NTIA, Defendant Gianato accommodated them," and "[w]hen Defendant Gianato wanted certain projects prioritized, the Frontier Defendants accommodated him." Id.

        Citynet's argument is mere speculation, which is insufficient to defeat a summary judgment motion.  Verisign, Inc. v. XYZ.COM LLC, 848 F.3d 292, 298 (4th Cir. 2017) (explaining that, to defeat a summary judgment motion, the nonmovant "must provide more than a scintilla of evidence -- and not merely conclusory allegations or speculation -- upon which a jury could properly find in its favor").  Citynet's position is

that Gianato's "plan all along" was to allow the Frontier
Defendants to run roughshod over the BTOP grant and, in
exchange, Frontier would allow him concessions and favors during
construction.  See Citynet Resp. to Gianato Given 13-15.  But
Citynet fails to provide any evidence of the alleged "quid pro
quo" between Gianato and the Frontier Defendants, much less one
that arose before March 23, 2010.  See Gugenheim, 36 F.4th at
179 ("[Relator] bears the burden to prove scienter at trial.
Therefore, summary judgment is warranted if [Relator] has failed
to marshal evidence from which a reasonable jury could find that
Defendants acted with the requisite state of mind.").

     In fact, Frontier appears to have resisted Gianato's
request to expedite construction in McDowell County.  See
February 1, 2012, Email Chain Between Gianato and Frontier.  And
more broadly, as Citynet points out, the Frontier Defendants
evidently were permitted to avoid overbuilds over the entire
grant implementation only after they "repeated[ly] objected" to
doing so over the course of months.  Citynet Resp. to Gianato
Given 4 (citing March 21, 2011, Letter from Frontier to
Todorovich; July 15, 2011, Email from McKenzie to WVEO).
Moreover, Citynet has failed to identify evidence suggesting
that Gianato knowingly, recklessly, or in deliberate ignorance
passed false estimates from Verizon and Frontier to NTIA.

31

No reasonable jury could find that Gianato and the Frontier Defendants had a <u>quid</u> <u>pro</u> <u>quo</u> agreement because there is no evidence that a <u>quid</u> <u>pro</u> <u>quo</u> existed.  On the contrary, the evidence suggests just the opposite.  Inasmuch as Citynet has not identified any evidence or theory to show that Gianato acted with the requisite scienter for an FCA claim, Gianato is entitled to summary judgment on Citynet's claim that he misrepresented the network the WVEO intended to build (Counts I and V) and, in turn, the conspiracy claim against him (Count IX) fails.

B. The Frontier Defendants

At the outset, the court notes that the Frontier Defendants seek dismissal of the conspiracy claim against them pursuant to the intracorporate conspiracy doctrine.  Frontier Defs. Mem. Supp. 31.  The intracorporate conspiracy doctrine, which was developed under antitrust law, holds that a corporation and its agents in their corporate capacity cannot conspire among themselves because they are effectively the same entity; that is, a corporation cannot conspire with itself.  <u>See Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 769 (1984); <u>see also</u> <u>Buschi v. Kirven</u>, 775 F.2d 1240, 1251-54 (4th Cir. 1985).  Although the Fourth Circuit has not yet been called

to decide whether the intracorporate conspiracy doctrine applies to the FCA, the district courts in this circuit, including one court in this district, have applied the doctrine to FCA conspiracy.  See United States ex rel. Brooks v. Lockheed Martin Corp., 423 F. Supp. 2d 522, 528 (D. Md. 2006); United States ex rel. DRC, Inc. v. Custer Battles, LLC, 376 F. Supp. 2d 617, 651-52 (E.D. Va. 2005), rev'd on other grounds, 562 F.3d 295 (4th Cir. 2009); United States v. Gwinn, No. 5:06-cv-00267, 2008 WL 867927, at *20-25 (S.D. W. Va. Mar. 31, 2008).  Citynet does not contend that the doctrine should not apply to this case. Inasmuch as the only remaining defendants in this matter are Frontier and its corporate agents, Citynet's conspiracy (Count IX) claim against the Frontier Defendants fails.

The court further notes that the evidence shows the Frontier Defendants did not themselves present a claim to the United States.  Rather, it is undisputed that the billing structure required the Frontier Defendants to submit invoices to the WVEO, which in turn submitted claims to the United States. Inasmuch as a presentment claim under 31 U.S.C. § 3729(a)(1)(A) requires a defendant to "knowingly submit[] a false claim to the government [itself]," Nicholson, 42 F.4th at 193, the Frontier Defendants are entitled to summary judgment on Citynet's presentment claims, Counts I through IV.

Remaining are Citynet's false records claims, Counts V through VIII, which require "a defendant knowingly [to have] made a false statement or produced a false record material to a false claim that was submitted to the government by someone else." Id. The court proceeds with Counts V through VIII below.

### 1. Count V -- Frontier Defendants' misrepresentation of fiber build

In Count V, Citynet brings a false-records fraudulent inducement claim related to the WVEO's application for BTOP grant funds. Under the FCA, liability for fraudulent inducement arises out of "fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 788 (4th Cir. 1999). Citynet alleges that the Frontier Defendants assisted the WVEO in preparing its grant application and "misrepresented the scope of the project [they] intended to build with BTOP funds." Citynet Resp. to Frontier Defs. 15, ECF No. 393.

The Frontier Defendants argue they are entitled to summary judgment on Count V for three reasons: (a) there was no false statement because they did not contribute to the WVEO's

grant application; (b) any false contribution was made without the requisite scienter; and (c) any false contribution was immaterial to the United States' decision to award BTOP grant funds to the WVEO.

As previously noted, "a person acts with the requisite scienter [under the FCA] if they (1) have 'actual knowledge of the [falsity of the] information'; (2) act 'in deliberate ignorance of the truth or falsity of the information'; or (3) act 'in reckless disregard of the truth or falsity of the information.'" Taylor, 39 F.4th at 197 (4th Cir. 2022) (quoting 31 U.S.C. § 3729(b)(1)(A)). The latter two states of mind are intended to capture defendants who "bur[y their] head[s] in the sand and fail[] to make simple inquiries which would alert [them] that false claims are being submitted." Id. at 198 (quotation marks omitted). Although that standard does not require "specific intent to defraud," 31 U.S.C. § 3729(b)(1)(B), it is not intended to punish "honest disagreements, routine adjustments and corrections, and sincere and comparatively minor oversights." United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 734 (4th Cir. 2010). Nor does the FCA reach "[b]ad math," mere "proof of mistakes," or "the common failings of engineers and other scientists." Id. "Likewise, [a]n FCA relator cannot base a fraud claim on nothing

more than his own interpretation of an imprecise contractual provision." Id. (quotation marks omitted).

The requisite scienter for Count V is further informed by Citynet's theory of liability, fraudulent inducement. "[F]raudulent inducement claims are concerned with whether the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct." United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 378 (4th Cir. 2008) (quotation marks and emphasis omitted). That is, the scienter behind fraudulent inducement is an intent not to perform a contract at the time the contract is made, or, in the context of the FCA, at least a deliberate indifference or reckless disregard to future performance. See id.

As evidence of scienter, Citynet hones in solely on Gianato's January 7, 2010, email response to the NTIA during the NTIA's consideration of the WVEO's application. Citynet Resp. to Frontier Defs. 17. In that email, Gianato represented that "[b]ased on the estimates from Verizon and Frontier, the fiber is new fiber that does not exist today. It includes fiber to the facility." January 7, 2010, Email Chain Between Gianato and

NTIA.[9]  According to Citynet, a reasonable jury could view that
email alone and find that the Frontier Defendants
"misrepresented the scope of their existing infrastructure" to
induce the NTIA to award the WVEO a grant, all the while
intending to build less fiber with virtually no open-access
potential.  Id. at 18.  As the Frontier Defendants contend,
however, Citynet's position is far too tenuous to survive a
summary judgment challenge.  See Frontier Defs. Mem. Supp. 17.

       Most importantly, the January 7, 2010, email is not
evidence of scienter by itself.  It states merely that Frontier
estimated that the WVEO's proposed fiber network was all new
fiber to be constructed.  To be sure, the network did not
require all new fiber since certain segments already had
existing fiber in place and the decision was made not to
overbuild new fiber in those places.  But at common law, the
isolated fact of nonperformance is not enough to prove an
intention not to perform.  The Seventh Circuit has aptly
summarized as follows:

     A statement about one's present intent to perform some
     act in the future can be false.  But the mere fact
     that the promised act is not subsequently performed
     does not necessarily mean that the promisor did not

---

[9] The Verizon and Frontier estimates to which Gianato refers are
unknown, although the court notes that Verizon and Frontier
provided the WVEO with technical data and estimates during the
grant application process.

intend to perform the act at the time of making the promise.

United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc., 764 F.3d 699, 712 n.14 (7th Cir. 2014); see also Restatement (Second) of Torts § 530 cmt. d (Am. Law Inst. 1977) ("The intention of the promisor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of its nonperformance, nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into."); cf. Wilson, 525 F.3d at 380 ("[I]n the context of a fraudulent inducement FCA claim, the requisite intent must be coupled with prompt, substantial nonperformance." (quotation marks omitted)). Thus, the fact that Frontier's estimate turned out to be inaccurate is insufficient to prove that it was knowingly false at the time it was made.

Otherwise, Citynet has simply failed to identify any other evidence -- no deposition testimony, affidavits, or documentation -- to support its contention that the Frontier Defendants knowingly misrepresented the scope of the proposed fiber build, or that the Frontier Defendants recklessly disregarded or deliberately ignored the estimate's accuracy or its ability or willingness to carry it out. See generally

United States ex rel. Bunk v. Gov't Logistics N.V., 842 F.3d
261, 276 (4th Cir. 2016) (explaining that "[b]ecause direct
evidence of such an intention is a rarity, courts generally look
to indirect and circumstantial evidence" to prove a person's
state of mind); Restatement (Second) of Torts § 530 cmt. d
("[Fraudulent] intention may be shown by any other evidence that
sufficiently indicates its existence, as, for example, the
certainty that he would not be in funds to carry out his
promise.").

        Accordingly, Citynet's conclusory assertions about the
Frontier Defendants' states of mind is not enough for Count V to
survive summary judgment.  See Gugenheim, 36 F.4th at 179
(noting that the relator bears the burden on a defendant's
summary judgment motion "to marshal evidence from which a
reasonable jury could find that [the defendant] acted with the
requisite state of mind"); see also United States v. The Boeing
Co., 825 F.3d 1138, 1149 (10th Cir. 2016) ("The relators' naked
assertions, devoid of any evidence of scienter, can't survive
summary judgment.").

        Turning to another factor, "the term 'material' means
having a natural tendency to influence, or be capable of
influencing, the payment or receipt of money or property."  31
U.S.C. § 3729(b)(4).  The Supreme Court explains that

materiality is tested by "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Universal Health Servs., Inc. v. United States ex rel. Escobar, 579 U.S. 176, 193 (2016). Materiality is intended to be "a rigorous and demanding" standard, Taylor, 39 F.4th at 190 (quotation marks omitted), so that the FCA does not transform into "a vehicle for punishing garden-variety breaches of contract or regulatory violations," Escobar, 579 U.S. at 194. "Materiality is a mixed question of law and fact." Harrison, 176 F.3d at 785.

Even if the court assumes that the estimate that Frontier provided Gianato for his January 7, 2010, email to the NTIA was knowingly false -- the only alleged misrepresentation Citynet identifies under Count V -- Citynet cannot establish that such misrepresentation was material. The facts show, as the Frontier Defendants contend, that the Frontier Defendants' alleged misrepresentation did not actually matter to the NTIA. See Frontier Defs. Mem. Supp. 20-21; Frontier Defs. Reply 15-16, ECF No. 402-2. It is undisputed that the NTIA at least approved of -- perhaps even required -- the changes to the grant during implementation that led to a lower amount of miles of new fiber being built. And there is no suggestion in the record that the NTIA took any action against the WVEO or the Frontier Defendants

over those changes, even after the filing of this action.  <u>See</u>

<u>Escobar</u>, 579 U.S. at 195 ("[I]f the Government pays a particular

claim in full despite its actual knowledge that certain

requirements were violated, that is very strong evidence that

those requirements are not material.");[10] <u>United States ex rel.</u>

<u>McBride v. Halliburton Co.</u>, 848 F.3d 1027, 1034 (D.C. Cir. 2017)

(stating that where the government investigates and does not

disallow certain costs, the investigating body's lack of action

is "very strong evidence" against materiality).

Accordingly, the Frontier Defendants are entitled to

summary judgment on Count V.

2. Count VI -- Loadings costs

In Count VI, Citynet advances a false records claim

related to the billing of Frontier's loadings costs under the

grant.  As previously explained, loadings costs were Frontier's

indirect costs, or overhead expenses, associated with its work

on the BTOP grant.  <u>See</u> OIG Report at 10-11.[11]  Citynet claims

---

[10] There is no evidence in the record that the changes to the grant's implementation violated the grant terms and conditions.

[11] NTIA explained the difference between direct and indirect costs as follows:

Direct costs are those that can be identified specifically with a particular final cost objective, i.e., a particular award, project, service, or other

that the Frontier Defendants charged loadings costs to the BTOP grant despite knowing those costs were impermissible.  <u>See</u> Citynet Mem. Supp. 17, ECF No. 383.  Citynet and the Frontier Defendants filed cross-motions for summary judgment on Count VI. The Frontier Defendants' motion is limited to the issues of falsity and scienter.

The Frontier Defendants' loadings charges were a primary subject of the OIG's investigation and report.  <u>See generally</u> OIG Report.  The OIG concluded that Frontier's loadings costs "were unallowable under the applicable rules and regulations."  <u>Id.</u> at 1.  In its final analysis, however, the OIG found that "the evidence establishes that Frontier was

_____

direct activity of an organization.  In the case of BTOP, direct costs are those specifically identified with the recipient's execution of its BTOP project.

Indirect costs are the costs incurred by an organization that are not readily identifiable with a particular project or program but are necessary to the operation of the organization and the performance of its programs.

U.S. Dep't of Com., Fact Sheet for BTOP Indirect Costs (Nov. 2010), https://www2.ntia.doc.gov/compliance (click "Indirect Cost Rates") [hereinafter "Indirect Cost Fact Sheet"]; <u>see also</u> OMB Circular A-87 Attach. A § F.1 (rev'd May 10, 2004) ("Indirect costs are those: (a) incurred for a common or joint purpose benefiting more than one cost objective, and (b) not readily assignable to the cost objectives specifically benefitted, without effort disproportionate to the results achieved."), https://obamawhitehouse.archives.gov/omb/circulars_a087_2004/.

transparent about the nature and amount of its 'loadings' charges." Id. at 17.

As previously discussed, the OIG recounted that the Frontier Defendants explained to the WVEO "the nature and amount of its 'loadings' charges." OIG Report at 17. "The various loadings expenses were conspicuously marked as indirect costs on" Frontier's invoices to the WVEO, and "the evidence establishes that Frontier provided a document explaining the bases for the various loadings charges to the [WVEO] and met with State officials on several occasions to discuss loadings." Id. at 16; see also id. at 10-11; Sample March 5, 2013, Invoice, ECF No. 380-5; May 9, 2013, WVEO Internal Email Containing Frontier Document Explaining Loadings, ECF No. 393-41.[12] Additionally, "Frontier was required to undergo biannual audits" by the accounting firm KPMG LLP ("KPMG"), "the results of which were submitted to NTIA." OIG Report at 12. "In 2012 and 2014," KPMG "concluded that Frontier's performance and costs complied with all requirements that could have a direct and material effect on the grant." Id.; see also KPMG Audit Reports, ECF No. 380-17; January 30, 2012, Letter from Frontier to KPMG Regarding

_____

[12] As noted by the OIG, an accounting firm hired by the WVEO opined that Frontier could charge its loadings costs to the BTOP grant, and the WVEO also had a good-faith belief that the NTIA had approved of the reimbursement of Frontier's loadings costs. See OIG Report at 11, 17-18.

2012 Audit Results, ECF No. 384-3; BTOP Audit Compliance Meeting Minutes, ECF No. 402-13.  "The 2014 audit report identified Frontier's indirect costs and included them as a line item in its Schedules of Project Costs."  OIG Report at 13; <u>see</u> <u>also</u> KPMG Audit Reports.

The OIG's finding on the Frontier Defendants' transparency presents a nearly insurmountable hurdle to a triable issue of scienter, which Citynet fails to clear.  As noted above, at its outer limit the FCA reaches entities that act in deliberate ignorance or with reckless disregard to the truth or falsity of a record.  31 U.S.C. § 3729(b)(1)(A).  The Frontier Defendants' forthrightness with two entities tasked with monitoring its grant compliance all but rules out those states of mind.  Moreover, Citynet has failed to proffer any evidence from which a reasonable jury could infer an unlawful state of mind, other than the OIG's decision that the loadings costs were improper.  Absent some compelling evidence to the contrary, the Frontier Defendants' conduct -- and that of the WVEO and KPMG -- is the type of "honest mistake[] or incorrect [submission of] claims . . . through mere negligence" that falls outside the FCA's purview.  <u>United States ex rel. Drakeford v. Tuomey</u>, 792 F.3d 364, 380 (4th Cir. 2015).

44

The Frontier Defendants invoke the "government knowledge inference," which tends to illustrate why the scienter element fails on Count VI.  Under the government knowledge inference, "the government's knowledge of the facts underlying a claim is relevant to the question of an FCA defendant's intent."  Ubl, 650 F.3d at 453.  The circumstances in this case are not typical of the government knowledge inference inasmuch as the Frontier Defendants' disclosures were to the WVEO, rather than to the NTIA.  See United States ex rel. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002) (explaining that "the presenter cannot be said to have knowingly presented a fraudulent or false claim" when "the government knows and approves of the particulars of [the] claim").  Nonetheless, the WVEO's acceptance and reimbursement of Frontier's loadings costs demonstrates the Frontier Defendants' lack of the required scienter for reasons similar to those underpinning the government knowledge inference.  See United States v. Southland Mgmt. Corp., 288 F.3d 665, 686 (5th Cir. 2002), aff'd en banc on other grounds, 326 F.3d 669 (5th Cir. 2003) (quoted with approval by Becker, 305 F.3d at 289) (explaining that the government knowledge inference is a recognition "that [a] defendant [may] actually believe[] his

claim was not false because the government approved and paid the claim with full knowledge of the relevant facts").[13]

Citynet argues that because the BTOP grant terms and conditions prohibited indirect costs, the Frontier Defendants' submission of invoices containing Frontier's indirect loadings costs was, ipso facto, knowingly violative of the grant.  See Citynet Mem. Supp. 21-22; Citynet Resp. to Frontier Defs. 19-28; Citynet Reply 6-7, ECF No. 405.  Under the "implied certification theory" of FCA liability, "a contractor can be liable under the FCA when [it] submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose [its] noncompliance with a statutory, regulatory, or contractual requirement." United States v. Triple Canopy, Inc., 857 F.3d 174, 176 (4th Cir. 2017) (quotation marks omitted and second alteration

---

[13] The Frontier Defendants also argue that they did not act with the requisite scienter because their actions were based on an "objectively reasonable interpretation" of the terms and conditions governing the BTOP grant.  See Frontier Defs. Mem. Supp. 24-27.  The Frontier Defendants cite the Fourth Circuit's recent decision in United States ex rel. Sheldon v. Allergan Sales, LLC, which is set for rehearing en banc.  24 F.4th 340 (4th Cir. 2022), reh'g en banc granted, 2022 WL 1467710 (4th Cir. May 10, 2022).  Under Fourth Circuit Rule of Appellate Procedure 35(c), "[g]ranting of rehearing en banc vacates the previous panel judgment and opinion."  The court therefore declines to apply Sheldon in this case and instead evaluates the effect of interpretive questions on scienter through the lens of existing case law, discussed further below.

added).  Citynet's argument proceeds that the grant terms and conditions prohibited the reimbursement of indirect costs; the Frontier Defendants invoiced the company's indirect loadings costs; and, therefore, the Frontier Defendants at least had their heads unlawfully buried in sand regarding their compliance with the grant.  See, e.g., Citynet Mem. Supp. 21-22.

There is, however, a significant gulf separating violation of grant terms and conditions from scienter.  The Fourth Circuit instructs that although "the correction of regulatory problems" -- in this case, federal grant terms and conditions -- "is a worthy goal, [it] is not actionable under the FCA in the absence of actual fraudulent conduct."  United States ex rel. Rostholder v. Omnicare, Inc., 745 F.3d 694, 702 (4th Cir. 2014) (alteration added, quotation marks and emphasis omitted).  Outside the violation of the grant, Citynet has failed to proffer any other evidence from which a reasonable jury could infer that the Frontier Defendants submitted invoices for loadings costs in reckless disregard or deliberate ignorance of the grant's terms and conditions.

Further, Citynet's failure to adduce probative evidence of the Frontier Defendants' state of mind is particularly fatal considering the interpretive difficulties at issue.  The grant terms and conditions generally prohibited

reimbursement of indirect costs absent approval for such costs. See Indirect Cost Fact Sheet, supra; see also U.S. Dep't of Com., Pre-Award Notification Requirements for Grants and Cooperative Agreements, 73 Fed. Reg. 7696, 7699-70 (Feb. 11, 2008) [hereinafter "Pre-Award Notification Requirements"]; Department of Commerce Financial Assistance Standard Terms and Conditions at A.05.a, https://www2.ntia.doc.gov/compliance (click "DOC Standard Terms and Conditions (March 2008)") [hereinafter "DOC Standard Terms and Conditions"].  The WVEO did not have approval to bill indirect costs.  The grant terms and conditions also mandated that "[t]he [grant] recipient shall require all subrecipients . . . to comply with the provisions of the award, including applicable cost principles."  DOC Standard Terms and Conditions, at J.02.a, supra.

        Yet, when discussing eligible costs, the Notice of Funds Availability, or NOFA, which also comprised part of the grant terms and conditions, stated as follows:

> [T]here is a set of federal principles for determining eligible or allowable costs.  Allowability of costs will be determined in accordance with the cost principles applicable to the entity incurring the costs.  . . . The allowability of costs incurred by commercial organizations . . . is determined in accordance with the provisions of the Federal Acquisition Regulation (FAR) at 48 CFR pt. 31.

NOFA at 33,112 n.37.  Those provisions of the Federal Acquisition Regulation contain regulations that allow indirect

costs for commercial organizations like Frontier, <u>see</u> 48 C.F.R.
§ 31.203, and regulations governing indirect cost rates, <u>see</u> 48
C.F.R. § 42.700 <u>et</u> <u>seq.</u>  That provision of the NOFA dovetails
with OMB Circular A-87, which states as follows:

> All subawards are subject to those Federal cost
> principles applicable to the particular organization
> concerned.  Thus, if a subaward is to a governmental
> unit (other than a college, university or hospital),
> this Circular shall apply; if a subaward is to a
> commercial organization, the cost principles
> applicable to commercial organizations shall apply . .
> . .

OMB Circular A-87 Attach. A § A.3.b.

        The court finds that there is ambiguity in the terms
and conditions of the WVEO's grant concerning whether Frontier
could invoice indirect loadings costs.  On the one hand, the
grant generally prohibited indirect costs absent approval.  On
the other hand, the grant appears flatly to permit subrecipients
who are commercial organizations to recoup their indirect costs.
Notably, the "prominent accounting firm" hired by the WVEO to
opine on this issue "concluded that Frontier, as a commercial
organization, was not subject to the rules that would have
prevented a similarly situated governmental entity from
recovering its indirect costs."  OIG Report at 11; <u>see</u> <u>also</u> May
17, 2013, Email from Ernst & Young to Frontier, ECF No. 405-9.
The court's conclusion is bolstered by the various readings
present in this case: the NTIA's; the WVEO's and that of the

accounting professionals hired by the WVEO and Frontier; and the OIG's mere "defer[ral] to NTIA's interpretation of the prevailing grant rules," OIG Report at 17.

Violations of ambiguous rules and conditions or other governing authority can still give rise to FCA liability so long as the necessary scienter is present. See Gugenheim, 36 F.4th at 181. But a court "cannot infer scienter from an alleged regulatory violation itself." Id. That is "especially" true "where there is . . . ambiguity as to whether [d]efendants' conduct even violated the [regulation]." Id. (quotation marks omitted and alterations added). Indeed, "[e]stablishing even the loosest standard of knowledge, i.e., acting in reckless disregard of the truth or falsity of the information, is difficult when -- as here -- falsity turns on a disputed interpretive question." Id. (quotation marks omitted and alteration added); see also United States ex rel. Purcell v. MWI Corp., 807 F.3d 281, 287-88 (D.C. Cir. 2015) ("Consistent with the need for a knowing violation, the FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation."). Accordingly, the "sufficiently ambiguous" grant terms and conditions further undermine Citynet's case for scienter. Gugenheim, 36 F.4th at 181. Without evidence that could bear on the Frontier Defendants'

scienter other than the fact of the violation itself, Count VI must fail.

### 3. Count VII -- FBO invoice processing costs

Count VII is a false records claim related to the billing of Frontier's FBO invoice processing costs under the grant.  As explained above, FBO work involved building the fiber from outside a CAI into the CAI where the customer could connect to the fiber network.  Frontier hired contractors to perform this work, and Frontier's FBO invoice processing costs were its purported costs to process the invoices it received from the contractors.  Frontier billed its FBO invoice processing costs to the grant.

Citynet alleges that the Frontier Defendants billed FBO invoice processing costs to the grant despite lacking documentation to support the costs and knowing the costs were impermissible and not reflective of costs actually incurred.  See Citynet Mem. Supp. 27-29.  Citynet and the Frontier Defendants filed cross-motions for summary judgment on Count VII.  The Frontier Defendants' motion is limited to the element of scienter.

Based upon Citynet's briefing and the OIG's analysis, the FBO invoice processing costs claim can be divided into two categories: (1) failure to comply with grant terms and conditions and (2) invoice amounts that were not reflective of actual costs incurred.  See Citynet Mem. Supp. 29; OIG Report 13-16.  These categories will be referred to herein as the compliance claim and the amounts claim, respectively.

Starting with the compliance claim, the OIG found that Frontier violated the grant by failing to adequately document the costs it allegedly incurred in processing FBO invoices, which in turn caused Frontier to violate the grant by lacking documentation to show that its FBO invoice processing costs were allocable to the grant as opposed to some other work in which Frontier was engaged.  See OIG Report at 13 (citing 48 C.F.R. §§ 31.201-2(d), 31.201-4(a) and OMB Circular A-87 Attach. A §§ C.1.a, b, and j).  The OIG also concluded that Frontier violated the grant by charging an unreasonably high amount for its FBO invoice processing costs.  See id. at 14-16 (citing 48 C.F.R. § 31.201-3(a) and OMB Circular A-87 Atach. A § C.2).  Further, Citynet claims that the Frontier Defendants billed the company's FBO invoice processing costs improperly as a profit-making opportunity in violation of the grant's no-profit requirement, as explained in further detail below.  See Citynet Mem. Supp. 27

(citing NOFA at 33,113).   The NTIA had notified Frontier via
email of the grant's no-profit requirement on February 11, 2010.
See February 11, 2010, Email from NTIA to Frontier, ECF No. 382-
14.

      Turning to the amounts claim, the court earlier
recounted the material facts as shown in the OIG Report.   See
Part I.C, supra.   Originally, Frontier set its FBO invoice
processing costs as a fee of 35.2% of what its contractors
charged to perform the FBO work.   See OIG Report at 8; McKenzie
Dep. 253.   Internal Frontier emails called the FBO invoice
processing costs "markup," and a "Frontier senior executive"
"told the OIG that it was accurate to describe the FBO fee as a
'percentage-based markup.'"   OIG Report at 8; November 2, 2012,
Internal Frontier Email, ECF No. 384-8; January 28, 2013,
Internal Frontier Email, ECF No. 382-30; July 16, 2013, Internal
Frontier Email, ECF No. 384-14.[14]   Internal Frontier emails and
documents also refer to the company's FBO invoice processing
costs as a "revenue opportunity," "profit," "income," and
"actual cost + 35.2%."   OIG Report at 8; see also November 30,
2011, Internal Frontier Email, ECF No. 384-7 ("revenue
opportunity"); November 2, 2012, Internal Frontier Email,

---

[14] "Markup" means "an amount added to the cost price to determine
the selling price," or broadly "profit."   Markup, Merriam-
Webster, https://www.merriam-webster.com/dictionary/markup.

("profit," "income," and "actual cost + the 35.2%"); January 24,
2013, Internal Frontier Email, ECF No. 384-9 ("profit" and
"profit increase"); January 28, 2013, Internal Frontier Email
("income"); July 16, 2013, Internal Frontier Email ("income");
see also McKenzie Dep. 176-77 (agreeing that FBO invoice
processing costs were actual cost plus 35.2%).

There is no evidence that the 35.2% markup figure was
based on the costs Frontier actually incurred processing FBO
invoices. OIG Report at 8. Rather, the evidence shows that the
markup was "actual cost + 35.2%." OIG Report at 8; November 2,
2012, Internal Frontier Email; McKenzie Dep. 176-77.
Furthermore, the evidence shows that Frontier never communicated
"the specific amount and nature of the FBO markup . . . to the
[WVEO]." OIG Report 8; see also November 20, 2012, Internal
Frontier Email, ECF No. 382-27 ("I cannot confirm the 35.2%
loading was fully communicated [to the WVEO].");  Given Dep. 156-
57, 230. On November 15, 2012, Given asked McKenzie, "what
activities does Frontier perform on each FBO site?" November 15
and 16, 2012, Email Chain Between Given and McKenzie, ECF No.
382-26. McKenzie replied that the percentage-based markup was
reflective of Frontier's incurred costs: "our Corporate office
did a cost analysis for this function and hence the standard
[cost] you see on these invoices." Id. McKenzie also set forth

a purported eleven-step process for processing FBO invoices from contractors.  Id.

On November 16, 2012, Given expressed concern that the 35.2% markup "seems entirely unreasonable."  Id.  At her deposition, Given correctly explained that a rate-based fee could not accurately capture Frontier's actual costs incurred to process an FBO invoice.  See Given Dep. 158; see also OIG Report at 9.  This is because the actual cost to process an invoice would be roughly the same from invoice to invoice, while a rate-based fee could vary wildly with the amount charged by a contractor.  See Given Dep. 158; see also OIG Report at 9.

In response, on January 29, 2013, Frontier, through a memorandum authored by McKenzie, proposed a $1,808 flat fee for each invoice submitted by it for its FBO invoice processing costs.  January 29, 2013, Memorandum to Given, ECF No. 380-6; see also McKenzie Dep. 187-89.  Frontier represented that its flat-fee figure was "[b]ased upon actual costs incurred by Frontier in processing FBO invoices," which it calculated after "correspond[ing] with the multiple Frontier departments who process invoices associated with [FBO] work."  January 29, 2013, Memorandum to Given.  The memorandum details an eleven-step process for each FBO invoice that took sixteen separate employees four hours total on average to complete.  Id.

However, the face of the memorandum plainly "show[s] that Frontier arrived at the figure" not by analyzing the costs associated with the purported eleven-step process, but rather "by simply taking the total amount of FBO fees as of that date that had been generated by the 35.2% markup . . . and dividing it by the total number of FBO invoices that had been processed." OIG Report at 9; see January 29, 2013, Memorandum to Given. Internal Frontier emails show a consultant hired by Frontier, Billy Jack Gregg, proposing various flat fees not based on actual costs, but based on a "target loading percentage." December 13, 2012, Email from Gregg to Frontier, ECF No. 384-11; see also December 12, 2012, Email from Gregg to Frontier, ECF No. 384-1; December 19, 2012, Email from Gregg to Frontier, ECF No. 384-12.  As the OIG found,

> Since Frontier had already submitted 84 invoices to the State with a 35.2% fee that totaled $266,952, it proposed, and the [WVEO] agreed, for Frontier to charge a reduced invoice processing fee of $1,340.20 on [each of] the remaining estimated 246 FBO invoices. The amount was intended ultimately to result in the same total amount as if $1,808 had been charged for every FBO invoice.

OIG Report at 9-10.

There is no evidence to support an $1,808 processing fee as FBO invoice processing costs. Id. at 10.  Instead, as the OIG explained:

> [S]everal Frontier employees, all of whom had some
> knowledge of the process by which Frontier developed
> the 11-step process . . . , told the OIG that Frontier
> did not review any such documentation in devising the
> steps, and furthermore asserted that Frontier did not
> possess any such documentation.

Id. McKenzie testified that, in helping to devise the eleven-

step process -- which was plainly not the basis for the fixed

fee -- he spoke to Frontier employees but did not review any

documents.  McKenzie Dep. 187-89.

Viewing these facts on Citynet's and the Frontier

Defendants' cross-motions for summary judgment, Citynet is

entitled to judgment as a matter of law against Frontier and

McKenzie, but not Arndt or Waldo, on Count VII.

Starting with falsity, because "Congress did not

define what makes a claim 'false' or 'fraudulent,'" the courts

must turn to the "common-law meaning" of those terms.  Taylor,

39 F.4th at 200.  "At common law, a false statement encompassed

any 'words or conduct' that 'amount[] to an assertion not in

accordance with the truth' . . . ."  Id. (quoting Restatement

(Second) of Torts § 525 cmt. b (1977)).  Under an "implied

certification theory" of FCA liability, a record is false when

it "fails to disclose the defendant's violation of a material

statutory, regulatory, or contractual requirement."  Id. at

190.[15]  In any case, to be false under the FCA, "the statement or conduct alleged must represent an objective falsehood."  Wilson, 525 F.3d at 376.

The undisclosed violations of grant terms and conditions described above would mislead anyone reviewing a Frontier invoice to believe that the FBO invoice processing costs were properly documented, attributable to the grant, reasonable, not a profit tool, and based on actual costs incurred.  The omission of those critical factors by Frontier renders the invoices for FBO invoice processing costs false.  Additionally, Frontier's misrepresentation that the FBO invoice processing costs markup was based on actual costs incurred was objectively false.  As for McKenzie, the evidence demonstrates that he falsely represented that the FBO invoice processing costs markup was based on actual costs incurred and authored the

---

[15] "Material," as it is used here in the falsity element, appears to be different than the materiality element.  The Supreme Court explains that under the implied certification theory, an omission of a statutory, regulatory, or contractual requirement is false "if [it] render[s] the defendant's representations misleading with respect to the goods or services provided." Escobar, 579 U.S. at 187 (alterations added).  An omission is misleading, the Supreme Court continues, if it constitutes a "half-truth[]": a "representation[] that state[s] the truth only so far as it goes, while omitting critical qualifying information."  Id. at 188 (alterations and emphasis added).

memorandum that falsely set forth the flat-fee basis for FBO invoice processing costs.

Materiality, as previously explained, "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Escobar, 579 U.S. at 193.  Under an implied certification theory, "a minor or insubstantial requirement will not suffice to show materiality." Taylor, 39 F.4th at 190 (quotation marks omitted).  "Instead, the provision at issue must be so central to the services provided that the Government would not have paid these claims had it known of these violations." Id. (quotation marks omitted).  Implied certification materiality is a measure of function over form. See id. (explaining that regulatory compliance may be immaterial "even if . . . labeled [a] condition[] of payment" (alterations added)).

As a matter of function, the NTIA likely would not have approved the reimbursement of the FBO invoice processing costs had it known that those costs lacked underlying documentation, could not be shown to be attributable to BTOP grant work, were unreasonably high, were profit centers, and did not reflect Frontier's actual costs.  The materiality of those falsities is so central to the grant as to be self-evident. Indeed, common sense dictates that the NTIA would not have

approved reimbursement of Frontier's FBO invoice processing costs had it known those costs were undocumented profit centers untethered to actual costs.

Turning to scienter, the FCA reaches "a person [who] 'has actual knowledge of the [falsity of the] information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the information.'" Gugenheim, 36 F.4th at 179 (alterations added) (quoting 31 U.S.C. § 3729(a)(1)(A)).

With respect to the compliance claim, Frontier, at the very least, "buried [its] head in the sand" in deliberate ignorance or reckless disregard of the truth or falsity of its invoices for FBO invoice processing costs. Taylor, 39 F.4th at 198. The grant terms were clear: "A contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles . . . ." 48 C.F.R. § 31.201-2(d); see also 31.201-4(a) and OMB Circular A-87 Attach. A §§ C.1.a, b, and j. Yet Frontier failed to meet those most basic of requirements. It could not show the OIG, and has not shown the court, any documentation of its FBO invoice processing costs. See Siebert v. Gene Security Network,

60

Inc., 75 F. Supp. 3d 1108, 1119 (N.D. Cal. 2014) (recognizing the "general principle that those who submit claims to the government for reimbursement may be acting in reckless disregard as to the truth or falsity of their submissions if they fail to take steps to confirm the accuracy of those submissions"). Further, the NTIA specifically warned Frontier about the grant's no-profit condition, but the evidence establishes that Frontier viewed FBO invoice processing costs as a profit opportunity.  No reasonable jury could view Frontier's compliance claim shortcomings as "honest mistakes" or "mere negligence." Gugenheim, 36 F.4th at 179.

The evidence of the amounts claim is more damning. Frontier and McKenzie repeatedly told the WVEO that Frontier's FBO invoice processing costs were based on actual costs incurred.  Frontier and McKenzie knew that was false because their own calculation of FBO invoice processing costs had nothing to do with Frontier's actual costs.  Frontier and McKenzie also knew that was false because they viewed FBO invoice processing costs as a profit-maker untethered to Frontier's actual costs -- "actual cost + 35.2%."  Thus, Frontier and McKenzie acted "knowingly" with respect to the amounts claim as a matter of law.  31 U.S.C. § 3729(a)(1)(B).

The facts of this case are at least as egregious as
United States v. Krizek, where the District of Columbia Circuit
Court determined that the conduct of a psychiatrist and his
billing assistant "[rose] to the level of reckless disregard" in
violation of the FCA.  111 F.3d 934, 942 (D.C. Cir. 1997).  In
Krizek, the billing assistant completed documentation "with
little or no factual basis" and "made no effort to establish how
much time [the psychiatrist] spent with any particular patient."
Id. (alteration added).  The psychiatrist, for his part,
"'failed utterly' to review bills submitted on his behalf.'"
Id.  Most telling of the pair's scienter, they requested payment
for patient treatment of nearly twenty-four hours in a single
day on several occasions and sometimes sought payment for more
than twenty-four hours in a single day.  Id.  The circuit court
concluded that the psychiatrist and his billing assistant acted
with reckless disregard because "even the shoddiest
recordkeeping would have revealed that false submissions were
being made."  Id.

In this case, the compliance claim resembles Krizek
inasmuch as Frontier completely lacked a factual basis or
documentation for the FBO invoice processing costs, which were
patently unreasonable.  See OIG Report at 14 (noting that
Frontier charged $452 per hour for labor to process FBO

invoices).  So, too, does the amounts claim.  Frontier knew, or
at least acted in reckless disregard to the fact, that its FBO
invoice processing costs were a profit-maker unrelated to its
actual costs despite its repeated statements to the contrary.
See also United States ex rel. Compton v. Midwest Specialties,
Inc., 142 F.3d 296, 304 (6th Cir. 1998) (finding that a
defendant at least acted with reckless disregard when it
attested that its product conformed to contractual requirements
despite knowing it had failed to test the product for
compliance); United States v. Stevens, 605 F. Supp. 2d 863, 869
(W.D. Ky. 2008) (finding that a defendant at least acted with
reckless disregard where he did nothing to make sure his
billings were correct and "simply assumed the claims were
correct because they were being paid").

     The Frontier Defendants offer a few arguments to the
contrary, none of which is availing.  First, the Frontier
Defendants purport that "the OIG found that [the FBO] costs were
assessed to the grant in 'good faith.'"  Frontier Defs. Resp.
13.  The Frontier Defendants thus contend that the government
knowledge inference weighs in their favor and precludes summary
judgment.  See Frontier Defs. Mem. Supp. 29-30.

     But that misrepresents what the OIG found.  Rather,
the OIG found that "the evidence shows that the [WVEO] consulted

with NTIA in good faith on the allowability of Frontier's [FBO invoice processing costs]" as a direct or indirect cost.  OIG Report at 16.  But concerning Frontier, the OIG explained that "there is insufficient evidence to conclude that NTIA knowingly approved the construct and factual underpinnings of the [FBO invoice processing costs] that Frontier charged" because "the Frontier memorandum outlining the 11-step FBO invoice process that was provided to the NTIA official contained several material representations that are not supported by the facts." Id.  Further, the OIG continued "that, at best, Frontier provided the [WVEO] (which, in turn provided to NTIA) incomplete information."  Id.  Thus, far from "good faith," the OIG concluded, and the evidence shows, that Frontier and McKenzie provided misleading information to the WVEO, which precludes application of the government knowledge inference.

Second, the Frontier Defendants contend that Frontier was simply trying to secure a reasonable rate, and that Citynet cannot show scienter because it does not suggest what a reasonable rate might have been.  See Frontier Defs. Resp. 11-12; Frontier Defs. Reply 17-18.  The evidence, however, disproves the Frontier Defendants' notion of a reasonable rate. Frontier's explicit goal was profit.  And the grant terms and conditions state what is reasonable under the grant: no profit.

And third, the Frontier Defendants attempt to wave off the company's use of terms like "revenue opportunity" as "off-hand reference[s]."  Frontier Defs. Resp. 12.  The Frontier Defendants cite a portion of McKenzie's testimony where McKenzie says he called FBO invoice processing costs "margin profit" because another Frontier executive had called FBO invoice processing costs "income."  McKenzie Dep. 176-77; see also Frontier Defs. Resp. 13.  It is unclear how McKenzie's testimony absolves Frontier or McKenzie.  Just after McKenzie's supposed clarification, he agreed that FBO invoice processing costs were "actual cost plus the 35.2 percent" -- profit.  McKenzie Dep. 177.  And as detailed above, it is undisputed that Frontier internally viewed FBO invoice processing costs as a profit opportunity.  Regardless, even if McKenzie's testimony were deemed to prove that Frontier did not derive a profit from FBO invoice processing costs -- though it plainly does not -- Frontier would still be liable for the false records it submitted under the compliance claim.

Lastly, liability under the FCA does not arise without causation.  See Taylor, 39 F.4th at 188.  It is undisputed that the false records containing the FBO invoice processing costs caused the payment of those costs.  Accordingly, Citynet is entitled to summary judgment against Frontier and McKenzie on

65

Count VII.  Concerning damages, however, the court notes that
the OIG accounted for $465,388 in FBO invoice processing costs
and 311 invoices containing FBO invoice processing costs, OIG
Report 10, while Citynet claims that Frontier "submitted 327
invoices with improper FBO Invoice Processing fees in the amount
of $461,106.94," Citynet Mem. Supp. 32.  This dispute precludes
summary judgment on damages.

     As for Arndt and Waldo, the court finds that a
reasonable jury could find against them on Count VII.  Starting
with Arndt, the internal Frontier emails dated November 2, 2012,
show McKenzie reporting to Arndt the "[s]teps being taken to
show BTOP FBO margin profit," which included calculating FBO
invoice processing costs as "income," "actual cost + the 35.2%,"
and "the 35% mark up."  November 2, 2012, Internal Frontier
Email.  Additionally, an email within the November 30, 2011,
email chain suggests that Arndt had an active role in viewing
FBO invoice processing costs as profit, stating that the "rate
has been established . . . so that this is a revenue opportunity
for Frontier via Ken Arndt."  November 30, 2011, Internal
Frontier Email.  Lastly, an email within the Ju16, 2013,
internal Frontier email chain shows a Frontier employee sending
Arndt a spreadsheet documenting Frontier's FBO invoices showing
"the markup amount (either a flat fee after Dana cut the deal

with the [WVEO]) or the % markup that we were doing in the beginning.  As you will see, there are 307 invoices totaling $2.3M.  Our markup's total [is] $456K."  July 16, 2013, Internal Frontier Email.

Turning to Waldo, the "Dana" in the July 16, 2013, email chain who "cut the deal" regarding the flat fee could be Dana Waldo, although that fact requires further development. Id.  Additionally, Waldo is a recipient of the series of emails by Gregg proposing various flat fees for FBO invoice processing costs not based on actual costs incurred.  See December 12, 2012, Email from Gregg to Frontier; December 13, 2012, Email from Gregg to Frontier; December 19, 2012, Email from Gregg to Frontier.

The aforementioned facts suggest not only that Arndt and Waldo had knowledge of the falsity of the FBO invoice processing fees, but also that they had a role in the making and using of those fees.  The nature and extent of Arndt's and Waldo's involvement in the FBO invoice processing costs scheme is a matter within the province of a jury.

4. Count VIII -- Maintenance coils

In Count VIII, Citynet brings a false records claim against Frontier and McKenzie related to the amount of maintenance coil included in Frontier's fiber build.  As noted above, maintenance coil "is the extra cable stored at a particular facility that service providers use to repair damaged fiber and to connect new fiber to the network."  OIG Report at 19 (quotation marks and alteration omitted).  Citynet claims that Frontier and McKenzie installed an excessive amount of maintenance coil, and that it used the excessive amount to inflate its invoices.  See Citynet Resp. 30.  Citynet also claims that Frontier and McKenzie "falsified the total length of fiber built and the number of strands on multiple jobs."  Id. at 30 n.6.[16]

It is undisputed that Frontier installed about four times as much maintenance coil than it originally reported to the WVEO.  See OIG Report at 19.  When questions concerning Frontier's installation of maintenance coil first arose in public in 2013, Frontier represented to the public that it built "approximately 12 miles of [maintenance coil]," which it claimed

---

[16] Frontier and McKenzie do not seek summary judgment on this component of Count VIII.

was consistent with "industry standards" of "100 feet of fiber maintenance coil for every mile of fiber placed." Id.  But a January 24, 2014, email from Gregg to McKenzie shows that Frontier "not only do[es] . . . not know how much fiber we actually placed, but we don't know how much of what we placed is coiled up on poles." January 24, 2014, Internal Frontier Emails, ECF No. 394-7; see also OIG Report at 20.  Gregg estimated that Frontier installed "4 times" more maintenance coil than it had previously told the WVEO, and he recommended that "I don't think we need to tell [the WVEO] unless [it] asks again." Id.; see also OIG Report at 20.  It appears that Frontier and McKenzie did not tell the WVEO.  See OIG Report at 20-21.  "[A] Frontier employee told the OIG that he believes Frontier did include maintenance coils in its mileage totals . . . . ." Id. at 21.

Viewing the facts in Citynet's favor, Frontier has not shown entitlement to summary judgment on the maintenance coil component of Count VIII, but McKenzie has.  The amount of fiber originally reported to the WVEO appears to have been an objective falsehood.  A reasonable jury could find that Frontier took Gregg's advice, just noted above, and withheld from the WVEO the real length of maintenance coil, which is evidence that such information was material.  That an NTIA official "gave

Frontier unofficial guidance that Frontier should not count coil at all in its mileage totals" is also evidence of materiality. As for scienter, a reasonable jury could find that Frontier acted in deliberate ignorance or reckless disregard because of its apparent lack of knowledge of how much maintenance coil -- for which the company billed -- was installed in the first place.[17]  Last, a reasonable jury's conclusion on causation could follow the other elements in Citynet's favor against Frontier. Concerning McKenzie, however, there is insufficient evidence from which a reasonable jury could find that McKenzie made a false record or statement related to maintenance coils, even though it appears he had some knowledge of the problems related to maintenance coils.  The Frontier Defendants' motion for summary judgment on Count VIII is denied.

### IV. Conclusion

Accordingly, for the foregoing reasons, it is ORDERED as follows:

1.  Gianato and Given's motion for summary judgment be, and hereby is, granted;

---

[17] Also concerning is that Frontier apparently did not know how much fiber it had installed over the entire build.

2.    Frontier, Arndt, Waldo, and McKenzie's motion for
      summary judgment be, and hereby is, granted with
      respect to Counts I through VI and Count IX against
      those four defendants, granted with respect to Count
      VIII against McKenzie, and otherwise denied; and

3.    Citynet's motion for summary judgment be, and hereby
      is, granted with respect to liability against Frontier
      and McKenzie on Count VII and otherwise denied.

      Remaining in this case are the issues of damages
against Frontier and McKenzie under Count VII, liability and
damages against Waldo under Count VII, and liability and damages
against Frontier under Count VIII.

      The Clerk is requested to transmit copies of this
order to all counsel of record and any unrepresented parties.

                              ENTER: September 8, 2022


                              John T. Copenhaver, Jr.
                              Senior United States District Judge