UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CITYNET, LLC, on behalf of
the United States of America,

         Plaintiff/Relator,

v.                                    Civil Action No. 2:14-cv-15947

FRONTIER WEST VIRGINIA, INC.,
a West Virginia corporation;
KENNETH ARNDT, individually;
DANA WALDO, individually;
MARK MCKENZIE, individually;
JIMMY GIANATO, individually;
and GALE GIVEN, individually,

         Defendants.


MEMORANDUM OPINION AND ORDER

         Pending is defendant Mark McKenzie's ("McKenzie")

motion to revise summary judgment ruling (ECF No. 481), filed

September 19, 2022.  In support of this motion, McKenzie filed a

declaration (ECF No. 487) dated September 19, 2022 but not

docketed until September 20, 2022.  Plaintiff/relator Citynet,

LLC ("Citynet") filed a response to the motion (ECF No. 511) on

September 23, 2022, and McKenzie filed a reply (ECF No. 521) on

September 27, 2022.

         McKenzie's motion to revise summary judgment is

substantially based upon an argument he did not raise at summary

judgment regarding the existence of a Memorandum of

Understanding between the State of West Virginia and Frontier West Virginia.  McKenzie's motion seeks revision of the court's order of September 8, 2022 insofar as it awarded summary judgment to Citynet establishing liability of McKenzie of the cause of action set forth in Count VII of the amended complaint relating to Frontier's charges for processing the invoices of third-party contractors who did facilities build-out ("FBO") work.

I.   <u>Background</u>

As part of the American Recovery and Reinvestment Act of 2009, Congress appropriated $4,700,000,000 to the National Telecommunications and Information Association ("NTIA") to carry out the Broadband Technology Opportunities Program ("BTOP"). Pub. L. No. 111-5, 123 Stat. 115, 128 (2009).  Through BTOP, Congress aimed to "establish a national broadband service development and expansion program" through which unserved and underserved areas could gain access to broadband internet.  <u>Id.</u> at 512-13.

On February 12, 2010, NTIA awarded the Executive Office of West Virginia ("WVEO") $126,323,296 of BTOP grant funding.  <u>See</u> Financial Assistance Award No. NT10BIX5570031, https://www2.ntia.doc.gov/grantee/executive-office-of-the-state-

2

of-west-virginia (click "Financial Assistance Award Form CD-450").  In its application, the WVEO stated that "the primary use of BTOP funding will be to extend the reach and density of broadband access throughout the state."  WVEO BTOP Application 11, https://www2.ntia.doc.gov/grantee/executive-office-of-the-state-of-west-virginia (click "Application Part 1 (Incorporated into the award by reference)").  WVEO's "strategy" to accomplish that goal was, among other things, the "build out of an 'open' network middle mile solution that will provide fiber to critical community anchor tenants."  Id. at 7.  "Middle mile" is a category of internet infrastructure comprising the fiber optic lines that link the larger "backbone" fiber optic lines to "last mile" lines that connect to the end consumer.  See Inquiry Concerning the Deployment of Advanced Telecommunications Capability, 15 FCC Rcd. 20913, 20922-23 (2000).

The WVEO proposed building a "backbone"[1] middle-mile fiber-optic network to "community anchor institutions" ("CAI") like schools, libraries, and healthcare provider centers.  See Application Part 1 at 3.  Other internet service providers could then tap into that middle mile -- it would be "open" to competitors -- for "last mile" service directly to consumers.

---

[1] As previously noted, "backbone" and "middle mile" are separate portions of internet infrastructure.  The parties, however, sometimes refer to "middle mile" as "backbone."

See, e.g., id. at 9.  WVEO represented that the fiber network was "estimated to be 900 miles of new fiber."  Id. at 26.

After the WVEO was awarded the grant, Frontier held internal discussions attempting to ascertain details of the WVEO's grant award and whether Frontier could assist in its implementation.  See February 17, 2010, Frontier Internal Email Chain, ECF No. 380-26; February 18, 2010, Frontier Internal Email Chain, ECF No. 380-18; Arndt Dep. 286-87.  Defendant McKenzie was an executive-level employee of Frontier during the times relevant to the pending motions.  See McKenzie Decl. ¶ 3, ECF No. 380-38.

Eventually, the WVEO and Frontier agreed that Frontier would serve as the WVEO's contractor to build the middle-mile fiber network component of the BTOP grant.  See August 30, 2010, Frontier Internal Email Chain, ECF No. 393-29.  WVEO's lead grant writer explained in a letter that "[t]his portion of the grant was written in a manner utilizing the pre-existing State of West Virginia MPLS contract" previously held by Verizon and passed to Frontier with Frontier's purchase of Verizon.  October 6, 2010, Todorovich Letter, ECF No. 402-8.[2]  But "[a]s [the WVEO]

---

[2] "MPLS" is short for Multi-Protocol Label Switching.  See William Lehr, Would You Like Your Internet With or Without Video?, 2017 Ill. J. of Law, Tech. & Policy 73, 87 n.62 (2017). Under the MPLS contract, Frontier "provide[d] network facilities

started implementing the grant . . . , NTIA advised that we should treat Frontier as a sub-recipient [of the BTOP grant] rather than a contractor." Id.

Thus, in October 2010, the WVEO entered into a memorandum of understanding ("MOU") with Frontier to be the BTOP grant's subrecipient and to build the fiber network contemplated by the grant. See MOU, ECF No. 382-9. The MOU provided that Frontier would carry out its subrecipient duties under the BTOP grant pursuant to the existing MPLS contract. Id. But because award of the BTOP grant required acceptance of the grant terms and conditions, Frontier and the WVEO also agreed to be bound by those as well. See id.; see also id. at 3.

As is emphasized in McKenzie's motion to revise the summary judgment order, the MOU provided that where Frontier incurred "any additional overhead costs . . . as a result of being a sub-recipient of the Grant," such costs would be allowed either as eligible costs under the grant or allowed as costs payable by WVEO under the MPLS contract. Id. at 3. Where Frontier sought payment for costs under the MPLS contract, the MOU required these to be "separately invoiced" to the WVEO. Id.

---

and other services to the State of West Virginia." See MOU at 1, ECF No. 380-4.

In a July 15, 2011, memorandum sent by Frontier to the WVEO, Frontier memorialized discussions between Frontier and the WVEO regarding apparent issues with "CAI premises conduit/entrance facilities." July 15, 2011, Email from McKenzie to WVEO, ECF No. 394-5. Frontier contended that prior documentation, including grant documents, the MPLS contract, and the MOU, showed "that the CAI is responsible for any conduit/entry work needed. In fact, the State allocated BTOP funding for this purpose." Id. Frontier also stated that "[its] business does not ordinarily include this type of work." Id. At some point, however, the WVEO and Frontier agreed that Frontier would perform this portion of the fiber build by hiring contractors, which was later referred to as "facilities build-out" or "FBO" work. See Gregg Dep. 127-29, ECF Nos. 380-2, 382-11, 392-2, 393-19. FBO work involved building fiber from a "meet point" outside each CAI into the CAI itself. See id. at 128-29. For example, "actually doing whatever was necessary to drill into that building and go to the closet, cabinet, whatever it was, where the service would be terminated" and the CAI could connect to the fiber network. Id. at 128.

Originally, Frontier set its FBO invoice processing costs as a fee of 35.2% of what its contractors charged to perform the FBO work. See McKenzie Dep. 253. Internal Frontier

emails called the FBO invoice processing costs a "markup."
November 2, 2012, Internal Frontier Email, ECF No. 384-8;
January 28, 2013, Internal Frontier Email, ECF No. 382-30; July
16, 2013, Internal Frontier Email, ECF No. 384-14.[3]  Internal
Frontier emails and documents also refer to the company's FBO
invoice processing costs as a "revenue opportunity," "profit,"
"income," and "actual cost + 35.2%."  See November 30, 2011,
Internal Frontier Email, ECF No. 384-7 ("revenue opportunity");
November 2, 2012, Internal Frontier Email, ("profit," "income,"
and "actual cost + the 35.2%"); January 24, 2013, Internal
Frontier Email, ECF No. 384-9 ("profit" and "profit increase");
January 28, 2013, Internal Frontier Email ("income"); July 16,
2013, Internal Frontier Email ("income"); see also McKenzie Dep.
176-77 (agreeing that FBO invoice processing costs were actual
cost plus 35.2%).

     Frontier prepared a memorandum to the State with
specific details about the amount and nature of the markups, but
it appears to have never been sent.  See November 20, 2012,
Internal Frontier Email, ECF No. 382-27 ("I cannot confirm the
35.2% loading was fully communicated [to the WVEO]."); Given
Dep. 156-57, 230.  On November 15, 2012, the State's Chief

---

[3] "Markup" means "an amount added to the cost price to determine
the selling price," or broadly "profit."  Markup, Merriam-
Webster, https://www.merriam-webster.com/dictionary/markup.

Technology Officer, defendant Given, asked McKenzie, "what activities does Frontier perform on each FBO site?" November 15 and 16, 2012, Email Chain Between Given and McKenzie, ECF No. 382-26. McKenzie replied that the percentage-based markup was reflective of Frontier's incurred costs: "our Corporate office did a cost analysis for this function and hence the standard [cost] you see on these invoices." Id. McKenzie also set forth a purported eleven-step process for processing FBO invoices from contractors. Id.

On November 16, 2012, Given expressed concern that the 35.2% markup "seems entirely unreasonable." Id. At her deposition, Given correctly explained that a rate-based fee could not accurately capture Frontier's actual costs incurred to process an FBO invoice. See Given Dep. 158. This is because the actual cost to process an invoice would be roughly the same from invoice to invoice, while a rate-based fee could vary wildly with the amount charged by a contractor. See Given Dep. 158.

In response, on January 29, 2013, Frontier, through a memorandum authored by McKenzie, proposed a $1,808 flat fee for each invoice submitted by it for its FBO invoice processing costs. January 29, 2013, Memorandum to Given, ECF No. 380-6; see also McKenzie Dep. 187-89. Frontier represented that its

8

flat-fee figure was "[b]ased upon actual costs incurred by Frontier in processing FBO invoices," which it calculated after "correspond[ing] with the multiple Frontier departments who process invoices associated with [FBO] work."  January 29, 2013, Memorandum to Given.  The memorandum details an eleven-step process for each FBO invoice that took sixteen separate employees four hours total on average to complete.  Id.

However, the face of the memorandum plainly evidences that the $1,808 figure was arrived at by dividing the cumulative amount of FBO fees charged as of that date at the 35.2% rate by the total number of FBO invoices processed, rather than by analyzing costs associated with the purported eleven-step process outlined in the memorandum.  See January 29, 2013, Memorandum to Given.  Internal Frontier emails show a consultant hired by Frontier, Billy Jack Gregg, proposing various flat fees not based on actual costs, but based on a "target loading percentage."  December 13, 2012, Email from Gregg to Frontier, ECF No. 384-11; see also December 12, 2012, Email from Gregg to Frontier, ECF No. 384-1; December 19, 2012, Email from Gregg to Frontier, ECF No. 384-12.  McKenzie testified that, in helping to devise the purported eleven-step process, he spoke to Frontier employees but did not review any documents.  McKenzie Dep. 187-89.

Pursuant to 31 U.S.C. § 3730(b)(2), Citynet's qui tam complaint was filed on May 17, 2014, in camera, sealed, and served on the United States but not the defendants.  ECF Nos. 2-3.  The United States then moved for several extensions under 31 U.S.C. § 3730(b)(3) while it investigated Citynet's allegations to decide whether to intervene and conduct the action on its own behalf.  See ECF Nos. 4-26.  On June 17, 2016, the United States declined to intervene.  ECF No. 27.  On July 18, 2016, Citynet filed the first amended complaint, which is the operative pleading in this matter.  First Am. Compl., ECF No. 30.  Citynet alleges generally that the defendants defrauded the United States in connection with the grant in violation of the FCA. Id. ¶¶ 3-6, 9-12, 14.  In Count VII, Citynet asserts specifically that the defendants fraudulently billed the United States for Frontier's FBO invoice processing costs.  See id. ¶¶ 147-53, 175-81.

On September 8, 2022, this court entered the order on the parties' cross-motions for summary judgment.  ECF No. 465. As relevant here, the court granted summary judgment in favor of the plaintiff-relator and against defendants McKenzie and Frontier as to liability on Count VII.  Id. at 71.

## II. <u>Legal Standard</u>

Under Rule 54(b), a trial court retains the power to reconsider and modify its interlocutory orders at any time prior to final judgment when such is warranted.  <u>See</u> <u>Am. Canoe Ass'n v. Murphy Farms, Inc.</u>, 326 F.3d 505, 514–15 (4th Cir. 2003); <u>Fayetteville Invs. v. Com. Builders, Inc.</u>, 936 F.2d 1462, 1469 (4th Cir. 1991).  The Fourth Circuit has applied two analyses to determine the applicable standard of review for a motion to reconsider: (1) comparison to the standards of Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure for amending a final judgment and (2) comparison to the law-of-the-case doctrine.

Under the first Rules-based analysis, amending or reconsidering a judgment is proper on three grounds: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." <u>Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.</u>, 148 F.3d 396, 403 (4th Cir. 1998).  In general, reconsideration of a judgment is an "extraordinary remedy [that] should be used sparingly."  <u>Id.</u> (quoting 11 Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 2810.1 (2d ed. 1995)).

11

Under the second analysis, federal courts cabin revision of interlocutory orders pursuant to Rule 54(b) by treating such rulings as law of the case. Carlson v. Bos. Sci. Corp., 856 F.3d 320, 325 (4th Cir. 2017). Although it is not a limitation on the court's power, the law-of-the-case doctrine "expresses the practice of courts generally to refuse to reopen what has been decided." Messenger v. Anderson, 225 U.S. 436, 444 (1912). The doctrine provides that, in the interest of finality, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." United States v. Aramony, 166 F.3d 655, 661 (4th Cir. 1999) (quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 815-16 (1988)). A court may revise an interlocutory order under the law-of-the-case doctrine under three circumstances: (1) "a subsequent trial produc[ing] substantially different evidence"; (2) a change in applicable law; or (3) clear error causing "manifest injustice." Am. Canoe Ass'n, 326 F.3d at 515 (quoting Sejman v. Warner–Lambert Co., Inc., 845 F.2d 66, 69 (4th Cir. 1988)); see, e.g., U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC, 899 F.3d 236, 257 (4th Cir. 2018) (applying these circumstances to review a motion to reconsider).

Motions to reconsider should not be used to present new arguments or evidence that could have been raised previously.  See Carlson v. Boston Sci. Corp., 856 F.3d 320, 326 (4th Cir. 2017); Cray Commc'ns Inc. v. Novatel Comput. Sys., Inc., 33 F.3d 390, 395-96 (4th Cir. 1994); see also Nanendla v. WakeMed, 24 F.4th 299, 304 (4th Cir. 2022).

### III. Discussion

McKenzie avers that revision of the court's entry of summary judgment against him as to liability on Count VII is appropriate for two reasons.  First, as his "core contention," McKenzie argues that there is "not sufficient evidence to conclude that McKenzie had, as a matter of law, the requisite scienter to determine his FCA liability for Frontier's FBO charges."  McKenzie Reply, ECF No. 521 at 2.  In support of this contention, McKenzie points to the existence of the Memorandum of Understanding ("MOU") between Frontier and the State,[4] as well as his background as an engineer who relied on other Frontier employees for matters relating to accounting, billing, and compliance.  Id.  Second, McKenzie renews an argument that the court has previously rejected, attempting to recharacterize what

---

[4] This argument was neither raised nor argued by the movant at the summary judgment stage when Frontier and McKenzie were represented by the same counsel.

he and others within Frontier repeatedly referred to as a "markup" and "actual cost + 35.2%" instead as "in reality a fee for various services associated with the retention of third-party contractors to perform the FBO work." McKenzie Mem. Supp. Mot. to Revise, ECF No. 482 at 7-9.

As an initial matter, the court need not reach McKenzie's second contention on reconsideration. With this exercise in post-hoc semantics, McKenzie argues that the court erred in attributing to his words the same meaning that he himself gave them. See id. at 7-8. This argument is substantially the same as one previously advanced and equally unavailing. The court thoroughly addressed the argument in its summary judgment order and sees no reason to revisit it here. See ECF No. 465 at 53-57. The court next considers whether McKenzie's contention with respect to scienter, now based on the MOU with WVEO, identifies a clear error of law or manifest injustice meriting revision of the summary judgment order.

The FCA is an anti-fraud statute aimed at those who submit to the United States "false claims" for payment. See 31 U.S.C. §§ 3729-3733. Section 3729 imposes liability upon "any person who," inter alia, "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or

used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires to commit a violation of" section 3729.  Id. § 3729(a)(A)-(C).

Count VII is a false records claim under the FCA.  See 31 U.S.C. § 3729(a)(1)(B).  "[A]ny time a false statement is made in a transaction involving a call on the U.S. fisc, False Claims Act liability may attach."  Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 788 (4th Cir. 1999).  A false records claim has four elements:

> (1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due.

United States ex rel. Nicholson v. MedCom Carolinas, Inc., 42 F.4th 185, 193 (4th Cir. 2022).

The FCA's element of scienter requires that "a person has actual knowledge of the information, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information." United States ex rel. Gugenheim v. Meridian Senior Living, LLC, 36 F.4th 173, 179 (4th Cir. 2022) (quoting 31 U.S.C. § 3729(b)(1)(A)) (internal marks omitted).  While no specific intent to defraud is required, 31 U.S.C. § 3729(b)(1)(B), the knowledge requirement is generally strictly enforced.  See

15

Purcell, 807 F.3d at 287; Ruckh v. Salus Rehabilitation, LLC, 963 F.3d 1089, 1108 (11th Cir. 2020).

The plaintiff-relator bears the burden of proving each element of the FCA. See United States ex rel. Purcell v. MWI Corp., 807 F.3d 281, 287 (D.C. Cir. 2015). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

A party is entitled to summary judgment if the record, as a whole, could not lead a reasonable trier of fact to find for the non-moving party. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable

fact-finder to return a verdict in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.

McKenzie's first contention is that the existence of the MOU between Frontier and the WVEO establishes a triable issue of fact as to his scienter on the FBO charges.  <u>See</u> McKenzie Mem. Supp. Mot. to Revise, ECF No. 482 at 1-2, 6-7.  In relevant part, a provision of this MOU under the heading "Accounting Requirements" states that:[5]

> FTR will invoice EOWV for eligible costs under the Grant, as defined in the [Notice of Funds Availability for BTOP grants].  FTR may separately invoice EOWV for other costs that are not eligible under the Grant pursuant to the MPLS.  EOWV agrees that any additional overhead costs incurred by FTR as a result of being a sub-recipient of the Grant shall either be allowed as eligible costs under the Grant or under the MPLS Contract.

ECF No. 382-9 at 3.

As evidenced by the MOU, Frontier and the WVEO agreed that Frontier's costs which were not eligible for payment with federal monies under the terms of the BTOP grant would be paid with separate State monies pursuant to the existing MPLS contract, per the MOU provision, if not allowed under the BTOP

---

[5] As defined in the MOU: FTR refers to Frontier; EOWV refers to the WVEO; MPLS refers to 2007 State Telecommunications Contract, MPLS07.

grant.[6]  Where Frontier sought payment under the MPLS contract for costs not eligible under the BTOP requirements, it was required to submit such invoices separately.  McKenzie concedes that "he understood Frontier was billing FBO charges," but he contends there is no record evidence to suggest he had knowledge that the WVEO would pay the FBO charges with BTOP grant funds, as opposed to State funds pursuant to the MOU.  McKenzie Reply at 2.  He further concedes that he was "Frontier's point person on the BTOP project," but contends that nevertheless "he is an engineer by trade, and the focus of his efforts related to engineering" such that "[i]n terms of other aspects of the project, [he] relied on Frontier's accounting department, accounts receivable personnel and other subject-matter specialists."  McKenzie Mem. at 6.  McKenzie makes no contention that the FBO charges were, in fact, invoiced separately as required by the MOU.  Taken at its highest, McKenzie's argument is essentially that there remains a genuine issue of material fact as to whether McKenzie had knowledge that the FBO invoices were being submitted for payment with federal BTOP funds or with State funds deriving from an alternative source not subject to the BTOP grant restrictions.

---

[6] The specific terms of the MPLS contract have not been made known to the court, as no party presented such evidence at summary judgment.

Citynet disputes McKenzie's argument as a factual
matter.  Citynet argues that the MOU between Frontier and the
WVEO does not disturb the court's grant of summary judgment in
Citynet's favor because the MOU included a specific requirement
that Frontier's charges for unallowable costs under the BTOP
grant be invoiced separately, which Frontier never did.  Citynet
Resp., ECF No. 511 at 3.  In Citynet's view, Frontier's failure
to submit separate invoices is conclusive evidence of McKenzie's
scienter; to support this contention, Citynet submits deposition
testimony of McKenzie.[7]  Therein, McKenzie testified that he
oversaw Frontier's billing process to the extent that he was
"tracking that billing was being done appropriately and timely,"
although he "wasn't involved in the preparation of the billing."
McKenzie Dep. 80-81, ECF No. 511-1.  McKenzie testified that he
was the person tasked with making sure all of the steps in the
billing process took place.  Id. at 81.

Taken together, Citynet's argument is that McKenzie's
claimed lack of knowledge as to whether the invoices being
submitted with FBO charges were being paid with BTOP funds or
other State funds pursuant to the MOU cannot stand because he

---

[7] The evidence in question was not submitted by either party at
summary judgment, but its consideration on this motion is
warranted to refute McKenzie's claim of legal error as to
scienter.  See Cray Commc'ns Inc. v. Novatel Comput. Sys., Inc.,
33 F.3d 390, 395 (4th Cir. 1994).

was the person responsible for overseeing billing and he knew
that NTIA was "monitoring the WVEO's administration of the
grant."  Citynet Resp. at 3.

        Ultimately, Citynet's argument is inadequate to
surmount the high bar it faces as the movant for summary
judgment.  While no party contests the court's finding on
summary judgment that Frontier knowingly submitted false claims
for payment with BTOP funds meriting FCA liability, <u>see</u> ECF No.
465 at 51-66, the same finding cannot stand for McKenzie.  There
is a genuine dispute of fact as to whether McKenzie individually
knew, or acted with reckless disregard, as to whom the FBO
charges were being billed.

        Citynet has presented strong circumstantial evidence
of McKenzie's involvement in the billing process such that a
reasonable juror could very well conclude he knew that the
falsified FBO charges were being submitted for payment with
federal funds that were subject to the grant's no-profit
requirement or, at the very least, acted with reckless disregard
of such occurrence.  However, on the evidence before the court,
an equally reasonable juror could also conclude that McKenzie
believed that the invoices were destined for payment with State
funds under the MPLS contract and thereby not subject to the no-

profit requirement.  <u>See</u> McKenzie Mem. Supp. Mot. to Revise at 1-2.

Citynet's other cited support — the notes of a three-day site visit by three NTIA representatives working on aspects of the BTOP grant program — provides little that might resolve the doubt of a reasonable juror as to McKenzie's scienter.  <u>See</u> ECF No. 380-29.  The document lists the three federal representatives as the sole "attendees," although it is clear on the face of the document that at certain points during the site visit McKenzie and other members of the Grant Implementation Team in West Virginia were also present.  <u>See</u> <u>id.</u>  As relevant here, the site visit notes reflect four items: (1) the "NTIA team met with representatives from Frontier Communications and WV Grant Implementation Team to discuss billing delays and challenges"; (2) McKenzie presented to the visitors information about the damage caused by a recent snowstorm, in the context of a conversation about the "current network expansion and deployment efforts on behalf of Frontier"; (3) it was resolved that an "independent verification and validation" inspection of Frontier's FBO work would be performed; and (4) the Grant Implementation Team provided the site visitors with an overview of their accounts payable process, using Frontier as an example. <u>Id.</u>

These notes of discussion suggest that detailed exchanges about Frontier's billing process and BTOP grant requirements may well have occurred, but it is not clear who might have been involved in such exchanges.  Indeed, it is certainly not clear on the face of the document whether McKenzie was present for any portion of the site visit other than the discussion of a snowstorm.  This hardly constitutes evidence of McKenzie's knowledge so as to command summary judgment in Citynet's favor.

Because the court finds that there is a genuine issue of material fact as to McKenzie's scienter regarding the source of the funds being used to pay the FBO invoices, summary judgment in favor of the plaintiff is improper.  The court finds no clear error of law in the analysis of its summary judgment order because McKenzie failed to raise the arguments contained in the pending motion at summary judgment.  However, the court nevertheless finds that summary judgment against McKenzie as to his liability on Count VII would result in manifest injustice to him by unduly denying him the opportunity to make his case to the jury.  Because Rule 54(b) allows the court to revise its prior orders before final judgment to prevent manifest injustice, Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d

396, 403 (4th Cir. 1998), the court revises its summary judgment
ruling on Count VII as to McKenzie's liability.

Finally, the court briefly addresses McKenzie's newly-
submitted declaration (ECF No. 487).  The court notes with
concern that this declaration was not submitted until McKenzie
submitted his motion to revise the summary judgment order
finding his Count VII liability.  McKenzie provides no
explanation as to why a straightforward declaration of his own
knowledge could not previously have been presented.[8]
Nevertheless, even were the court to consider McKenzie's
declaration, it would do nothing to affect the reasoning or
conclusions in this memorandum opinion and order.  Whether on
the face of this declaration or on the basis of the other
evidence discussed above, it is clear that there is a material
question of fact remaining about McKenzie's knowledge of the
billing and invoicing of FBO charges, including whether he was
aware of Frontier's failure to comply with the MOU's "separate
invoice" requirement resulting in the FBO charges being paid
with BTOP funds.  The resolution of such questions is one
appropriately left to the jury for its consideration and

---

[8] Despite not being docketed until September 20, 2022, one day
after the present motion, the declaration is dated September 19,
2022 and referenced in McKenzie's memorandum in support of the
motion.

decision on the basis of documentary evidence and witness testimony, not one to be resolved by the court as a matter of law based on a late-filed self-serving declaration of the movant.

### IV. Conclusion

For the reasons expressed herein, it is ORDERED that:

1. McKenzie's Motion to Revise Summary Judgment Ruling be, and hereby is, granted to the extent set forth below;

2. The court's order on summary judgment (ECF No. 465) be, and hereby is, set aside and vacated as to the finding of liability against defendant McKenzie on Count VII.

Remaining in the case are the issues of damages against Frontier under Count VII; liability and damages against Waldo and McKenzie under Count VII; and liability and damages against Frontier under Count VIII.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: December 2, 2022

John T. Copenhaver, Jr.
Senior United States District Judge

24